**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
RALLS CORPORATION,                )
                                                    )
            *Plaintiff*,                             )
      v.                                            )        Case No. _____
                                                    )
TERNA ENERGY USA HOLDING    )
CORPORATION,                             )
                                                    )
            *Defendant*.                          )
_____)

**MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION
[ORAL ARGUMENT REQUESTED]**

Pursuant to Federal Rule of Civil Procedure 65 and Local Rules 7 and 65.1, Plaintiff

Ralls Corporation ("Ralls") hereby moves for a temporary restraining order and preliminary

injunction in this case enjoining Defendant Terna Energy USA Holding Corporation ("Terna")

from proceeding with any sale or disposition of collateral pledged in Security Agreements dated

March 16, 2012, including the imminent February 7, 2013 sale described in Terna's January 17,

2013 notice to Ralls, and also from exercising any remedies under or otherwise enforcing any

aspect of the Security Agreements, the Master Wind Projects Membership Interests Purchase

Agreement (the "MIPSA") dated February 28, 2012, or the related Guarantee Agreements dated

February 28, 2012.

As more fully set forth in the accompanying Memorandum in Support of Motion for

Temporary Restraining Order and Preliminary Injunction and declaration and exhibits attached

thereto, immediate injunctive relief is necessary to prevent Terna from selling collateral pledged

by Ralls consisting of, among other things, 100% of the membership interests in Ralls Wind

Farm, LLC, a windfarm currently owned by Ralls and in commercial operation in Ralls, Texas.

Terna has informed Ralls that, pursuant to the aforementioned Security Agreements, it intends to sell the foregoing collateral at a nonjudicial sale on February 7, 2013. Ralls will suffer immediate and irreparable injury if Terna proceeds with that imminent sale. The collateral sale, moreover, would be patently unlawful. Terna has no legal right to exercise any remedies under the Security Agreement, as well as the MIPSA or Guarantee Agreements, including the collateral sale, because the transaction evidenced by those agreements has been prohibited by President Obama, rendering it and the related agreements void *ab initio* and unenforceable. Ralls is currently challenging the President's Order as unconstitutional and *ultra vires* in an action pending in this Court. S*ee Ralls Corporation v. Obama*, Case No. 1:12-cv-01513-ABJ (Jackson, J.). However, until and unless the Court concludes that the President's Order is unlawful, it has the force of law and renders the Ralls-Terna transaction and related agreements void *ab initio* and unenforceable.

Ralls respectfully requests that this Court enter a temporary restraining order enjoining Terna from proceeding with any sale or disposition of the collateral pledged pursuant to the Security Agreements, including the imminent February 7, 2013 collateral sale, and from exercising any remedies under or otherwise enforcing any aspect of the Security Agreements, MIPSA, or Guarantee Agreements. Ralls further requests that this Court schedule a hearing on Ralls's request for a preliminary injunction at the earliest available date, and, after such hearing, enter a preliminary injunction enjoining any such sale and enjoining Terna from exercising any additional remedies under the agreements until a final determination of the legality of the President's Order in *Ralls Corporation v. Obama*.

Pursuant to Local Rules 7(m) and 65.1, Ralls hereby states that it has conferred with Defendant regarding its request for a preliminary injunction (which Defendant opposes), notified

counsel for Defendant of its intention to seek a temporary restraining order, and provided counsel for Defendant with copies of all filings in this action.

Respectfully submitted,

_____
Viet D. Dinh (D.C. Bar No. 456608)
Paul D. Clement (D.C. Bar No. 433215)
H. Christopher Bartolomucci (D.C. Bar No. 453423)
George W. Hicks, Jr. (D.C. Bar No. 499223)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

Steven S. Honigman (D.C. Bar No. 201020)
500 East 77th Street
New York, New York 10162
(202) 549-4917

*Counsel for Plaintiff Ralls Corporation*

Dated:  January 28, 2013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
RALLS CORPORATION,                        )
                                          )
          *Plaintiff*,                    )
     v.                                   )          Case No. _____
                                          )
TERNA ENERGY USA HOLDING                  )
CORPORATION,                              )
                                          )
          *Defendant*.                    )
_____)

## MEMORANDUM IN SUPPORT OF MOTION FOR
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 4

      A.    RALLS SEEKS TO ACQUIRE THE PROJECT COMPANIES
           FROM TERNA. ................................................................................................ 4

      B.    RALLS AND TERNA JOINTLY SEEK FEDERAL GOVERNMENT
           REVIEW OF RALLS'S ACQUISITION OF THE PROJECT
           COMPANIES FROM TERNA. ..................................................................... 7

      C.    PRESIDENT OBAMA PROHIBITS RALLS'S ACQUISITION OF
           THE PROJECT COMPANIES FROM TERNA, AND RALLS
           CHALLENGES THE PRESIDENT'S ORDER. ...................................... 9

      D.    RALLS INFORMS TERNA THAT THE TRANSACTION IS
           PROHIBITED, AND TERNA IMPROPERLY DECLARES THAT
           RALLS HAS DEFAULTED AND SEEKS TO SELL RALLS'S
           COLLATERAL. ........................................................................................... 11

ARGUMENT .............................................................................................................................. 13

I.     RALLS IS LIKELY TO SUCCEED ON THE MERITS. ................................................ 14

II.    RALLS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF
       TEMPORARY INJUNCTIVE RELIEF. ........................................................................ 21

III.   THE BALANCE OF THE EQUITIES FAVORS RALLS. ............................................. 25

IV.   TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST. .................... 26

CONCLUSION ........................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211 (1899)................................. 19

*Ahern v. Pierce*, 653 N.Y.S.2d 620 (App. Div. 1997) .................................................. 23

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573 (2d Cir. 2006)........................................................................................ 14, 15

*Citizens for Responsibility and Ethics in Wash. v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) ............................................................................................ 25

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...................... 21

*Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2004 WL 1933621 (S.D.N.Y. Aug. 30, 2004) ........................................................................... 14, 16

*Dornberger v. Met. Life Ins. Co.*, 961 F. Supp. 506 (S.D.N.Y. 1997)........................... 14

*Express One Int'l, Inc. v. USPS*, 814 F. Supp. 87 (D.D.C. 1992)................................. 21

*Feldman v. Grant*, 625 N.Y.S.2d 7 (App. Div. 1995) ................................................ 20

*Firemen's Ins. Co. of Newark, N.J. v. Keating,* 753 F.Supp. 1146 (S.D.N.Y.1990) .................. 23

*First Tennessee Bank Nat. Ass'n v. Pacific America Group, Inc.*, 2008 WL 269537 (M.D. Tenn. Jan. 29, 2008)........................................................................... 23

*Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley LLC,* 2010 WL 1005169 (S.D.N.Y. Mar. 18, 2010) .................................................. 22

*Hall v. Johnson*, 599 F. Supp. 2d 1 (D.D.C. 2009)........................................................ 14

*Housing Study Group v. Kemp*, 736 F. Supp. 321 (D.D.C. 1990)................................. 22

*In re Baker*, 2012 WL 1313489 (N.D.N.Y. Apr. 17, 2012).......................................... 23

*Jackson Purchase Rural Elec. Co-op. Ass'n v. Local Union 816, Intern. Broth. of Elec. Workers*, 646 F.2d 264 (6th Cir. 1981).................................................... 15

*Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838 (2d Cir. 1952) ................................ 15

*KM Enterprises, Inc. v. McDonald*, 2012 WL 541084 (E.D.N.Y. Jan. 5, 2012)........................ 24

*Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246 (N.Y. 1992) ..................... 14

*Louisville & Nashville Railroad Co. v. Mottley*, 219 U.S. 467 (1911)......................... 19

*Mawhinney v. Millbrook Wollen Mills, Inc.*, 132 N.E. 93 (N.Y. 1921)........................................ 20

*McMillan v. Park Towers Owners Corp.*, 640 N.Y.S.2d 144 (App. Div. 1996) ................... 22, 23

*Nalco Co. v. EPA*, 786 F. Supp. 2d 177 (D.D.C. 2011)................................................................. 13

*National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240 (2d. Cir. 1991)............... 21

*Norman v. Baltimore & O.R. Co.*, 294 U.S. 240 (1935)........................................................... 19, 20

*Pacific Electric Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*, 2003 WL 23095564
  (S.D.N.Y. Dec. 30, 2003) ................................................................................................. 23

*Schlessinger v. Valspar Corp.*, 686 F.3d 81 (2d Cir. 2012)........................................................ 14

*State v. Insurance Co. of the State of Pa.*, 762 N.Y.S.2d 116 (App. Div. 2003) ......................... 23

*Tamach Airport Manager, LLC v. HRC Fund III Pooling Domestic LLC*, 933
  N.Y.S.2d 275 (App. Div. 2011) ...................................................................................... 23

*Textron Financial Corp. v. Freeman*, 2010 WL 5778756 (D.R.I. Oct. 28, 2010)....................... 23

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995)............. 24

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841 (D.C. Cir.
  1977) .............................................................................................................................. 24

*Wash. Teachers' Union, Local No. 6 v. American Federation of Teachers*, 751 F.
  Supp. 2d 38 (D.D.C. 2010) ............................................................................................. 25

*Whitney Nat. Bank v. Flying Tuna, LLC*, 2011 WL 2669450 (S.D. Ala. July 7, 2011) .............. 23

*Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669 (D.C. Cir. 1985) .................................................... 22, 25

*World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) ........................ 24

**Statutes**

50 U.S.C. app. § 2170(a)(3)............................................................................................................. 7

50 U.S.C. app. § 2170(b)(1)(A)(i) ................................................................................................. 7

50 U.S.C. app. § 2170(d)(1)...................................................................................................... 8, 15

50 U.S.C. app. § 2170(k) ................................................................................................................ 7

50 U.S.C. app. § 2170(*l*)(1)(A). .................................................................................................... 7

31 C.F.R. § 800.506(b) ................................................................................................................... 7

N.Y. U.C.C. Law § 9-609 .......................................................................................... 23

N.Y. U.C.C. Law § 9-610 .......................................................................................... 23

**Other Authorities**

Executive Order 11858 (May 7, 1975),
        as amended by Executive Order 13456 (Jan. 23, 2008) ..................................... 5

Plaintiff Ralls Corporation ("Ralls") respectfully submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction with temporary restraining order to enjoin and restrain Defendant Terna Energy USA Holding Corporation ("Terna") from proceeding with any sale or disposition of collateral pledged in security agreements relating to a transaction between Ralls and Terna, which transaction was prohibited on national security grounds by an order of President Barack Obama on September 28, 2012.

## PRELIMINARY STATEMENT

The President of the United States has declared a commercial transaction between Ralls and Terna illegal.  The President prohibited that transaction on national security grounds, and the United States Department of Justice has asserted that the purpose of the President's prohibition was to restore the *status quo ante*.  The government has further stated that because of the President's order, the transaction between Ralls and Terna did not result in an exchange of property interests; while Ralls thought that it was purchasing from Terna membership interests in four windfarms in Oregon, there was no valid exchange of interests because the federal government, acting pursuant to federal law, did not approve the transaction.  Ralls does not agree with these assertions and has argued in a pending case in this Court that the President's order is unconstitutional and *ultra vires*.  *See Ralls Corporation v. Obama*, Case No. 1:12-cv-01513-ABJ (Jackson, J.).  However, until and unless this Court concludes that the President's Order is unlawful, it has the force of law, and it constitutes a declaration by the President that the Ralls-Terna transaction is void.

Terna refuses to accept this fact and insists upon consummating a transaction that, at present, no longer exists.  It has demanded $4.2 million in payment under the agreements evidencing the transaction, and it has declared Ralls in default for failure to make that payment. Ralls has repeatedly informed Terna that because of the current force of the President's order, the

transaction is prohibited and void *ab initio*, and the parties have been restored to their *ex ante* positions.  Terna not only has remained undeterred but has upped the ante:  on January 17, 2013, it informed Ralls that pursuant to security agreements accompanying the prohibited and void transaction, it will proceed to a nonjudicial sale of collateral that Ralls pledged in connection with the transaction, due to Ralls's purported "default."  The sale will include assets critical to Ralls's business and operations and will take place on February 7, 2013 absent intervention by this Court.

The sale must be stopped.  And it should be stopped, because it is unlawful and will result in extraordinary, irreparable injury to Ralls.  Terna has no legal right to sell Ralls's collateral.  The transaction on which Ralls is alleged to have defaulted has—at least for the time being—been prohibited by the President, with the intention of restoring the *status quo ante*; indeed, according to the government, Ralls never acquired anything in the first place.  The transaction is void *ab initio*, and accordingly Ralls owes no further payments to Terna under the agreements evidencing the transaction.  Because Ralls is not in default, Terna cannot proceed to any sale of collateral Ralls pledged in related security agreements; and in all events, those security agreements automatically expired when the master agreement governing the transaction terminated by operation of the President's order declaring the transaction illegal.

The collateral sale, if it proceeds, will result in the conveyance of Ralls's most valuable asset—its 100% membership interest in Ralls Wind Farm, LLC ("Ralls Wind Farm"), its only windfarm currently in commercial operation.  The transfer of that membership interest itself constitutes irreparable injury that warrants temporary injunctive relief.  But it is even more serious than that.  Ralls's entire reason for existence is to develop windfarms in which it can demonstrate the quality of turbines manufactured by its affiliate, Sany Electric.  If Ralls loses

ownership of Ralls Wind Farm, it will have no windfarms left in commercial operation—an obvious and formidable obstacle to its continued existence.  Plainly, the burden to Ralls of proceeding with the collateral sale far outweighs the burden to Terna of temporarily enjoining the collateral sale.  Temporary injunctive relief is also consistent with the public interest, since Terna's sale of the collateral is inconsistent with the federal government's interpretation of the President's order and disrupts the execution and consummation of that order.  To be sure, Ralls believes that the President's order is unlawful and unauthorized, as it has argued in related, ongoing litigation in this Court.  But so long as the order has the force of law, Terna cannot proceed to a sale of Ralls's collateral.

For these reasons and those that follow, Ralls respectfully requests that this Court enter a temporary restraining order enjoining Terna from proceeding with any sale or disposition of the collateral pledged pursuant to the security agreements, including the imminent February 7, 2013 collateral sale, and from exercising any remedies under or otherwise enforcing any aspect of the agreements underlying the Ralls-Terna transaction prohibited by the President.  Ralls further requests that this Court schedule a hearing on Ralls's request for a preliminary injunction at the earliest available date, and, after such hearing, enter a preliminary injunction enjoining any such sale and enjoining Terna from exercising any additional remedies under the agreements until a final determination of the legality of the President's Order in *Ralls Corporation v. Obama*.

## STATEMENT OF FACTS

### A.   RALLS SEEKS TO ACQUIRE THE PROJECT COMPANIES FROM TERNA.

In 2009, Oregon Windfarms, LLC, an Oregon limited liability company owned by U.S. citizens, created four Oregon limited liability companies for the purpose of holding assets related to four separate windfarm projects in Oregon.  Ex. A (Declaration of Robert Guertin) ("Guertin Decl.") ¶¶ 3-4.   Specifically, Oregon Windfarms created Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC (collectively, the "Project Companies" or the "Butter Creek Projects").  *Id.* ¶ 4.   Each Project Company held assets related to the development of a windfarm:   easements with local landowners to access their property and construct windfarm turbines; power purchase agreements with the local utility; generator interconnection agreements permitting connection to the utility's grid; agreements for the management and use of shared facilities with other nearby windfarms; and necessary government permits and approvals to construct five windfarm turbines at specific, approved locations.  *Id.* ¶ 5.  In December 2010, Oregon Windfarms sold its interests in the Project Companies to Defendant Terna.  *Id.* ¶ 6.

Plaintiff Ralls is a Delaware corporation with its principal place of business in Georgia.  Ex. B (Declaration of Jialiang Wu) ("Wu Decl.") ¶ 3.  It is privately owned by two Chinese nationals, Messrs. Dawei Duan and Jialiang Wu.  *Id.* ¶ 4.  Mr. Duan is the CFO of the Sany Group ("Sany"), a Chinese global manufacturing company.  *Id.*  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric Company, Ltd. ("Sany Electric"), a wholly-owned Chinese subsidiary of Sany.  *Id.* ¶ 2.  Ralls is in the business of identifying U.S. opportunities for the construction of windfarms in which the wind turbines of Sany Electric can

be used and their quality and reliability demonstrated to the U.S. wind industry in comparison to competitor products.  *Id.* ¶ 5.

On February 28, 2012, Ralls, Terna, Intelligent Wind Energy, LLC ("IWE"), Ralls Wind Farm—a wholly owned subsidiary of Ralls[1]—and the Project Companies entered into a two-tier structured transaction memorialized in a Master Wind Projects Membership Interests Purchase Agreement (the "MIPSA").  *See* Ex.  C.   Under the MIPSA, Terna agreed to sell to IWE its 100% membership interests in the four Project Companies.  *Id.* § 2.1.  In return, Ralls and Terna agreed that Terna would receive from IWE $6 million, broken down as follows:  $600,000 on the closing date; $1.2 million on May 31, 2012; and $4.2 million on the earlier of December 21, 2012, or the date on which 36 megawatts (MW) of power generation associated with the windfarms was commissioned.  *Id.* § 2.2.  Exhibits appended to the MIPSA included the form of a Guarantee Agreement and Security Agreement for use by Ralls in favor of Terna.  *Id.* Ex. F and G.

Terna represented and warranted in the MIPSA that the "execution, delivery, and performance by [Terna]" of the MIPSA and "the consummation by [Terna] of the transactions contemplated hereby do not and will not … violate any law or regulation applicable to [Terna] or any Project Company or any order of any court or Governmental Authority having jurisdiction over [Terna] or any Project Company."  *Id.* § 5.2(b).  Terna further represented that aside from two minor notification requirements to a county planning commission, "no … consent or approval of or other action by … any Governmental Authority or any other Person is or will be necessary for the valid execution, delivery and performance by [Terna] of this Agreement or the

---

[1] Ralls Wind Farm is the operating company for a five-turbine windfarm located in Ralls, Texas that is currently in commercial operation.  Ralls has no other windfarms currently in commercial operation, and Ralls Wind Farm is Ralls's only operating asset.  Wu Decl. ¶ 11.

consummation of the transactions contemplated hereby." *Id.* § 5.8, Schedule 5.8.   These representations were made "[a]s an inducement to [IWE] to execute" the MIPSA. *Id.* § 5 preamble.

Also on February 28, 2012, Ralls and its wholly-owned subsidiary Ralls Wind Farm entered into Guarantee Agreements with Terna by which they "guarantee[d] the obligations of" IWE under the MIPSA, including "the punctual payment of all payment obligations of [IWE] when due." *See* Ex. D, E.  On March 16, 2012, Ralls, Ralls Wind Farm, and IWE each entered into Security Agreements with Terna granting Terna security interests in certain collateral owned by Ralls, Ralls Wind Farms, LLC, and IWE.  *See* Ex. F, G, H.  Ralls pledged collateral including its 100% membership interest in Ralls Wind Farm.  Ex. F, § 1(c), Schedule III.  Ralls Wind Farm pledged collateral including five wind turbines in operation in Texas.  Ex. G, § 1(a), Schedule II.  IWE pledged collateral including the membership interests in the Project Companies.  Ex. H, § 1(c), Schedule III.  Under the Security Agreements, and as a condition to closing the MIPSA, Terna was given certificates representing the foregoing collateral, as well as instruments of transfer endorsed in blank.  *See* § 4(a) of Ex. F, G, H; MIPSA §3.3(j).  Each Security Agreement provides that upon "termination of the MIPSA, the pledge and security interest granted hereunder shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor."  *See* § 22 of Ex. F, G, H.

On March 26, 2012, Ralls completed the structured two-tier transaction by which Terna transferred the Project Companies to Ralls by purchasing IWE from its owner, U.S. Innovative Renewable Energy, LLC.  Wu Decl. ¶¶ 6, 7.  Pursuant to the structured agreement, Ralls paid Terna $600,000 upon closing and $1.2 million on May 31, 2012.  *Id.* ¶ 8.  Ralls also paid Terna a $400,000 advance and $500,000 to cover security that Terna had paid for interconnection to the

local utility.  *Id.* ¶ 9.  Ralls began construction of the turbines at the Butter Creek Projects on

April 23, 2012.  *Id.* ¶ 10.

> **B.     RALLS AND TERNA JOINTLY SEEK FEDERAL GOVERNMENT REVIEW OF RALLS'S ACQUISITION OF THE PROJECT COMPANIES FROM TERNA.**

On June 28, 2012, Ralls and Terna submitted a joint voluntary notice to the Committee

on Foreign Investment in the United States ("CFIUS") regarding Ralls's acquisition of the

Project Companies from Terna.  Ex. J.  CFIUS is an interagency committee established under

Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. app. § 2170

("Section 721").  CFIUS is authorized to review transactions that could result in the control of a

U.S. business by a foreign person in order to determine the effect of such transactions on the

national security of the United States.  Timothy Geithner, the Secretary of the Treasury, serves as

Chairperson of CFIUS and is also a member.  The other members of CFIUS are the heads of the

following eight departments and offices:   Department of Justice, Department of Homeland

Security, Department of Commerce, Department of Defense, Department of State, Department of

Energy, Office of the U.S. Trade Representative, and Office of Science and Technology Policy.

The Director of National Intelligence and the Secretary of Labor are non-voting members of

CFIUS.  Additionally, the following five offices observe and sometimes participate in CFIUS's

activities:  Office of Management and Budget, Council of Economic Advisors, National Security

Council, National Economic Council, and Homeland Security Council.   *See id.* § 2170(k);

Executive Order 11858 (May 7, 1975), as amended by Executive Order 13456 (Jan. 23, 2008).

Section 721 authorizes CFIUS to "review" and "investigat[e]" a "covered transaction" to

determine its effects on national security.  50 U.S.C. app. § 2170(b)(1)(A)(i), (2)(A).  A "covered

transaction" is "any merger, acquisition, or takeover … by or with any foreign person which

could result in foreign control of any person engaged in interstate commerce in the United

States."  *Id*. § 2170(a)(3).  Upon receiving a notice from parties to a transaction, CFIUS "shall review the covered transaction to determine the effects of the transaction on the national security of the United States."  *Id.* § 2170(b)(1)(A)(i).  It may "negotiate, enter into or impose, and enforce any agreement or condition with any party to the covered transaction in order to mitigate any threat to the national security of the United States that arises as a result of the covered transaction."  *Id.* § 2170(*l*)(1)(A).

Upon completion of an investigation, under three circumstances, CFIUS "shall send a report to the President requesting the President's decision":  (1) it "recommends that the President suspend or prohibit the transaction"; (2) it is "unable to reach a decision on whether to recommend that the President suspend or prohibit the transaction"; or (3) it "requests that the President make a determination with regard to the transaction."  31 C.F.R. § 800.506(b).  Section 721 authorizes the President of the United States to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States."  50 U.S.C. app. § 2170(d)(1).

In their joint notice to CFIUS, Ralls and Terna repeatedly described the two-stage Ralls-Terna-IWE transaction mechanism by which Ralls ultimately acquired the Project Companies as a single "transaction between Ralls Corporation and Terna Energy USA Holding Corporation." Ex. J (cover page).  Page four of the notice refers to a "transaction between Terna and Ralls."  *Id.* at 4.  Page five states that "[t]he transaction at issue involves the transfer of small, unconstructed wind farm projects … from one foreign party, Terna, to Ralls."  *Id.* at 5.  Several paragraphs later, the notice mentions "[t]he acquisition by Ralls of the right to construct four small windfarms from Terna."  *Id.*  On July 11, 2012, counsel for both Ralls and Terna made a joint presentation to CFIUS entitled "Ralls/Terna Transaction Concerning Butter Creek Windfarm

Projects."  Ex. K.  Slide six of the presentation identifies the "Parties to the Transaction" as

"Ralls Corp." and "Terna Energy USA Corp."  *Id.* at 6.  Slide sixteen of the presentation, entitled

"Description of Transaction," describes a transaction in "[t]wo stages" whose "Result" is that

"Ownership of the Project Companies was transferred from Terna to Ralls."  *Id.* at 16.

### C.    PRESIDENT OBAMA PROHIBITS RALLS'S ACQUISITION OF THE PROJECT COMPANIES FROM TERNA, AND RALLS CHALLENGES THE PRESIDENT'S ORDER.

On July 25, 2012, CFIUS issued an Order Establishing Interim Mitigation Measures

regarding the Ralls-Terna transaction ("July Order").  Ex. L.  The July Order stated that CFIUS

had determined that the Ralls-Terna transaction was a "covered transaction" and that "there are

national security risks to the United States that arise as a result of the Transaction."  *Id.* (recitals).

On August 2, 2012, CFIUS issued an Amended Order Establishing Interim Mitigation Measures

(the "August Order"), noting the same findings.  Ex. M.  On September 13, 2012, CFIUS

transmitted a report to President Barack Obama describing CFIUS's assessment of the purported

risks to national security posed by the transaction.

On September 28, 2012, President Obama issued an order entitled, "Order Regarding the

Acquisition of Four U.S. Wind Farm Project Companies by Ralls Corporation" (the "President's

Order").  *See* Ex. N.  In Section 1 of the President's Order, entitled "Findings," the President

identified the Sany Group as "a Chinese company affiliated with Ralls" and Messrs. Duan and

Wu as "citizens of the People's Republic of China and senior executives of the Sany Group, who

together own Ralls."  *Id.* § 1(a).  He defined Ralls and the Sany Group (including Sany Electric

and Sany Heavy Industries) as the "Companies."

The President then stated that "[t]here is credible evidence" that "leads [him] to believe"

that Ralls, Sany, and Messrs. Duan and Wu, "through exercising control of" the Project

Companies, "might take action that threatens to impair the national security of the United

States." *Id.*  The President further stated that "[p]rovisions of law," aside from Section 721 and the International Emergency Economic Powers Act, "do not … provide adequate and appropriate authority for [him] to protect the national security in this matter." *Id.* § 1(b).

As a result, in Section 2 of the President's Order, entitled "Actions Ordered and Authorized," the President ordered that "[t]he transaction resulting in the acquisition of the Project Companies and their assets by the Companies or Mr. Wu or Mr. Duan" was "hereby prohibited," as was "ownership by the Companies or Mr. Wu or Mr. Duan of any interest in the Project Companies and their assets, whether directly or indirectly." *Id.* § 2(a).  The President ordered Ralls to divest "all interests" in the Project Companies within 90 days of the Order (December 27, 2012).  *Id.* § 2(b).  The President also imposed a litany of additional conditions, including that the Companies must remove all items from the Project Companies' Oregon properties; they must cease all access to the properties; and they could not sell any Sany-manufactured items to third parties for use at the properties.  *Id.* § 2(c)-(e).

On October 1, 2012, Ralls filed an amended complaint in the United States District Court for the District of Columbia against President Obama, CFIUS, and Treasury Secretary Geithner challenging the President's Order as violating its constitutional rights to due process and equal protection and alleging that the President acted *ultra vires*.  The amended complaint also challenged the previous CFIUS orders as arbitrary and capricious, *ultra vires*, and in violation of the Constitution.  *See* Amended Complaint for Declaratory and Injunctive Relief, *Ralls Corp. v. Obama*, No. 1:12-cv-01513-ABJ (D.D.C. Oct. 1, 2012), ECF No. 20.  The case was assigned to the Honorable Judge Amy Berman Jackson.

On October 29, the federal government moved to dismiss Ralls's complaint for lack of jurisdiction.  *See Ralls Corp. v. Obama*, No. 1:12-cv-01513-ABJ, ECF No. 34.  Ralls opposed

the motion, and oral argument was held before Judge Jackson on November 28.  Judge Jackson has not yet issued a decision on the government's motion to dismiss.

The government has asserted during litigation with Ralls that in issuing orders under Section 721, the President "has the authority to insure that the *status quo ante* is restored, and to insure that the foreign party does not … gain the benefit of assets that it should not have acquired in the first place."  Defts.' Reply In Support of Their Mot. to Dismiss at 15, *Ralls Corp. v. Obama*, ("Government's Reply").  The government has also asserted that absent CFIUS approval—which did not occur with respect to the Ralls-Terna transaction—a foreign purchaser does not acquire a "legitimate" property interest in the purchased property.  *See* Defts.' Mem. In Support of Mot. to Dismiss at 26-27, *Ralls Corp. v. Obama* ("Government's Memorandum").  It has stated that "Ralls had no legitimate claim of entitlement in any assets that it sought to acquire after forgoing review through the CFIUS process, and thus no property interest protected by the due process clause accrued to it."  Government's Reply at 18-19.  And at oral argument on the motion to dismiss, the government's counsel contended that any property interests Ralls ostensibly acquired from Terna via the MIPSA "are revocable contingent subject to the President's discretion, and therefore do not amount to a property interest."  Transcript of Oral Argument at 20:8-10, *Ralls Corp. v. Obama* (Nov. 28, 2012) ("Transcript").

## D.    RALLS INFORMS TERNA THAT THE TRANSACTION IS PROHIBITED, AND TERNA IMPROPERLY DECLARES THAT RALLS HAS DEFAULTED AND SEEKS TO SELL RALLS'S COLLATERAL.

On October 2, 2012, two business days after the President's Order, Ralls informed Terna that the President had prohibited Ralls's acquisition of the Project Companies on national security grounds and that, as a result, the Ralls-Terna transaction is void *ab initio*.  Ralls stated that ownership of the Project Companies accordingly remains with Terna, and it demanded that Terna return Ralls's previous payments to Terna.  Ex. O.  Terna rejected Ralls's position on

11

October 10.  Ex. P.  On October 11, Ralls informed CFIUS of Terna's resistance and asked CFIUS for clarification as to the meaning and effect of the Order concerning reversion of ownership of the Project Companies and their assets to Terna.  Ex. Q.  In its November 1 response, CFIUS did not disagree with Ralls's position; instead, CFIUS stated its belief that the Order is "plain on its face" and its expectation that its terms would be effectuated.  Ex. R.

Ralls conveyed CFIUS's response to Terna by letter dated November 14 and reiterated its position that the transfer of the Project Companies from Terna to Ralls is void *ab initio* as a result of the President's Order.  Ex. S.  Terna provided no response.  On November 30, Ralls advised Terna that the Government had asserted in litigation with Ralls that the President's authority under Section 721 is intended "to insure that the *status quo ante* is restored," again supporting Ralls's position that the transaction is void *ab initio* and that ownership of the Project Companies remains with Terna.  Ex. T.  Again, Terna provided no response.  On December 19, 2012, Ralls notified CFIUS that it had tendered to Terna notice that the transaction resulting in its acquisition of the Project Companies is void *ab initio*, and accordingly ownership of all interests in the Project Companies remains with Terna.  Ex. U.

On December 24, 2012, Terna notified Ralls that its failure to make the $4.2 million payment as of December 21 constituted a default under the MIPSA.  Terna demanded payment and stated that because of the "payment default," Terna is "entitled to exercise its rights and remedies under" the Security Agreements, MIPSA, and Guarantee Agreements.  Specifically, Terna stated that if it failed to receive payment within fourteen days, it would "immediately proceed with the process of selling its collateral in a commercially reasonable manner pursuant to its rights under the Security Agreements."  Ex. V.  On January 3, 2013, Ralls responded to Terna's December 24 letter, reiterating that the President's Order rendered the Ralls-Terna

transaction void *ab initio*, that ownership of the Project Companies remains with Terna, and that Terna is not entitled to further payment.  Ralls added that neither Ralls nor IWE is in default, and Terna has no grounds for proceeding with any sale of collateral.  Ralls also noted that because the transaction terminated upon the President's Order prohibiting the Ralls-Terna transaction, any security interest under the Security Agreements automatically terminated, with rights to the collateral reverting to the grantors.  Ex. W.  Ralls notified CFIUS of its letter to Terna the same day.  Ex. X.

On January 4, 2013, CFIUS informed Ralls that because "there is no evidence that Terna is willing or able to support compliance with" the President's Order, Ralls is "in violation of the Order."  Ex. Y.  On January 8, 2013, Terna again rejected Ralls's position that the transaction is void *ab initio*, and it reiterated its intention to exercise its rights as provided by the Security Agrements and other underlying agreements.  Ex. Z.

Finally, on January 17, 2013, Terna notified Ralls that on February 7, 2013, pursuant to its Security Agreement with Terna and Section 9-611 of the New York Uniform Commercial Code, Terna will hold a public sale of the collateral Ralls pledged under that Security Agreement—including, specifically, 100% of Ralls's membership interests in Ralls Wind Farm, Ralls's only operational windfarm.  In the notice, Terna reiterated its claim that "payment is due" to Terna in the amount of $4.2 million.  Ex. AA.

## ARGUMENT

To obtain injunctive relief through either a temporary restraining order or preliminary injunction, the moving party must show:  (1) a likelihood of success on the merits, (2) that it would likely suffer irreparable injury in the absence of an injunction, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest.  *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 185 (D.D.C. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555

13

U.S. 7, 20 (2008)); *see Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions.").  Ralls satisfies each of the requirements here.

## I.      RALLS IS LIKELY TO SUCCEED ON THE MERITS.

Ralls is likely to succeed on the merits of its claim that the President's Order prohibiting the Ralls-Terna transaction, to the extent it is lawful and authorized, renders the transaction and underlying agreements void *ab initio*, and, therefore, Terna may not exercise any remedies under the Security Agreements, including sale of the collateral pledged thereunder.

It has long been held that "[a]s a general rule, New York courts will not enforce illegal contracts."  *Schlessinger v. Valspar Corp.*, 686 F.3d 81, 85 (2d Cir. 2012) (citing *Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948)).[2]  "Contracts for an illegal purpose or contrary to public policy are not enforceable."  *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) (citing *64th Associates, L.L.C. v. Manhattan Eye, Ear & Throat Hosp.*, 813 N.E.2d 887 (N.Y. 2004)); *see also Dornberger v. Met. Life Ins. Co.*, 961 F. Supp. 506, 532 (S.D.N.Y. 1997) ("Courts have long recognized that agreements made in violation of law are unenforceable."  (citing *Benjamin v. Koeppel*, 650 N.E.2d 829, 830 (N.Y. 1995), and *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 247 (N.Y. 1992))).

Contracts or agreements are considered to be illegal or in violation of public policy when, among other things, they contradict state or federal positive law.  Thus if "a statute directly prohibits an agreement or sale, it is clear that the courts will not lend their aid to any attempt by the parties to enforce the agreement."  *Dervin Corp. v. Banco Bilbao Vizcaya Argentaria, S.A.*, 2004 WL 1933621, at *3 (S.D.N.Y. Aug. 30, 2004) (quoting 8 Williston on Contracts § 19:42

---

[2] Terna and Ralls agreed that New York law would govern all relevant agreements.  *See* Security Agreements § 24; MIPSA § 8.4(d); Guarantee Agreement § 10.

(4th ed. 1993)).   "There is a strong presumption that agreements in violation of a statute will not be sanctioned by the courts."   *Jackson Purchase Rural Elec. Co-op. Ass'n v. Local Union 816, Intern. Broth. of Elec. Workers*, 646 F.2d 264, 267 (6th Cir. 1981); *see also id.* at 268 (noting the "presumption that courts will not give legal effect to illegal acts"); *cf. Beth Israel Med. Ctr.*, 448 F.3d at 584 (describing "otherwise legitimate contracts that have been abrogated in part by a statute").   This rule applies not only to agreements in violation of a statute, but also to agreements in violation of any of the "laws of the United States" or that "contravene[] the public policy as expressed in those laws"; such agreements are "unenforceable."   *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952).

Faithful application of the foregoing black-letter law confirms that the Terna-Ralls transaction and the agreements memorializing it are illegal, void *ab initio*, and unenforceable as a result of the President's Order.   The Order could not be more clear:   in it, the President unequivocally and expressly ordered that the "transaction resulting in the acquisition of the Project Companies and their assets" by Ralls and its owners "is hereby prohibited."   Ex. N § 2(a).   The Order reinforced that command by also ordering that "ownership … of *any* interest" in the Project Companies by Ralls and its owners is also "prohibited."   *Id.* (emphasis added).   Until and unless it is found unlawful, the President's Order carries the same force of law as federal statute; indeed, the President purported to promulgate the Order by the authority vested in him "by the Constitution and the laws of the United States of America," including Section 721.   *See id.* (preamble); *see also* 50 U.S.C. app. § 2170(d)(1) (authorizing the President to "take such action for such time as the President considers appropriate to *suspend or prohibit* any covered transaction that threatens to impair the national security of the United States."   (emphasis added)).   Accordingly, just as courts will not "lend their aid to any attempt … to enforce" an

agreement where a "statute directly prohibits an agreement or sale," no court may aid in enforcing the "agreement or sale" that is "directly prohibit[ed]" by the President's Order—the agreements evidencing the transfer of the Project Companies from Terna to Ralls. *Dervin*, 2004 WL 1933621.  Indeed, if anything, the President's Order carries *more* prohibitive force than in the ordinary statutory context, for unlike a statute, which covers a broad class of activity, the President's Order is squarely and unambiguously aimed at a single transaction:   Ralls's acquisition of the Project Companies.

It is equally clear, moreover, that the "transaction resulting in the acquisition of the Project Companies" by Ralls that the President's Order prohibits is the overall transaction by which Terna sold the Project Companies to IWE and Ralls purchased IWE from USIRE. Though the transaction was structured to proceed in two stages, both Terna and Ralls repeatedly represented to CFIUS that the transaction it was to review—and that CFIUS and the President ultimately found to raise national security risks—was the overall Ralls-Terna transaction effecting transfer of the Project Companies from Terna to Ralls.  In their joint notice to CFIUS, Ralls and Terna variously described the transaction as a "transaction between Ralls Corporation and Terna Energy USA Holding Corporation," a "transaction between Terna and Ralls," a "transaction … involv[ing] the transfer of small, unconstructed wind farm projects … from one foreign party, Terna, to Ralls," and an "acquisition by Ralls of the right to construct four small windfarms from Terna."  Ex. J at 4, 5.  A joint presentation to CFIUS by Ralls and Terna counsel, furthermore, was titled "Ralls/Terna Transaction Concerning Butter Creek Windfarm Projects."  That presentation identified the "Parties to the Transaction" as "Ralls Corp." and "Terna Energy USA Corp," and it described the transaction as having a "[t]wo stage[]" structure

whose "Result" is that "Ownership of the Project Companies was transferred from Terna to Ralls." Ex. K at 6, 16.

The federal government supports Ralls's position that the President's Order prohibiting the Ralls-Terna transaction operates to render the transaction void *ab initio* and return the parties to their previous positions. In its litigation with Ralls over the legality of the President's Order, the government has asserted that the President's authority to prohibit transactions under Section 721 is intended to "insure that the *status quo ante* is restored" and to insure that a foreign purchaser does not "gain the benefit of assets" that, legally, it "should not have acquired in the first place." Government's Reply 15. These contentions cannot be squared with Terna's attempts to enforce the agreements underlying the transaction, which are premised on Terna's belief, contrary to the government's, that ownership of the Project Companies remains with Ralls subsequent to the President's Order, rather than having reverted to Terna.

Indeed, the government has also argued that absent CFIUS's approval of a foreign purchaser's acquisition of a U.S. business—which did not occur here, and which the President's Order obviously precludes—a foreign purchaser does not have a valid interest in property it purportedly acquired in that transaction. The government has asserted that Ralls has "no legitimate claim of entitlement in any assets" that it "sought to acquire" in the Ralls-Terna transaction. *Id.* at 18-19. That is because, as the government stated at oral argument on its motion to dismiss, any property interests Ralls ostensibly acquired from Terna "are revocable contingent subject to the President's discretion, and therefore do not amount to a property interest." Transcript at 20:8-10. To be sure, Ralls disagrees with the government's position and has contended in litigation against the government that it acquired valid property interests in its transaction with Terna—which the President's Order deprived absent due process of law. But

Terna and the government cannot both be right.  And so long as the President's Order remains in effect, Terna's position must yield to the government's view:  that to the extent Ralls may have acquired valid property interests in the Project Companies in the first place, the President's Order returns Terna and Ralls to the *status quo ante* by declaring their transaction prohibited.

Terna cannot be heard to argue that Ralls failed to bargain for the possibility that the President would declare the transaction prohibited, as it has suggested in correspondence with Ralls.  *See* Ex. P.   First, that contention is foreclosed by the fact that illegality and unenforceability operate as a matter of law.   As such, the President's declaration of the transaction as illegal operates to void the transaction entirely, regardless of whether the parties bargained for an "illegality" clause, in the same manner that courts may void contracts on grounds of mistake, impossibility, duress, or other legal principles without specific provisions contemplating such grounds.   Second, in all events, Terna and Ralls *did* contemplate that the transaction would not violate the law, either at closing or in the future.   "As an inducement to" execution of the transaction, Terna expressly represented and warranted that the "execution, delivery, and performance by [Terna]" of the MIPSA and "the consummation by [Terna] of the transactions contemplated hereby do not *and will not*" violate "any law or regulation applicable to [Terna] or any Project Company" or "any order of any … Government Authority having jurisdiction over [Terna] or any Project Company."   MIPSA § 5.2(b) (emphasis added).   This provision indicates that the parties to the MIPSA acknowledged the prospect of future illegality, the absence of which was a material condition to the transaction's execution and performance.

In addition, Terna represented that aside from two minor notification requirements to a county planning commission, "no … consent or approval of or other action by … any Governmental Authority … is or *will be necessary* for the valid execution, delivery and

performance by [Terna] of this Agreement or the consummation of the transactions contemplated hereby." MIPSA § 5.8 (emphasis added). But according to the government in its litigation with Ralls, CFIUS consent *is* necessary for the valid execution of a transaction transferring ownership of a U.S. company to a foreign purchaser, as in the Ralls-Terna transaction—otherwise, the foreign purchaser has not actually acquired valid property interests. As noted, Ralls does not agree with that argument, which is currently before Judge Jackson, but if it is correct, it further demonstrates that the transaction is void *ab initio* and the agreements underlying it unenforceable. And in all events, the parties to the MIPSA plainly contemplated that any present *or future* illegality of the agreement would be a material impediment to its "execution, delivery and performance." Accordingly, the President's Order declaring the Ralls-Terna transaction "prohibited" renders the transaction and the underlying agreements illegal and void *ab initio*.

There is nothing inequitable about this outcome. The Supreme Court has long acknowledged the "possible consequences of [federal] enactments in frustrating the expected performance of contracts"—even in "rendering them fruitless, or partially fruitless." *Norman v. Baltimore & O.R. Co.*, 294 U.S. 240, 304 (1935) (internal quotation marks omitted). Thus the Court has recognized that previously valid contracts or agreements made illegal by federal antitrust laws are unenforceable. *See, e.g.*, *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 212 (1899). Likewise, in *Louisville & Nashville Railroad Co. v. Mottley*, 219 U.S. 467 (1911), the Supreme Court held unenforceable an agreement, "valid when made," for free transportation in exchange for a release of a claim for damages, after Congress subsequently outlawed such agreements. *Id.* at 482. The Court held that the agreement "must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might … render that agreement unenforceable." *Id.*

In short, Congress has "the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt." *Norman*, 294 U.S. at 309. *A fortiori*, so too does the President have that power, such that if exercised in a lawful manner, he too may "prohibit and invalidate contracts although previously made." *See Mawhinney v. Millbrook Wollen Mills, Inc.*, 132 N.E. 93, 294, 297-98 (N.Y. 1921) (excusing defendant from private contractual obligations where Executive Branch, pursuant to act of Congress, ordered defendant's commitments to government to take precedence over commitments to private customers). To be sure, Ralls does not agree that the President exercised such power in a lawful manner here, but to extent the President's Order is lawful notwithstanding Ralls' contentions, it plainly "prohibit[s] and invalidate[s]" the underlying agreements and results in returning the parties to the *status quo ante*. *See Feldman v. Grant*, 625 N.Y.S.2d 7, 8 (App. Div. 1995) (exercising "our equitable power … to award rescission of the loan agreement" and "put the parties in the *status quo ante*").

Because the President's Order prohibits the Ralls-Terna transaction, it follows directly that Terna cannot "exercise its rights and remedies under" the related Security Agreements or Guarantee Agreements, as it seeks to do by proceeding to a sale of the collateral. That is plain from the provisions of the Security Agreements and Guarantee Agrements themselves. The Security Agreements provide that upon "termination of the MIPSA, the pledge and security interest granted hereunder shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor." Ex. F § 22; Ex. G § 22; Ex. H § 22. The MIPSA's termination by operation of the President's Order accordingly results in the automatic termination of the Security Agreements and reversion of the collateral to Ralls, Ralls Wind Farm, and IWE (the latter two of which are wholly owned by Ralls)—

resulting, notably, in the *status quo ante* that the government has declared is the goal of the President's Order.  Similarly, the Guarantee Agreements provide that they are effective until "performance in full of the Obligations," defined in part as "all payment obligations" under the MIPSA.  Ex. D §§ 1, 9; Ex. E §§ 1, 9.  The President's Order rendering the transaction void *ab initio* consequently releases the Guarantors from any such obligations.  Yet even if the Security and Guarantee Agreements did not provide for their own termination, they would terminate by operation of law given their intertwined nature with the void underlying transaction.  *See National Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 930 F.2d 240, 243 (2d. Cir. 1991) (holding that under New York law, a "perfectly legitimate contract may be rendered unenforceable by its 'direct connection' with an illegal transaction" (citing *Bankers Trust Co. v. Litton Sys.*, 599 F.2d 488, 491 (2d Cir. 1979))).  In all events, Ralls has established a substantial likelihood that it will ultimately prevail on the merits of its claim that the President's Order prohibiting the Ralls-Terna transaction renders the transaction and related agreements void *ab initio* and unenforceable.

## II.    RALLS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF TEMPORARY INJUNCTIVE RELIEF.

If the court does not grant temporary injunctive relief enjoining Terna from proceeding with the February 7, 2013 collateral sale during the pendency of this case, Ralls will suffer harm that is imminent and irreparable.  *See, e.g.*, *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (observing that "the basis of injunctive relief in the federal courts has always been irreparable harm" (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)) (brackets and internal quotation marks omitted)).  Although the irreparable harm inquiry is a "fact-based process unique to each case before the court," *Express One Int'l, Inc. v. USPS*, 814 F. Supp. 87, 90 (D.D.C. 1992), a movant generally must establish injury "that is certain, great,

and actual, not theoretical," *Housing Study Group v. Kemp*, 736 F. Supp. 321, 330 (D.D.C. 1990). The "injury complained of [must be] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985). Those conditions are plainly satisfied here.

The February 7 sale of the collateral would cause Ralls irrevocably to lose its membership interests Ralls Wind Farm, as well as the five turbines and other equipment and assets owned by Ralls Wind Farm. It is indisputable that such loss constitutes irreparable harm, as courts addressing similar circumstances have consistently held. Thus, for example, in *Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley LLC*, 2010 WL 1005169 (S.D.N.Y. Mar. 18, 2010), the defendant asserted that because the plaintiff was in default of a loan agreement, it could foreclose on plaintiff's property absent judicial intervention pursuant to the terms of the agreement. *Id.* at *2. Claiming that defendant had breached the agreement, thereby excusing its default, plaintiff sought temporary injunctive relief enjoining defendant from proceeding with sale of the property. *Id.* at *3. Granting that relief, the court cited well-established case law in holding that "[t]he ability of a creditor to foreclose can suffice to establish irreparable harm." *Id.* (quoting *Kamine/Besicorp Allegany v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180, 1188 (W.D.N.Y. 1995) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975) (2d Cir. 1989))).

Likewise, in *McMillan v. Park Towers Owners Corp.*, 640 N.Y.S.2d 144 (App. Div. 1996), the plaintiff sought to enjoin defendant "from effecting a nonjudicial foreclosure" on her membership shares in a cooperative housing corporation pursuant to Uniform Commercial Code article 9, as Terna seeks here with respect to the membership interests in Ralls Wind Farm. *Id.* at 145. Granting temporary injunctive relief, the court held that "[p]reservation of the status quo"

was "essential" since the plaintiff would otherwise lack "any judicial determination" of her claims. *Id.*; *see also In re Baker*, 2012 WL 1313489, *2 (N.D.N.Y. Apr. 17, 2012) (granting temporary restraining order enjoining foreclosure sale because "once the foreclosure sale goes forward, [plaintiff] will lose her property," which harm "cannot be remedied once it occurs"); *Ahern v. Pierce*, 653 N.Y.S.2d 620, 622 (App. Div. 1997) (noting "the irreparable injury which would result from the sale of the subject premises"). Indeed, the cases are legion in which courts, recognizing the permanence of a sale of collateral, have granted a temporary restraining order enjoining such sales pending a fuller determination on the merits. *See, e.g.*, *Tamach Airport Manager, LLC v. HRC Fund III Pooling Domestic LLC*, 933 N.Y.S.2d 275 (App. Div. 2011); *State v. Insurance Co. of the State of Pa.*, 762 N.Y.S.2d 116 (App. Div. 2003); *Pacific Electric Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*, 2003 WL 23095564 (S.D.N.Y. Dec. 30, 2003).[3]

The same result obtains here. Under New York's Uniform Commercial Code, which governs the Security Agreements, *see* § 24 of Ex. F, G, H, Terna may take possession of the collateral and dispose of it by public sale without any judicial proceeding. *See* N.Y. U.C.C. Law §§ 9-609, 9-610. Indeed, Terna's January 17, 2013 notice to Ralls provides that the February 7 sale will take place at the office of Terna's counsel without any further notice. *See* Ex. AA. Accordingly, there is no tribunal in which Ralls may intervene to object to or prevent the sale as unlawful given the President's Order prohibiting the Ralls-Terna transaction and rendering it and

---

[3] On similar grounds of irreparable harm, courts regularly grant temporary injunctive relief enjoining parties from dissipating property that is the subject of a security agreement, so as to ensure that the secured party can recover collateral in the event of default. *See, e.g.*, *Whitney Nat. Bank v. Flying Tuna, LLC*, 2011 WL 2669450, at *2 (S.D. Ala. July 7, 2011); *Textron Financial Corp. v. Freeman*, 2010 WL 5778756, at *5 (D.R.I. Oct. 28, 2010); *First Tennessee Bank Nat. Ass'n v. Pacific America Group, Inc.*, 2008 WL 269537, at *3 (M.D. Tenn. Jan. 29, 2008); *Firemen's Ins. Co. of Newark, N.J. v. Keating*, 753 F.Supp. 1146, 1153 (S.D.N.Y.1990).

the underlying agreements void *ab initio*.  Absent temporary injunctive relief by this Court, Terna will have disposed of the collateral by the time the Court fully addresses Ralls's claims on the merits.  Should Terna dispose of the collateral but the Court ultimately hold that the transaction is void *ab initio*, Ralls would not have been in default, and Terna would not have been authorized to proceed to a collateral sale—but it will be too late for Ralls, which will have no adequate remedy at law to recover the membership interests in Ralls Wind Farm, as well as the turbines and equipment operating there.  *See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (noting that the "loss of a relatively unique product" results in irreparable harm).

Even if Ralls had an adequate remedy at law, which it does not, it would still be entitled to temporary injunctive relief under the circumstances here.  That is because irreparable injury occurs "in circumstances where a party is threatened with the loss of a business," *KM Enterprises, Inc. v. McDonald*, 2012 WL 541084, at *2 (E.D.N.Y. Jan. 5, 2012), or where "the very viability of the plaintiff's business … ha[s] been threatened." *Tom Doherty Associates*, 60 F.3d at 38; *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977) ("The destruction of a business is … is not … one of the 'mere' economic injuries which … are insufficient to warrant a stay."); *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000) ("[E]conomic loss may constitute irreparable harm where the loss threatens the very existence of the movant's business.").  The collateral Terna intends to sell on February 7 includes membership interests in Ralls Wind Farm—the only windfarm Ralls currently has in commercial operation, and Ralls's only operating asset.  *See* Wu Decl. ¶ 11.  If Terna were to sell Ralls Wind Farm in the imminent, but unlawful, sale of the

collateral, the "very viability of [Ralls's] business" would be more than "threatened"—Ralls's

existence would be in serious jeopardy.  *See id.* ¶ 12.

Finally, it is clear beyond peradventure that the irreparable harm to Ralls is "of such

*imminence* that there is a 'clear and present' need for equitable relief to prevent" it.  *Wis. Gas

Co.*, 758 F.2d at 674.  Terna has provided Ralls with a notice of default, and it has provided Ralls

with a notice of the upcoming sale of collateral.  Without immediate injunctive relief by this

Court, Terna will presently proceed to sell Ralls Wind Farm, Ralls's most valuable asset.  The

injury is looming and irreparable, and temporary injunctive relief is necessary.

## III.    THE BALANCE OF THE EQUITIES FAVORS RALLS.

The balance of the equities weighs in favor of Ralls.  "Under this factor, the Court must

consider the balance of the equities and determine whether an injunction would more

substantially injure other parties, such as the [defendant]."  *Wash. Teachers' Union, Local No. 6

v. American Federation of Teachers*, 751 F. Supp. 2d 38, 57 (D.D.C. 2010).  Granting

preliminary injunctive relief to Ralls will not "substantially injure" other parties, above all Terna;

it will merely prevent Terna from proceeding to an immediate sale of the collateral on February

7.  Terna has held the collateral for almost a year; it can hardly be the case that delaying any sale

of the collateral for the period necessary for the Court fully to decide the merits of this case—

which has no disputed facts—will substantially injure Terna.  *See Citizens for Responsibility and

Ethics in Wash. v. Cheney*, 577 F. Supp. 2d 328, 340 (D.D.C. 2008) (granting preliminary relief

where "a preliminary injunction … does not impose burdensome obligations on Defendants").

By contrast, the substantial injury to Ralls absent temporary injunctive relief is

identifiable, imminent, certain, and permanent.  As noted, Ralls will lose its most critical assets.

It will lack any adequate remedy at law to replace those assets, notwithstanding the utter

lawlessness of the collateral sale in light of the President's Order.  As evidenced by the

numerous cases enjoining foreclosure sales under similar circumstances, *see* pp. 22-23, *supra*, the burden Ralls will face from the failure of this Court temporarily to enjoin such a sale far outweighs the burden to Terna from postponing the sale for only a short while more.

## IV.     TEMPORARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The public interest weighs heavily in favor of Ralls and temporary injunctive relief. Until and unless the President's Order is found unlawful—which is currently at issue in *Ralls Corporation v. Obama*, pending before Judge Jackson—it has the force of law.  Terna's failure to be "willing or able to support compliance with" the President's Order, as CFIUS has described Terna's conduct, Ex. Y, contradicts the public interest in efficient and orderly operation of the law and execution of presidential decrees.   Furthermore, Terna's intention to exercise its purported remedies and sell collateral that includes the Project Companies frustrates the terms of the President's Order.  The Order states that Ralls may not transfer the Project Companies to a third party until Ralls "notifies CFIUS in writing of the intended recipient or buyer," and CFIUS does not object to the intended recipient or buyer within ten business days of that notification. Ex. N § 2(f).  Under its view of the relevant agreements, however, Terna may dispose of the Project Companies on its own volition, on its own terms, and for its own recompense, without conforming to any of the requirements of the President's Order.  Indeed, it is unclear how Ralls could satisfy the demands of the President's Order, or the government could facilitate the asserted purposes of the Order, if Terna were to sell off the Project Companies consistent with its stated intention to exercise any and all of its alleged remedies.  Frustrating, if not circumventing, presidential orders with the force of law is hardly acting in the public interest.

## CONCLUSION

For the foregoing reasons, Ralls respectfully requests that this Court enter a temporary restraining order enjoining Terna from proceeding with any sale or disposition of the collateral pledged pursuant to the Security Agreements, including the imminent February 7, 2013 collateral sale, and from exercising any remedies under or otherwise enforcing any aspect of the agreements underlying the Ralls-Terna transaction prohibited by the President.   Ralls further requests that this Court schedule a hearing on Ralls's request for a preliminary injunction at the earliest available date, and, after such hearing, enter a preliminary injunction enjoining any such sale and enjoining Terna from exercising any additional remedies under the agreements until a final determination of the legality of the President's Order in *Ralls Corporation v. Obama*.

Respectfully submitted,

Viet D. Dinh (D.C. Bar No. 456608)
Paul D. Clement (D.C. Bar No. 433215)
H. Christopher Bartolomucci (D.C. Bar No. 453423)
George W. Hicks, Jr. (D.C. Bar No. 499223)
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, D.C. 20036
(202) 234-0090

Steven S. Honigman (D.C. Bar No. 201020)
500 East 77th Street
New York, New York 10162
(202) 549-4917

*Counsel for Plaintiff Ralls Corporation*

Dated:  January 28, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2013, I caused to be served copies of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction, all accompanying declarations and exhibits, Proposed Temporary Restraining Order, Proposed Order Granting Preliminary Injunction, and Local Civil Rule 65.1 Certification by email on the following counsel for Defendant, with delivery by first-class U.S. Mail to follow on January 28, 2013, thereby satisfying service obligations:

> Robert Weigel
> Gibson, Dunn & Crutcher
> 200 Park Avenue
> New York, NY 10166-0193
> rweigel@gibsondunn.com

George W. Hicks, Jr.
BANCROFT PLLC
1919 M Street, N.W., Suite 470
Washington, DC 20036
(202) 234-0090

*Counsel for Plaintiff Ralls Corporation*