## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RALLS CORPORATION,                          )
                                            )
       *Plaintiff,*                         )
                                            )
v.                                          )     Case No. _____
                                            )
TERNA ENERGY USA HOLDING                    )
CORPORATION,                                )
                                            )
       *Defendant.*                        )
                                            )

### DECLARATION OF ROBERT GUERTIN

I, Robert Guertin, declare under penalty of perjury that the following is true and accurate to the best of my knowledge, information, and belief:

1.      I am over 18 years of age, am competent to testify about the matters set forth herein, and submit the testimony below based upon personal knowledge and information.

2.      I am a member and manager of Oregon Windfarms, LLC.

3.      Oregon Windfarms, LLC is an Oregon limited liability company, owned entirely by United States citizens.

4.      In 2009, Oregon Windfarms created four Oregon limited liability companies for the purpose of owning assets related to windfarm projects in the State of Oregon. Specifically, Oregon Windfarm created Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC (collectively, the "Project Companies" or the "Butter Creek Projects").

5.      The Project Companies' assets consisted of all assets related to the development, construction, operation and management of the Butter Creek Projects, including subeasements with local landowners that allow access and use of privately-owned land for windfarm construction and operation; power purchase agreements with PacifiCorp, the electricity purchasing utility; generator interconnection agreements permitting connection to PacifiCorp's grid; transmission agreements and agreements for the management and use of shared facilities with other nearby windfarms; necessary government permits and approvals to construct windfarm turbines at particular locations; and other assets.

6.      In December 2010, Oregon Windfarms sold its interests in the Project Companies to Terna Energy USA Holdings Corporation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 18th day of January 2013.

Robert Guertin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RALLS CORPORATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| TERNA ENERGY USA HOLDING | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendant.* | ) | |

### DECLARATION OF JIALIANG WU

I, Jialiang Wu, declare under penalty of perjury that the following is true and accurate to the best of my knowledge, information, and belief:

1.      I am over 18 years of age, am competent to testify about the matters set forth herein, and submit the testimony below based upon personal knowledge and information.

2.      I am an owner of Ralls Corporation ("Ralls"), Vice President of Sany Group ("Sany"), a Chinese global manufacturing company, and General Manager of Sany Electric Company, a wholly-owned subsidiary of Sany.

3.      Ralls is a Delaware corporation with its principal place of business in Georgia.

4.      Ralls is owned by myself and Mr. Dawei Duan.  We are both Chinese nationals. Mr. Duan is the CFO of Sany.

5.      Ralls is in the business of identifying U.S. opportunities for the construction of windfarms in which the wind turbines of Sany Electric can be used and their quality and reliability demonstrated to the U.S. wind industry in comparison to competitor products.

6.      On March 26, 2012, as part of a structured two-tier transaction with Terna Energy USA Holding Corporation ("Terna"), Ralls purchased Intelligent Wind Energy, LLC ("IWE") from its owner, U.S. Innovative Renewable Energy, LLC.

7.      Ralls's purchase of IWE completed a structured two-tier transaction by which Ralls acquired from Terna four project companies identified in the Master Wind Projects Membership Interests Purchase Agreement (the "MIPSA") between Ralls, Terna, and IWE dated February 28, 2012—specifically, Pine City Windfarm, LLC; Mule Hollow Windfarm, LLC; High Plateau Windfarm, LLC; and Lower Ridge Windfarm, LLC.

8.      Pursuant to the structured agreement, Ralls paid Terna $600,000 upon closing and $1.2 million on May 31, 2012.

9.      Pursuant to the structured agreement, Ralls also paid Terna a $400,000 advance and $500,000 to cover security that Terna had paid for interconnection to the local utility.

10.     Ralls began construction of the turbines at the Project Companies' properties on April 23, 2012.

11.     Ralls Wind Farm, LLC, of which Ralls owns 100% of the membership interests, is the operating company for a five-turbine windfarm located in Ralls, Texas and currently in commercial operation.  Ralls has no other windfarms currently in commercial operation aside from Ralls Wind Farm, LLC.  Ralls Wind Farm, LLC is the only operating asset of Ralls Corporation.

12.     The viability and existence of Ralls Corporation is threatened and would be in serious doubt if Ralls Wind Farm, LLC were sold by Terna in a collateral sale.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of January 2013.

Jan. 24. 2013

_____
Jialiang Wu

EXECUTION COPY

---

## MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT

**by and among**

### INTELLIGENT WIND ENERGY, LLC

### RALLS CORPORATION

### RALLS WIND FARM, LLC

**THE PROJECT COMPANIES (as defined herein)**

**and**

### TERNA ENERGY USA HOLDING CORPORATION

**dated as of**

**FEBRUARY 28, 2012**

---

NYDOCS02/955720.9

**Table of Contents**

Page

ARTICLE 1 DEFINITIONS ...................................................................................2
1.1     Definitions..................................................................................... 2
1.2     Rules of Usage .............................................................................. 8
ARTICLE 2 PURCHASE AND SALE ....................................................................9
2.1     Purchase of Membership Interests ............................................... 9
2.2     Purchase Price ............................................................................... 9
2.3     Closing ........................................................................................ 10
2.4     Profit and Loss Allocation .......................................................... 10
2.5     Taxes............................................................................................ 10
2.6     Interest......................................................................................... 11
2.7     Buyback ...................................................................................... 11
2.8     Advance ...................................................................................... 12
ARTICLE 3 CLOSING CONDITIONS ..................................................................13
3.1     Closing Conditions ..................................................................... 13
3.2     Purchaser Conditions to Closing................................................ 13
3.3     Seller and Project Companies Conditions to Closing ................ 15
3.4     Satisfaction of Conditions.......................................................... 17
3.5     Termination................................................................................. 17
3.6     Procedure Upon Termination...................................................... 17
3.7     Effect of Termination.................................................................. 17
3.8     Subsequent Sale of the Projects ................................................. 17
ARTICLE 4 COVENANTS ..................................................................................18
4.1     Purchaser Covenants................................................................... 18
4.2     Other Payments........................................................................... 19
4.3     Cooperation................................................................................. 20
4.4     Correspondence Regarding Project Assets ................................ 21
4.5     Assistance by Seller .................................................................... 21
4.6     Exclusivity .................................................................................. 22
4.7     Development of Projects between the Effective Date and the Closing Date........ 22
4.8     Due Diligence ............................................................................. 22
4.9     Confidentiality Agreement.......................................................... 22
4.10    REC Transfer Agreements and Subeasement Agreements.......... 22
4.11    Completion of Exhibits and Schedules ...................................... 23
ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLER AND THE
        PROJECT COMPANIES....................................................................23
5.1     Organization, Qualification and Corporate Power...................... 23
5.2     Authorization; No Conflict ......................................................... 24
5.3     Validity ....................................................................................... 24
5.4     Membership Interests.................................................................. 24
5.5     Assets, Liabilities and Obligations ............................................ 25
5.6     Land Contracts and Real Property ............................................. 26
5.7     Litigation; Compliance with Law; Legislation; No Condemnation ...................... 27
5.8     Consents and Approvals ............................................................. 28
5.9     Permits ........................................................................................ 28
5.10    No Employees; No Benefit Plans ............................................... 28

| | | |
|---|---|---|
| 5.11 | Tax Matters | 28 |
| 5.12 | Books and Records | 29 |
| 5.13 | Environmental Matters | 29 |
| 5.14 | No Liability | 31 |
| 5.15 | No Seller Material Adverse Effect | 31 |
| 5.16 | Brokers | 31 |
| 5.17 | [Reserved] | 31 |
| 5.18 | Cash Grant Eligibility | 31 |
| 5.19 | Wind Data | 31 |
| 5.20 | Material Misstatements or Omissions | 32 |
| **ARTICLE 6** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER, RALLS AND RALLS OPCO** | **32** |
| 6.1 | Organization, Qualification and Power | 32 |
| 6.2 | Authorization; No Conflict | 32 |
| 6.3 | Validity | 33 |
| 6.4 | Membership Interests | 33 |
| 6.5 | Ralls Financial Statements | 34 |
| 6.6 | No Purchaser Material Adverse Effect | 34 |
| 6.7 | Fixed Assets | 34 |
| 6.8 | Brokers | 34 |
| 6.9 | Material Misstatements or Omissions | 34 |
| **ARTICLE 7** | **INDEMNITY** | **35** |
| 7.1 | Seller Indemnity | 35 |
| 7.2 | Purchaser Indemnity | 35 |
| 7.3 | Indemnity Procedures | 36 |
| 7.4 | Limitations | 37 |
| 7.5 | Offset | 37 |
| 7.6 | Survival | 37 |
| 7.7 | Limitation of Liability | 38 |
| **ARTICLE 8** | **MISCELLANEOUS** | **38** |
| 8.1 | Remedies Cumulative | 38 |
| 8.2 | Entire Agreement; Modification; Benefit; Assignment | 38 |
| 8.3 | Notices | 39 |
| 8.4 | Disputes and Governing Law | 39 |
| 8.5 | Expenses | 40 |
| 8.6 | Severability | 40 |
| 8.7 | Waiver | 40 |
| 8.8 | Headings | 40 |
| 8.9 | Counterparts | 40 |
| 8.10 | Attorneys' Fees | 40 |

## EXHIBITS

| | |
|---|---|
| Exhibit A-1 | The Projects |
| Exhibit A-2 | Sites |
| Exhibit B | [Reserved] |
| Exhibit C | Form of Assignment of Interests |
| Exhibit D | Form of Officer's Certificate |
| Exhibit E | Form of Secretary's Certificate |
| Exhibit F | Form of Guarantee Agreement |
| Exhibit G | Form of Security Agreement |
| Exhibit H | Form of REC Transfer Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule 4.1(c) | Ralls OpCo Preexisting Liens |
| Schedule 4.5(b) | Amendments to and Other Actions Regarding Land Contracts |
| Schedule 4.8 | Diligence Requests |
| Schedule 5.4 | Membership Interests |
| Schedule 5.5(b) | Contracts |
| Schedule 5.6 | Land Contracts and Real Property |
| Schedule 5.8 | Consents and Approvals |
| Schedule 5.9 | Permits |
| Schedule 5.19 | Wind Data |
| Schedule 6.4 | Ralls OpCo Membership Interests |
| Schedule 6.5 | Financial Statements of Ralls and Ralls OpCo |
| Schedule 6.7 | Ralls and Ralls OpCo Assets |

## MASTER WIND PROJECTS MEMBERSHIP INTERESTS
## PURCHASE AGREEMENT

THIS MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT (this "**Agreement**") is entered into as of February 28, 2012 (the "**Effective Date**"), by and among **INTELLIGENT WIND ENERGY, LLC**, a Delaware limited liability company ("**Purchaser**"), **RALLS CORPORATION**, a Delaware Corporation ("**Ralls**"), **RALLS WIND FARM, LLC**, a Delaware limited liability company, ("**Ralls OpCo**"), **TERNA ENERGY USA HOLDING CORPORATION**, a Delaware corporation ("**Seller**"), **LOWER RIDGE WINDFARM, LLC**, an Oregon limited liability company ("**Lower Ridge**"), **HIGH PLATEAU WINDFARM, LLC**, an Oregon limited liability company ("**High Plateau**"), **MULE HOLLOW WINDFARM, LLC**, an Oregon limited liability company ("**Mule Hollow**"), and **PINE CITY WINDFARM, LLC**, an Oregon limited liability company ("**Pine City**," each of Lower Ridge, High Plateau, Mule Hollow and Pine City a "**Project Company**," and collectively, the "**Project Companies**"). Seller, Purchaser, Ralls, Ralls OpCo, and each Project Company are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, Seller owns, beneficially and of record, one hundred percent (100%) of the issued and outstanding membership interests in each of the Project Companies (collectively, the "**Membership Interests**");

WHEREAS, each of the Project Companies is developing a 10 megawatt ("**MW**") wind turbine power generation project to be located in the State of Oregon (as more particularly described in Exhibit A-1 to this Agreement, each Project Company's "**Project**" and collectively, the "**Projects**");

WHEREAS, the Project Assets (as defined below) of each Project Company were acquired, and each Project Company was formed, for the exclusive purpose of developing, owning and operating its Project, which is to be located on the sites located in the State of Oregon, as specifically depicted on Exhibit A-2 (each Project's "**Site**" and collectively, the "**Sites**");

WHEREAS, Seller has previously posted $500,000 as security to Transmission Owner necessary for the interconnection of the Projects to the transmission grid (the "**Interconnection Security**") and, in addition to the Purchase Price (defined below), Purchaser will also reimburse to Seller the Interconnection Security and make certain other payments as described in Section 4.2;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a material condition and inducement to Seller's willingness to enter into this Agreement, each of Ralls and Ralls OpCo is entering into a Guarantee Agreement in favor of Seller with respect to each of the obligations of Purchaser under this Agreement and, following the Closing and until the Purchase Price has been paid in full, of the Project Companies under this Agreement and of Purchaser and the Project Companies under each of the Subeasement Agreements; and

~~and the Project Company~~

WHEREAS, subject to the terms and conditions contained herein, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, all of the Membership Interests upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the Parties hereby agree as follows:

<div align="center">

**ARTICLE 1**
**DEFINITIONS**

</div>

1.1    Definitions.

As used in this Agreement, the following defined terms have the meanings indicated below:

"**36 MW Commissioning Date**" has the meaning specified in Section 2.2(a)(iii).

"**Advance**" has the meaning specified in Section 2.8.

"**Affiliate**" means, for any Person, any other Person directly or indirectly controlling, directly or indirectly controlled by, or under direct or indirect common control with, such Person. As used in this definition, the terms "control," "controlling" or "controlled by" shall mean the possession, directly or indirectly, of the power either to (a) vote fifty percent (50%) or more of the securities or interests having ordinary voting power for the election of directors (or other comparable controlling body) of such Person; or (b) direct or cause the direction of the actions, management or policies of such Person, whether through the ownership of voting securities or interests, by contract or otherwise.

"**Agreement**" has the meaning specified in the introductory paragraph.

"**Allocation**" has the meaning specified in Section 2.2.

"**Applicable Law**" means any applicable statute, common law, treaty, rule, code, ordinance, regulation, governmental approval, interpretation, certificate or order of any Governmental Authority, or any judgment, decision, decree, injunction, order or the like of any court, arbitrator or other Governmental Authority currently in effect.

"**Assets**" means, with respect to any Party, all deposits, studies, plans, reports, cost models, analyses, projections, applications, Books and Records, drawings, specifications, memoranda, options, rights, know-how, goodwill, property, equipment, the Land Contracts, all Permits and all the Contracts, in each case, for, relating to, or used in connection with such Party's Project (in the case of a Project Company) or project (in the case of any other Party).

"**Auditor**" has the meaning specified in Section 2.7(b).

"**Books and Records**" means, with respect to a Project Company, any and all data, reports, accounting records, ledgers, computer files and programs, correspondence, engineering documents and other business records relating to such Project Company, its Project Assets and

the operations of such Project Company that are owned or in the possession of such Project Company, Seller or its Affiliates prior to Closing.

"**Business Day**" means a day of the year that is not a Saturday, a Sunday or a day on which banks are required by Applicable Law to close in New York, New York.

"**Buyback Price**" has the meaning specified in Section 2.7.

"**Buyback Right**" has the meaning specified in Section 2.7.

"**Cash Grant**" means a cash grant available under Section 1603 of the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5), as amended.

"**Charter Documents**" means, with respect to any Person, the certificate or articles of incorporation, organization or formation and by-laws, the limited partnership agreement, the partnership agreement or the operating or limited liability company agreement, and/or other organizational and governance documents of such Person, including those that are required to be registered or kept in the place of incorporation, organization or formation of such Person and which establish the legal personality of such Person.

"**Claim Notice**" has the meaning specified in Section 7.3.

"**Closing**" has the meaning specified in Section 2.3.

"**Closing Date**" has the meaning specified in Section 2.3.

"**Code**" has the meaning specified in Section 2.2(b).

"**Collateral**" means the interests and Assets secured by each of the Security Agreements, which shall include (a) with respect to the Purchaser, the Membership Interests, (b) with respect to Ralls, the Ralls OpCo Membership Interests and the Ralls OpCo Assets and (c) with respect to Ralls OpCo, the Ralls OpCo Assets.

"**Confidentiality Agreement**" has the meaning specified in Section 4.9.

"**Contracts**" means, with respect to any Project Company, all legal and binding agreements, whether written or oral, to which such Project Company is a party or by which it or its Project Assets are bound, other than the Land Contracts or contracts which are not material to its business.

"**Damages**" has the meaning specified in Section 7.1.

"**Diligence Materials**" has the meaning specified in Section 4.8.

"**Dispute**" has the meaning specified in Section 8.4.

"**Effective Date**" has the meaning specified in the introductory paragraph.

"**Environmental Laws**" means any applicable federal, state or local laws, including statutes, regulations, ordinances, rulings, orders, administrative interpretations and other governmental restrictions and requirements, relating to the production, handling, release, discharge, treatment, disposal or other regulation of air pollutants, water pollutants, process waste water, Hazardous Materials or otherwise relating to the natural environment or natural resources, each as amended from time to time.

"**Final Payment**" has the meaning specified in Section 2.2(a).

"**Governmental Authority**" means the government of the United States of America, any state, or any political subdivision, instrumentality, ministry, department, agency, court, tribunal, authority, corporation, commission or other body or entity of, or under the direct or indirect control of, any of the foregoing, including any central bank or other fiscal or monetary authority; provided that, solely with respect to Ralls and Ralls OpCo, the term Governmental Authority shall also include the government of the People's Republic of China. The term "Governmental Authority" includes any arbitral organization or tribunal.

"**Guarantors**" means Ralls, Ralls OpCo and each of the Project Companies.

"**Guarantee Agreement**" means agreements substantially in the form of Exhibit F whereby each of the Guarantors will jointly and severally guarantee 100% of the obligations, including payment and performance obligations, of Purchaser under this Agreement and, following the Closing and until the Purchase Price has been paid in full, of the Project Companies under this Agreement and of Purchaser and the Project Companies under each of the Subeasement Agreements.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes regulated pursuant to any Applicable Law.

"**Indemnified Party**" has the meaning specified in Section 7.3(a).

"**Indemnifying Party**" has the meaning specified in Section 7.3(a).

"**Initial Payment**" has the meaning specified in Section 2.2(a)(i).

"**Interconnection Agreement**" means with respect to a Project, an agreement for the interconnection of such Project to Transmission Owner's transmission system, between the Project Company developing such Project and Transmission Owner.

"**Interconnection Security**" has the meaning specified in the Recitals.

"**Land Contracts**" means, with respect to a Project Company, all of such Project Company's leases, easements, licenses, rights of way or other agreements with the owners or occupants of real property, including those evidenced by a Subeasement Agreement, and all such agreements that provide such Project Company with the real property interests and rights

reasonably necessary or appropriate for the applicable Project to transmit energy generated by the Project to the Point of Interconnection.

"**Liability**" means any liability, obligation, expense, claim, loss, damage, indebtedness, principal, interest, penalty, guaranty or endorsement of or by any Person, absolute or contingent, known or unknown, accrued or unaccrued, due or to become due, or liquidated or unliquidated.

"**Lien**" means any mortgage, lien, pledge, charge, security interest or other easement or encumbrance of any kind.

"**May 31 Payment**" has the meaning specified in Section 2.2(a)(ii).

"**Membership Interests**" has the meaning specified in the Recitals.

"**Notifying Party**" has the meaning specified in Section 2.7(b).

"**Party**" and "**Parties**" have the meaning specified in the introductory paragraph.

"**Permits**" means all permits, licenses, authorizations, approvals, registrations, certificates of authority, rights and similar consents of any Governmental Authority pursuant to Applicable Law.

"**Permitted Lien**" means (a) Liens for property Taxes not yet due and payable, (b) statutory Liens incurred in the ordinary course of business, which do not currently present any risk of sale of the property subject to the Liens, which do not cause the Membership Interests or the Ralls OpCo Membership Interests, as applicable, or any of the Project Assets or Ralls OpCo Assets, as applicable, to be unmarketable, and which will not interfere with the construction, operation or maintenance of the project with which they are related, (c) as of any time prior to the Closing hereunder, any Liens which are discharged in full before the Closing, (d) any other Liens against Seller or, prior to Closing, a Project Company, created by the act or omission of, or with the written consent of, Purchaser, Ralls or Ralls OpCo, as applicable, and (e) any other Liens against Purchaser, Ralls, Ralls OpCo or, after Closing, a Project Company, created by the act or omission of, or with the written consent of, Seller.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization, Governmental Authority or any other form of entity.

"**Point of Interconnection**" means, with respect to a Project, the point on Transmission Owner's transmission system whereby energy generated from such Project is transmitted to the Transmission Owner.

"**Power Purchase Agreement**" means, with respect to each Project, the agreement for the sale of the energy generated by such Project, between the Project Company developing such Project and PacifiCorp.

"**Project**" and "**Projects**" have the meaning specified in the Recitals.

"**Project Assets**" means, with respect to a Project, the Assets of the applicable Project Company.

"**Project Company**" and "**Project Companies**" have the meaning specified in the introductory paragraph.

"**Prudent Industry Practice**" means any of the practices, methods and acts engaged in or approved by a significant portion of the wind industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with Applicable Law, regulation, codes, good business practices, reliability, safety, and expedition. Prudent Industry Practices is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be acceptable practices, methods or acts generally accepted in the United States.

"**Purchase Price**" has the meaning specified in Section 2.2(a).

"**Purchaser**" has the meaning specified in the introductory paragraph.

"**Purchaser Indemnification Deductible**" has the meaning specified in Section 7.7(b).

"**Purchaser Indemnified Parties**" has the meaning specified in Section 7.1.

"**Purchaser Material Adverse Effect**" means the effect, consequence or result of any event, act, omission, change, occurrence, fact or other circumstance that is, or in the aggregate with any other events, acts, omissions, changes, occurrences, facts or other circumstances are, materially adverse to, or would reasonably be expected to have a material adverse effect on (or would reasonably be expected to materially impair) (i) the business, operations, assets, liabilities, properties, results of operations, or condition (financial or otherwise) of Purchaser, Ralls or Ralls OpCo or its or their respective assets, taken as a whole, or (ii) the ability of Purchaser, Ralls and Ralls OpCo to perform their obligations under this Agreement as and when such performance is required, including each of their obligations under Section 2.2 hereof on the applicable dates set forth therein, other than, in each case, any effect, consequence or result that is reasonably capable of being cured and is cured on or before the Closing Date.

"**Purchaser's Knowledge**" and the correlative terms "known" and "knows," whether or not capitalized, means the knowledge of the following persons: Kevin Zhu, Xiaolin Zhang and Stacy Rowles or any Person having (or having had) the title of officer, director, manager, managing member or the knowledge that the above mentioned would have had, if they had made a careful investigation of any circumstances which would have been investigated by an officer or principal acting in accordance with Prudent Industry Practices. Being named in the immediately preceding sentence shall not give rise to or otherwise result in any personal liability or other obligation of any of the named individuals.

"**Ralls**" has the meaning specified in the introductory paragraph.

"**Ralls Financial Statements**" means, with respect to Ralls and Ralls OpCo, the consolidated balance sheet and statements of operations, owner's equity and cash flows for Ralls and Ralls OpCo, as attached as Schedule 6.5.

"**Ralls OpCo**" has the meaning specified in the introductory paragraph.

"**Ralls OpCo Assets**" means the Assets of Ralls OpCo.

"**Ralls OpCo Membership Interests**" means one hundred percent (100%) of the issued and outstanding membership interests of Ralls OpCo.

"**Real Property**" means, with respect to a Project Company, the real property subject to the Land Contracts.

"**Reviewing Party**" has the meaning specified in Section 2.7(b).

"**Review Period**" has the meaning specified in Section 2.7(b).

"**Security Agreement**" means a security agreement substantially in the form of Exhibit G.

"**Seller**" has the meaning specified in the introductory paragraph.

"**Seller Development Activities**" has the meaning specified in Section 4.5(a).

"**Seller Indemnified Parties**" has the meaning specified in Section 7.2.

"**Seller's Knowledge**" and the correlative terms "known" and "knows," whether or not capitalized, means the knowledge of the following persons: Georgios Angeletos, Markos Katsimis, Alex Karyotakis, Alicia Torre and Todd Haynes or any Person having (or having had) the title of officer, director, manager, managing member or the knowledge that the above mentioned would have had, if they had made a careful investigation of any circumstances which would have been investigated by an officer or principal acting in accordance with Prudent Industry Practices.  Being named in the immediately preceding sentence shall not give rise to or otherwise result in any personal liability or other obligation of any of the named individuals.

"**Seller Material Adverse Effect**" means the effect, consequence or result of any event, act, omission, change, occurrence, fact or other circumstance that is, or in the aggregate with any other events, acts, omissions, changes, occurrences, facts or other circumstances are, materially adverse to, or would reasonably be expected to have a material adverse effect on (or would reasonably be expected to materially impair) (i) the business, operations, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Projects, the Project Companies, their respective Project Assets or the Sites, taken as a whole, (ii) the development, construction, ability to place each of the Projects in service by December 31, 2012, or operation of the Projects, taken as a whole, or (iii) the ability of Seller and the Project Companies to perform their obligations under this Agreement as and when such performance is required, other

than, in each case, any effect, consequence or result that is reasonably capable of being cured and is cured on or before the Closing Date.

"**Seller's Recovered Costs**" has the meaning specified in Section 2.7.

"**Site**" and "**Sites**" have the meaning specified in the Recitals.

"**Subeasement Agreement**" means each Subeasement Agreement, dated on or about December 10, 2010, between Oregon Windfarms, LLC and a Project Company (as further described in Part 2 of Schedule 5.6).

"**Taxes**" has the meaning specified in Section 5.11(b).

"**Termination Date**" has the meaning specified in Section 3.5(a).

"**Transformer Order**" has the meaning Specified in Section 4.2(b)(i).

"**Transmission Owner**" means PacifiCorp or any other owner(s) of a transmission or distribution asset.

"**UCC**" has the meaning specified in Section 3.2(h).

"**Wind Data**" means the wind data described on Schedule 5.19.

      1.2    Rules of Usage.

The rules of usage for this Agreement are as follows:

      (a)    The terms defined above in Section 1.1 have the meanings set forth above for all purposes, and such meanings are equally applicable to both the singular and plural forms of the terms defined.

      (b)    "Include," "includes," and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

      (c)    Any agreement, instrument or Applicable Law defined or referred to means such agreement or instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Law) by succession of comparable successor Applicable Law and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

      (d)    References to a Person are also to its successors and assigns.

      (e)    Any term defined in this Agreement by reference to any agreement or instrument has such meaning whether or not such agreement or instrument is in effect.

(f)     "Hereof," "herein," "hereunder," and comparable terms refer, unless otherwise expressly indicated, to this entire Agreement and not to any particular article, section or other subdivision hereof or attachment hereto. References to the introductory paragraph, Recitals, Articles, Sections, Exhibits and Schedules shall be deemed to be references to such parts of this Agreement. Such references are for convenience only and do not, nor do their titles, affect the interpretation of this Agreement. All references to exhibits, appendices or schedules in any other transaction document are to exhibits, appendices or schedules attached to the relevant transaction documents.

(g)     The word "or" will have the inclusive meaning represented by the phrase "and/or."

(h)     "Shall" and "will" mean "must", and shall and will have equal force and effect and express an obligation.

(i)     Except as otherwise provided, whenever the consent or approval of a Party is specifically required hereunder as to any matter, such consent or approval shall be in writing.

(j)     References to any amount of money shall mean a reference to the amount in United States Dollars.

## ARTICLE 2
## PURCHASE AND SALE

2.1     Purchase of Membership Interests.  On the basis of the representations, warranties and agreements contained herein, and subject to the terms and conditions hereof, Seller hereby agrees to sell, transfer, assign, convey and deliver to Purchaser, and Purchaser hereby agrees to purchase and accept from Seller for the consideration specified in Section 2.2 and on the other terms and conditions provided herein, all right, title and interest in and to the Membership Interests free and clear of all Liens.

2.2     Purchase Price.

(a)     Subject to the terms and conditions of this Agreement, Purchaser shall pay as the Purchase Price to Seller Six Million Dollars (US$6,000,000), payable in the following amounts on the corresponding dates set forth below:

(i)     on the Closing Date, Purchaser shall pay Seller an amount equal to Six Hundred Thousand Dollars (US$600,000) (the **"Initial Payment"**);

(ii)     on May 31, 2012, Purchaser shall pay Seller an amount equal to One Million Two Hundred Thousand Dollars (US$1,200,000) (the **"May 31 Payment"**); and

(iii)     on the earlier of (A) the date on which an aggregate of 36 MW of wind turbine power generation associated with the Projects has been commissioned (the **"36 MW Commissioning Date"**), and (B) December 21, 2012, Purchaser shall pay to Seller an amount equal to Four Million Two Hundred Thousand Dollars (US$4,200,000) (the **"Final Payment"** and, collectively, with the Initial Payment and the May 31 Payment,

the "**Purchase Price**"). For the avoidance of doubt, the Final Payment shall be due and payable by Purchaser on December 21, 2012 if the 36 MW Commissioning Date shall not have occurred.

(b)     The Purchase Price shall be allocated among the Project Assets of the Project Companies as of the Closing Date in accordance with the allocation to be mutually agreed on by the Seller and Purchaser before Closing and otherwise if not provided therein as designated by Seller in accordance with Section 1060 of the Internal Revenue Code, as amended (the "**Code**") and the Treasury regulations thereunder (and any similar provision of other Applicable Law, as appropriate) (the "**Allocation**"). Any subsequent adjustments to the Purchase Price mutually acceptable to the Seller and Purchaser shall be reflected in the Allocation in a manner consistent with Section 1060 of the Code and the Treasury regulations thereunder. For all Tax purposes, the Purchaser and the Seller agree that the transactions contemplated in this Agreement shall be reported in a manner consistent with the terms of this Agreement, including the Allocation, and that none of them will take any position inconsistent therewith in any Tax return, in any refund claim, in any litigation, or otherwise.

2.3     Closing. The closing of the purchase and sale of the Membership Interests as contemplated by this Agreement (the "**Closing**") shall take place on the second (2nd) Business Day after the date of satisfaction or waiver of the conditions set forth in Article 3 at the location agreed by the Parties; provided that Closing shall take place on the date of satisfaction or waiver of the conditions set forth in Article 3 if such satisfaction or waiver occurs within one (1) Business Day prior to March 15, 2012 or within one (1) Business Day prior to either Termination Date. "**Closing Date**" means the date on which the Closing occurs.

2.4     Profit and Loss Allocation. For tax purposes, the books of each Project Company will be closed as of the Closing Date, with all profits and losses of such Project Company through such date allocated to Seller and all profits and losses of such Project Company thereafter allocated to Purchaser.

2.5     Taxes.

(a)     Sales and Transfer Taxes. Purchaser, on the one hand, and Seller, on the other hand, shall share equally all sales, use, transfer, real property transfer, recording, stock transfer and other similar Taxes and fees (not including capital gains, income and other similar Taxes), if any, arising out of or in connection with the sale of the Membership Interests and the consummation of the transactions contemplated by this Agreement. Seller shall file all necessary documentation and tax returns required of it with respect to such Taxes, and shall provide Purchaser with evidence satisfactory to Purchaser that such taxes, if any, have been paid by Seller; provided that Purchaser shall timely provide Seller with all information, documentation and other cooperation reasonably requested by Seller to comply with such filing obligations. Neither Purchaser nor Seller is currently aware of any obligation to pay any such taxes in connection with this Agreement.

(b)     Property Taxes. Purchaser shall reimburse Seller for any ad valorem, property or similar Taxes, imposed on or incurred with respect to a Project Company in respect of a Project Company or Project Assets that are allocable to any taxable period commencing

after the Closing Date or the portion of any other taxable period occurring after the Closing Date (such Taxes to be determined by prorating the Taxes on a daily basis to the applicable taxable period). Seller shall reimburse Purchaser for any ad valorem, property or similar Taxes, imposed on or incurred with respect to a Project Company in respect of a Project Company or Project Assets that are allocable to any taxable period ending on or before the Closing Date or the portion of any other taxable period occurring on or before the Closing Date (such Taxes to be determined by prorating the Taxes on a daily basis to the applicable taxable period).

2.6    Interest. If any payment is not made within five (5) Business Days of the due date hereunder, interest shall accrue on the unpaid amount at the rate of eighteen percent (18%) per annum, or if less, the maximum interest rate allowed under Applicable Law, from the due date until and including the date payment is received. Collection or payment of such interest shall be in addition to Seller's other remedies and shall not waive or excuse the failure to pay on the date due.

2.7    Buyback.

(a)    In addition to all other remedies available to Seller under this Agreement, if Purchaser fails to make timely payments of the Purchase Price under Section 2.2(a) or any other payment obligation pursuant to Section 4.2(a), Seller may, upon ten (10) days' prior written notice to Purchaser, at any time before the earlier of (x) the date Purchaser has paid the Purchase Price in full and (y) January 31, 2013, buy back all (but not less than all) Membership Interests (the "**Buyback Right**") for a payment to Purchaser of an amount equal to (i) all payments made by Purchaser towards the Purchase Price, plus (ii) all funds necessary for the Interconnection Security plus all amounts paid by Purchaser under Section 4.2(a)(i)(x), plus (iii) any and all deposits and progress payments reasonably made by Purchaser in connection with equipment purchases and otherwise for the development and construction of the Projects (such total amount, which for the avoidance of doubt shall not include interest, the "**Buyback Price**"); provided that the Buyback Price shall only be payable after (A) Seller sells or begins to commercially operate the Projects and (B) Seller first recovers any and all deposits and progress payments reasonably made by Seller after exercise of the Buyback Right in connection with equipment purchases and otherwise for the development and construction of the Projects plus interest on such amounts at the rate set forth in Section 2.6 from the date (or dates) incurred (such amount recoverable by Seller, "**Seller's Recovered Costs**"). For the avoidance of doubt, Seller has no obligation to pay the Buyback Price to Purchaser unless and until Seller has fully recovered Seller's Recovered Costs. If Seller notifies Purchaser of its intent to exercise its Buyback Right, the transfer and assignment of the Membership Interests from Purchaser to Seller shall occur on a date selected by Seller which shall be not less than ten (10) days and not more than thirty (30) days following the date of Seller's written notice of the exercise of such Buyback Right. At the closing of the Buyback Right, if any, Purchaser shall represent that all representations and warranties set forth in Article 5 are true in all material respects and Purchaser shall execute assignments transferring the Membership Interests in the form of Exhibit C. Purchaser and Seller agree to cooperate to expeditiously obtain regulatory and other approval of any such transfer, to the extent required by Applicable Law or Contract. Notwithstanding the above, in the event that, after exercising its Buyback Right, Seller recovers the full amount of the Purchase Price (including the May 31 Payment, even if May 31, 2012 has not occurred, and the Final Payment, even if the 36 MW Commissioning Date or December 21, 2012 has not occurred)

and all other payment obligations pursuant to <u>Section 4.2(a)</u>, together with interest thereon pursuant to <u>Section 2.6</u> under a Guarantee Agreement, the Membership Interests (if not sold (whether by sale, merger, or similar transaction) by Seller) shall be transferred back to Purchaser upon payment by Purchaser to Seller of all Seller Recovered Costs.

        (b)      Within thirty (30) days of (i) Seller's exercise of the Buyback Right, Purchaser shall provide to Seller a written notice setting forth Purchaser's determination of the amount of the Buyback Price and a reasonably detailed summary of any information used in making such determination and (ii) the sale of, or commencement of commercial operations of, the Projects by Seller after exercise of the Buyback Right, Seller shall provide to Purchaser a written notice setting forth Seller's determination of the amount of Seller Recovered Costs and a reasonably detailed summary of any information used in making such determination (the Party providing such notice, the "**Notifying Party**" and the Party reviewing such notice, the "**Reviewing Party**"). The Notifying Party's determination as to the foregoing shall be conclusive and binding upon the Parties unless, within thirty (30) days following the Reviewing Party's receipt of such notice (the "**Review Period**"), the Reviewing Party notifies the Notifying Party in writing that it disagrees with Notifying Party's determination. Such notice shall include, to the extent the Reviewing Party is able to make such determination, the Reviewing Party's estimated determination of the Buyback Price or Seller Recovered Costs, as applicable, together with a copy of any information used in making such determination. During the Review Period, and for the duration of any resulting dispute, the Notifying Party shall make available to the Reviewing Party and its accountants and other advisors, upon reasonable advance notice from the Reviewing Party and the applicable parties entering into a customary confidentiality agreement prepared by the Notifying Party and reasonably acceptable to the Reviewing Party, a copy of all books and records reasonably related to calculation of the Buyback Price or Seller Recovered Costs, as applicable. The Parties shall attempt in good faith to reach a resolution of such disagreement. If such disagreement is not resolved within fifteen (15) days after delivery of the Reviewing Party's notice of dispute, the Notifying Party and the Reviewing Party shall jointly request that an independent accounting firm reasonably agreed by the Parties (the "**Auditor**") determine as promptly as practicable the Buyback Price or Seller Recovered Costs, as applicable, and such determination shall be binding upon the Parties unless due to manifest error. The Notifying Party shall make (or cause to be made), as soon as reasonably practicable, all books, records, work papers and backup materials used in determining the applicable amount available to the Auditor and the Reviewing Party. The fees and expenses of the Auditor shall be allocated between the Notifying Party and the Reviewing Party in such manner that (x) the Notifying Party shall be responsible for that portion of the fees and expenses equal to such fees and expenses multiplied by a fraction the numerator of which is the difference between the amount due as determined by the Notifying Party and the amount due as determined by the Auditor and the denominator of which is the difference between the amount due as determined by the Notifying Party and the amount due as determined by the Reviewing Party, and (y) the Reviewing Party shall be responsible for the remainder of such fees and expenses.

        2.8      <u>Advance</u>. Within three (3) Business Days after the execution and delivery of this Agreement, and as a material condition and inducement to Seller's willingness to enter into this Agreement and achieve Closing, Purchaser shall pay to Seller an amount equal to Four Hundred Thousand Dollars (US$400,000), which Seller shall use to provide the advance payments required by the Transmission Owner, or to cover interconnection costs invoiced by

*[handwritten margin note: Purchaser has no access to such information]*

(e)     <u>Permits</u>.  Seller shall have delivered to Purchaser copies of the Permits set forth on Section 1 of <u>Schedule 5.9</u>.

(f)     <u>Third Party Consents</u>.  All authorizations, approvals and consents described in <u>Schedule 5.8</u> under the heading "Third Party Consents to be Obtained by Seller" shall have been received.

(g)     <u>Officers' Certificates</u>.  Seller and each Project Company shall have delivered to Purchaser:

(i)     a certificate, dated the Closing Date and executed by an authorized officer of Seller or such Project Company, as applicable, in substantially the form of <u>Exhibit D</u>, attesting to the matters set forth in <u>Sections 3.2(a)</u> and <u>(b)</u> above; and

(ii)     a certificate, dated the Closing Date and executed by the Secretary or a similar authorized officer of Seller or such Project Company, as applicable, in substantially the form of <u>Exhibit E</u>, certifying that all actions required to be taken on behalf of Seller or such Project Company, as applicable, to authorize the execution, delivery and performance of Seller's or such Project Company's, as applicable, obligations under this Agreement, and the various instruments to be executed and delivered in connection therewith, have been taken and attaching copies of any resolutions, consents or similar documents, in form and substance acceptable to Purchaser, evidencing such authorization.

(h)     <u>UCC Search Reports</u>.  Seller shall have delivered to Purchaser (i) Uniform Commercial Code search reports for all offices in which Uniform Commercial Code ("UCC") financing statements would be filed with respect to the Membership Interests revealing no filings remaining in effect, and (ii) all Project Assets and judgment and tax lien searches in appropriate jurisdictions for Seller and each Project Company, revealing no filings remaining in effect.

(i)     <u>Good Standing Certificate</u>.  Seller shall have delivered to Purchaser certificates from the State of Oregon (dated within five (5) Business Days of the Closing Date) indicating that each Project Company is in good standing in the State of Oregon, as applicable.

(j)     <u>FIRPTA</u>.  Seller shall have delivered to Purchaser a statement that it is not a foreign person in compliance with U.S. Treasury regulations Section 1.1445-2(b)(2).

(k)     <u>Resignation of Managers</u>.  All of the managers of each Project Company shall have resigned effective as of the Closing Date.

(l)     <u>Opinion of Permitting Counsel</u>.  Seller's counsel shall have delivered to Purchaser an opinion reasonably acceptable to Purchaser (i) opining that no public utilities commission permit is required in connection with the development of the Projects and (ii) as to the validity and assignability of the Approval by the Morrow County Planning Commission of the Conditional Use Permit and of the Approval by the Umatilla County Planning Commission of the Land Use Permit, including and subject to customary assumptions, qualifications, factual certificates and limitations.

(m)     No Liabilities.  As of Closing, there shall be no outstanding intercompany loans between Seller and its Affiliates, on the one hand, and any Project Company, on the other.

3.3     Seller and Project Companies Conditions to Closing.  If the following conditions precedent are not satisfied, or waived in writing by Seller and each Project Company on or before the Closing Date, Seller and the Project Companies shall not be obligated to effect the Closing hereunder:

(a)     Representations and Warranties.  Each of the representations and warranties made by Purchaser, Ralls and Ralls OpCo in this Agreement shall be true, accurate and correct in all material respects (or if qualified by materiality, in all respects), on and as of the Closing Date as though made on and as of the Closing Date; provided, however, that any representation or warranty expressly made only as of a specified date need only be true and correct on and as of such specified date.

(b)     Performance.  Purchaser, Ralls and Ralls OpCo shall have performed and complied in all material respects, with the agreements, covenants and obligations required by this Agreement to be so performed or complied with by Purchaser, Ralls or Ralls OpCo, as applicable, at or before the Closing, including all payment obligations set forth in Sections 2.2(a)(i) and 4.2(a).

(c)     No Purchaser Material Adverse Effect.  No Purchaser Material Adverse Effect shall have occurred since the Effective Date; provided that Purchaser may alternatively satisfy the conditions set forth in this Section 3.3(c) by providing additional credit support to Seller, which may include one or more letters of credit, reasonably acceptable to Seller.

(d)     Payment of Advance.  Purchaser shall have paid to Seller the Advance in accordance with Section 2.8.

(e)     Third Party Consents.  All authorizations, approvals and consents described in Schedule 5.8 under the heading "Third Party Consents to be Obtained by Purchaser" shall have been received.

(f)     Officers' Certificates.  Purchaser, Ralls and Ralls OpCo shall have delivered to Seller:

(i)     a certificate, dated the Closing Date and executed by an authorized officer of Purchaser, Ralls or Ralls OpCo, as applicable, in substantially the form of Exhibit D, attesting to the matters set forth in Sections 3.3(a) and 3.3(b) above; and

(g)     a certificate, dated the Closing Date and executed by the Secretary or a similar authorized officer of Purchaser, Ralls or Ralls OpCo, as applicable, in substantially the form of Exhibit E, certifying that all actions required to be taken on behalf of Purchaser, Ralls or Ralls OpCo, as applicable to authorize the execution, delivery and performance of Purchaser's, Ralls' or Ralls OpCo's, as applicable obligations under this Agreement, and the various instruments to be executed and delivered in connection therewith, have been taken and attaching copies of any resolutions, consents or similar documents, in form and substance acceptable to Seller, evidencing such authorization.

(h)     Good Standing Certificate. Each of Purchaser, Ralls and Ralls OpCo shall have delivered to Seller certificates from the State of Delaware (dated within five (5) Business Days of the Closing Date) indicating that such company is in good standing in the State of Delaware.

(i)     Opinion of Permitting Counsel. Purchaser's counsel shall have delivered to Seller an opinion reasonably acceptable to Seller as to the validity and assignability (including upon exercise of the remedies under the Security Agreements) of permits held by Ralls OpCo in connection with the development and operation of the wind energy project (including wind turbines, substation and the balance of plant) operated by Ralls OpCo in Texas, including and subject to customary assumptions, qualifications, factual certificates and limitations.

(j)     Guarantee and Security. Each of the Guarantee Agreements delivered by Ralls and Ralls OpCo concurrent with the execution and delivery of this Agreement shall be in full force and effect, and no Guarantor shall have terminated or rescinded, or notified Seller of its intention to terminate or rescind, any Guarantee Agreement in any manner. Seller shall have received (i) from each of the Project Companies, a duly executed Guarantee Agreement (ii) from Purchaser, a duly executed Security Agreement covering all of the Membership Interests and certificates representing the Membership Interests pledged thereunder, accompanied by instruments of transfer endorsed in blank, shall be in the actual possession of the Seller; (iii) from Ralls, a duly executed Security Agreement covering the Ralls OpCo Assets and the Ralls OpCo Membership Interests and certificates representing the Ralls OpCo Membership Interests pledged thereunder, accompanied by instruments of transfer endorsed in blank, shall be in the actual possession of the Seller and (iv) from Ralls OpCo, a duly executed Security Agreement securing the Ralls OpCo Assets.

(k)     UCC Financing Statements. Purchaser shall have delivered to Seller (A) appropriately completed UCC financing statements (Form UCC-1), naming Purchaser, Ralls, Ralls OpCo and each of the Project Companies, as applicable, as debtor and Seller as secured party, in form appropriate for filing under the UCC for each jurisdiction as may be necessary to perfect the security interests purported to be created by the Security Agreements described in Section 3.3(j), covering the applicable Collateral, (B) certified copies of UCC search reports, or equivalent reports, listing all effective financing statements that name any of Purchaser, Ralls and Ralls OpCo as debtor and that are filed in the jurisdictions referred to in clause (A), together with copies of such financing statements (none of which shall cover the Collateral, except to the extent disclosed on Schedule 4.1(c)), (C) appropriately completed filings of, or with respect to, the Security Agreements as may be necessary to perfect the security interests purported to be created by the Security Agreements, and (D) evidence reasonably satisfactory to Seller that all other actions necessary to perfect and protect the security interests purported to be created by the Security Agreements have been or will be taken on the Closing Date

(l)     REC Transfer Agreement. Each of the Project Companies and Purchaser shall have executed and delivered to Seller REC transfer agreements substantially in the form of Exhibit H.

(m)     Warranty and Services Agreement. Each of Ralls and Ralls OpCo shall have entered into a warranty and operation and maintenance services agreement in connection

with the wind energy project (including wind turbines, substation and the balance of plant) operated by Ralls OpCo in Texas, on arm's length commercial terms substantially similar to the terms set forth in the term sheet described in <u>Section 4.11(a)</u> and in form and substance reasonably acceptable to Seller.

(n)     <u>Due Diligence</u>. Purchaser shall have delivered to Seller all Diligence Materials and other information requested by Seller pursuant to <u>Section 4.8</u> and Seller shall have either (i) certified the satisfactory completion of due diligence in accordance with <u>Section 4.8</u> or (ii) received from Purchaser additional credit support, which may include one or more letters of credit, reasonably acceptable to Seller.

3.4     <u>Satisfaction of Conditions</u>. After the Effective Date and until the Closing Date or the earlier termination of this Agreement pursuant to <u>Section 3.5</u>, each Party shall take such commercially reasonable steps as are necessary and shall proceed in good faith, and in a timely manner and consistent with such commercially reasonable steps, to satisfy each condition precedent to be satisfied by it.

3.5     <u>Termination</u>. This Agreement may be terminated prior to the Closing as follows:

(a)     by Seller if the Advance is not received by Seller within three (3) Business Days of the Effective Date;

(b)     by either Seller or Purchaser in the event that (i) the Parties fail to reasonably agree on the terms of a warranty and services agreement, as required under <u>Section 4.11</u> or (ii) a Party reasonably rejects to an updated schedule in accordance with <u>Section 4.11</u>;

(c)     at the election of (i) Seller, on or after March 15, 2012 or (ii) Purchaser, on or after April 1, 2012, (each such date, a "**Termination Date**"), if the Closing shall not have occurred by the close of business on such date; provided that the terminating party is not in breach in any material respect of any of its covenants hereunder;

(d)     by mutual written consent of Purchaser and Seller.

3.6     Procedure Upon Termination.  In the event of termination of this Agreement by either Purchaser or Seller, or both, pursuant to Section 3.5, written notice thereof shall be given to the other Parties, and this Agreement shall terminate, and the purchase of the Membership Interests hereunder shall be abandoned, without further action by any Party.

3.7     Effect of Termination.  In the event that this Agreement is validly terminated in accordance with Section 3.5, then each Party shall be relieved of their duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the terminating Party; provided that no such termination shall relieve any Party from liability for any willful or intentional breach of this Agreement; provided further that Section 3.7, Section 3.8, Section 4.9, Article 8, and the last sentence of Sections 2.8, 4.2(a)(i) and 4.2(b)(i) shall remain in full force and effect and survive any termination of this Agreement.

3.8     Subsequent Sale of the Projects.  If (a) Closing does not occur for any reason other than a breach by Purchaser, Ralls or Ralls OpCo of any of its obligations under this Agreement and (b) Seller sells any of the Projects, the Project Companies, or all or substantially all of any of the Project Assets held by a Project Company to a third party other than an Affiliate of Seller (which Affiliate shall thereafter be subject to this Section 3.8), whether by sale, merger, or similar transaction, prior to December 31, 2012, then Seller or such Affiliate will refund to Purchaser, immediately upon closing of any such transaction, the Advance and, if Seller assumes the Transformer Order as set forth in Section 4.2(b)(i), any deposits and any progress payments made in connection with the Transformer Order.

**ARTICLE 4**
**COVENANTS**

4.1     Purchaser Covenants.  Purchaser covenants and agrees that until the total Purchase Price has been paid in full:

(a)     Purchaser will cause each of the Project Companies to operate their respective business in the ordinary course consistent with past practices and to timely pay all invoices due and owing by such Project Company (other than those invoices being contested in good faith and for which adequate reserves have been established).

(b)     Other than those Liabilities that are incurred in the ordinary course of developing and constructing the Projects, Purchaser will not permit the Project Companies, without the written consent of Seller, to incur any additional material Liability.  For purposes of this Section 4.1(b), a "material Liability" shall include any Liability in excess of One Hundred Thousand Dollars (US$100,000).

(c)     Purchaser will not, and will not permit the Project Companies to, transfer any of the Membership Interests or the Project Assets, and Ralls and Ralls OpCo will not transfer any of the Ralls OpCo Membership Interests or the Ralls OpCo Assets (except, subject to Seller's prior consent, which shall not be unreasonably withheld, delayed, or conditioned, to its wholly-owned subsidiaries; provided that any such transferee shall enter into guarantees and security agreements in the same form as the Guarantee Agreements and the Security Agreement

and agree to be subject to covenants similar to those of Purchaser, Ralls and Ralls OpCo set forth herein relating to restrictions on transfers and encumbrances and post-Closing operations, and agreeing to pledge 100% of the equity and assets of such transferee to Seller), or permit any Liens against any of the Membership Interests, the Project Assets, the Ralls OpCo Membership Interests or the Ralls OpCo Assets, other than Permitted Liens. Seller acknowledges that the Ralls OpCo Assets are subject to the outstanding Liens set forth on Schedule 4.1(c).

(d)     With respect to any contract to be entered into by any or all of Purchaser, any Project Company, Ralls, Ralls OpCo or any of their respective Affiliates in connection with development of the Projects with (i) any turbine supplier, engineer, contractor, or other vendor that is an Affiliate of Purchaser, any Project Company, Ralls, Ralls OpCo or any of their respective Affiliates, Purchaser will require that any such contract shall be terminable by the Project Companies in connection with Seller's buyback option described in Section 2.7 with no penalty, notice period or other materially adverse consequences or other conditions to any of the Project Companies and (ii) any other turbine supplier, engineer, contractor, or other vendor, Purchaser will use commercially reasonable efforts to require that any such contract shall be terminable by the Project Companies in connection with Seller's buyback option described in Section 2.7 with no penalty, notice period or other materially adverse consequences or other conditions to any of the Project Companies; provided that upon termination of any agreement for the purchase of turbines by the Project Companies, such turbines will, at Seller's sole option, revert to Purchaser at no cost to Seller.

(e)     Purchaser will provide written notice to Seller of the achievement of the 36 MW Commissioning Date within one (1) Business Day of such achievement.

(f)     Purchaser, Ralls and Ralls OpCo will not take any action that would reasonably be expected to, individually or in the aggregate, have a material adverse effect on (or would reasonably be expected to materially impair) (i) the business, operations, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Projects, the Project Companies, their respective Project Assets or the Sites as they existed at Closing, taken as a whole, (ii) the development, construction, ability to place each of the Projects in service by December 31, 2012, or operation of the Projects as they existed at Closing, taken as a whole, or (iii) the ability of Purchaser, Ralls, Ralls OpCo and the Project Companies to perform their obligations under this Agreement, each of the REC Transfer Agreements, each of the Subeasement Agreements and each of the Guarantee Agreements as and when such performance is required, including each of their obligations under Section 2.2 hereof on the applicable dates set forth therein.

(g)     Purchaser will provide assurances as may be required by the firms providing the preconstruction activities described in Section 2.8.

4.2     Other Payments.

(a)     Payments to or Relating to the Transmission Owner.

(i)     On or before March 15, 2012, Purchaser will (x) provide the remaining security required by the Transmission Owner in connection with the interconnection of

the Projects to the transmission grid (which security shall replace any security provided by Seller in the event that the deadline for providing the remaining security to PacifiCorp necessary for the interconnection of the Projects to the transmission grid is not deferred to a date later than March 15, 2012), and (y) pay to Seller any financing, commitment, letter of credit, or similar fees charged by one or more lenders to Seller in connection with providing any such security in an amount not to exceed one percent (1.0%) of the amount of the financing or security provided by Seller to the Transmission Owner. Seller shall have no obligation to repay the amounts set forth in this Section 4.2(a)(i) to Purchaser.

(ii)     On the Closing Date, Purchaser shall pay to Seller an amount equal to Five Hundred Thousand Dollars (US$500,000), which shall constitute a refund of the Interconnection Security.

(b)     Commercial Payments.

(i)     No later than March 5, 2012, Purchaser shall deliver a purchase order, along with all deposits and other progress payments required thereunder, to a supplier of the substation transformer required for the Projects (the **"Transformer Order"**). The selection of the supplier and the specifications of the substation transformer shall be subject to the prior approval of Seller, which shall not be unreasonably withheld, conditioned, or delayed. If Purchaser has allowed Seller at least five (5) Business Days to provide such approval after written notification of the transformer specifications by Purchaser to Seller, and Seller has failed to provide its approval or rejection prior to March 5, 2012, Purchaser shall be permitted to deliver the Transformer Order to a supplier at Purchaser's discretion without prior approval from Seller. Such Transformer Order shall provide that, if Closing has not occurred by March 15, 2012, Seller may assume the Transformer Order at its option until April 30, 2012. Amounts paid by Purchaser in connection with the Transformer Order shall not be repaid to Purchaser except in accordance with Section 3.8.

(ii)     Upon execution of this Agreement, Purchaser will undertake such studies as are necessary to change the specified turbine supplier and turbines under the Interconnection Agreements and the Power Purchaser Agreements. Subject to Section 2.8, Purchaser will pay any related fees and expenses, and provide any other assurances as may be required in connection with obtaining such studies.

(c)     Purchaser will cause each Project Company to enter into a turnkey construction contract in form and substance reasonably satisfactory to Seller and make any deposits or notice to proceed payments thereunder on or before March 15, 2012.

4.3     Cooperation. From and after the Effective Date until the Closing Date, Seller shall continue to reasonably cooperate with Purchaser to assist Purchaser's evaluation and development of the Projects; provided, however, that Seller shall not, without the prior written consent of Purchaser:

(a)     incur any material Liability with respect to the Project Companies or the Projects (for purposes of this Section 4.3(a), a "material Liability" shall include any Liability in excess of One Hundred Thousand Dollars (US$100,000)).;

(b)     mortgage, pledge or subject to any Lien any of the Project Assets (other than any Lien that will be discharged in full prior to the Closing);

(c)     waive any rights of material value with respect to the Project Companies or the Projects or terminate, or amend, any Contract, Land Contract, or Permit to which any of the Project Companies or Projects are bound or affected;

(d)     sell, transfer, abandon, purchase or otherwise acquire or dispose of any Project Assets;

(e)     enter into any material Contracts or the like, or respond to any requests for proposals, with respect to the Project or that would bind Purchaser or any Project Asset;

(f)     consent to or acquiesce in the entry of any judgment, order, decree or injunction by any court or Governmental Authority, or file, settle or agree to settle any litigation, with respect to any Project Company or Project; or

(g)     commit or agree to do in the future any of the foregoing.

Notwithstanding the foregoing, Purchaser hereby consents to Seller undertaking the activities described in Section 2.8.

4.4     Correspondence Regarding Project Assets. From and after the Effective Date, Seller shall promptly advise Purchaser of any notices, demands, claims, requests for material information or other material communications received relating to or in connection with the Project Assets and shall consult with Purchaser before responding thereto.

4.5     Assistance by Seller.

(a)     Seller, at the direction of Purchaser and subject to reasonable reimbursement from Purchaser to Seller pursuant to a development agreement to be reasonably agreed by the Parties, shall assist in finishing the development activities for the Projects after Closing, including assistance with land leasing, obtaining final Permits, obtaining easements for access to grid interconnection, interconnection arrangements, and such other activities as may be reasonably requested by Purchaser (the "**Seller Development Activities**"). Seller agrees to conduct all Seller Development Activities on behalf of Purchaser on a transparent basis, and any and all material commercial decisions with respect to the Project or the Seller Development Activities will be made by Purchaser. For the avoidance of doubt, Seller's obligations under this Section 4.5(a) are limited to assistance, and, except as otherwise expressly set forth in Sections

4.5(b) and 4.5(c), Seller shall not be responsible for any failure by Seller, Purchaser or any Project Company to obtain any land leasing documents, final Permits, easements or interconnection arrangements.

(b)     Within One Hundred and Twenty (120) days of Closing, Seller shall, with assistance from and at the expense of Purchaser, (i) complete the corrective work set forth in Schedule 4.5(b)(i) and (ii) obtain the amendments to Land Contracts set forth in Schedule 4.5(b)(ii).

(c)     Within four (4) Business Days of the Effective Date, Seller shall, with assistance from and at the expense of Purchaser, cause the Project Companies to obtain a pro forma ALTA leasehold policy or policies of title insurance, covering all the Land Contracts comprising the Project, subject only to encumbrances that will not reasonably be expected to prevent or materially impair the Project Companies' ability to develop, construct and operate the Project, and including such endorsements as Purchaser may require (which shall include endorsements relating to mineral rights). Upon receipt of such pro forma leasehold policy or policies, Purchaser shall have four (4) Business Days to provide written notice of its reasonable acceptance or rejection of such pro forma leasehold policy or policies; provided that failure to provide such notice shall constitute acceptance. In the event Purchaser shall reject such pro forma leasehold policy or policies, Purchaser shall be entitled to terminate this Agreement within two (2) Business Days of any such rejection unless such rejection is due to Purchaser's rejection of, or unwillingness to purchase, customary endorsements on commercially reasonable terms. Following the Effective Date, Purchaser may obtain ALTA leasehold policy or policies of title insurance that is consistent with such proforma policies.

4.6     Exclusivity. For the period from the Effective Date through the earlier of the Closing Date or a termination of this Agreement pursuant to Section 3.5, Seller agrees that it shall not, directly or indirectly, enter into any binding agreement with respect to the sale of any of the Projects or Project Companies to a third party, other than a confidentiality agreement. *poor*

4.7     Development of Projects between the Effective Date and the Closing Date. *drafting* Except as otherwise provided herein, the Parties acknowledge and agree that on and after the Effective Date and until the earlier of the Closing Date or a termination of this Agreement pursuant to Section 3.5, Purchaser shall have the sole and exclusive right to direct the development of the Projects and to take any other activities related to the development of the Projects, including preparing the Projects for commencement of financing, construction, and operation and any marketing of the Projects.

4.8     Due Diligence. From and after the Effective Date and until the Closing, the Purchaser, Ralls and Ralls OpCo will give to Seller and its authorized representatives reasonable access to the books and records, contracts, commitments, facilities and accountants of Purchaser, Ralls and Ralls OpCo, and will furnish and make available to Seller and its authorized representatives all such documents and copies of documents and all such additional financial and operating data and other information pertaining to the creditworthiness of Purchaser, Ralls and Ralls OpCo, including but not limited to the information set forth on Schedule 4.8 (such information, the "Diligence Materials"). None of the Diligence Materials or other information provided by Purchaser, Ralls or Ralls OpCo to Seller and its authorized representatives in

connection with Seller's due diligence investigation pertaining to the creditworthiness of Purchaser, Ralls and Ralls OpCo will contain any untrue or incorrect statement of fact, or omit to state any fact necessary to make the information not misleading. Purchaser shall provide all Diligence Materials and provide written certification to Seller that all Diligence Materials have been provided within three (3) Business Days after the Effective Date and, upon receipt of such certification, Seller shall have ten (10) days to review the Diligence Materials and provide written certification to Purchaser that the Diligence Materials are or are not, as the case may be, satisfactory to it in its sole discretion. In the event that Seller is not satisfied with the Diligence Materials, Purchaser shall either provide (a) additional information reasonably requested by Seller and reasonably satisfactory to Seller (and Seller shall as soon as reasonably practicable provide written certification to Purchaser that such information is or is not, as the case may be, satisfactory to it in its sole discretion) or (b) additional credit support to Seller, which may include one or more letters of credit, reasonably acceptable to Seller.

    4.9 <u>Confidentiality Agreement</u>. Each of Seller and Purchaser acknowledges that Seller and Ralls executed a non-disclosure agreement dated February 2012, (the **"Confidentiality Agreement"**), which will continue in full force and effect in accordance with its terms and which shall apply to Ralls OpCo and Purchaser.

    4.10 <u>REC Transfer Agreements and Subeasement Agreements</u>. Each of the Project Companies will perform, and each of Purchaser and Ralls will cause the Project Companies to perform, all obligations under the REC Transfer Agreement and each of the Subeasement Agreements.

    4.11 <u>Completion of Exhibits and Schedules</u>. (a) The Parties (including Seller) shall reasonably agree on a term sheet for the warranty and services agreement described in <u>Section 3.3(m)</u> within three (3) Business Days of the Effective Date and (b) each of Purchaser and Seller shall update any of the schedules to this Agreement, as necessary, and shall deliver such updated schedules to the other Party within three (3) Business Days of the Effective Date. Upon receipt of the updated schedules described in clause (b) above, the other Party shall have two (2) Business Days to provide written notice of its reasonable acceptance or rejection of such updated schedules; <u>provided</u> that failure to provide such notice shall constitute acceptance. Subject to <u>Section 3.5(b)</u>, in the event that Purchaser or Seller, as applicable, rejects an updated schedule, the other Party shall promptly address the rejecting Party's concerns and the Parties shall work in good faith to agree on a mutually acceptable schedule as soon as reasonably practicable and, in any event, on or before Closing.

<div align="center">

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES OF SELLER AND THE PROJECT COMPANIES**

</div>

    As an inducement to Purchaser to execute this Agreement, Seller and, with respect to each individual Project, the applicable Project Company, represents and warrants the truth and accuracy of each of the matters set forth in this <u>Article 5</u>, as follows.

Transmission Owner on or before March 15, 2012, or to finance the preconstruction activities described immediately below (the "**Advance**"). For purposes of the preceding sentence, "preconstruction activities" include commencing (but not necessarily completing) on behalf of and with the involvement of Purchaser such preconstruction activities as necessary for the Projects to be placed in service on or before December 31, 2012, which may include, without limitation, (a) changing the turbine supplier under the relevant Project Company agreements, (b) coordinating electrical design and (c) obtaining Permits. Seller shall pay the fees and expenses relating to such preconstruction activities up to an amount equal to the lesser of (x) to the extent the Advance is not paid in full to Transmission Owner, the excess amount of such Advance and (b) One Hundred and Fifty Thousand Dollars (US$150,000). The Advance shall not be repaid to Purchaser except in accordance with Section 3.8.

## ARTICLE 3
## CLOSING CONDITIONS

3.1    Closing Conditions. Each of the occurrence of the Closing Date, the obligations of Purchaser to make any payments toward the Purchase Price, and the obligations of Seller to transfer the Membership Interests, is subject to the satisfaction or waiver in accordance with the terms hereof of the following conditions, as applicable:

(a)    Orders and Laws; Litigation. There shall not be in effect on the Closing Date any order of a Governmental Authority or Applicable Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement.

3.2    Purchaser Conditions to Closing. If the following conditions precedent are not satisfied, or waived in writing by Purchaser on or before the Closing Date, Purchaser shall not be obligated to effect the Closing hereunder:

(a)    Representations and Warranties. Each of the representations and warranties made by Seller and the Project Companies in this Agreement shall be true, accurate and correct in all material respects (or if qualified by materiality, in all respects), on and as of the Closing Date as though made on and as of the Closing Date; provided, however, that any representation or warranty expressly made only as of a specified date need only be true and correct on and as of such specified date.

(b)    Performance. Seller and the Project Companies shall have each performed and complied in all material respects, with the agreements, covenants and obligations required by this Agreement to be so performed or complied with by Seller or such Project Company, as applicable, at or before the Closing.

(c)    No Seller Material Adverse Effect. No Seller Material Adverse Effect shall have occurred since the Effective Date.

(d)    Assignment of Interests. Seller shall have executed and delivered to Purchaser an Assignment of Membership Interests in substantially the form of Exhibit C transferring the Membership Interests free and clear of all Liens, which Assignment of Membership Interests shall be effective upon Closing.

5.1     Organization, Qualification and Corporate Power.

(a)     It is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and is duly licensed or qualified to transact business in the State of Delaware. It is duly qualified or licensed to do business in each other jurisdiction where the actions required to be performed by it under this Agreement make such qualification or licensing necessary. It has full corporate power and authority to own the Membership Interests, and to execute, deliver and perform its obligations under this Agreement and any other agreements, documents and instruments delivered in connection with the Closing hereunder and it has undertaken all such actions and it has not taken any action which constitutes a default under or results in any default in any of its Charter Documents.

(b)     Each Project Company is a wholly-owned subsidiary of Seller and is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Oregon and is duly licensed or qualified to transact business in the State of Oregon. Each Project Company is duly qualified or licensed to do business in each other jurisdiction where the actions required to be performed by it under this Agreement make such qualification or licensing necessary. Each Project Company has full limited liability company power and authority to own its Project Assets, and to execute, deliver and perform its obligations under this Agreement and any other agreements, documents and instruments delivered in connection with the Closing hereunder and no Project Company has taken any action which constitutes a default under or results in any default in any of its Charter Documents.

5.2     Authorization; No Conflict.

(a)     The execution, delivery and performance by Seller of this Agreement and any other agreements, documents and instruments delivered in connection herewith as well as the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller necessary to authorize the execution, delivery and performance by Seller of this Agreement or the consummation of the transactions contemplated hereby.

(b)     The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (i) violate any law or regulation applicable to Seller or any Project Company or any order of any court or Governmental Authority having jurisdiction over Seller or any Project Company, (ii) violate or conflict with, or constitute a default (or an event with due notice or lapse of time or both which would become a default) under, require any consent under, or give to others any right of termination, amendment, acceleration, suspension, revocation or cancellation, or result in a Lien on any of the Membership Interests or on any assets of the Project Companies pursuant to any note, bond, mortgage, contract, agreement, lease, license, permit, franchise or other arrangement to which any Project Company is a party or by which any of such assets or properties are bound or (iii) violate or conflict with or result in a breach of any provision of Seller's or any Project Company's Charter Documents.

5.3     Validity. This Agreement has been duly executed and delivered by Seller and the Project Companies and, assuming the due authorization, execution and delivery by

Purchaser, Ralls and Ralls OpCo of this Agreement constitutes the valid and binding obligation of Seller and the Project Companies, enforceable against each in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereinafter in effect relating to creditors rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

    5.4    Membership Interests.

    (a)    the Seller is the sole owner, legally, beneficially and of record, of the Membership Interests all as listed on Schedule 5.4 and such Membership Interests represent 100% of the total outstanding equity interest of each of the Project Companies;

    (i)    the Membership Interests are validly issued and outstanding, fully paid and nonassessable, and free and clear of any Liens and none of the Membership Interests was ever issued in violation of any preemptive right or other right obligating Seller or any Project Company from issuing or selling any membership interests;

    (ii)    except as set forth on Schedule 5.4, no Person has any right, title, interest or claim (including any option) against Seller in or to any Project Company, the assets to any Project Company or any Project; and

    (iii)    all rights, title and interest in the Membership Interests shall be transferred to Purchaser free and clear of any Liens.

    (b)    None of the following exist:

    (i)    any authorized or outstanding subscription, warrant, option, convertible security, or other right (contingent or other) to purchase or otherwise acquire from Seller or any Project Company, equity securities or membership interests of such Project Company;

    (ii)    any commitment on the part of Seller or any Project Company to issue shares, subscriptions, warrants, options, convertible securities, membership interests or other such rights or interests;

    (iii)    any reservation for issuance for any purpose of any equity securities or membership interests of any Project Company;

    (iv)    any obligation (contingent or other) on the part of any Project Company to purchase, redeem or otherwise acquire any of its membership interests or equity securities;

    (v)    any voting trust or agreement, members' agreement, pledge agreement, buy-sell agreement, right of first refusal, preemptive right or proxy relating to any securities or interests of any Project Company or to which Seller or such Project Company is a party; or

(vi)     any contractual restrictions on the transfer of (1) Seller's membership interests in a Project Company or (2) a Project Company's membership interests in a Project.

5.5     Assets, Liabilities and Obligations.

(a)     All Project Assets are free and clear of any and all Liens and other rights of third parties other than Permitted Liens. Other than the Project Assets, there are no other Assets that are held by Seller or any Affiliate of Seller relating to, associated with or concerning the Projects or the Sites, including any assets that are necessary for the design, development, construction, ownership, operation, or maintenance of one or more Projects or one or more Sites. No other Persons own or have any ownership or equity interest in, including a right of first refusal or a right of first offer, or have any Lien on any Assets relating to, associated with or concerning one or more Projects or one or more Sites.

(b)     Attached as Schedule 5.5(b) is a true and complete list of all Contracts in existence with respect to each Project.

(c)     No Project Company is in default under any Contract, and, to Seller's Knowledge, no other parties are in breach or default under any Contract nor are there any potential defaults under any Contract.

(d)     Seller has provided Purchaser with copies of all such Contracts as in effect as of the date hereof (including all amendments or modifications thereof).

(e)     Each Contract is fully effective and enforceable by its terms and no counterparties to any Contract in existence on the Closing Date have any claims, defenses, offsets, any right of termination, amendment, acceleration, suspension, revocation or cancellation, or result in a Lien under such Contract.

5.6     Land Contracts and Real Property.

(a)     Schedule 5.6 contains a true, accurate and complete list of all Land Contracts including without limitation all grant easements and transmission easements between landowners and the Project Companies as listed in Schedule 5.6, for each Project Company (including all amendments and modifications of those Land Contracts). The Land Contracts:

(i)     comprise all of the real property interests and rights reasonably necessary or appropriate in connection with the Project to which it relates and provide sufficient real property interests and rights to enable each Project to be located as currently contemplated as set forth on Exhibit A-2; and

(ii)     provide legal and physical ingress and egress rights to and from a public right-of-way for any reasonable purpose in connection with the construction, ownership, operation and maintenance of the Project.

(b)     Each Seller has delivered to Purchaser correct and complete copies of each Land Contract in existence on the Closing Date (including all amendments and modifications of those Land Contracts) and with respect thereto:

(i)     each Land Contract in existence on the Closing Date is legal, valid, binding and in full force and effect; and

(ii)    all rent and royalties pursuant to the Land Contracts in existence on the Closing Date have been properly calculated and paid and such Seller is not in breach or default under any Land Contract, and to Seller's Knowledge, no other party to any Land Contract in existence on the Closing Date is in breach or default, and to Seller's Knowledge, no event has occurred that, with notice or lapse of time and without a cure being completed, would constitute a breach or default or permit termination, or modification thereof, or acceleration thereunder.

(c)     Seller's interest in each Land Contract is free and clear of all Liens other than Permitted Liens. There are no leases, subleases, licenses, concessions or any other contracts, options or rights of first refusal or agreement granting to any Person other than the respective Project Company any right to the possession, use, occupancy or enjoyment of any of the Real Property or any portion thereof, except as to matters of record disclosed in the applicable title commitments or survey and other matters, if any, disclosed in writing to Purchaser prior to the Effective Date. No real property is subject to any pending or, to Seller's Knowledge, threatened condemnation proceedings by any Governmental Authority.

(d)     There are no zoning or other land use proceedings, either instituted or, to Seller's Knowledge, planned to be instituted that would detrimentally affect the use and operation of the real property interests provided by the Land Contracts in connection with the Projects;

(e)     No disputes, claims, or litigation exist, or, to Seller's Knowledge, threatened, asserting that any Land Contract is unenforceable or violates any other agreement, and to Seller's Knowledge, no Land Contract is the subject of any bankruptcy or foreclosure proceeding;

(f)     Neither Seller nor any Project Company has received notice of any condemnation proceeding, moratorium, or eminent domain proceeding pending or threatened against any part of the real property that is covered by such Land Contracts; and

(g)     Except as set forth in the Land Contracts, there are no rents, royalties, fees or other amounts payable or receivable by the Project Companies in connection with real property required for the Project.

5.7     Litigation; Compliance with Law; Legislation; No Condemnation.

(a)     There is no action, suit, claim or proceeding (including any arbitration proceeding) pending, or, to Seller's Knowledge, threatened, nor is there any investigation pending or, to Seller's Knowledge, threatened, against any Project Company, at law or in equity, or before or by any Governmental Authority, and neither Seller nor such Project Company has

received any notices respecting the threat or existence of any such proceeding. No Project Company is in default (and to Seller's Knowledge, no event exists that with due notice or passage of time, or both, would constitute a default) with respect to any order, writ, injunction or decree known to or served upon such entity of any Governmental Authority.

(b)    Each Project Company is in compliance in all material respects with all Applicable Laws relating to its business, including with respect to the Site, the Project, and the Project Assets.

(c)    To Seller's Knowledge, no legislation or regulation has been publicly proposed by any Oregon state or local Governmental Authority which, if enacted or promulgated is reasonably likely to have a material adverse effect on the ability of Purchaser to develop one or more of the Projects.

(d)    No condemnation proceeding or moratorium is pending, or to Seller's Knowledge, threatened against any Project Company or any Project.

5.8    Consents and Approvals. Except as set forth on Schedule 5.8, no registration or filing with, or consent or approval of or other action by, any Governmental Authority or any other Person is or will be necessary for the valid execution, delivery and performance by Seller of this Agreement or the consummation of the transactions contemplated hereby.

5.9    Permits.

(a)    Except as indicated on Schedule 5.9, Seller (or Project Companies, as the case may be) has not applied for or obtained any other governmental approvals required to be obtained for the construction and operation of each Project and the sale of electricity therefrom. All such government approvals listed in Section 1 of Schedule 5.9 are currently valid and in full force and effect.

(b)    Except as indicated on Schedule 5.9, no proceeding is pending or, to Seller's Knowledge, threatened, to revoke, amend or limit any Permit relating to a Project. Neither Seller nor any Project Company has received written notice from any Governmental Authority indicating that any Permit application relating to a Project filed by Seller or by or on behalf of such Project Company will fail to be granted in a timely manner or, if granted, will contain conditions which would reasonably be expected to have or result in a material adverse effect on the transactions contemplated by this Agreement.

(c)    Except as indicated on Schedule 5.8, the sale of the Membership Interests under this Agreement and the consummation of the transactions contemplated hereby will not result in a termination, revocation, suspension or any adverse modification of any Permit relating to a Project or trigger a requirement that any notice be given to any Governmental Authority in order to maintain the validity of any Permit relating to a Project.

(d)    To Seller's Knowledge, the Permits set forth in Sections 1 and 2 of Schedule 5.9 constitute all Permits necessary under Applicable Law as in effect on the Effective

NYDOCS02/955720.9                                        28

Date for the successful and timely development of the Projects and there is no currently existing event or circumstance that would reasonably be expected to cause any Permit that is necessary to the development of the Project to not be obtained on reasonable terms and conditions when such Permit would be needed.

5.10    No Employees; No Benefit Plans.  No Project Company has any employees or maintains or contributes to, or has any direct or indirect liability with, any employee benefit plan subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended.  No Project Company owes any sums under any services agreements nor to the Seller's Knowledge, can any Person make a claim for employment or rights for payment of any kind as an employee thereunder as a result of such service agreements.

5.11    Tax Matters.

(a)    All tax returns required to be filed by or on behalf of each Project Company have been filed, such tax returns are true, accurate and correct and all taxes required to be shown on such returns or otherwise due or payable have been paid.  There are no Tax Liens on any Membership Interests or Project Assets, except with respect to Taxes that are not yet due and payable.

(b)    Seller has not, on behalf of any Project Company, waived or extended any statute of limitations for any foreign, federal, state, county or local income, sales and use, value-added, alternative, add-on or minimum, excise, franchise, property, payroll, employment, or similar tax or charge imposed by any Governmental Authority ("**Taxes**") paid or payable by such Project Company.  No Person has made a claim for indemnification for Taxes under any agreement by the Project Company.  No Project Company is a party to any pending action by any Governmental Authority for the assessment or collection of any Taxes, and no notice of any such assessment or collection has been received by or communicated in writing to any Project Company or Seller on behalf of a Project Company and to the Seller's Knowledge, no such notices been threatened.

(c)    No Project Company is a party to a tax allocation or tax sharing agreement or arrangement.

(d)    No Project Company has elected to be characterized as an association taxable as a corporation for United States federal income tax purposes.

(e)    The Project Companies are disregarded as separate entities for federal and Oregon income tax purposes.

(f)    There are no outstanding requests, agreements, consents or waivers to extend the statute of limitations applicable to the assessment of any Taxes or any deficiencies against either Seller or any Project Company or in respect to the Projects.

5.12    Books and Records.  True, accurate and correct copies of the Books and Records of each Project Company have been provided to Purchaser.  The records and minute books, or equivalent records and documents, of each Project Company have been kept and maintained in all material respects as required by Applicable Law, and the Books and Records

contain true, accurate, complete and correct copies of the Charter Documents, all corporate resolutions and other similar records of the Project Company through the Closing Date.

    5.13   Environmental Matters.

    (a)   Each Project Company and Seller is and at all times has been in compliance in all material respects with all applicable Environmental Laws with respect to its Project and its Project Assets. None of any Project Company nor Seller has received any written request for information from any Governmental Authority, nor been notified in writing from any Governmental Authority that it is a potentially responsible party under any Environmental Law with respect to the Real Property. Each Project Company and Seller, as applicable, has provided all information requested by any Governmental Authority to the extent providing such information is reasonably necessary for such Governmental Authority to determine its jurisdiction over the Projects.

    (b)   Neither the Seller nor any Project Company has entered into or agreed to any consent decree or order, and is subject to any outstanding judgment, decree, or judicial order relating to compliance with any Environmental Law or to the investigation or cleanup of Hazardous Materials under any Environmental Law, in either case with respect to the Real Property or otherwise.

    (c)   There are no claims pending or, to the Seller's Knowledge, threatened against any Project Company or Seller before any court or Governmental Authority under any Environmental Law with respect to the Real Property or the Site.

    (d)   Neither the Seller nor any Project Company has released any Hazardous Material at any part of the Site or on any other Real Property Interest. To the Seller's Knowledge, no Person has released any Hazardous Material at any part of any Site or at any other Real Property.

    (e)   To Seller's Knowledge, no environmental condition exists at any Site that would adversely affect the Purchaser's or a Project Company's ability to develop, construct, or operate any Project or any portion thereof.

    (f)   No Governmental Authority has provided any written notification to any Project Company or to Seller that indicates that one or more Projects is (i) in violation of any Environmental Law or a cultural, historic or archaeological resources law or (ii) likely to be in violation of any Environmental Law or a cultural, historic or archaeological resources law during construction or operation of any of the Projects as currently anticipated by Seller to be constructed or operated.

5.14    No Liability. Except for intercompany loans, which will be canceled or otherwise extinguished on or prior to the Closing Date, the Project Companies have no liabilities.

5.15    No Seller Material Adverse Effect. Since December 31, 2011, there has been no event, act, omission, change, occurrence, fact or other circumstance that has had, or in the aggregate with any other events, acts, omissions, changes, occurrences, facts or other circumstances that would reasonably be expected to have, a Seller Material Adverse Effect.

5.16    Brokers. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Seller directly with Purchaser without the intervention of any Person on behalf of Seller in such manner as to give rise to any valid claim by any Person against Purchaser or any Project Company for a finder's fee, brokerage commission or similar payment.

5.17    [Reserved].

5.18    Cash Grant Eligibility. To Seller's Knowledge, neither the Seller nor any Project Company has taken any action to qualify any Project for the Cash Grant and neither the Seller nor any Project Company has applied for production tax credits, investment tax credits or other similar government incentives in connection with any Project. Each Project Company has retained its respective rights to apply for the Cash Grant and has not entered into any agreement to sell, pledge, or otherwise encumber or interfere with any such rights.

5.19    Wind Data. Schedule 5.19 of this Agreement is a true and complete list of the Wind Data. With respect to each item of Wind Data identified on Schedule 5.19 of this Agreement:

(a)    the Project Companies possess all right, title, and interest in and to the item, free and clear of any Liens;

(b)    neither Seller nor any Project Company has assigned, transferred, or conveyed any interest in the Wind Data or the information contained therein in any manner that would impair Purchaser's right to use the Wind Data; and

(c)    neither Seller nor any Project Company has agreed to indemnify any Person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

5.20   Material Misstatements or Omissions. To Seller's Knowledge, none of the representations or warranties given by Seller or any Project Company in this Agreement (including the schedules hereto), or any document, exhibit, statement, certificate or schedule heretofore furnished or made available by or on behalf of Seller or any Project Company in connection with the transactions contemplated by this Agreement, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make the statements or facts contained herein or therein, in light of the circumstances in which they were made, not misleading.

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER, RALLS AND RALLS OPCO**

As an inducement to Seller to execute this Agreement, Purchaser, Ralls and Ralls OpCo, jointly and severally, represent and warrant the truth and accuracy of each of the matters set forth in this Article 6, as follows:

6.1   Organization, Qualification and Power.

(a)   Purchaser is a limited liability company, and Ralls is a corporation, duly organized, validly existing and in good standing under the laws of Delaware, and is duly licensed to do business in each other jurisdiction where the actions required to be performed by it under this Agreement makes such qualification or licensing necessary, except in those jurisdictions where the failure to be so qualified or licensed would not in the aggregate have a Purchaser Material Adverse Effect. Each of Purchaser and Ralls has full limited liability company or corporate (as applicable) power and authority to execute, deliver and perform its obligations under this Agreement and any other agreements, documents and instruments delivered in connection with the Closing hereunder and it has undertaken all such actions and it has not taken any action which constitutes a default under or results in any default in any of its Charter Documents.

(b)   Ralls OpCo is a wholly-owned subsidiary of Ralls and is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly licensed or qualified to transact business in the State of Delaware. Ralls OpCo is duly qualified or licensed to do business in each other jurisdiction where the actions required to be performed by it under this Agreement make such qualification or licensing necessary. Ralls OpCo has full limited liability company power and authority to own the Ralls OpCo Assets, and to execute, deliver and perform its obligations under this Agreement and any other agreements, documents and instruments delivered in connection with the Closing hereunder and Ralls OpCo has not taken any action which constitutes a default under or results in any default in any of its Charter Documents.

6.2   Authorization; No Conflict.

(a)   The execution, delivery and performance by Purchaser, Ralls and Ralls OpCo of this Agreement and any other agreements, documents and instruments delivered in connection herewith as well as the consummation by Purchaser, Ralls and Ralls OpCo of the

transactions contemplated hereby have been duly authorized by all requisite action on the part of Purchaser, Ralls and Ralls OpCo necessary to authorize the execution, delivery and performance by Purchaser, Ralls and Ralls OpCo of this Agreement or the consummation of the transactions contemplated hereby.

(b)     The execution, delivery and performance by Purchaser, Ralls and Ralls OpCo of this Agreement and the consummation by Purchaser, Ralls and Ralls OpCo of the transactions contemplated hereby do not and will not (i) violate any law or regulation applicable to Purchaser, Ralls or Ralls OpCo or any order of any court or Governmental Authority having jurisdiction over Purchaser, (ii) violate or conflict with, or constitute (with due notice or lapse of time or both) a default under any Lien to which Purchaser, Ralls or Ralls OpCo is a party, or (iii) violate or conflict with or result in a breach of any provision of Purchaser's, Ralls' or Ralls OpCo's Charter Documents.

6.3     Validity.  This Agreement has been duly executed and delivered by Purchaser, Ralls and Ralls OpCo and assuming the due authorization, execution and delivery by Seller of this Agreement, constitutes the valid and binding obligation of Purchaser, Ralls and Ralls OpCo, enforceable against Purchaser, Ralls and Ralls OpCo in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or others similar laws now or hereinafter in effect relating to creditors rights generally, and general equitable principles (whether considered in a proceeding in equity or at law).

6.4     Membership Interests.

(a)     Ralls is the sole owner, legally, beneficially and of record, of the Ralls OpCo Membership Interests as listed on Schedule 6.4 and such Ralls OpCo Membership Interests represent 100% of the total outstanding equity interest of Ralls OpCo;

(i)     the Ralls OpCo Membership Interests are validly issued and outstanding, fully paid and nonassessable, and free and clear of any Liens and none of the Ralls OpCo Membership Interests was ever issued in violation of any preemptive right or other right obligating Ralls or Ralls OpCo from issuing or selling any membership interests; and

(ii)     except as set forth on Schedule 6.4, no Person has any right, title, interest or claim (including any option) against Ralls in or to Ralls OpCo or the assets of Ralls OpCo.

(b)     None of the following exist:

(i)     any authorized or outstanding subscription, warrant, option, convertible security, or other right (contingent or other) to purchase or otherwise acquire from Ralls or Ralls OpCo, equity securities or membership interests of Ralls OpCo;

(ii)     any commitment on the part of Ralls or Ralls OpCo to issue shares, subscriptions, warrants, options, convertible securities, membership interests or other such rights or interests;

(iii)    any reservation for issuance for any purpose of any equity securities or membership interests of Ralls OpCo;

(iv)    any obligation (contingent or other) on the part of Ralls OpCo to purchase, redeem or otherwise acquire any of its membership interests or equity securities; or

(v)    any voting trust or agreement, members' agreement, pledge agreement, buy-sell agreement, right of first refusal, preemptive right or proxy relating to any securities or interests of Ralls OpCo or to which Ralls or Ralls OpCo is a party.

6.5    Ralls Financial Statements.  The Ralls Financial Statements attached hereto as Schedule 6.5 are accurate, true and complete and fairly present the financial position of Ralls and Ralls OpCo, as applicable, as of the date of such Ralls Financial Statements, all material liabilities of Ralls and Ralls OpCo, as applicable, are reflected therein, and there has been no material change in the financial position or results of operations of Ralls or Ralls OpCo, as applicable since December 31, 2011.

6.6    No Purchaser Material Adverse Effect.  Since the date of the Ralls Financial Statements, there has been no event, act, omission, change, occurrence, fact or other circumstance that has had, or in the aggregate with any other events, acts, omissions, changes, occurrences, facts or other circumstances that would reasonably be expected to have, a Purchaser Material Adverse Effect.

6.7    Fixed Assets.  Schedule 6.7 contains a list of all material Assets owned by each of Ralls and Ralls OpCo as of the Effective Date.  Except as otherwise noted on Schedule 6.7, Ralls and Ralls OpCo, as applicable, own all of such property and assets, free and clear of all Liens except for (a) Permitted Liens, (b) those items set forth in Schedule 6.7, (c) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of Ralls and Ralls OpCo, or (d) easements, rights of way, zoning ordinances and other similar Liens affecting real property which do not, individually or in the aggregate, materially impede the business of Ralls and Ralls OpCo as currently conducted.  Schedule 6.7 also identifies all of the leased tangible personal property used by Ralls and Ralls OpCo, as applicable, in the conduct of their business.  As of the date hereof, Ralls and Ralls OpCo, as applicable, have the right to use all of such leased assets in connection with the operation of their business pursuant to valid and enforceable lease agreements.

6.8    Brokers.  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Seller directly with Purchaser without the intervention of any Person on behalf of Purchaser in such manner as to give rise to any valid claim by any Person against Seller or the Project Company for a finder's fee, brokerage commission or similar payment.

6.9    Material Misstatements or Omissions.  To Purchaser's Knowledge, none of the representations or warranties given by Purchaser, Ralls or Ralls OpCo in this Agreement (including the schedules hereto), or any document, exhibit, statement, certificate or schedule

heretofore furnished or made available by or on behalf of Purchaser, Ralls or Ralls OpCo in connection with the transactions contemplated by this Agreement, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make the statements or facts contained herein or therein, in light of the circumstances in which they were made, not misleading.

## ARTICLE 7
## INDEMNITY

7.1     Seller Indemnity.  From and after Closing, Seller hereby agrees to indemnify, defend and hold harmless each Project Company, Purchaser and its Affiliates and their employees, representatives, agents, shareholders, members, managers, officers, and directors (the "**Purchaser Indemnified Parties**") from and against all demands, claims, actions or causes of action, assessments, losses, damages, Liabilities, costs and expenses (including taxes, interest, penalties and reasonable attorneys' fees and disbursements) (collectively "**Damages**"), asserted against, imposed upon or incurred by one or more Purchaser Indemnified Parties, directly or indirectly, by reason of, resulting from, or in connection with any or all of the following:

(a)     the misrepresentation, inaccuracy, or breach of any representation or warranty made or given by Seller or a Project Company (prior to Closing) in this Agreement and any other matter pursuant to which the Seller has agreed to indemnify the Purchaser Indemnified Parties as set forth in Schedule 4.5(b)(i);

(b)     the breach, nonfulfillment or failure to perform of any covenant or agreement made or given by Seller or a Project Company (prior to Closing) in this Agreement;

(c)     any imposition of Liability from claims brought against the Project Company (i) by Persons (other than Persons affiliated with Purchaser) who were managers or officers of the Project Company prior to the Closing Date and which claims arise from such Persons' role as manager or officer of the Project Company or (ii) arising from obligations of the Project Company under that certain First Amended and Restated Master Wind Projects Membership Interests Purchase and Development Services Agreement, dated as of December 10, 2010, among Idaho Windfarms, LLC, Oregon Windfarms, LLC, the project companies named therein and Seller;

(d)     any fraud, intentional misrepresentation or willful misconduct by Seller in connection with this Agreement or the transactions contemplated by this Agreement; or

(e)     any liability for Taxes (other than any Taxes subject to Section 2.5(b)) related to the Project Companies imposed on or incurred by Purchaser for any taxable period ending on or before the Closing Date or the portion of any other taxable period occurring on or before the Closing Date (such Taxes to be determined by an interim closing of the books as of the end of the Closing Date, except for ad valorem, property, capital or franchise Taxes not based on or measured by income, or similar Taxes, which shall be prorated on a daily basis).

7.2     Purchaser Indemnity.  From and after Closing, Purchaser hereby agrees to indemnify, defend and hold harmless Seller and its Affiliates and their employees,

representatives, agents, shareholders, members, managers, officers and directors (the "**Seller Indemnified Parties**") from and against all Damages asserted against, imposed upon or incurred by one or more Seller Indemnified Parties, directly or indirectly, by reason of, resulting from or in connection with each or all of the following:

(a)     the misrepresentation, inaccuracy, or breach of any representation or warranty made or given by Purchaser, Ralls or Ralls OpCo in this Agreement,

(b)     the breach, nonfulfillment or failure to perform of any covenant or agreement made or given by Purchaser, Ralls, Ralls OpCo or a Project Company (following Closing) in this Agreement, any REC Transfer Agreement, any Subeasement Agreement, any Guarantee Agreement and any Security Agreement,

(c)     Liabilities arising after the Closing Date involving the Project Companies.

(d)     any fraud, intentional misrepresentation or willful misconduct by Purchaser, Ralls or Ralls OpCo in connection with this Agreement or the transactions contemplated by this Agreement (including any REC Transfer Agreement, any Subeasement Agreement, any Guarantee Agreement and any Security Agreement); or

(e)     any liability for Taxes (other than any Taxes subject to Section 2.5(b)) related to the Project Companies imposed on or incurred by Seller for any taxable period commencing after the Closing Date or the portion of any other taxable period occurring after the Closing Date (such Taxes to be determined by an interim closing of the books as of the end of the Closing Date, except for ad valorem, property, capital or franchise Taxes not based on or measured by income, or similar Taxes, which shall be prorated on a daily basis).

7.3     Indemnity Procedures.

(a)     The Party seeking indemnification pursuant to this Article 7 (the "**Indemnified Party**") shall give written notice (the "**Claim Notice**") to the Party required to indemnify pursuant to this Article 7 (the "**Indemnifying Party**") of any matters giving rise to a claim for indemnification not later than ninety (90) days after the Indemnified Party learns of such claim, provided that the failure of Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice, and provided further that if action is required by the Indemnifying Party prior to the expiration of such period in order to maintain its rights or defenses, then the Indemnified Party shall provide such written notice within such earlier time frame as to prevent the Indemnifying Party from being prejudiced.

(b)     With respect to breaches of representation, warranties and covenants of either Party, the Indemnifying Party shall have thirty (30) days following the receipt of the Claim Notice to remedy such breach, which cure period shall be extended an additional sixty (60) days if (i) the Indemnifying Party attempts to cure within the thirty (30) day cure period, (ii) continues to diligently pursue such cure, and (iii) the Indemnified Party consents to such cure extension period; provided that no cure period shall apply to any breach due to the failure to make a payment when due. If the Seller and Purchaser disagree regarding whether a breach has occurred, the provisions of Section 8.4 shall apply with respect to settling such dispute.

(c)     With respect to third-party claims, the Indemnified Party shall cooperate fully with the Indemnifying Party, shall allow the Indemnifying Party to control the defense, and may retain its own counsel at its sole expense. The Indemnifying Party shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent. Notwithstanding anything in this Agreement to the contrary, the Indemnifying Party shall not, without the Indemnified Party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof that imposes any future obligation on the Indemnified Party or that does not include, as an unconditional term thereof, the giving by the claimant or the plaintiff to the Indemnified Party of a release from all liability in respect of such claim.

7.4     Limitations. NO PARTY TO THIS AGREEMENT SHALL BE LIABLE FOR ANY LOST OR PROSPECTIVE PROFITS AND IN NO EVENT SHALL ANY PARTY BE LIABLE FOR ANY OTHER SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (IN TORT, CONTRACT OR OTHERWISE) UNDER OR IN RESPECT TO THIS AGREEMENT OR FOR ANY FAILURE OF PERFORMANCE RELATED HERETO, HOWSOEVER CAUSED, AND EACH PARTY HEREBY RELEASES THE OTHER PARTY, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, MANAGERS, DIRECTORS, OFFICERS, EMPLOYEES, SUCCESSORS, ASSIGNS, AGENTS AND CONTRACTORS FROM ANY SUCH LIABILITY.

7.5     Offset. If it is finally determined by a court of competent jurisdiction, or if Seller shall otherwise agree in writing, that there exists an amount payable by Seller to Purchaser, pursuant to this Article 7 or otherwise, on any date upon which a payment is due to be made by Purchaser to Seller pursuant to Article 2, an amount equal to such amount may, at Purchaser's sole option, be deducted from such payment and applied to reduce the amount owing by Purchaser to Seller.

7.6     Survival. The indemnification obligations in this Article 7 shall survive the Closing; provided, however, the indemnification obligations in Sections 7.1(a) and 7.2(a) shall survive until the first (1st) anniversary of the Closing Date, except that (a) the indemnification obligations of Seller in Section 7.1 with respect to (i) the representations or warranties made by Seller in Sections 5.6 (Land Contracts and Real Property) and 5.9 (Permits) and the matters pursuant to which Seller has agreed to indemnify the Purchaser Indemnified Parties as set forth on Schedule 4.5(b)(i) shall survive until the third (3rd) anniversary of the Closing Date and (ii) the representations or warranties made by Seller in Sections 5.11 (Tax Matters) and 5.13 (Environmental Matters) shall survive until the sixth (6th) anniversary of the Closing Date, (b) the indemnification obligations of Seller in Section 7.1 with respect to the representations or warranties made by Seller in Sections 5.1 (Organization, Qualification and Corporate Power), 5.2 (Authorization; No Conflict), 5.3 (Validity), and 5.4 (Membership Interests) shall survive indefinitely, and (c) the indemnification obligations of Purchaser in Section 7.2(a) with respect to the representations or warranties made by Seller in Sections 6.1 (Organization, Qualification and Limited Liability Company Power), 6.2 (Authorization; No Conflict) and 6.3 (Validity) shall survive indefinitely. Notwithstanding anything to the contrary in this Section 7.6, if an Indemnified Party has delivered a Claim Notice to the Indemnifying Party prior to the expiration of the applicable survival period for indemnification set forth in such

Claim Notice, such claim shall survive the expiration of the applicable survival period until it is resolved in accordance with Section 7.3.

7.7     Limitation of Liability.

(a)     The aggregate amount of indemnity damages to which either Seller or Purchaser shall be entitled to under Section 7.1(a) or 7.2(a), as the case may be, shall be limited to (i) in the case of Seller, the actual amount of the Purchase Price then received by Seller or (ii) in the case of Purchaser, subject to Purchaser's right of offset in Section 7.5, an amount equal to the portion of the Purchase Price not yet paid by Purchaser to Seller plus interest thereon pursuant to Section 2.6; provided, however that such limitation of liability shall not apply to any breach of any representation or warranty contained in Sections 5.1 (Organization, Qualification and Corporate Power), 5.2 (Authorization; No Conflict), 5.3 (Validity), and 5.4 (Membership Interests), 5.11 (Tax Matters) and 5.13 (Environmental Matters), 6.1 (Organization, Qualification and Limited Liability Company Power), 6.2 (Authorization; No Conflict) and 6.3 (Validity); provided further that such limitation of liability shall not apply to Seller's indemnification obligation under Section 7.1(c)(ii).

(b)     No Purchaser Indemnified Parties shall be entitled to assert any claim for indemnification under Section 7.1(a), until such time as the aggregate of all Damages that Purchaser Indemnified Parties may have under such Section 7.1(a) exceed Sixty Thousand Dollars (US$60,000) (the **"Purchaser Indemnification Deductible"**), in which case Seller shall be liable to the Purchaser Indemnified Parties for such Damages to the extent exceeding the Purchaser Indemnification Deductible; provided, however that Damages covered by Seller's indemnification obligation under Section 7.1(c)(ii) shall not be subject to, or count toward payment of, Purchaser's Indemnification Deductible.

## ARTICLE 8
## MISCELLANEOUS

8.1     Remedies Cumulative. The remedies provided herein shall be cumulative and shall not preclude the assertion by either Party of any other rights or the seeking of any other remedies against the other, or their respective successors or permitted assigns.

8.2     Entire Agreement; Modification; Benefit; Assignment.

(a)     This Agreement (including the Exhibits and Schedules), together with the Confidentiality Agreement, constitutes the entire agreement of the Parties with respect to the matters contemplated herein and supersedes all prior oral and written agreements with respect to the matters contemplated herein. Each of the Exhibits and Schedules is an integral part of this Agreement and is made a part hereof by reference as if set forth herein in its entirety.

(b)     This Agreement may not be modified, deleted or amended except by written instrument executed by the Parties.

(c)     It is the explicit intention of the Parties that no Person other than the Parties is or shall be entitled to bring any action to enforce any provision of this Agreement against any of the Parties, and that the covenants, undertakings, and agreements set forth in this

Agreement shall be solely for the benefit of, and shall be enforceable only by the Parties or their respective successors and permitted assigns.

(d)     This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either Party without prior written consent of the other Party. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the Parties and their respective successors and permitted assigns.

8.3     Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered, mailed or transmitted, and shall be effective upon receipt, if delivered personally, mailed by registered or certified mail (postage prepaid, return receipt requested) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like changes of address) or sent by electronic transmission to the facsimile number or electronic mail address specified below with confirmation:

**If to Seller:**

Terna Energy USA Holding Corporation
400 Montgomery Street, Suite 1105
San Francisco, California 94104
Facsimile: (415) 398-3917

**If to Purchaser:**

Intelligent Wind Energy, LLC
c/o Xiaolin Zhang
11413 Ashbourne Hall Rd.
Charlotte, North Carolina 28277
Facsimile: (704) 900-2005

8.4     Disputes and Governing Law.

(a)     In the event any dispute, controversy or claim between or among the Parties arises under this Agreement or is connected with or related in any way to this Agreement or any right, duty or obligation arising hereunder or the relationship of the Parties (a "**Dispute**"), any affected Party may notify the relevant other Party of the Dispute and that the affected Party has elected to implement the procedures set forth in this Section 8.4; provided that with respect to claims for indemnification pursuant to Sections 7.1 or 7.2, the Parties have already complied with the procedures provided in Section 7.3.

(b)     Within fifteen (15) days after delivery of any notice under Section 8.4(a), a representative of each Party with the requisite authority to settle the Dispute shall meet at a mutually agreed time and place to attempt, with diligence and good faith, to resolve the Dispute. Should a mutual resolution and settlement not be obtained at such meeting or should no such meeting take place within such fifteen (15) day period, then any Party may, by notice to any

other Party, refer the Dispute to senior management of the Parties for resolution. Within fifteen (15) days after delivery of any such notice by a Party, members of senior management of each of the Parties shall meet at a mutually agreed time and place to attempt, with diligence and good faith, to resolve and settle such Dispute.

(c)     Should mutual resolution and settlement not be obtained at the meeting of senior management members or should no such meeting take place within such fifteen (15)–day period (unless extended by mutual agreement), then either Party may commence an action in a court of competent jurisdiction as defined in Section 8.4(d).

(d)     This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. Each Party hereby submits itself to the exclusive jurisdiction of the state and federal courts located in New York, New York, for the resolution of disputes hereunder and waives its right to trial by jury.

8.5     Expenses. Except for costs and expenses specifically assumed by a Party under this Agreement, each Party shall pay its own costs and expenses incident to this Agreement and the transactions contemplated hereunder, including all legal and accounting fees and disbursements.

8.6     Severability. If any part of any provision of this Agreement or any other agreement, document or writing given pursuant to or in connection with this Agreement shall be invalid or unenforceable under Applicable Law, said part shall be ineffective to the extent of such invalidity or unenforceability only, without in any way affecting the remaining parts of said provision or the remaining provisions of this Agreement or such document.

8.7     Waiver. Neither the waiver by any Party of a breach of or a default under any of the provisions of this Agreement, nor the failure of any Party, on one or more occasions, to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder shall thereafter be construed as a waiver of any subsequent breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

8.8     Headings. Section and subsection headings contained in this Agreement are inserted for convenience of reference only, shall not be deemed to be a part of this Agreement for any purpose, and shall not in any way define or affect the meaning, construction or scope of any of the provisions hereof.

8.9     Counterparts. This Agreement may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (e.g., electronic mail or .pdf) shall be effective as delivery of an original counterpart to this Agreement.

8.10     Attorneys' Fees. If a Party shall commence any action, arbitration or other proceeding against the other Party in order to enforce the provisions of this Agreement or to recover damages as a result of the alleged breach of any of the provisions of this Agreement, the

prevailing Party shall be entitled to recover from the other Party all reasonable attorneys' fees and costs actually incurred in connection therewith, in addition to any other remedies to which it may be entitled.

*[Signature page follows]*

Each of the undersigned has caused this Agreement to be duly executed on its behalf, as of the day and year first written above.

INTELLIGENT WIND ENERGY, LLC,
a Delaware limited liability company

By: _____
Name:   Xiaolin Zhang
Title:    President

TERNA ENERGY USA HOLDING
CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

RALLS CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

LOWER RIDGE WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

RALLS WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

HIGH PLATEAU WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

MULE HOLLOW WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

PINE CITY WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

[Signature Page to Master Wind Projects Membership Interests Purchase Agreement]

Each of the undersigned has caused this Agreement to be duly executed on its behalf, as of the day and year first written above.

INTELLIGENT WIND ENERGY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

TERNA ENERGY USA HOLDING
CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

RALLS CORPORATION,
a Delaware corporation

By: _____
Name:    Jialiang Wu
Title:    Chief Executive Officer

LOWER RIDGE WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

RALLS WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name:    Jialiang Wu
Title:    President

HIGH PLATEAU WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

MULE HOLLOW WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

PINE CITY WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

[Signature Page to Master Wind Projects Membership Interests Purchase Agreement]

Each of the undersigned has caused this Agreement to be duly executed on its behalf, as of the day and year first written above.

**INTELLIGENT WIND ENERGY, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**RALLS CORPORATION,**
a Delaware corporation

By: _____
Name:
Title:

**RALLS WIND FARM, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**TERNA ENERGY USA HOLDING CORPORATION,**
a Delaware corporation

By: _____
Name: Georgios Angeletos
Title: Secretary

**LOWER RIDGE WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name: Georgios Angeletos
Title: Manager

**HIGH PLATEAU WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name: Georgios Angeletos
Title: Manager

**MULE HOLLOW WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name: Georgios Angeletos
Title: Manager

**PINE CITY WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name: Georgios Angeletos
Title: Manager

## **EXHIBITS**

[See attached]

## Exhibit A-1

### THE PROJECTS

The Butter Creek Wind Projects (Project) is a cluster of 4 QFs totaling 40 MW wind power project located in Morrow and Umatilla Counties, Oregon. The Project will consist of site facilities to accommodate twenty (20) wind turbine generators (WTG). The Project output will be delivered to PacifiCorp Power Company's 69 kV line within the Project boundary in accordance with the Generator Interconnection Agreement (GIA).

The coordinates of the WTGs are presented in the following table (coordinates in DMS NAD83):

| Official project name | Land owner | X" | Y" | User label | FAA lights needed |
|---|---|---|---|---|---|
| Pine City | Dougherty | -119°32'28.90" | 45°34'50.01" | DH1 | √ |
| | | -119°32'19.53" | 45°34'43.59" | DH2 | |
| | | -119°32'08.88" | 45°34'36.16" | DH3 alt 2 | √ |
| | | -119°32'00.45" | 45°34'30.56" | DH4 | |
| | | -119°31'47.41" | 45°34'21.38" | DH5 alt | √ |
| Mule Hollow | Christensen | -119°34'41.58" | 45°39'34.72" | CH1 | √ |
| | | -119°34'32.03" | 45°39'28.11" | CH2 | |
| | | -119°34'22.99" | 45°39'21.84" | CH3 | √ |
| | | -119°34'13.32" | 45°39'15.17" | CH4 | |
| | | -119°34'03.89" | 45°39'08.48" | CH5 | √ |
| High Plateau | Rust - Mader | -119°26'54.02" | 45°39'26.95" | RU1 | √ |
| | | -119°26'46.06" | 45°39'19.57" | RU2 | |
| | | -119°26'38.47" | 45°39'12.54" | RU3 | √ |
| | | -119°26'30.91" | 45°39'05.52" | RU4 | |
| | | -119°26'23.36" | 45°38'58.47" | RU5 | √ |
| Lower Ridge | Madison | -119°27'53.38" | 45°44'20.67" | MD1 | √ |
| | | -119°27'45.44" | 45°44'13.71" | MD2 | |
| | | -119°27'38.86" | 45°44'06.20" | MD3 | √ |
| | | -119°27'34.11" | 45°43'58.03" | MD4 | |
| | | -119°27'30.24" | 45°43'49.71" | MD5 | √ |

## Exhibit A-2

### SITES

[See Attached Maps]







**Butter Creek Wind Projects**                                    Lower Ridge Windfarm LLC

*CONSTRUCTION ROAD & COLLECTION SYSTEM LAYOUT*           | 11-11-2011



Butter Creek Wind Projects

Mule Hollow WindfarmLLC

*CONSTRUCTION ROAD & COLLECTION SYSTEM LAYOUT*

11-11-2011

Project Vicinity Map



**Butter Creek Wind Projects**                                    Pine City Windfarm LLC

*CONSTRUCTION ROAD & COLLECTION SYSTEM LAYOUT*      | 11-11-2011

**Exhibit B**

[Reserved]

## Exhibit C

### ASSIGNMENT OF MEMBERSHIP INTERESTS

THIS ASSIGNMENT OF MEMBERSHIP INTERESTS (this "**Assignment**") is made and entered into as of [●] (the "**Effective Date**"), by and among Tema Energy USA Holding Corporation, a Delaware corporation ("**Assignor**") and Intelligent Wind Energy, LLC, a Delaware limited liability company ("**Assignee**").

### WITNESSETH:

**WHEREAS**, Assignor and Assignee are parties to that certain Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012 (the "**Purchase Agreement**"; capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement);

**WHEREAS**, the Purchase Agreement provides for, among other things, the execution and delivery of an assignment of interests agreement to effect the sale by Assignor to Assignee of all of the outstanding membership interests in High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, Pine City Windfarm, LLC, an Oregon limited liability company, and Lower Ridge Windfarm, LLC, an Oregon limited liability company (the "**Membership Interests**"); and

**WHEREAS**, Assignor desires to assign to Assignee, and Assignee desires to accept and assume, all of the Membership Interests and all rights in or connected with such Membership Interests, as hereinafter provided.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee do hereby agree as follows:

1.      **Assignment of Membership Interests**. Assignor hereby assigns, transfers, sets over, conveys and delivers unto Assignee, its successors and assigns, all of the rights, powers, privileges and interests to the Membership Interests free and clear of all Liens.

2.      **Miscellaneous**.

a.      **Counterparts**. This Assignment may be executed in any number of counterparts, each of which, when executed, shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument. Delivery of an executed counterpart of a signature page to this Assignment by facsimile or other electronic means (e.g., electronic mail or .pdf) shall be effective as delivery of an original counterpart to this Assignment.

b.      **Successors and Assigns**. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and each of their respective heirs, legal representatives, successors and assigns.

c.   **Modification**.  No supplement, modification, waiver or termination of this Assignment or any provision hereof shall be binding unless executed in writing by the parties to be bound thereby.

d.   **Governing Law**.  This Assignment shall be construed and enforced in accordance with the laws of the State of New York.  Each Party hereby submits itself to the exclusive jurisdiction of the federal courts located in New York, New York, for the resolution of disputes hereunder.

The undersigned has caused this Assignment to be duly executed on its behalf as of the day and year first above written.

**ASSIGNOR:**

**Terna Energy USA Holding Corporation**
a Delaware corporation

By:   _____
        Name:
        Title:

By:   _____
        Name:
        Title:

**ASSIGNEE:**

**[Purchaser]**
a [●] limited liability company

By:   _____
        Name:
        Title:

By:   _____
        Name:
        Title:

**Exhibit D**

**CERTIFICATE OF OFFICER**
**OF**
**[TERNA ENERGY USA HOLDING CORPORATION][PROJECT**
**COMPANY][INTELLIGENT WIND ENERGY, LLC][RALLS CORPORATION][RALLS**
**WIND FARM, LLC]**

This certificate, dated as of [●], 2012 (this "**Certificate**"), is being delivered to [Intelligent Wind Energy, LLC][Terna Energy USA Holding Corporation] pursuant to that certain Master Wind Projects Membership Interest Purchase Agreement, dated February 28, 2012 ("**Purchase Agreement**"), by and among Intelligent Wind Energy, LLC ("**Purchaser**"), Ralls Corporation ("**Ralls**"), Ralls Wind Farm, LLC ("**Ralls OpCo**"), the project companies named therein ("**Project Companies**") and Terna Energy USA Holding Corporation ("**Seller**"). All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

The undersigned officer, acting for and on behalf of [●], and solely in this capacity as an officer of [●], hereby attests to [Seller][Purchaser], in each case as of the date hereof, and subject to the terms and conditions of the Purchase Agreement:

(1)     each of the representations and warranties made by [●] in the Purchase Agreement is true, accurate and correct in all material respects (or if qualified by materiality, in all respects), on and as of the date hereof as though made on and as of the date hereof; provided, however, that any representation or warranty expressly made only as of a specified date need only remain true and correct on and as of such specified date; and

(2)     [●] has performed and complied in all material respects with the agreements, covenants and obligations required by the Purchase Agreement to be so performed or complied with by it at or before the Closing.

The undersigned has executed and delivered this Certificate on behalf of [●] on the date first set forth above.

<div style="margin-left:40%">

[TERNA ENERGY USA HOLDING
CORPORATION][PROJECT
COMPANY][INTELLIGENT WIND ENERGY,
LLC][RALLS CORPORATION][RALLS
WIND FARM, LLC]

By: _____
     Name:
     Title:

</div>

**Exhibit E**

**[TERNA ENERGY USA HOLDING CORPORATION][PROJECT COMPANY][INTELLIGENT WIND ENERGY, LLC][RALLS CORPORATION][RALLS WIND FARM, LLC]**
**SECRETARY'S CERTIFICATE**

The undersigned, the duly appointed Secretary of [●] (the "**Company**"), pursuant to Section [3.2][3.3] of that certain Master Wind Projects Membership Interest Purchase Agreement, dated February 28, 2012 ("**Purchase Agreement**"), by and among Intelligent Wind Energy, LLC, Ralls Corporation, Ralls Wind Farm, LLC, the project companies named therein and Terna Energy USA Holding Corporation ("**Seller**"), hereby certifies as follows, and in each case, as of [●], that:

1.      attached hereto as <u>Exhibit A</u> is a true, correct, and complete copy of the Certificate of Formation of the Company, which has not been amended since the date thereof and which is in full force and effect as of the date hereof;

2.      attached hereto as <u>Exhibit B</u> is a true, correct, and complete copy of the Operating Agreement of the Company, which has not been amended since the date thereof and which is in full force and effect as of the date hereof;

3.      attached hereto as <u>Exhibit C</u> is a true, correct and complete copy of resolutions duly adopted by the sole member of the Company, which document the authorization and approval of all matters in connection with the Purchase Agreement and the transactions contemplated therein, which resolutions have not been amended, modified or rescinded, and remain in full force and effect as of the date hereof; and

4.      set forth on <u>Exhibit D</u> are the names, the respective offices and the true and genuine specimen signatures of the duly elected, qualified and acting officers of the Company authorized to execute and deliver on behalf of the Company the Purchase Agreement and all other documents necessary or appropriate to consummate the transactions contemplated therein.

The undersigned has executed this Secretary's Certificate on behalf of the Company on and as of the date set forth above.

By:     _____
         Name:
         Title:

**EXHIBIT A**
**to Secretary's Certificate**

## CERTIFICATES OF FORMATION

[See Attached]

**EXHIBIT B**
**to Secretary's Certificate**

**OPERATING AGREEMENTS**

[See Attached]

**EXHIBIT C**
**to Secretary's Certificate**

**RESOLUTIONS**

[See Attached]

**EXHIBIT D**
**to Secretary's Certificate**

**INCUMBENCY OF OFFICERS**

| Name | Title | Signature |
|------|-------|-----------|
| [＿＿＿＿＿＿＿] | [＿＿＿＿＿＿] | ＿＿＿＿＿＿＿＿ |
| [＿＿＿＿＿＿＿] | [＿＿＿＿＿＿] | ＿＿＿＿＿＿＿＿ |
| [＿＿＿＿＿＿＿] | [＿＿＿＿＿＿] | ＿＿＿＿＿＿＿＿ |
| [＿＿＿＿＿＿＿] | [＿＿＿＿＿＿] | ＿＿＿＿＿＿＿＿ |

## Exhibit F

### Form of Guarantee Agreement

[Attached]

GUARANTEE AGREEMENT

.GUARANTEE AGREEMENT (this "Guarantee"), dated as of [•], is made and entered into by and among [•], a [•] (the "Guarantor"), Intelligent Wind Energy, LLC, a Delaware limited liability company and [a wholly owned subsidiary][an affiliate] of the Guarantor ("Purchaser"), and Terna Energy USA Holding Corporation, a Delaware corporation ("Terna"). The Guarantor, Purchaser and Terna are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, pursuant to a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, (the "Agreement", capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement), among Terna, Purchaser, Ralls Corporation, Ralls Wind Farm, LLC and the project companies named therein, Terna has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Terna, the membership interests of High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC and Lower Ridge Windfarm, LLC (collectively, the "Project Companies"), on the terms and conditions provided in the Agreement;

WHEREAS, the Parties desire to enter into this Guarantee pursuant to which the Guarantor will guarantee the obligations of Purchaser and, after Closing, the Project Companies under the Agreement, as described herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Terna to enter into the Agreement, the Guarantor hereby agrees as follows:

Section 1.     Guarantee. The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Terna (a) the punctual payment of all payment obligations of Purchaser when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (b) the punctual performance of all other covenants, agreements, undertakings and obligations of Purchaser under, and to extent set forth in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (c) after Closing and until the Purchase Price has been paid in full, the punctual payment of all payment obligations of each of the Project Companies when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and the Subeasement Agreement and (d) after Closing and until the Purchase Price has been paid in full, the punctual performance of all other covenants, agreements, undertakings and obligations of each of the Project Companies under, and to extent set forth in, the Agreement and the Subeasement Agreement (all such payment and performance obligations being the "Obligations"). For the avoidance of doubt, the Obligations shall include the payment of accrued interest and indemnification for Damages.

Section 2.     Guarantee Absolute. The Guarantor guarantees that the Obligations will be paid and performed strictly in accordance with the terms of, and to the extent set forth in, the Agreement and the Subeasement Agreement, as applicable. The obligations of the Guarantor under this Guarantee are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guarantee,

irrespective of whether any action is brought against Purchaser or any other Guarantor (as defined in the Agreement) or whether Purchaser or any other Guarantor (as defined in the Agreement) is joined in any such action or actions; provided, however, that Terna will notify Purchaser and give Purchaser 14 days to respond (or such shorter period as may be reasonable under the circumstances) before exercising any of its rights hereunder.

This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by Terna upon the insolvency, bankruptcy or reorganization of Purchaser or otherwise, all as though such payment had not been made.  This Guarantee is a guarantee of payment and not of collection only.

Section 3.    Waiver.  The Guarantor hereby waives (a) promptness, diligence, presentment, demand, protest, notice of acceptance and (except as set forth in the proviso in Section 2) any other notice with respect to any of the Obligations and this Guarantee, (b) any requirement that Terna protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against Purchaser or any other person or entity or any collateral, and (c) diligence in collection or protection of or realization upon any obligation hereunder, or any security for or guarantee of any of the foregoing, and any and all formalities that otherwise might be legally required to charge the Guarantor with liability.

Section 4.    Subrogation.  The Guarantor will not exercise any rights which it may acquire by way of subrogation under this Guarantee, by any payment made hereunder or otherwise, until all the Obligations and all other amounts payable under this Guarantee shall have been paid and performed in full.  If any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the payment or performance in full of the Obligations and all other amounts payable under this Guarantee, such amount shall be held in trust for the benefit of Terna and shall forthwith be paid to Terna to be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of the applicable Agreement or to be held by Terna as collateral security for any Obligations thereafter existing.

Section 5.    Representations and Warranties.  The Guarantor hereby represents and warrants as follows:

(a)    The Guarantor is a [•] duly organized and validly existing under the Laws of [•].  The Guarantor has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)    The Guarantor has full power and authority to execute and deliver this Guarantee and to perform its obligations under this Guarantee.  The execution and delivery of this Guarantee by the Guarantor and the performance by the Guarantor of its obligations hereunder have been duly and validly authorized by all necessary corporate action on the part of the Guarantor.  This Guarantee has been duly executed and delivered by the Guarantor and constitutes the valid and binding agreement of the Guarantor, enforceable against the Guarantor in accordance with its terms.

(c)     The execution, delivery and performance of this Guarantee and the fulfillment of and compliance with the terms and conditions hereof do not violate or conflict with, (a) any term or provision of the organizational documents of the Guarantor, (b) any judgment, decree or order of any governmental entity to which the Guarantor is a party or by which the Guarantor is bound or (c) any law applicable to the Guarantor. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required with respect to the Guarantor in connection with the execution, delivery or performance of this Guarantee.

(d)     There are no conditions precedent to the effectiveness of this Guarantee that have not been satisfied or waived.

Section 6.     Amendments, Etc.  No amendment or waiver of any provision of this Guarantee, and no consent to any departure by the Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Terna, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.     Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by telecopy or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand or telecopied, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service), as follows:

To Purchaser or the Guarantor:

[•]
c/o Xiaolin Zhang
11413 Ashbourne Hall Rd.
Charlotte, North Carolina 28277
Facsimile: (704) 900-2005

To Terna:

Terna Energy USA Holding Corporation
400 Montgomery Street, Suite 1105
San Francisco, California 94104
Facsimile: (415) 398-3917

Section 8.     No Waiver; Remedies.  No failure on the part of Terna to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.    Continuing Guarantee; Assignment. This Guarantee is a continuing guarantee and shall (a) remain in full force and effect until the payment and performance in full of the Obligations and the payment of all other amounts payable under this Guarantee, (b) be binding upon the Guarantor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by, Terna and its successors, transferees and assigns. No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties.

Section 10.    Governing Law. This Guarantee shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without reference to its choice of law rules.

Section 11.    Consent to Jurisdiction; Waiver of Immunities. The Guarantor hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City and any appellate court from any thereof in any action or proceeding arising out of or relating to this Guarantee, and the Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court. The Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

Section 12.    Waiver of Trial by Jury. The Guarantor hereby irrevocably waives its right to trial by jury.

Section 13.    Severability. Whenever possible each provision of this Guarantee shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guarantee shall be held invalid or ineffective, such ineffectiveness or invalidity shall not affect any other provisions of this Guarantee, and this Guarantee shall be construed as if such ineffective or invalid provision had never been contained herein.

Section 14.    Counterparts. This Guarantee may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Guarantee or the terms hereof to produce or account for more than one of such counterparts.

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

[●], as Guarantor

By:_____
    Name:
    Title:

INTELLIGENT WIND ENERGY, LLC

By:_____
    Name:
    Title:

TERNA ENERGY USA HOLDING CORPORATION

By:_____
    Name:
    Title:

**Exhibit G**

**Form of Security Agreement**

[Attached]

SECURITY AGREEMENT

Dated [●], 2012

From

[●]

as Grantor

to

TERNA ENERGY USA HOLDING CORPORATION

as Secured Party

# T A B L E   O F   C O N T E N T S

| Section | Page |
|---|---|
| Section 1. Grant of Security | 1 |
| Section 2. Security for Obligations | 5 |
| Section 3. Grantor Remains Liable | 5 |
| Section 4. Delivery and Control of Security Collateral | 5 |
| Section 5. Maintaining the Account Collateral | 6 |
| Section 6. Investing of Amounts in the Collateral Account | 6 |
| Section 7. Release of Amounts | 6 |
| Section 8. Representations and Warranties | 7 |
| Section 9. Further Assurances | 8 |
| Section 10. As to Equipment | 9 |
| Section 11. Insurance | 9 |
| Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts | 10 |
| Section 13. Transfers and Other Liens; Additional Shares | 11 |
| Section 14. Secured Party Appointed Attorney in Fact | 11 |
| Section 15. Secured Party May Perform | 12 |
| Section 16. The Secured Party's Duties | 12 |
| Section 17. Remedies | 12 |
| Section 18. Indemnity and Expenses | 13 |
| Section 19. Amendments; Waivers; Etc. | 14 |
| Section 20. Notices, Etc. | 14 |
| Section 21. Continuing Security Interest; Assignments under the MIPSA | 14 |
| Section 22. Termination | 14 |
| Section 23. Execution in Counterparts | 14 |
| Section 24. Governing Law | 14 |

Schedules

Schedule I      -    Location, Chief Executive Office, Type of Organization, Jurisdiction of
                     Organization and Organizational Identification Number
Schedule II     -    Locations of Equipment
Schedule III    -    Membership Interests
Schedule IV     -    Preexisting Liens

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this *"Agreement"*), dated as of [●], 2012, is made by and between [●], a [●] (the *"Grantor"*), and TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation (the *"Secured Party"*).

### PRELIMINARY STATEMENTS.

(1) The Grantor has entered into a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, by and among Intelligent Wind Energy, LLC, Ralls Corporation, Ralls Wind Farm, LLC, the project companies named therein and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the *"MIPSA"*)[ and a Guarantee Agreement, dated as of February 28, 2012, by and among Grantor, Intelligent Wind Energy, LLC and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the *"Guarantee"*)].[1]

(2) The Grantor proposes to open a deposit account (the *"Collateral Account"*), which will be the collateral account for purposes hereunder.

(3) Pursuant to Section 3.3(i) of the MIPSA, it is a condition precedent to Closing that that the Grantor shall have granted the security interest contemplated by this Agreement.

(4) The Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the MIPSA.

(5) Terms defined in the MIPSA and not otherwise defined in this Agreement are used in this Agreement as defined in the MIPSA. Further, unless otherwise defined in this Agreement or in the MIPSA, terms defined in Article 8 or 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9. *"UCC"* means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, *"UCC"* means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Party to transfer the Membership Interests as contemplated under the MIPSA, the Grantor hereby agrees with the Secured Party as follows:

Section 1. Grant of Security. The Grantor hereby grants to the Secured Party a security interest in its right, title and interest in and to the following, in each case, as to each type

---

[1]     Include bracketed language unless Purchaser is the Grantor.

of property described below, whether now owned or hereafter acquired by it, wherever located, and whether now or hereafter existing or arising (collectively, the "*Collateral*"):

(a) all equipment in all of its forms, including, without limitation, all machinery, tools, furniture and fixtures, and all parts thereof and all accessions thereto, including, without limitation, computer programs and supporting information that constitute equipment within the meaning of the UCC (any and all such property being the "*Equipment*");

(b) all accounts (including, without limitation, health-care-insurance receivables), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance (including, without limitation, receivables under any cash grant, production tax credit, investment tax credit or similar credit under the American Recovery and Reinvestment Act of 2009 or otherwise and receivables from the sale or transfer of renewable energy credits), and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e) or (f) below, being the "*Receivables*," and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "*Related Contracts*");

(c) the following (collectively, the "*Security Collateral*"):

(i) the membership interests described in Schedule III (the "*Membership Interests*") and the certificates, if any, representing the Membership Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Membership Interests and all warrants, rights or options issued thereon or with respect thereto;

(ii) all additional shares of stock and other equity interests from time to time acquired by Grantor in any manner, and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other equity interests and all warrants, rights or options issued thereon or with respect thereto; and

(iii) and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C)

securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all warrants, rights or options issued thereon or with respect thereto;

(d) the following (collectively, the "*Account Collateral*"):

(i)     all deposit accounts, the Collateral Account and all funds and financial assets from time to time credited thereto (including, without limitation, all Cash Equivalents), and all certificates and instruments, if any, from time to time representing or evidencing the Collateral Account;

(ii)    all promissory notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by the Secured Party for or on behalf of the Grantor in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)   all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral; and

(e) the following (collectively, the "*Intellectual Property Collateral*"):

(i)     all patents, patent applications, utility models and statutory invention registrations, all inventions claimed or disclosed therein and all improvements thereto ("*Patents*");

(ii)    all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together, in each case, with the goodwill symbolized thereby ("*Trademarks*");

(iii)   all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), internet web sites and the content thereof, whether registered or unregistered ("*Copyrights*");

(iv)    all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test

rights, improvement rights, renewal rights and indemnification rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("*Computer Software*");

(v)      all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "*Trade Secrets*"), and all other intellectual, industrial and intangible property of any type, including, without limitation, industrial designs and mask works;

(vi)      all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration, together with all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)      all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)   all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary ("*IP Agreements*"); and

(ix)      any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(f) all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of such Grantor pertaining to any of the foregoing Collateral; and

(g) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (i) of this Section 1) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, and (B) cash.

4

Section 2. <u>Security for Obligations</u>.  This Agreement secures all payment obligations of the Purchaser now or hereafter existing under the MIPSA[, and all payment obligations of the Grantor now or hereafter existing under the Guarantee][2], whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "*Secured Obligations*").

Section 3. <u>Grantor Remains Liable</u>.  Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral (except as such exercise of Secured Party's rights results in Grantor's performance of such duties and obligations in accordance with the terms of such contracts and agreements), and (c) the Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement and shall not be obligated to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. <u>Delivery and Control of Security Collateral</u>.

(a) All certificates or instruments representing or evidencing Security Collateral, if any, shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party.  The Secured Party shall have the right at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations.

(b) With respect to the Securities Account, the Collateral Account and any Security Collateral, the Grantor will cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Secured Party as the entitlement holder thereof or (ii) to agree with the Grantor and the Secured Party that such securities intermediary will comply with entitlement orders originated by the Secured Party without further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a "*Securities Account Control Agreement*").

(c) Upon the request of the Secured Party following the occurrence and during the continuance of a failure to make timely payments under the MIPSA[ or the Guarantee][3] (such a failure, a "*Default*"), the Grantor will notify each issuer of Security Collateral granted by it hereunder that such Security Collateral is subject to the security interest granted hereunder.

---

[2]    Include bracketed language unless Purchaser is the Grantor.

[3]    Include bracketed language unless Purchaser is the Grantor.

Section 5. Maintaining the Account Collateral. So long as any payment of the Purchase Price or any other obligation of Purchaser under the MIPSA[ or Grantor under the Guarantee][4] shall remain unpaid:

(a) The Grantor will maintain deposit accounts (the "*Pledged Deposit Accounts*") only with a bank (a "*Pledged Account Bank*"), which may be the same bank that Grantor currently uses for its deposit accounts, that has agreed with the Grantor and the Secured Party to comply with instructions originated by the Secured Party directing the disposition of funds in such deposit account without the further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a "*Deposit Account Control Agreement*").

(b) The Secured Party may, upon five (5) Business Days' prior written notice, transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account to satisfy the Grantor's obligations under the MIPSA[ or the Guarantee][5] if any Default shall have occurred and be continuing; provided that immediately upon receipt of such written notice, Grantor shall not transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account.

Section 6. Investing of Amounts in the Collateral Account. The Secured Party will, subject to the provisions of Sections 5, 7 and 17, from time to time (a) invest, or direct the applicable Pledged Account Bank to invest, amounts received with respect to the Collateral Account in such Cash Equivalents credited to the Collateral Account as the Grantor may select and the Secured Party may approve (such approval to not be unreasonably withheld, conditioned or delayed), and (b) invest interest paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents that may mature or be sold, in each case in such Cash Equivalents credited in the same manner. Interest and proceeds that are not invested or reinvested in Cash Equivalents as provided above shall be deposited and held in the Collateral Account. In addition, the Secured Party shall have the right at any time to exchange, or direct the applicable Pledged Account Bank to exchange, such Cash Equivalents for similar Cash Equivalents of smaller or larger determinations, or for other Cash Equivalents, credited to the Collateral Account.

Section 7. Release of Amounts. So long as (a) no Default shall have occurred and be continuing or (b) the Secured Party has not provided written notice to the Grantor in accordance with Section 5, the Grantor will be entitled to spend amounts from the Collateral Account, for purposes of operating the business of Ralls OpCo, in the ordinary course of business and in a manner consistent with past practice; provided that any dividends, distributions or other payments made to Affiliates of Grantor (other than [Purchaser, Ralls, Ralls OpCo or any

---

[4]    Include bracketed language unless Purchaser is the Grantor.

[5]    Include bracketed language unless Purchaser is the Grantor.

of the Project Companies][6]) shall require the prior written consent of the Secured Party, which consent shall not be unreasonably withheld.

Section 8. <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name, location, chief executive office, type of organization, jurisdiction of organization and organizational identification number is set forth in Schedule I hereto. The Grantor has no trade names and, except as identified on Schedule I hereto, has no Subsidiaries.

(b) Except as set forth on Schedule IV, (i) the Grantor is the legal and beneficial owner of the Collateral granted or purported to be granted by it free and clear of any Lien, claim, option or right of others, except for the security interest created under this Agreement or permitted under the MIPSA and (ii) no effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to the MIPSA or as otherwise permitted under the MIPSA.

(c) All of the Equipment of the Grantor is located at the places specified therefor in Schedule II hereto or at another location as to which the Grantor has complied with the requirements of Section 10(a). Such Grantor has exclusive possession and control of its Equipment.

(d) None of the Receivables or Agreement Collateral is evidenced by a promissory note or other similar instrument that has not been delivered to the Secured Party.

(e) The Grantor has no investment property other than investment property as to which the Grantor has complied with the requirements of Section 4.

(f) The Grantor has no deposit accounts, other than the Pledged Deposit Accounts as to which the Grantor has complied with the applicable requirements of Section 5.

(g) The Grantor is not a beneficiary or assignee under any letter of credit.

(h) This Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing the payment of the Secured Obligations; all filings and other actions (including, without limitation, actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-106 and 9-107 of the UCC and necessary to perfect the security interest in the Collateral granted by the Grantor) have been duly made or taken

---

[6]    Remove party that is the Grantor.

and are in full force and effect; and such security interest is (except with respect to security interests, if any, identified in Schedule IV) first priority.

(i) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority (except with respect to security interests, if any, identified in Schedule IV) nature of such security interest), except for the filing of financing and continuation statements under the UCC, which financing statements have been duly filed and are in full force and effect and the actions described in Section 4 with respect to the Security Collateral, which actions have been taken and are in full force and effect, or (iii) the exercise by the Secured Party of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(j) The Grantor has no patents, parent applications, trademarks, service marks, domain names, logos, whether registered or unregistered, copyrights, computer software programs and databases or confidential or proprietary information or rights similar in type to any of the above.

(k) The Grantor has no commercial tort claims.

Section 9. Further Assurances. (a) The Grantor agrees that from time to time, at its expense, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if any such Collateral shall be evidenced by a promissory note or other instrument, deliver and pledge to the Secured Party hereunder such note or instrument duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Secured Party; (ii) file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Secured Party may request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; and (iii) deliver to the Secured Party evidence that all other actions that the Secured Party may deem reasonably necessary or desirable in order to perfect and protect the security interest granted or purported to be granted under this Agreement has been taken.

(b) The Grantor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, regardless of whether any particular asset

described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Secured Party to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c) The Grantor will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with such Collateral as the Secured Party may reasonably request, all in reasonable detail.

(d) Upon reasonable advance written notice, the Grantor will provide the Secured Party and its authorized representatives with reasonable access during Grantor's normal business hours to the books and records (including meeting minutes), contracts, commitments, facilities, accounts and financial and operating data of the Grantor relating to the Collateral, including without limitation wind data and maintenance logs, solely for the purpose of protecting the security interest granted to Secured Party hereunder. To the extent any such review may involve proprietary or other confidential information of Grantor, the parties hereto agree that the terms of the confidentiality agreement, dated February 2012, between Ralls Corporation and the Secured Party shall apply to such information; provided that, notwithstanding Section 3 of such confidentiality agreement, such information may be used for the purpose of protecting the security interest granted hereunder.

Section 10. As to Equipment. (a) The Grantor will cause its Equipment to be maintained and preserved in the same condition, repair and working order as when new, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any of such Equipment as soon as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. The Grantor will promptly furnish to the Secured Party a statement respecting any loss or damage to any of its Equipment.

(b) The Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against, its Equipment.

Section 11. Insurance. (a) The Grantor will, at its own expense, maintain insurance with respect to its Equipment with responsible and reputable insurance companies or associations in such amounts and covering such risks as usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Grantor operates. Each policy for liability insurance shall provide for all losses to be paid on behalf of the Secured Party and the Grantor as their interests may appear, and each policy for property damage insurance shall provide for all losses to be paid directly to the Secured Party. Each such policy shall in addition (i) name the Grantor and the Secured Party as insured parties thereunder (without any representation or warranty by or obligation upon the Secured Party) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Secured Party notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (iii) provide that there shall be no recourse against the Secured Party for payment of premiums or other amounts with respect thereto and (iv) provide that at least 10

days' prior written notice of cancellation or of lapse shall be given to the Secured Party by the insurer. The Grantor will, if so requested by the Secured Party, deliver to the Secured Party original or duplicate policies of such insurance. Further, the Grantor will, at the request of the Secured Party, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 10 and cause the insurers to acknowledge notice of such assignment.

(b) Reimbursement under any liability insurance maintained by the Grantor pursuant to this Section 11 may be paid directly to the Person who shall have incurred liability covered by such insurance. In case of any loss involving damage to Equipment when subsection (c) of this Section 11 is not applicable, the Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment, and any proceeds of insurance properly received by or released to the Grantor shall be used by the Grantor, except as otherwise required hereunder, to pay or as reimbursement for the costs of such repairs or replacements.

(c) So long as no Default shall have occurred and be continuing, all insurance payments received by the Secured Party in connection with any loss, damage or destruction of any Inventory or Equipment will be promptly released and transferred by the Secured Party to the Grantor for the repair, replacement or restoration thereof. To the extent that (i) the amount of any such insurance payments exceeds the cost of any such repair, replacement or restoration, or (ii) such insurance payments are not otherwise required by the Grantor to complete any such repair, replacement or restoration required hereunder, the Secured Party will not be required to release the amount thereof to the Grantor and shall hold or continue to hold such amount in the Collateral Account as additional security for the Secured Obligations. Upon the occurrence and during the continuance of any Default or the actual or constructive total loss of any Equipment, all insurance payments in respect of such Equipment shall be paid to the Secured Party and shall, in the Secured Party's sole discretion, (i) be released to the Grantor to be applied as set forth in the first sentence of this subsection (c) or (ii) be held as additional Collateral hereunder or applied as specified in Section 17.

Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts. (a) The Grantor will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 8(a) of this Agreement without first giving at least 30 days' prior written notice to the Secured Party and taking all action required by the Secured Party for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor will hold and preserve its records relating to the Collateral, including, without limitation, Related Contracts, and will permit, upon reasonable advance written request of the Secured Party, representatives of the Secured Party at any time during normal business hours to inspect and make abstracts from such records and other documents. If the Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Secured Party of such organizational identification number.

(b) Except as otherwise provided in this subsection (b), the Grantor will continue to collect, at its own expense, all amounts due or to become due the Grantor under the Receivables and Related Contracts. In connection with such collections, the Grantor may take such action as the Grantor may deem necessary or advisable to enforce collection of the

Receivables and Related Contracts; *provided, however*, that the Secured Party shall have the right at any time that Default shall have occurred and be continuing, upon written notice to the Grantor of its intention to do so, to notify the Obligors under any Receivables and Related Contracts of the assignment of such Receivables and Related Contracts to the Secured Party and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Secured Party and, upon such notification and at the expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Secured Party referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts shall be received in trust for the benefit of the Secured Party hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement) to be deposited in the Collateral Account and applied as provided in Section 17(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof or allow any credit or discount thereon. The Grantor will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 13. Transfers and Other Liens; Additional Shares. The Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral except for the pledge, assignment and security interest created under this Agreement and Liens permitted under the MIPSA.

Section 14. Secured Party Appointed Attorney in Fact. The Grantor hereby irrevocably appoints the Secured Party the Grantor's attorney in fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of a Default, in the Secured Party's reasonable discretion, to take any action and to execute any instrument that the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(b) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above, and

(c) to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral.

Section 15. <u>Secured Party May Perform</u>. If the Grantor fails to perform any agreement contained herein, the Secured Party may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor under Section 18.

Section 16. <u>The Secured Party's Duties</u>. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 17. <u>Remedies</u>. If a Default shall have occurred and be continuing:

(a) The Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at a place and time to be designated by the Secured Party that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at the Secured Party's office or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable; and (iii) exercise any and all rights and remedies of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by or on behalf of the Secured Party and all cash proceeds received by or on behalf of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Secured Party pursuant to Section 18) in whole or in part by the Secured Party against, all or any part of the Secured Obligations. Any surplus of such cash or cash proceeds held by or on the behalf of the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c) All payments received by the Grantor under or in connection in respect of the Collateral shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement).

(d) The Secured Party may, without notice to the Grantor except as required by law and at any time or from time to time, charge, set off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.

(e) The Secured Party may send to each bank, securities intermediary or issuer party to any Deposit Account Control Agreement, Securities/Deposit Account Control Agreement, Securities Account Control Agreement or Uncertificated Security Control Agreement a "Notice of Exclusive Control" as defined in and under such Agreement.

Section 18. Indemnity and Expenses. (a) The Grantor agrees to indemnify, defend and save and hold harmless the Secured Party and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an "*Indemnified Party*") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from enforcement of this Agreement and Grantor's breach of or nonperformance under this Agreement, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(b) The Grantor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Secured Party may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Secured Party hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof; provided, however, for the purposes of clarity, the obligation to pay expenses described in this Section 18 shall not apply to any costs or expenses of the Secured Party in connection with the negotiation, execution and/or delivery of this Agreement.

Section 19. <u>Amendments; Waivers; Etc.</u> No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Secured Party to exercise, and no delay in exercising, any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 20. <u>Notices, Etc.</u> All notices and other communications provided for hereunder shall be either (i) in writing (including telecopier communication) and mailed, telecopied, or otherwise delivered or (ii) by electronic mail (if electronic mail addresses are designated as provided below) confirmed immediately in writing addressed to it at its address specified in the MIPSA or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, sent by electronic mail or otherwise, be effective when deposited in the mails, telecopied, sent by electronic mail and confirmed in writing, or otherwise delivered (or confirmed by a signed receipt), respectively, addressed as aforesaid; except that notices and other communications to the Secured Party shall not be effective until received by the Secured Party. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or Schedule hereto shall be effective as delivery of an original executed counterpart thereof.

Section 21. <u>Continuing Security Interest; Assignments under the MIPSA</u>. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the earlier of (i) the payment in full in cash of the Secured Obligations and (ii) termination of the MISPA, (b) be binding upon the Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party's successors, transferees and assigns.

Section 22. <u>Termination.</u> Upon the earlier of (a) the payment in full in cash of the Secured Obligations and (b) termination of the MIPSA, the pledge and security interest granted hereby shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Secured Party will, at the Grantor's expense, promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 23. <u>Execution in Counterparts.</u> This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (e.g. electronic mail or .pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 24. <u>Governing Law.</u> This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

[●], as Grantor

By: _____

    Name:
    Title:

TERNA ENERGY USA HOLDING
CORPORATION, a Delaware corporation, as
Secured Party

By: _____

    Name:
    Title:

Schedule I to the
Security Agreement

### LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER

| Grantor | Location | Chief Executive Office | Type of Organization | Jurisdiction of Organization | Organizational I.D. No. |
|---------|----------|------------------------|----------------------|------------------------------|-------------------------|

<div style="text-align: right">

**Schedule II to the**
**Security Agreement**

</div>

## LOCATIONS OF EQUIPMENT

## MEMBERSHIP INTERESTS

**Schedule IV to the
Security Agreement**

PREEXISTING LIENS

[None.][7][Certain of Ralls OpCo's assets are subject to a security interest pursuant to that certain Security Agreement dated December 15, 2011, among Ralls OpCo, Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital, executed in connection with that certain Promissory Note dated of even date therewith by Ralls OpCo in favor of Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital for the principal sum of Three Hundred and Fifty Thousand Dollars (US$350,000).][8]

---

[7]     To be used for all Grantors except Ralls OpCo.

[8]     To be used for Ralls OpCo.

**<u>Exhibit H</u>**

**Form of REC Transfer Agreement**

[Attached]

## REC TRANSFER AGREEMENT

This REC TRANSFER AGREEMENT ("RTA") is dated this [●] day of [●], 2012, by and among [●] LLC, an Oregon limited liability company ("**Company**"), Intelligent Wind Energy, LLC, a Delaware limited liability company ("**IWE**"), and Terna Energy USA Holding Corporation, a Delaware corporation ("**Developer**") (Company, IWE and Developer are hereinafter each referred to as a "**Party**" and collectively as the "**Parties**").

## RECITALS

A.      Company is developing and will own and operate a wind energy generation facility located in Morrow County, Oregon and related collection and transmission shared facilities in Umatilla County (the "**Project**").

B.      Pursuant to that certain Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, among IWE, the project companies named therein and Developer, IWE is acquiring all of the membership interests of the Company.

C.      As a material condition of the acquisition of the membership interests of Company, IWE agreed that Developer and Company shall enter into this RTA, under which all of the RECs (defined below) shall be Developer RECs (defined below) and shall be transferred to Developer in accordance with the terms of this RTA.

D.      Company and Developer wish to enter into this RTA to define fully rights and responsibilities of Company and Developer with regard to the generation, marketing and distribution of proceeds of the sale of Developer RECs.

**NOW THEREFORE**, in consideration of the above premises, and the mutual promises and consideration set forth below, the receipt and adequacy of which are acknowledged by the Parties, the Parties agree as follows:

## AGREEMENT

1.      RECs.  As used in this RTA, "RECs" shall be defined as any and all direct and indirect environmental benefits or characteristics of whatever nature or form attributable to, and/or produced by, the Project, the fuel source (i.e., wind) utilized by the Project, the operation of the Project, and/or the technology employed by the Project, including, without limitation, the satisfaction of the renewable energy portfolio standards (whether under federal law, regulations promulgated under state law, or otherwise), certifications (e.g., the "Green-e"™ renewable electricity certification program), natural and/or renewable resource benefits, and emissions credits and any so-called "carbon credits" or credits due to the lack of carbon-based by-products from the Project, in whatever form or format and however evidenced.  "RECs" do not include any federal, state or local tax benefits or tax credits, including, without limitation, the federal wind energy Production Tax Credit (U.S. Internal Revenue Code Section 45).  Subject to the foregoing proviso, it is the intent of the Parties that the term RECs shall be broadly interpreted to include all environmental benefits and characteristics related to the output of the Project and

shall include such benefits and characteristics as defined in legislation and/or regulations relating to such benefits and characteristics in the future.

2.     Developer RECs; Transfer to Developer.

(a)     Developer and Company agree that one hundred percent (100%) of the RECs from the Project shall be owned by the Developer and transferred to Developer in accordance with the terms of this RTA (the **"Developer RECs"**) for use or transfer by Developer in Developer's sole discretion. Company agrees to transfer Developer RECs monthly promptly after RECs are posted to the account of Company in the Western Renewable Energy Generation Information System (**"WREGIS"**) system, free and clear of all liens, mortgages, deeds of trust, charges, pledges, security interests or other encumbrances, and shall similarly transfer the RECs to the account of Developer under a replacement or similar system if the WREGIS system is replaced during the Term. IWE and Company further agree to take all reasonable actions to cause Company to appoint Developer as a "Third-Party Agent" in accordance with Section 7.2 of the WREGIS Operating Agreement and, upon the request of Developer, to appoint as "Third-Party Agent" any purchaser or assignee that obtains the Developer RECs in accordance with Section 2(b) of this RTA. If any type of REC is of different kind or quality than any other REC, Developer shall own one hundred percent (100%) of each type of REC. If any REC is recorded or issued in Company's name, Company immediately shall cause transfer of such RECs to Developer.

(b)     Company agrees that Developer shall (a) to the fullest extent allowed by law, own all of the Developer RECs from the instant such Developer RECs are generated by the Project; (b) have the exclusive right to all attributes of ownership from the instant such Developer RECs are generated; and (c) shall be entitled to sell or assign the Developer RECs in whole or in part under terms acceptable to Developer, in its sole discretion, including by negotiating one or more long-term contracts for the sale of Developer RECs (a **"REC Sale Agreement"**). Company shall cooperate to cause clauses (a) through (c) to be effectuated at all times. Without limiting the foregoing, Company and IWE hereby expressly consent to the assignment of Developer RECs to Oregon Windfarms, LLC, an Oregon limited liability company, or any affiliate thereof in Developer's sole discretion.

(c)     Developer shall have the right to negotiate that all payments for the sale or transfer of Developer RECs under an REC Sale Agreement shall be made directly to Developer. If any proceeds of the sale or other transfer of Developer RECs are ever received by the Company, the Company agrees that all such revenue shall be considered held in trust for Developer and Company immediately shall transfer such funds to Developer. Should Developer decide to market the Developer RECs, the Company shall assist Developer in negotiating the form of the REC Sale Agreement with the purchaser of the Developer RECs in good faith, including the Company's agreement to cause conveyance of Developer RECs to the acquiring party to the extent Company legally may do so. Developer will set the terms of the REC Sale Agreement and shall have the sole authority to negotiate the terms with the purchaser; provided, however, the Company will, at Developer's request, execute any acknowledgements of any such REC Sale Agreement to confirm Developer's rights hereunder, or to confirm that Company will convey Developer RECs that may be issued or recorded in Company's name and to provide such

other reasonable requirements of any REC purchaser or financial institution in connection with a transaction related to the Developer RECs.

3.    Replacement Agreement. If during the term of the RTA, an REC Sale Agreement expires (and Developer desires to enter into another REC Sale Agreement) or a purchaser of Developer RECs defaults under an REC Sale Agreement and Developer terminates such agreement, or Developer determines to amend or extend an REC Sale Agreement, Developer elects to replace a purchaser of Developer RECs prior to the expiration of the REC Sale Agreement, or Developer determines to take any other action regarding an REC Sale Agreement, Company shall cooperate with such action and any new or modified agreement shall be an REC Sale Agreement and subject to the same conditions as an REC Sale Agreement entered into under Section 2 above.

4.    Authority; Reporting Records; Audit Right. Company shall have no authority to take any action with regard to Developer RECs without the written consent of Developer. Throughout the Term, Company shall provide Developer with access to all information related to the generation of Developer RECs by the Project and data and other information reasonably requested by Developer with respect to this RTA or the Project's performance. Developer's accountants shall be afforded access to, and shall be permitted to audit and copy, the Company's and IWE's records, books, correspondence and other data relating to the RECs, and the Company and IWE shall preserve these for a period of three (3) years after the last Developer REC is issued or granted, or for such longer period as may be required by law.

5.    Term. The term of this RTA (as extended, the "Term") shall commence on the date hereof and shall expire on the latest of (a) the twentieth (20th) anniversary of the commercial operation date under the power purchase agreement (the "PPA") for the sale of energy generated by the Project, between the Company and PacifiCorp, (b) the date when the PPA is terminated in accordance with its terms (without amendment or extension) and (c) December 31, 2033. Company shall not have the right to terminate this RTA prior to the expiration of the Term for any reason.

6.    Financing.

(a)    Company and IWE agree that neither the right to RECs, the RECs nor the proceeds of the sale of RECs as described in this RTA shall be used as collateral for any loan or encumbered in any manner, so that the Developer RECs at all times are available to Developer for use and disposition free and clear of any lien or encumbrance created or suffered by Company, IWE or their affiliates.

(b)    Developer may grant a security interest or lien in this RTA, the Developer RECs or any of its rights herein or therein, and related liens, in favor of any lender or other third party, provided such lien or security interest shall not attach to the Company RECs. Company shall consent to Developer's collateral assignment of this RTA and related agreements and liens in favor of Developer's lender from time to time, and shall execute any related certificates or documents reasonably requested by Developer, that are consistent with this paragraph.

7.   Security Interest; Security Agreement.

(a)    Company and IWE (collectively, **"Grantor"**) hereby pledge, assign and grant to Developer a continuing security interest in one hundred percent (100%) of (i) any and all contract, legal and other intangible rights to the RECs generated or resulting from the Project, (ii) all Project RECs themselves and (iii) all proceeds, accounts, general intangibles, instruments, monies, payments and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in clauses (i) and (ii) (collectively, the **"Collateral"**) to secure issuance of the Developer RECs and Grantors' other performance obligations under this RTA.

(b)    Grantor authorizes Developer to file UCC financing statements and continuations thereof to perfect Developer's security interest in the Collateral provided that Developer shall share a draft of such with IWE before filing such so IWE can review it for accuracy and provide comments to Developer.  At Developer's request, Grantor additionally agrees to sign all other documents that are necessary to perfect Developer's security interest in the Collateral.

(c)    Grantor irrevocably appoints Developer (or Developer's designee) as Grantor's attorney-in-fact to execute, file and record any and all documents, financing statements or other documents and instruments necessary to (a) create, attach or perfect any security interest in the Collateral arising under this RTA and/or (b) transfer title if there is a default.

(d)    If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this RTA changes, Grantor will promptly notify the Developer of such change.

(e)    If a Default occurs under this RTA, at any time thereafter, Developer shall have all the rights of a secured party under the Uniform Commercial Code, including, without limitation, the right to take possession of and foreclose the Collateral.  Such rights are in addition to, and not in lieu of, Developer's other rights and remedies, and Developer's continuing rights under this RTA to issuance of the Developer RECs.  Developer may sell the Collateral at public auction or private sale.  The requirements of reasonable notice of disposition under the Uniform Commercial Code shall be met if such notice is given at least ten (10) days before the time of the sale or disposition.  All expenses relating to the disposition of the Collateral, including, without limitation, the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the obligations secured by this security agreement.  To further assure its rights and to facilitate collection, Developer may notify third parties of Developer's interest in the Collateral, and upon Default, to make payments directly to Developer.  Foreclosure of certain Collateral shall not affect Developer's rights regarding other collateral, nor Developer's continuing right to receipt of Developer RECs in accordance with this RTA or to obtain a deficiency judgment.

(f)    Except as may be prohibited by applicable law, all of Developer's rights and remedies shall be cumulative and may be exercised singularly or concurrently.  Election by Developer to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this RTA, after

Grantor's failure to perform, shall not affect Developer's right to declare a default and exercise its remedies.

(g)     The security interest granted herein shall continue until all Developer RECs have been issued to Developer or Developer's designee.

8.     Registrations.

IWE and Company hereby irrevocably appoint the Developer (and each of its assignees) IWE's and Company's attorney in fact, with full authority in the place and stead of IWE and Company and in the name of IWE and Company or otherwise, from time to time, in Developer's (or assignee's) sole discretion, to take any action and to execute any instrument that Developer (or assignee) may deem necessary or advisable to apply for and prosecute any and all registrations, certifications and other qualifications relating to the Project and the Developer RECs necessary to comply with and qualify as a renewable resource under federal, state and local renewable portfolio standards or voluntary renewable energy programs as and when enacted in the State of Oregon and any other jurisdiction.

9.     Default and Termination.

(a)     A "**Default**" shall occur under this RTA if (a) Company fails to transfer RECs to Developer in any month in accordance with the terms of this RTA and, within ten (10) days of notification by Developer of such failure, does not cure the default; (b) Company receives revenues from the sale of Developer RECs and fails to transfer such revenues to Developer within ten (10) days of receipt of any proceeds from such sale; or (c) either party shall materially breach any other term of this RTA and fail to cure such breach within twenty (20) days after receipt of notice of breach from the other party.

(b)     Upon a Default by either Party, the other Party shall be entitled to interest on any late payment at a rate of one percent (1%) per month simple interest or the maximum rate allowed by law, if lower ("**Interest Rate**"), and shall have the right to any other remedy available under this RTA or at law or equity.

10.     Company Obligations.  Company shall provide Developer with reasonable access to all documents, data, notices and other information in the possession of Company or received by Company and necessary for Developer to monitor Company's compliance with this RTA and to perform its obligations under this RTA.  Company hereby grants Developer a license to access the Project and Property, subject to the terms of the Subeasement, and shall continue to provide Developer with all such necessary access to monitor Company's compliance with this RTA for the performance of its obligations hereunder.

12.     Representations and Warranties of the Parties.  Each Party represents and warrants to the other Parties:

(a)     Organization.  Such Party is a company duly organized and validly existing and in good standing under the laws of the state of its formation and has all requisite legal power and authority to own and operate its properties and facilities as they are now being operated, to execute this RTA and carry out the terms, conditions and provisions hereof and its

obligations hereunder. Such Party is duly qualified to conduct business in every jurisdiction in which its activities require such qualification.

(b) <u>Valid and Binding Agreement</u>. This RTA constitutes a valid, legal and binding obligation of such Party, enforceable in accordance with the terms hereof except as the enforceability hereof may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting creditors' rights generally and except to the extent that the remedies of specific performance, injunctive relief and other forms of equitable relief are subject to equitable defenses, the discretion of the court before which any proceeding therefor may be brought and the principles of equity in general.

(c) <u>No Litigation</u>. There are no actions, suits or proceedings pending or, to such Party's knowledge, threatened against or affecting such Party before any court or administrative body or arbitral tribunal that might materially adversely affect the ability of such Party to meet and carry out its obligations under this RTA.

(d) <u>Authorization; No Violation</u>. The execution, delivery and performance of this RTA by such Party has been duly authorized and will not contravene any provision of, or constitute a default under, any applicable law or any other agreement or instrument to which it is a party or by which it or its property may be bound.

(e) <u>Consents and Approvals</u>. No consent, approval, or authorization of, or declaration, filing or registration with, any governmental authority or other third party is required in connection with the execution, delivery and performance of this RTA and the consummation of the transactions contemplated hereby.

13. <u>Notices</u>. All notices, requests, demands and other communications provided for by this RTA shall be in writing and shall be deemed to have been duly given at the time when hand delivered, or five (5) days after being mailed in any general or branch United States Post Office enclosed in a registered or certified postage-paid envelope, addressed to the following addresses of the Parties hereto:

| **Company:** | **Developer:** |
|---|---|
| Intelligent Wind Energy, LLC | Terna Energy USA Holding Corporation |
| c/o Xiaolin Zhang | 400 Montgomery Street, Suite 1105 |
| 11413 Ashbourne Hall Rd. | San Francisco, California 94104 |
| Charlotte, North Carolina 28277 | Facsimile: (415) 398-3917 |
| Facsimile: (704) 900-2005 | |

14. <u>Miscellaneous</u>.

(a) <u>Independent Contractor</u>. The Parties agree and understand that Developer is and shall act as an independent contractor in the performance of its duties hereunder. Developer is not, and in the performance of its duties under this RTA will not hold itself out as, an employee, agent or partner of Company or of any of Company's governors or members

(except as provided in Section 2(a)). Company and Developer shall at all times remain independent entities with respect to this RTA.

(b)      Assignment. Neither IWE nor Company may assign this RTA or any of its rights or obligations hereunder without the prior written consent of Developer. Developer may assign this RTA, in whole or in part, in its sole discretion.

(c)      Successor and Assigns. Except as otherwise specifically provided, this RTA shall be binding on the Parties, and shall inure to the benefit of the Parties and their respective successors and assigns.

(d)      No Third–Party Beneficiaries. Except as otherwise specifically provided, no provision of this RTA is intended to nor shall it in any way inure to the benefit of any third party so as to constitute any such person a third-party beneficiary under this RTA, or of any one or more of the terms of this RTA, or otherwise give rise to any cause of action in any person not a party to this RTA.

(e)      Entire Agreement. It is mutually understood and agreed that this RTA constitutes the entire agreement between Developer, IWE and Company with respect to the matters contained herein and supersedes any and all prior oral or written understandings, representations or statements with respect to the matters contained herein, and that no understandings, representations or statements, verbal or written, have been made which modify, amend, qualify or affect the terms of RTA. This RTA may not be amended except in a writing executed by both Parties. Developer acknowledges that any prior agreement with Company as to the matters contained herein is terminated as of the effective date of this RTA, and that no amounts are due from Company under any such prior agreement.

(f)      Severability. Should any provision of RTA be or become void, illegal, or unenforceable, the validity or enforceability of the other provisions of this RTA shall not be affected and shall continue in force. The Parties will, however, use their reasonable best endeavors to agree on the replacement of the void, illegal or unenforceable provision with legally acceptable clauses which correspond as closely as possible to the sense and purpose of the affected provision and this RTA as a whole.

(g)      Headings. The section headings in this RTA are for convenience of reference only, and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

(h)      Governing Law. This RTA is made in Oregon and the provisions of this RTA shall be governed by and construed and enforced in accordance with the laws of the State of Oregon.

(i)      Interpretation. The Parties acknowledge and agree that: (i) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this RTA, and (ii) the terms and provisions of this RTA shall be construed fairly as to all Parties and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this RTA.

(j)    Counterparts. This RTA may be executed in any number of counterparts each of which shall be an original, but all of which together shall constitute one instrument. Facsimile or ".pdf" signatures shall have the same force and effect as original signatures.

(k)    Citations and Use of Trademarks. Neither party shall use the other party's name or other trademarks, trade marks or service marks in any advertisement, publication or otherwise without the other party's prior written approval.

(l)    Time of the Essence. Time is of the essence in the performance of the parties' obligations under this RTA.

(m)    Attorneys Fees. In the event a suit, action, arbitration or other proceeding of any nature whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is instituted, or the services of an attorney are retained, to interpret or enforce any provision of this RTA or with respect to any dispute relating to this RTA, the prevailing party shall be entitled to recover from the losing party its attorneys', accountants' and other experts' fees and all other fees, costs and expenses actually incurred and reasonably necessary in connection therewith. In the event of suit, action, arbitration or other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts provided by law.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** this RTA has been duly executed as of the day and year first written above.

**TERNA ENERGY USA HOLDING CORPORATION**

By: _____
Name: _____
Title: _____

**[PROJECT COMPANY], LLC**

By: _____
Name: _____
Title: _____

**INTELLIGENT WIND ENERGY, LLC**

By: _____
Name: _____
Title: _____

## SCHEDULES

**[See attached]**

## Schedule 4.1(c)

### Ralls OpCo Preexisting Liens

1.    Certain of Ralls OpCo's assets are subject to a security interest pursuant to that certain Security Agreement dated December 15, 2011, among Ralls OpCo, Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital, executed in connection with that certain Promissory Note dated of even date therewith by Ralls OpCo in favor of Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital for the principal sum of Three Hundred and Fifty Thousand Dollars (US$350,000).

## Schedule 4.5(b)

### Amendments to and Other Actions Regarding Land Contracts

(i) Corrective Work

1.  Obtain consent agreements in recordable form from the following parties in form reasonably acceptable to Purchaser:

    a.  Dan Lindsay and Ashley Lindsay

    b.  John Madison and Nellie Madison

2.  Obtain a Subordination, Non-Disturbance and Attornment Agreement (or a Non-Disturbance and Attornment Agreement if a Subordination, Non-Disturbance and Attornment Agreement is not reasonably obtainable) in recordable form from Commodity Credit Corporation in form reasonably acceptable to Purchaser, or otherwise cause the Commodity Credit Corporation mortgage to be removed as an exception to the proforma leasehold policy or policies of insurance, or alternatively Seller shall indemnify each Purchaser Indemnified Party pursuant to Article 7 of the Agreement from and against all Damages asserted against, imposed upon or incurred by one or more Purchaser Indemnified Parties, directly resulting from any failure of Seller to obtain any such agreement, in an amount not to exceed the amount of the obligations secured by the Commodity Credit Corporation mortgage as they existed as of the Effective Date plus any accrued and unpaid interest thereon.

3.  Obtain all signatures to the Consent and Accommodation Agreement proposed by and between ConAgra Foods Lamb Weston, Inc., Landowner, Oregon Windfarms, LLC and the Project Companies relating to that certain Water Use Agreement, dated July 30, 1990, a memorandum of which was recorded in Umatilla County on June 29, 1993, in Reel 237, Page 1152 and also recorded in Morrow County on July 14, 1993 as Document No. M-40795.

4.  Obtain an updated and revised survey addressing the following comments, and any other comments reasonably provided by Purchaser:

    a.  The survey should be signed and dated.
    b.  The survey should reference the date of the proforma.
    c.  The survey should define the meaning of the double gray lines in the Legend section.
    d.  The survey should define in the Legend section the meaning of the blank strip running through Sections 12, 13, and 24 on page 20.

5.  Delete the following exceptions from the proforma leasehold policy or policies of insurance, or alternatively Seller shall indemnify each Purchaser Indemnified Party pursuant to Article 7 of the Agreement from and against all Damages

asserted against, imposed upon or incurred by one or more Purchaser Indemnified Parties, directly resulting from any failure of Seller to obtain any such deletion:

a.   Ingress and egress easement in favor of Clarkson Estates, Inc.

b.   Ingress and egress easement in favor of Tucker-Echo Ranch, Inc. / Stanley Tucker and Relta Tucker / Brok Tucker and Janet Tucker

c.   Mortgage in favor of Shannon K. Hansell, f/k/a Shannon K. Madison

(ii)   Amendments

1.   Execute amendments relating to the Mader Easement and the Madison Easement to conform the names of the executing parties to the names of the landowners identified on the proforma leasehold policy or policies of insurance.

## Schedule 4.8

### Diligence Requests

1. All audited or unaudited financial statements (balance sheets and income statements)

2. Share register

3. Power Purchase Agreement and related agreements (e.g. price hedges, swaps, renewable energy credits transfer agreements)

4. Interconnection Agreement

5. Land Lease Agreements and Estoppels from Land Owners

6. Turbine Supply Agreement, Warranty and Service Agreement

7. Evidence of title of equipment transferred to project owner free and clear of any Liens, including the issuance of final lien waivers by the WTG vendor and its suppliers and subcontractors

8. Financing Agreement(s) or summary of any loans and liabilities

9. Summary of existing liens or legal actions

10. Cash grant application and determination (and sales/use tax exemption eligibility, if any

11. Wind measurements & siting information (map & coordinates) including site suitability report performed by WTG vendor or a third party and project design (as constructed)

12. FAA determinations

13. Report on compliance with project licenses (including, without limitation, from the FAA), land lease agreements and land easements of the WTG siting and technical characteristics including information on pending litigation, if any

14. Asset list for Ralls and Ralls OpCo

15. Tax returns

16. Summary of material commitments and contingencies (FAS 5 analysis)

17. Agreements with Sany Affiliates

18. Bank accounts and balance statements

19. Any labor contracts or material contracts for services

20. Financial model

21. Regulatory determinations, judgments and/or sanctions

22. WTG technical characteristics and specifications including:
   a) WTG technical specifications and descriptions including IEC classification and relevant certification (completed or in progress)
   b) Power curve guaranteed (site specific)
   c) Electrical systems specifications (power generation system and control systems) including evidence of compliance with Grid requirements (in GIA and PPA), lightning protection system
   d) Erection and commissioning manual and specifications
   e) Operation & Maintenance manuals (including preventive maintenance schedule)
   f) Scada specifications & operation manual

23. Records for the construction of the wind farm including:
   a) Foundation design including study evidencing satisfaction of foundation loads requirements and geotechnical study findings
   b) Foundation construction records (material certificates and tests performed)
   c) Wind turbines erection and commissioning records
   d) Collection Grid design including report on the satisfaction of the Grid requirements (GIA & PPA), lightning protection and grounding systems
   e) Roads and Hardstandings design ("as constructed") and compliance with O&M manual requirements and the land rights & easements owned by the project

24. Records for the Operation of the WTGs (monthly reports) including:
   a) Availability records including error occurrences
   b) Production and Wind measurement records
   c) Any power curve measurement verification campaign (planned or in execution)
   d) Any repair or replacement activity of WTG components including possible … cause analysis
   e) Access to the Scada system records
   f) List of Spare parts and consumables available any owned by the project

25. Insurance policies taken for construction and operation phases including any records for any claims under such insurance policies

**Schedule 5.4**

**Membership Interests**

High Plateau Windfarm, LLC – 100% owned by Terna Energy USA Holding Corporation

Lower Ridge Windfarm, LLC – 100% owned by Terna Energy USA Holding Corporation

Mule Hollow Windfarm, LLC – 100% owned by Terna Energy USA Holding Corporation

Pine City Windfarm, LLC – 100% owned by Terna Energy USA Holding Corporation

## Schedule 5.5(b)

### CONTRACTS

**ENTERED INTO:**

Feasibility Study Agreement between PacifiCorp and Oregon Windfarms, LLC, dated April 6, 2009. (Study completed May 18, 2009).

System Impact Study Agreement dated May 29, 2009 between PacifiCorp and Oregon Windfarms, LLC, dated May 29, 2009. (Study completed February 26, 2010).

Facilities Study Agreement between PacifiCorp and Oregon Windfarms, LLC, dated April 6, 2010. (Study completed June 9, 2010).

Surveying Contract between Primm Land Surveying, Inc. and Oregon Windfarms, LLC, dated April 29, 2010. (Ongoing work for ALTA survey).

Contract for Noise Studies between GL Garrad Hassan and Oregon Windfarms, LLC, dated October 26, 2010. (Ongoing work for noise evaluation for generic WTG).

Letter Agreement Related to Request of Oregon Windfarms, LLC to Allow the Butter Creek Project Access to the Existing Echo Project Interconnection Facilities between Oregon Windfarms, LLC and John Deere Renewables, LLC, dated October 10, 2010.

Engineering Agreement, dated November 4, 2011, among PacifiCorp Transmission Services, Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC and Pine City Windfarm, LLC.

Memorandum of Power Purchase Agreement and Fixture Filing, dated November 17, between PacifiCorp and Lower Ridge Windfarm, LLC.

Memorandum of Power Purchase Agreement and Fixture Filing, dated November 17, between PacifiCorp and High Plateau Windfarm, LLC.

Memorandum of Power Purchase Agreement and Fixture Filing, dated November 17, between PacifiCorp and Mule Hollow Windfarm, LLC.

Memorandum of Power Purchase Agreement and Fixture Filing, dated November 17, between PacifiCorp and Pine City Windfarm, LLC.

Settlement Agreement and Release, dated November 18, 2011, between PacifiCorp d/b/a PacifiCorp Power, Oregon Windfarms, LLC, Terna Energy USA Holding Corporation, Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC and Pine City Windfarm, LLC.

Small Generator Interconnect Agreement, dated November 18, 2011, between High Plateau Windfarm, LLC and PacifiCorp, as amended by (a) the Amendment to the Small Generator

Interconnection Agreement, dated December 20, 2011, (b) the Second Amendment to the Small Generator Interconnection Agreement, dated December 22, 2011 and (c) the Third Amendment to the Small Generator Interconnection Agreement, dated January 19, 2012.

Small Generator Interconnection Agreement, dated November 18, 2011, between Lower Ridge Windfarm, LLC and PacifiCorp, as amended by (a) the Amendment to the Small Generator Interconnection Agreement, dated December 20, 2011, (b) the Second Amendment to the Small Generator Interconnection Agreement, dated December 22, 2011 and (c) the Third Amendment to the Small Generator Interconnection Agreement, dated January 19, 2012.

Small Generator Interconnection Agreement, dated November 18, 2011, between Mule Hollow Windfarm, LLC and PacifiCorp, as amended by (a) the Amendment to the Small Generator Interconnection Agreement, dated December 20, 2011, (b) the Second Amendment to the Small Generator Interconnection Agreement, dated December 22, 2011 and (c) the Third Amendment to the Small Generator Interconnection Agreement, dated January 19, 2012.

Small Generator Interconnection Agreement, dated November 18, 2011, between Pine City Windfarm, LLC and PacifiCorp, as amended by (a) the Amendment to the Small Generator Interconnection Agreement, dated December 20, 2011, (b) the Second Amendment to the Small Generator Interconnection Agreement, dated December 22, 2011 and (c) the Third Amendment to the Small Generator Interconnection Agreement, dated January 19, 2012.

Power Purchase Agreement, dated November 18, 2011, between High Plateau Windfarm, LLC and PacifiCorp, together with Addendum A, Addendum B and Addendum L.

Power Purchase Agreement, dated November 18, 2011, between Lower Ridge Windfarm, LLC and PacifiCorp, together with Addendum A, Addendum B and Addendum L.

Power Purchase Agreement, dated November 18, 2011, between Mule Hollow Windfarm, LLC and PacifiCorp, together with Addendum A, Addendum B and Addendum L.

Power Purchase Agreement, dated November 18, 2011, between Pine City Windfarm, LLC and PacifiCorp, together with Addendum A, Addendum B and Addendum L.

Agreement Regarding Shared Interconnection Facilities, dated January 18, 2012, among PacifiCorp, Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC, Sand Ranch Windfarm, LLC, Oregon Trail Windfarm, LLC, Ward Butte Windfarm, LLC, Pacific Canyon Windfarm, LLC, Four Mile Canyon Windfarm, LLC, Four Corners Windfarm, LLC, Big Top, LLC, Butter Creek Power, LLC, Wagon Trail, LLC and Exelon Wind, LLC.

69 kV Power Line Agreement among Oregon Windfarms, LLC, Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC, Sand Ranch Windfarm, LLC, Oregon Trail Windfarm, LLC, Ward Butte Windfarm, LLC, Pacific Canyon Windfarm, LLC, Four Mile Canyone Windfarm, LLC, Four Corners Windfarm, LLC, Big Top, LLC, Butter Creek Power, LLC, Wagon Trail, LLC and Exelon Wind, LLC.

Wind Turbine Lockout Agreement among Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC, Sand Ranch Windfarm, LLC, Oregon Trail Windfarm, LLC, Ward Butte Windfarm, LLC, Pacific Canyon Windfarm, LLC, Four Mile Canyone Windfarm, LLC, Four Corners Windfarm, LLC, Big Top, LLC, Butter Creek Power, LLC, Wagon Trail, LLC and Exelon Wind, LLC.

## Schedule 5.6

### LAND CONTRACTS AND REAL PROPERTY

1. **Underlying Easements** – the Project Companies are not parties to these agreements, but the land rights conveyed by Oregon Windfarms, LLC to the Project Companies are derived from these agreements:

   a. Madison Easement: That certain Grant of Easement and Easement Agreement dated as of February 15, 2006, by and between Kent Madison and Shannon Madison, husband and wife, and Madison Ranches Inc., an Oregon corporation, as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, as grantee, which was recorded in the real property records of Umatilla County, Oregon (the **"Umatilla Records"**) on February 22, 2006 as Instrument No. 2006-4960418, and which was amended and superseded in its entirety by (1) that certain Amended and Restated Grant of Easement and Easement Agreement effective as of August 16, 2007 and (2) that certain Second Amended and Restated Grant of Easement and Easement Agreement effective as of July 8, 2008, a memorandum of which was recorded in the Umatilla Records on July 11, 2008 as Instrument No. 2008-5390563, and which was also recorded in the real property records of Morrow County, Oregon (the **"Morrow Records"**) on July 15, 2008 as Document No. 2008-22317.

   b. Mader Easement: That certain Grant of Easement and Easement Agreement dated as of November 14, 2005, by and between L. Franklin Mader and C. LaVonne Mader, Shannon Lynn Rust, Kirk D. Mader, Clarkston Development Company, a Washington corporation, William R. Tomlinson and Inez Tomlinson, husband and wife, William and Inez Tomlinson Trust, and/or William R. Tomlinson, collectively as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, as grantee, which was recorded in the Umatilla Records on February 22, 2006 as Instrument No. 2006-4960483, and which was amended and superseded in its entirety by (1) that certain Amended and Restated Grant of Easement and Easement Agreement effective as of June 4, 2007 and (2) that certain Second Amended and Restated Grant of Easement and Easement Agreement effective as of July 8, 2008, a memorandum of which was recorded in the Umatilla Records on July 11, 2008 as Document No. 2008-5390564, and which was also recorded in the Morrow Records on July 15, 2008 as Document No. 2008-22318.

   c. Christensen Easement: That certain Grant of Easement and Easement Agreement dated as of April 21, 2009, by and between Ivar L. Christensen and Lina G. Christensen, husband and wife, as to Tract 2 and Ivar & Lina L.L.C., an Oregon limited liability company, as to Tract 1, as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, as grantee, a memorandum of which was recorded in the Morrow Records on June 10, 2009 as Document No. M-2009-24009.

    d. <u>Doherty Easement:</u>  That certain Grant of Easement and Easement Agreement dated as of May 10, 2010, by and between William J. Doherty, as to Tract One; and William James Doherty and Joan Frances Doherty, husband and wife, as to Tract Two, as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, as grantee, a memorandum of which was recorded in the Morrow Records on August 17, 2010 as Document No. 2010-26684.

    e. <u>Lindsay Section 9 Access Easement:</u>  That certain Easement Agreement dated May 31, 2011, between Lawrence D. Lindsay and Corrine Ann Lindsay, as tenants in common, together as grantor, and Oregon Windfarms, LLC, an Oregon limited liability company, which was recorded in the Morrow Records on June 1, 2011 as Document No. 2011-28150.

    f. <u>Lindsay Section 23 Easement:</u>  That certain Agreement for Grant of Perpetual Easement dated June 15, 2010, by and among Lawrence D. Lindsay and Corrine Ann Lindsay, as tenants in common, together as grantor, and Oregon Windfarms, LLC, an Oregon limited liability company, which was recorded in the Morrow Records on August 17, 2010 as Document No. 2010-26687.

    g. <u>Lindsay Section 35 Easement:</u>  That certain Agreement for Grant of Perpetual Easement dated June 15, 2010, by and among Lawrence D. Lindsay and Corrine Ann Lindsay, as tenants in common, together as grantor, and Oregon Windfarms, LLC, an Oregon limited liability company, which was recorded in the Morrow Records on August 17, 2010 as Document No. 2010-26688.

**2.**    **Subeasements** – the land rights conveyed by Oregon Windfarms, LLC to the Project Companies are set forth in these agreements:

    a. <u>Lower Ridge Subeasement:</u>  That certain Grant of Subeasement and Subeasement Agreement by and between Oregon Windfarms, LLC, an Oregon limited liability company, as grantor, and Lower Ridge Windfarm, LLC, an Oregon limited liability company, as grantee, dated as of December 10, 2010, a memorandum of which was recorded in the Morrow Records on August 9, 2011 as Document No. 2011-28559, and re-recorded in the Morrow Records (1) on August 19, 2011, as Document No. 2011-28649, and (2) on September 15, 2011 as Document No. 2011-28792; and also recorded in the Umatilla Records on August 15, 2011 as Document No. 2011-5810441, and re-recorded in the Umatilla Records on September 2, 2011 as Document No. 2011-5820232.

    b. <u>High Plateau Subeasement:</u>  That certain Grant of Subeasement and Subeasement Agreement by and between Oregon Windfarms, LLC, an Oregon limited liability company, as grantor, and High Plateau Windfarm, LLC, an Oregon limited liability company, as grantee, dated as of December 10, 2010, a memorandum of which was recorded in the Morrow Records August 9, 2011 as Document No. 2011-28558, and re-recorded in the Morrow Records on September 15, 2011 as Document No. 2011-28791; and also recorded in the Umatilla Records on August

15, 2011 as Document No. 2011-5810440, and re-recorded in the Umatilla Records on September 8, 2011 as Document No. 2011-5820368.

c.   Mule Hollow Subeasement:   That certain Grant of Subeasement and Subeasement Agreement by and between Oregon Windfarms, LLC, an Oregon limited liability company, as grantor, and Mule Hollow Windfarm, LLC, an Oregon limited liability company, as grantee, dated as of December 10, 2010, a memorandum of which was recorded in the Morrow Records August 9, 2011 as Document No. 2011-28560, and re-recorded in the Morrow Records on September 15, 2011 as Document No. 2011-28793; and also recorded in the Umatilla Records on August 15, 2011 as Document No. 2011-5810442, and re-recorded in the Umatilla Records on September 8, 2011 as Document No. 2011-5820369.

d.   Pine City Subeasement:   That certain Grant of Subeasement and Subeasement Agreement by and between Oregon Windfarms, LLC, an Oregon limited liability company, as grantor, and Pine City Windfarm, LLC, an Oregon limited liability company, as grantee, dated as of December 10, 2010, a memorandum of which was recorded in the Morrow Records August 9, 2011 as Document No. 2011-28561, and re-recorded in the Morrow Records on September 15, 2011 as Document No. 2011-28794; and also record in the Umatilla Records on August 15, 2011 as Document No. 2011-5810443, and re-recorded in the Umatilla Records on September 8, 2011 as Document No. 2011-5820370

3.   **69 kV Line Agreement**

a.   69 kV Line:   69 kV Power Line Agreement among Oregon Windfarms, LLC, Lower Ridge Windfarm, LLC, High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC, Sand Ranch Windfarm, LLC, Oregon Trail Windfarm, LLC, Ward Butte Windfarm, LLC, Pacific Canyon Windfarm, LLC, Four Mile Canyone Windfarm, LLC, Four Corners Windfarm, LLC, Big Top, LLC, Butter Creek Power, LLC, Wagon Trail, LLC and Exelon Wind, LLC, together with the underlying licenses and easements referred to therein.

4.   **Acknowledgement and Non-Disturbance Agreements** – entered into between landowners, Oregon Windfarms, LLC, and the Project Companies:

e.   Madison Acknowledgement:   That certain Acknowledgement and Non-Disturbance Agreement dated effective as of December 10, 2010, among Kent Madison and Madison Ranches, Inc., an Oregon corporation, as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Lower Ridge Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, collectively as grantees, which was recorded in the Umatilla Records on November 21, 2011 as Document No. 2011-5850202, and

which was also recorded in the Morrow Records on November 29, 2011 as Document No. 2011-29216.

f.  Mader/Rust Acknowledgement:    That certain Acknowledgement and Non-Disturbance Agreement dated effective as of December 10, 2010, among Frank Mader and LaVonne Mader, Trustees under the Frank and LaVonne Mader Living Trust dated September 15, 2008, as to an undivided 40% interest, Shannon Lynn Rust, as to an undivided 40% interest and Clarkston Development Company, a Washington corporation, as to an undivided 20% interest, collectively as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Lower Ridge Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, collectively as grantees, which was recorded in the Umatilla Records on November 21, 2011 as Document No. 2011-5850201, and which was also recorded in the Morrow Records on November 29, 2011 as Document No. 2011-29215.

g.  Christensen Acknowledgement:    That certain Acknowledgement and Non-Disturbance Agreement dated effective as of December 10, 2010, among Ivar & Lina, L.L.C., an Oregon limited liability company, as to Tract One, and Ivar L. Christensen and Lina G. Christensen, as tenants by the entirety as to Tract Two, collectively as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Lower Ridge Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, collectively as grantees, which was recorded in the Morrow Records on November 29, 2011 as Document No. 2011-29212.

h.  Doherty Acknowledgement:    That certain Acknowledgement and Non-Disturbance Agreement dated effective as of December 10, 2010, among William J. Doherty, as to Tract One, and William James Doherty and Joan Frances Doherty, husband and wife, as to Tract Two, collectively as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Lower Ridge Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, collectively as grantees, which was recorded in the Morrow Records on November 29, 2011 as Document No. 2011-29213.

i.  Lindsay Acknowledgement:    That certain Acknowledgement and Non-Disturbance Agreement dated effective as of December 10, 2010, among Lawrence D. Lindsay and Corrine Ann Lindsay, as tenants in common, as grantors, and Oregon Windfarms, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Lower Ridge

Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, collectively as grantees, which was recorded in the Morrow Records on November 29, 2011 as Document No. 2011-29214.

5.   **Lender Agreements** – these agreements relate to recorded mortgages and deeds of trust burdening the Real Property underlying the Projects; the MONY SNDA has not been executed by all parties or recorded:

a.   Zions Bank NDA:   That certain Nondisturbance and Attornment Agreement entered into as of October 21, 2011, by and between U.S. Bank National Association, as Custodian/Trustee for Zions First National Bank, a chartered National Bank; Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was recorded in the real property records of Morrow County, Oregon on February 6, 2012 as Document No. 2012-29529.

b.   Banner Bank Subordination:   That certain Subordination Agreement executed as of December 5, 2011, by Banner Bank of Oregon, a Washington bank, for the benefit of Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was recorded in the real property records of Morrow County, Oregon on December 15, 2011 as Document No. 2011-29325.

c.   Bank of Eastern Oregon NDA:   That certain Nondisturbance and Attornment Agreement entered into as of December 2, 2011, by and between Bank of Eastern Oregon, an Oregon chartered bank, as grantor; and Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, as grantees, which was recorded in the real property records of Morrow County, Oregon on February 6, 2012 as Document No. 2012-29528.

d.   Community Bank Subordination:   That certain Subordination Agreement executed as of December 14, 2011, by and between Community Bank, an Oregon state chartered bank, for the benefit of Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was

recorded in the real property records of Umatilla County, Oregon on December 19, 2011 as Document No. 2011-5860209.

e. <u>MONY SNDA:</u> That certain Subordination, Nondisturbance and Attornment Agreement (Subeasements) entered into as of _____, 2012, by MONY Life Insurance Company of New York, a New York corporation f/k/a The Mutual Life Insurance Company of New York, a New York Corporation, and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was recorded in the real property records of Umatilla County, Oregon on _____, 2012 as Document No. _____ _____, and which was also recorded in the real property records of Morrow County, Oregon on _____, 2012 as Document No. _____ _____.

6. **Other Executed Title Curative Agreements** – these agreements relate to recorded water use and farm tenant agreements which burden the Madison property; the ConAgra Consent and Accommodation Agreement has not been executed by all parties or recorded:

a. <u>ConAgra Consent and Accommodation Agreement:</u> That certain Consent and Accommodation Agreement entered into on _____, 2012, by and between ConAgra Foods Lamb Weston, Inc., a Delaware corporation and successor-in-interest to Lamb Weston, Inc., also a Delaware corporation; Landowner; Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was recorded in the real property records of Umatilla County, Oregon on _____, 2012 as Document No. _____ _____, and which was also recorded in the real property records of Morrow County, Oregon on _____, 2012 as Document No. _____

b. <u>Royale Columbia Farms SNDA:</u> That certain Subordination and Nondisturbance Agreement made and entered into as of January 10, 2012, between Royale Columbia Farms, Inc., an Oregon corporation and Betz and McDevitt Real Estate, L.L.C., an Oregon limited liability company and successor-in-interest to Betz-McDevitt Real Estate, a general partnership; Oregon Windfarms, LLC, an Oregon limited liability company; and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, which was recorded in the real property records of Umatilla County, Oregon on January 30, 2012 as Document No. 2012-5870455, and which was also recorded in the real

property records of Morrow County, Oregon on February 6, 2012 as Document No. 2012-29531.

7.     **Other Anticipated Agreements** – these agreements are currently being negotiated and have not been executed by any party.

a.     <u>Shannon Hansell NDA:</u>  That certain Nondisturbance and Attornment Agreement entered into as of _____, 20___, by and between Shannon K. Hansell, formerly known as Shannon K. Madison, as grantor, and Lower Ridge Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, and Pine City Windfarm, LLC, an Oregon limited liability company, as grantees, which was recorded in the real property records of Umatilla County, Oregon on _____, 20___ as Document No. _____.  And any covenants regarding setbacks required by Shannon Hansell as consideration for executing the foregoing NDA.

8.     **Other Potential Agreements**

a.     The subeasements grant the rights to erect and use power lines, but a pole hanging agreement with Exelon may be required if the Projects desire to use existing poles.

9.     **Real Property** – None of Oregon Windfarms, LLC or the Project Companies owns fee title to any real property underlying the Projects.  Oregon Windfarms, LLC obtained its real property rights through the easements described above.

## Schedule 5.8

### CONSENTS AND APPROVALS

Third Party Consents to be Obtained by Seller

Notify County Planning Commission of new contact information in connection with the Approval of Land Use Decision Request LUD-120-10.

Notify County Planning Commission of new contact information in connection with the Approval of Conditional Use Request CUP-N-285.

Third Party Consents to be Obtained by Purchaser

None.

**Schedule 5.9**

**PERMITS**

## SECTION 1: PERMITS/APPROVALS OBTAINED

Permits

Approval of Land Use Decision Request LUD-120-10, dated October 2010, by Umatilla County to Oregon Windfarms, LLC, as extended by Extension of Land Use Decision Request LUD-120-10, dated September 2011, by Umatilla County to Oregon Windfarms LLC (copy required to be provided to Morrow County Planning Director)

Approval of Conditional Use Request CUP-N-285, dated September 1, 2010, by Morrow County Planning Department to Oregon Windfarms, LLC (copy required to be provided to Umatilla County Planning Director)

Determination of No Hazard to Air Navigation, dated September 14, 2010, issued by Federal Aviation Administration for Wind Turbine BC 31

Determination of No Hazard to Air Navigation, dated September 14, 2010, issued by Federal Aviation Administration for Wind Turbine BC 32

Determination of No Hazard to Air Navigation, dated September 14, 2010, issued by Federal Aviation Administration for Wind Turbine BC 33

Determination of No Hazard to Air Navigation, dated September 14, 2010, issued by Federal Aviation Administration for Wind Turbine BC 34

Determination of No Hazard to Air Navigation, dated September 14, 2010, issued by Federal Aviation Administration for Wind Turbine BC 35

Determination of No Hazard to Air Navigation, dated September 21, 2010, issued by Federal Aviation Administration for Wind Turbine BC 21

Determination of No Hazard to Air Navigation, dated September 21, 2010, issued by Federal Aviation Administration for Wind Turbine BC 22

Determination of No Hazard to Air Navigation, dated September 21, 2010, issued by Federal Aviation Administration for Wind Turbine BC 23

Determination of No Hazard to Air Navigation, dated September 21, 2010, issued by Federal Aviation Administration for Wind Turbine BC 24

Determination of No Hazard to Air Navigation, dated September 21, 2010, issued by Federal Aviation Administration for Wind Turbine BC 25

Determination of No Hazard to Air Navigation, dated September 30, 2010, issued by Federal Aviation Administration for Wind Turbine BC56

Determination of No Hazard to Air Navigation, dated September 30, 2010, issued by Federal Aviation Administration for Wind Turbine BC57

Determination of No Hazard to Air Navigation, dated September 30, 2010, issued by Federal Aviation Administration for Wind Turbine BC58

Determination of No Hazard to Air Navigation, dated September 30, 2010, issued by Federal Aviation Administration for Wind Turbine BC59

Determination of No Hazard to Air Navigation, dated September 30, 2010, issued by Federal Aviation Administration for Wind Turbine BC60

Determination of No Hazard to Air Navigation, dated June 22, 2011, issued by Federal Aviation Administration for Wind Turbine BC51

Determination of No Hazard to Air Navigation, dated June 22, 2011, issued by Federal Aviation Administration for Wind Turbine BC52

Determination of No Hazard to Air Navigation, dated June 22, 2011, issued by Federal Aviation Administration for Wind Turbine BC53B

Determination of No Hazard to Air Navigation, dated June 22, 2011, issued by Federal Aviation Administration for Wind Turbine BC54

Determination of No Hazard to Air Navigation, dated June 22, 2011, issued by Federal Aviation Administration for Wind Turbine BC55A

Butter Creek Project Weed Control Plan, dated January 24, 2012, approved by Morrow County Public Works Department/Weed Control Supervisor for Christensen Farms and Oregon Windfarms, LLC

Butter Creek Project Weed Control Plan, dated January 24, 2012, approved by Morrow County Public Works Department/Weed Control Supervisor for Doherty Farms and Oregon Windfarms, LLC

Butter Creek Project Weed Control Plan, dated January 24, 2012, approved by Morrow County Public Works Department/Weed Control Supervisor for Madison Farms and Oregon Windfarms, LLC

Butter Creek Project Weed Control Plan, dated January 24, 2012, approved by Morrow County Public Works Department/Weed Control Supervisor for Mader-Rust Farms and Oregon Windfarms, LLC

QF Filings

Federal Regulatory Energy Commission Form 556 Certification of Qualifying Facility (QF) Status for a Small Power Production or Cogeneration Facility for High Plateau Windfarm, LLC filed

Federal Regulatory Energy Commission Form 556 Certification of Qualifying Facility (QF) Status for a Small Power Production or Cogeneration Facility for Lower Ridge Windfarm, LLC filed

Federal Regulatory Energy Commission Form 556 Certification of Qualifying Facility (QF) Status for a Small Power Production or Cogeneration Facility for Mule Hollow Windfarm, LLC filed

Federal Regulatory Energy Commission Form 556 Certification of Qualifying Facility (QF) Status for a Small Power Production or Cogeneration Facility for Pine City Windfarm, LLC filed

Emergency Contingency Plans

Approved Emergency Contingency Plan from Morrow County for Pine City Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Morrow County for Lower Ridge Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Morrow County for Mule Hollow Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Morrow County for High Plateau Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Umatilla County for Pine City Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Umatilla County for Lower Ridge Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Umatilla County for Mule Hollow Windfarm LLC, dated December 2011

Approved Emergency Contingency Plan from Umatilla County for High Plateau Windfarm LLC, dated December 2011

Surveys and Studies

Biological Study Results for Butter Creek Projects, dated November 21, 2011, prepared by Northwest Wildlife Consultants, Inc. for Pine City Windfarm, LLC, Lower Ridge Windfarm, LLC, Mule Hollow Windfarm, LLC, High Plateau Windfarm, LLC and Terna Energy USA Holding Corporation

Wind Power GeoPlanner Licensed Microwave Report, dated November 29, 2011, prepared by Comsearch for Terna Energy USA Holding Corporation

Report of Geotechnical Site Investigation, dated December 2011, prepared by GN Northern, Inc. Consulting Geotechnical Engineers for Aubrey Silvey Enterprises, Inc.

Butter Creek Windfarm Cultural Resource Survey for Morrow and Umatilla Counties, Oregon, dated January 2012, prepared by Tetra Tech for Pine City Windfarm, LLC, Lower Ridge Windfarm, LLC, Mule Hollow Windfarm, LLC and High Plateau Windfarm, LLC

## SECTION 2: PERMITS/APPROVALS NOT OBTAINED

### Environmental/Historic

*404 Permit (Water Quality)*: Madison land has a bank to a dry creek which will be crossed by the collection line, but this jurisdictional dry creek can be spanned by the electrical line so no 404 permit is currently expected to be required.

*Oregon Department of Fish and Wildlife Approval*: Department will review and approve reports prepared by consultants; post-construction monitoring required.

*Flood Zone Permits*: Morrow County Flood Plain Permit may be required for the collection line that crosses a 100 year floodplain east of Alpine Road, but exemption possibilities may apply.

*Wetland Permits*: Review currently indicates no wetlands impacted.

### Pollution/Storm Water Discharge

*NPDES (SWPPP)*: The state permit application has been filed; awaiting building permit for final approval.

*Hazardous Material Storage Permits*: Contractors and operators will be required to maintain hazardous material storage and SPCC plans.

### Civil/Road/Land

*Zoning Permits*: After the conditions attached to the CUP are satisfied, a zoning permit to be issued upon application.

*Utility Permits, ROW Permits and Utility Crossing Permits*: Permits require engineering design.

*State Highway Access and Use Permits*: Permits to be obtained by turbine supplier or contractor.

*County Road Access and Use Permit*: Permits require engineering design.

*Road Crossing Permits/Oversize/Overweight Road Use Permits and County Road Occupancy Permits*: The projects will require a road crossing permit from Morrow County where the collection system line crosses Alpine Lane and from ODOT where the collection system crosses Highway 207. To be completed after engineering design details on the pole location and height

are known.  Morrow County requested that projects negotiate a road use agreement that will cover usage of county roads during and after construction.  Umatilla County has a standard road use permit process.  Additional state and local permits for transportation to the site will be the responsibility of the contractor/transportation company.

    a)   *Access Permit for New Entry to Doherty Property from Melville Road (Morrow County)*: Part of road use agreement with Morrow County; Public Works Director has provided guidelines for preparing request.

    b)   *Road Use Permits for Bombing Range Road, Alpine Land and Melville Road (Morrow County)*: Part of road use agreement with Morrow County; Public Works Director has provided guidelines for preparing request; details of transportation plan required for completion.

    c)   *Road Use Permits for Madison Road, Col. Jordan Road (Umatilla County)*: Agreement reached with Public Works Director; awaiting commissioner's signature.

    d)   *Road Crossing Permit for Utility Line on Alpine Lane (Morrow County)*: Requires pole location and height details for completion.

    e)   *Road Crossing Permit for Hwy 207 (ODOT)*: Requires pole location and height details for completion.

    f)   *Road Use Permit for Hwy 207 (ODOT)*: Requires transportation plan.

    g)   *MOU with Morrow County for Road Improvements and Maintenance*: Public Works Director has provided guidelines for preparing request.  Design details required for completion.

*Rezoning Permits (O&M)*: The project facilities are located in the EFU zone; commercial buildings are not a permitted use so O&M facilities will be located off site in a commercial zone.

*Well Permit*: All water in EFU zones is designated for agricultural use; temporary waiver required to divert water to commercial use for construction.  Madison Farms has applied for a permit to divert well water on their property for project construction.  Water can also be trucked in from Hermiston or another nearby community.  Arrangements for obtaining and paying for water required during construction expected to be the responsibility of contractor.

*Septic Permit*: No septic permit is known to be required for the completed facilities.  If the contractor requires one during construction then contractor expected to be responsible.

*Grading Permits, Temporary Trailer/Storage Land Permit, Dust Control Permit, Explosives Permits, OSHA Permits, Traffic Control Permit, Foundation Permit, Erection Permit*: Several permits may be required for the construction phase that directly relate to construction activities.  Requirements may depend on design details, soil conditions, source of materials and other matters.  It is expected that the contractor will be responsible for identifying and obtaining these permits.

*Building Permit*: Requires design details after zoning permit is issued.

<u>PPA and GIA</u>

*Conditions Identified in Power Purchase Agreement and Interconnection Agreement*

Miscellaneous

*Aeronautical Hazard Permit*

*Electrical Permits and Electrical Inspection (State of Oregon)*: Permits expected to be obtained by electrical contractor; inspection required before energizing system.

*Noise Study for Morrow County*: Study in process for generic WTG; to be submitted to County Planning Director prior to construction.

*Post Reclamation Guarantee with Morrow County*: Required after construction.

*Record Covenants Not to Sue (Umatilla County)*: In process.

*Record Right to Farm Disclaimer (Morrow County)*: In process.

*Final Site Plan (Morrow County)*: To be completed after construction.

*Insurance Certificates (Morrow County)*: Required for construction and operations.

*Insurance Certificates (Umatilla County)*: Required for construction and operations.

*Confederated Tribes of the Umatilla Indian Reservation (re Cultural Resources)*: Materials submitted to CTUIR; no issues have been indicated; proof of consultation to be submitted to county prior to construction.

*Oregon Department of Fish and Wildlife (re Minimizing Impacts on Birds, Wildlife and Habitat)*: Report reviewed and approved by ODFW; proof of consultation has been submitted to county; post-construction avian fatality monitoring program will be required.

*Coordination with Westland Irrigation District (re Impacts to District's Irrigation Water Delivery System)*: Proof of consultation to be submitted to county prior to construction.

*Cultural Resource Survey (per Agreement with Oregon State Historic Preservation Office)*: Consultant report provided to SHPO; no issues have been identified.

*Covenant Not to Sue (for Parcels and Underlying Substation and Transmission Corridor)*: To be submitted to County Planning Director prior to construction.

*Weed Control and Re-Vegetation Plan (Developed in Consultation with Umatilla County Weed Control Office)*: Plan completed; to be submitted to County Planning Director prior to construction.

*Fire Prevention and Emergency Response Plans*: Plans completed; to be submitted to Morrow and Umatilla County Planning Directors prior to construction.

*Decommissioning Plan*: To be submitted prior to construction.

*Haul Route and Road Use Agreement (Developed in Consultation with Umatilla County Public Works Director)*: Agreement completed with Public Works Director; awaiting Commissioner's signature; to be submitted to County Planning Director prior to construction.

**Schedule 5.19**

**WIND DATA**

[See attached]

| Folder | Subfolder | Subfolder | Files | Comments |
|---|---|---|---|---|
| Wind resource | Met Masts | Rust 50M1 Met Data | Rust 50M1 013006 to 030207.zip | original wind data |
| | | | Rust 50M1 030207 to 030408.zip | |
| | | | Rust 50M1 030408 to 072909.zip | |
| | | | Rust 50M1 072909 to 060810.zip | |
| | | | Rust 50M1 060910 to 013111.zip | |
| | | | Rust 50M1 040610 to 061311.zip | |
| | | | Rust#1 Install log refurbish Jan 2010.xlsx | Commissioning & installation sheets |
| | | | Rust Met Towers Commissioning Sheet_rev1-Rust1.pdf | |
| | | Rust 50M2 Met Data | Rust 50M2 020111 to 061911.zip | original wind data |
| | | | Rust 50M2 052209 to 082009.zip | |
| | | | Rust 50M2 050910 to 013111.zip | |
| | | | Rust 50M2 061308 to 052209.zip | |
| | | | Rust 50M2 082009 to 060810.zip | |
| | | | Rust 50M2 111105 to 061308.zip | |
| | | | EVMetTowersCommissioningSheet_Rust#2.doc | Commissioning & installation sheets |
| | | | Rust #2 Install log refurbish Jan 2010.xlsx | |
| | | Rust 50M3 Met Data | Rust 50M3 030111 to 060711.zip | original wind data |
| | | | Rust 50M3 052507 to 061308.zip | |
| | | | Rust 50M3 060809 to 061210.zip | |
| | | | Rust 50M3 061210 to 071910.zip | |
| | | | Rust 50M3 061210 to 101810.zip | |
| | | | Rust 50M3 061308 to 060809.zip | |
| | | | Rust 50M3 101810 to 030111.zip | |
| | | | Rust#3 Installation Log refurbish Jan 2010.xlsx | Commissioning & installation sheets |
| | | | EVMetTowersCommissioningSheet_Rust#3_Madison#1.doc | |
| | | Christensen 60M1 Met Data | Christensen 60M1 022511 to 060711.zip | original wind data |
| | | | Christensen 60M1 060809 to 061210.zip | |
| | | | Christensen 60M1 061210 to 101810.zip | |
| | | | Christensen 60M1 101810 to 022411.zip | |
| | | | Christensen Commissioning Record.pdf | Commissioning & installation sheets |
| | | | Christensen Refit Log.xls | |

| Category | File | Description |
|---|---|---|
| Madison 50M1 Met Data | Madison 50M1 020111 to 061911.zip | original wind data |
| | Madison 50M1 050609 to 060809.zip | |
| | Madison 50M1 052707 to 062408.zip | |
| | Madison 50M1 060910 to 013111.zip | |
| | Madison 50M1 062408 to 091708.zip | |
| | Madison 50M1 070109 to 060810.zip | |
| | Madison 50M1 091708 to 050609.zip | |
| | Madison 50M1 Commissioning sheet.doc | Commissioning sheet |
| Luciani 60M2 Met Data | Luciani 60M2 030111 to 060711.zip | original wind data |
| | Luciani 60M2 061210 to 071910.zip | |
| | Luciani 60M2 070909 to 061210.zip | |
| | Luciani 60M2 081710 to 101810.zip | |
| | Luciani 60M2 101810 to 030111.zip | |
| | Luciani 60M2 commissioning sheet.pdf | Commissioning sheet |
| Hawkins 60M1 Met Data | Hawkins 60M1 031711 to 060711.zip | original wind data |
| | Hawkins1 Installation Log.xlsx | installation sheet |
| Lindsay 60M1 Met Data | Lindsay 60M1 032311 to 060811.zip | original wind data |
| | Lindsay1 Installation Log.xls.xlsx | installation sheet |
| Myers 60M1 Met Data | Myers1 Installation Log.xlsx | original wind data |
| | Myers 60M1 032111 to 060711.zip | installation sheet |
| WIND DATA UPDATE - 11-10-11 - ALL MET TOWERS | Christensen 60M1 060711 to 102411.zip | Updated original wind data for all masts |
| | Hawkins 60M1 060711 to 102411.zip | |
| | Lindsay 60M1 060811 to 102411.zip | |
| | Luciani 60M2 060711 to 102411.zip | |
| | Madison 50M1 062011 to 110411.zip | |
| | Myers 60M1 060711 to 102411.zip | |
| | Rust 50M1 061311 to 102411.zip | |
| | Rust 50M2 062011 to 102411.zip | |
| | Rust 50M3 060711 to 102411.zip | |
| Met Masts photos | | masts photos |
| | Measurement status summary | Overview - General infos for the masts |
| | Met Data Logbook (25 May 2010) | |
| | Meteorological Tower Information | |

**Schedule 6.4**

**RALLS OPCO MEMBERSHIP INTERESTS**

Ralls Wind Farm, LLC – 100% owned by Ralls Corporation

## Schedule 6.5

### FINANCIAL STATEMENTS OF RALLS AND RALLS OPCO

[See attached]

# Ralls Corporation
## Balance Sheet
### As of December 31, 2011

|  | Dec 31, 11 | Dec 31, 10 | $ Change |
|---|---|---|---|
| **ASSETS** | | | |
| **Current Assets** | | | |
| **Checking/Savings** | | | |
| **Bank of America** | 163,920.73 | 2,902.67 | 161,018.06 |
| **Total Checking/Savings** | 163,920.73 | 2,902.67 | 161,018.06 |
| **Other Current Assets** | | | |
| Due from Sany America | 912,500.00 | 0.00 | 912,500.00 |
| **Total Other Current Assets** | 912,500.00 | 0.00 | 912,500.00 |
| **Total Current Assets** | 1,076,420.73 | 2,902.67 | 1,073,518.06 |
| **Other Assets** | | | |
| Investment in Ralls Wind Farm | 10,638,096.63 | 3,089,748.69 | 7,548,347.94 |
| **Total Other Assets** | 10,638,096.63 | 3,089,748.69 | 7,548,347.94 |
| **TOTAL ASSETS** | 11,714,517.36 | 3,092,651.36 | 8,621,866.00 |
| **LIABILITIES & EQUITY** | | | |
| **Equity** | | | |
| Additional Paid in Capital | 12,225,603.23 | 3,253,472.00 | 8,972,131.23 |
| Retained Earnings | -160,820.64 | 0.00 | -160,820.64 |
| Net Income | -350,265.23 | -160,820.64 | -189,444.59 |
| **Total Equity** | 11,714,517.36 | 3,092,651.36 | 8,621,866.00 |
| **TOTAL LIABILITIES & EQUITY** | 11,714,517.36 | 3,092,651.36 | 8,621,866.00 |

2:55 PM
02/24/12
Accrual Basis

# Ralls Corporation
# Profit & Loss
### January through December 2011

|  | Jan - Dec 11 | Jan - Dec 10 | $ Change |
|---|---|---|---|
| **Ordinary Income/Expense** |  |  |  |
| **Expense** |  |  |  |
| Bank Service Charges | 4,120.17 | 474.33 | 3,645.84 |
| Office Supplies | 0.00 | 95.00 | -95.00 |
| **Total Expense** | 4,120.17 | 569.33 | 3,550.84 |
| **Net Ordinary Income** | -4,120.17 | -569.33 | -3,550.84 |
| **Other Income/Expense** |  |  |  |
| **Other Income** |  |  |  |
| Gain/Loss from Ralls Wind Farm | -346,145.06 | -160,251.31 | -185,893.75 |
| **Total Other Income** | -346,145.06 | -160,251.31 | -185,893.75 |
| **Net Other Income** | -346,145.06 | -160,251.31 | -185,893.75 |
| **Net Income** | -350,265.23 | -160,820.64 | -189,444.59 |

2:47 PM
02/24/12
Accrual Basis

# Ralls Wind Farm LLC
# Balance Sheet
## As of December 31, 2011

|  | Dec 31, 11 | Dec 31, 10 | $ Change |
|---|---|---|---|
| **ASSETS** |  |  |  |
| **Current Assets** |  |  |  |
| **Checking/Savings** |  |  |  |
| Bank Of America | 1,164,425.84 | 87,551.05 | 1,076,874.79 |
| **Total Checking/Savings** | 1,164,425.84 | 87,551.05 | 1,076,874.79 |
| **Accounts Receivable** |  |  |  |
| Accounts Receivable | 81,757.09 | 0.00 | 81,757.09 |
| **Total Accounts Receivable** | 81,757.09 | 0.00 | 81,757.09 |
| **Total Current Assets** | 1,246,182.93 | 87,551.05 | 1,158,631.88 |
| **Fixed Assets** |  |  |  |
| Wind Turbines | 16,642,759.76 | 0.00 | 16,642,759.76 |
| Land Improvements - Roads | 582,984.26 | 0.00 | 582,984.26 |
| Land Improvements - Other | 6,800.00 | 0.00 | 6,800.00 |
| Substation - Qualified | 254,625.50 | 0.00 | 254,625.50 |
| Substation - Unqualified | 18,728.37 | 0.00 | 18,728.37 |
| Buildings & improvements | 60,134.82 | 0.00 | 60,134.82 |
| Transportation Equipment | 14,318.86 | 0.00 | 14,318.86 |
| Accumulated Depreciation | -445,028.00 | 0.00 | -445,028.00 |
| CIP - New Project | 1,447,751.40 | 16,800.00 | 1,430,951.40 |
| Construction in Progress - Inel | 0.00 | 95,000.00 | -95,000.00 |
| Construction work in process | 0.00 | 1,389,182.84 | -1,389,182.84 |
| **Total Fixed Assets** | 18,583,074.97 | 1,500,982.84 | 17,082,092.13 |
| **TOTAL ASSETS** | 19,829,257.90 | 1,588,533.89 | 18,240,724.01 |
| **LIABILITIES & EQUITY** |  |  |  |
| **Liabilities** |  |  |  |
| **Current Liabilities** |  |  |  |
| **Accounts Payable** |  |  |  |
| Accounts Payable | 1,244,718.00 | -1,501,214.80 | 2,745,932.80 |
| **Total Accounts Payable** | 1,244,718.00 | -1,501,214.80 | 2,745,932.80 |
| **Other Current Liabilities** |  |  |  |
| Due to the US Treasury - 1603 | 547,500.00 | 0.00 | 547,500.00 |
| **Total Other Current Liabilities** | 547,500.00 | 0.00 | 547,500.00 |
| **Total Current Liabilities** | 1,792,218.00 | -1,501,214.80 | 3,293,432.80 |
| **Long Term Liabilities** |  |  |  |
| Note Payable - AVIC | 800,000.00 | 0.00 | 800,000.00 |
| Note Payable - Sany America | 1,635,000.00 | 0.00 | 1,635,000.00 |
| Deferred Revenue - Treasury Gra | 4,963,943.27 | 0.00 | 4,963,943.27 |
| **Total Long Term Liabilities** | 7,398,943.27 | 0.00 | 7,398,943.27 |
| **Total Liabilities** | 9,191,161.27 | -1,501,214.80 | 10,692,376.07 |
| **Equity** |  |  |  |
| Equity - Ralls Corporation | 11,144,493.00 | 3,250,000.00 | 7,894,493.00 |
| Members Equity | -160,251.31 | 0.00 | -160,251.31 |
| Net Income | -346,145.06 | -160,251.31 | -185,893.75 |
| **Total Equity** | 10,638,096.63 | 3,089,748.69 | 7,548,347.94 |
| **TOTAL LIABILITIES & EQUITY** | 19,829,257.90 | 1,588,533.89 | 18,240,724.01 |

2:48 PM
02/24/12
Accrual Basis

# Ralls Wind Farm LLC
# Profit & Loss
### January through December 2011

|  | Jan - Dec 11 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Power Sales - Southwestern Publ | 424,834.44 |
| Other Income | 53.02 |
| **Total Income** | 424,887.46 |
| **Cost of Goods Sold** | |
| Freight and Shipping Costs | 3,914.74 |
| **Total COGS** | 3,914.74 |
| **Gross Profit** | 420,972.72 |
| **Expense** | |
| Admin Fees | 405.00 |
| Bank Service Charges | 530.53 |
| Depreciation Expense | 445,028.00 |
| Dues and Subscriptions | 10.00 |
| Insurance Expense | 4,956.00 |
| Land Lease | 20,000.00 |
| Legal Service Charge | 336,170.34 |
| Professional Fees | 17,072.94 |
| Repairs and Maintenance | 592.39 |
| Security System | 146.11 |
| Sponsorship | 2,250.00 |
| State Income Taxes | 1,269.90 |
| Utilities | 1,521.30 |
| **Total Expense** | 829,952.51 |
| **Net Ordinary Income** | -408,979.79 |
| **Other Income/Expense** | |
| **Other Income** | |
| 1603 Treasury Grant Income | 62,834.73 |
| **Total Other Income** | 62,834.73 |
| **Net Other Income** | 62,834.73 |
| **Net Income** | -346,145.06 |

## Schedule 6.7

**Ralls and Ralls OpCo Assets**

[See attached]

**Ralls Windfarm LLC**
**Depreciable Asset Breakdown.**

| | | Depr Life | Direct Costs | AI Allocation | PI Allocation | Adjusted Cost |
|---|---|---|---|---|---|---|
| WT-1 | Turbine | 5 Year | 13,853,337.57 | - | - | 13,853,337.57 |
| WT-2 | Foundations | 5 Year | 1,800,392.39 | 102,541.74 | 88,245.99 | 1,991,180.12 |
| WT-3 | Other | 5 Year | 1,773,298.77 | 98,514.70 | 86,661.42 | 1,958,474.88 |
| CL-1 | Roads | 15 Year | 527,124.80 | 30,022.51 | 25,836.95 | 582,984.26 |
| INT | Intangibles | 15 Year | 969,654.27 | - | - | 969,654.27 |
| SS-1 | Substation - Qualified | 5 Year | 246,000.00 | - | 8,625.50 | 254,625.50 |
| SS-2 | Substation - Unqualified | 15 Year | 15,239.25 | - | 3,489.12 | 18,728.37 |
| AI | Account Indirect | | 231,078.95 | (231,078.95) | - | - |
| PI | Project Indirect | | 212,858.97 | - | (212,858.97) | - |
| | | | 19,628,984.97 | 0.00 | - | 19,628,984.97 |

S&S DRAFT 03/15/12

## AMENDMENT AND WAIVER TO THE
## MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT
## AND THE SECURITY AGREEMENTS

This AMENDMENT AND WAIVER TO THE MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT AND THE SECURITY AGREEMENTS (this "Amendment"), dated as of March 15, 2012, is made by and among INTELLIGENT WIND ENERGY, LLC, a Delaware limited liability company, RALLS CORPORATION, a Delaware Corporation, RALLS WIND FARM, LLC, a Delaware limited liability company, TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation, LOWER RIDGE WINDFARM, LLC, an Oregon limited liability company, HIGH PLATEAU WINDFARM, LLC, an Oregon limited liability company, MULE HOLLOW WINDFARM, LLC, an Oregon limited liability company, and PINE CITY WINDFARM, LLC, an Oregon limited liability company (collectively, the "Parties").

### RECITALS

WHEREAS, the Parties entered into that certain Master Wind Projects Membership Interests Purchase Agreement (the "MIPSA"), dated as of February 28, 2012;

WHEREAS, pursuant to the MIPSA, the each of Purchaser, Ralls and Ralls OpCo are entering into a Security Agreement with Seller; and

WHEREAS, the Parties have agreed to extend the deadline for certain requirements in the MIPSA and the Security Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, the Parties agree as follows:

Section 1. Definitions. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the MIPSA and the Security Agreements, as applicable.

Section 2. Amendments to the MIPSA. The Parties hereby agree to amend the MIPSA as follows:

(a)     Section 4.2(a)(i) of the MIPSA is hereby amended by replacing the words "March 15, 2012" in the first line and in the parenthetical therein within the words "March 16, 2012".[1]

(b)     Section 4.2(b)(i) of the MIPSA is hereby amended by replacing the words "March 15, 2012" in the first and third sentences therein with the words "April 6, 2012".[2]

(c)     Section 4.2(c) of the MIPSA is hereby amended by replacing the words "March 15, 2012" therein with the words "April 6, 2012".[3]

---

[1]     Section 4.2(a)(i) relates to payment of the $2.9 million to PacifiCorp.
[2]     Section 4.2(b)(i) relates to the transformer order.
[3]     Section 4.2(c) relates to the construction contract.

(d)     Section 4.5(c) of the MIPSA is hereby amended by replacing the words "Within four (4) Business Days of the Effective Date" therein with the words "On or before April 6, 2012".[4]

Section 3.  Waivers.

(a)     Seller and each of the Project Companies hereby agree to waive:

(i)     the closing condition set forth in Section 3.3(m); provided that Ralls OpCo shall enter into a warranty and operation and maintenance services agreement as described therein on or before April 6, 2012;[5]

(ii)     the requirement to enter into a Deposit Account Control Agreement as set forth in Section 5(a) of each of the Security Agreements; provided that each of Purchaser, Ralls and Ralls OpCo shall enter into a Deposit Account Control Agreement on or before April 6, 2012 (or such later date as the Seller may agree in its sole discretion) and Purchaser, Ralls and Ralls OpCo shall be deemed to be in default under the MIPSA if such Deposit Account Control Agreement is not entered into on a timely basis; and[6]

(iii)     the requirements set forth in Section 11(a) of the Security Agreements, provided that such requirements shall be satisfied on or before April 6, 2012.[7]

(b)     Purchaser hereby agrees to waive:

(i)     the requirement set forth in Section 3.2(f) of the MIPSA; provided that Seller shall provide all authorizations, approvals and consents referred to therein promptly after Closing.[8]

Section 4.  Payment Obligations and Termination Rights.  The Parties hereby agree that the amendments and waivers set forth in this Amendment, and any subsequent failure to timely complete the requirements set forth in this Amendment, shall not excuse or delay any of Purchaser's payment obligations under the MIPSA (except as expressly set forth herein with respect to Section 4.2(a)(i) of the MIPSA) and, after the Closing Date, shall not give Purchaser the right to terminate the MIPSA.

Section 5.  References.  Each reference in the MIPSA to "*this Agreement*", "*hereunder*", "*hereof*" and words of like import referring to the MIPSA, and each reference in the Guarantee Agreements, the Security Agreements, the REC Transfer Agreements and each other ancillary document required under the MIPSA to "*the MIPSA*", "*thereunder*", "*thereof*" and words of like import referring to the MIPSA, shall mean and be a reference to the MIPSA, as

---

[4]   Section 4.5(c) relates to the ALTA proforma.
[5]   Section 3.3(m) relates to the warranty agreement.
[6]   Section 5(a) of the Security Agreement requires deposit account control agreements.
[7]   Section 11(a) of the Security Agreement requires changes to insurance policies.
[8]   Section 3.2(f) requires Terna to notify county planning commissions of new contact information for the LUD and CUP.  The counties will be notified after closing occurs.

in effect after giving effect to this Amendment. Each reference in the Security Agreements to *"this Agreement"*, *"hereunder"*, *"hereof"* and words of like import referring to a Security Agreement, and each reference in the MIPSA and each other ancillary document required under the MIPSA to *"the Security Agreement"*, *"thereunder"*, *"thereof"* and words of like import referring to the Security Agreements, shall mean and be a reference to the Security Agreements, as in effect after giving effect to this Amendment.

Section 6. Execution in Counterparts. This Amendment may be executed in counterparts, all of which taken together shall constitute one Amendment binding on the Parties. Delivery by telecopier or in portable document format (PDF) of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart thereof.

Section 7. Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

[*Signature page follows*]

3

IN WITNESS WHEREOF, each of the Parties has executed this Amendment as of the day and year first written above.

**INTELLIGENT WIND ENERGY, LLC,**
a Delaware limited liability company

By: _____
Name:   X LADLEW ZHHowr
Title:      president

**RALLS CORPORATION,**
a Delaware corporation

By: _____
Name:
Title:

**RALLS WIND FARM, LLC,**
a Delaware limited liability company

By: _____
Name:
Title:

**TERNA ENERGY USA HOLDING
CORPORATION,**
a Delaware corporation

By: _____
Name:
Title:

**LOWER RIDGE WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name:
Title:

**HIGH PLATEAU WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name:
Title:

**MULE HOLLOW WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name:
Title:

**PINE CITY WINDFARM, LLC,**
an Oregon limited liability company

By: _____
Name:
Title:

IN WITNESS WHEREOF, each of the Parties has executed this Amendment as of the day and year first written above.

INTELLIGENT WIND ENERGY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

RALLS CORPORATION,
a Delaware corporation

By: _____
Name:  Jia liang wu
Title:  CEO

RALLS WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name:  Jia liang wu
Title:  President

TERNA ENERGY USA HOLDING
CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

LOWER RIDGE WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

HIGH PLATEAU WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

MULE HOLLOW WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

PINE CITY WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name:
Title:

IN WITNESS WHEREOF, each of the Parties has executed this Amendment as of the day and year first written above.

INTELLIGENT WIND ENERGY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

RALLS CORPORATION,
a Delaware corporation

By: _____
Name:
Title:

RALLS WIND FARM, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

TERNA ENERGY USA HOLDING
CORPORATION,
a Delaware corporation

By: _____
Name: GEORGIOS ANGELETOS
Title: Secretary

LOWER RIDGE WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name: GEORGIOS ANGELETOS
Title: Manager

HIGH PLATEAU WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name: GEORGIOS ANGELETOS
Title: Manager

MULE HOLLOW WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name: GEORGIOS ANGELETOS
Title: Manager

PINE CITY WINDFARM, LLC,
an Oregon limited liability company

By: _____
Name: GEORGIOS ANGELETOS
Title: Manager

## SECOND AMENDMENT AND WAIVER TO THE
## MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT
## AND THE SECURITY AGREEMENTS

This SECOND AMENDMENT AND WAIVER TO THE MASTER WIND PROJECTS MEMBERSHIP INTERESTS PURCHASE AGREEMENT AND THE SECURITY AGREEMENTS (this "Amendment"), dated as of April 6, 2012, is made by and among INTELLIGENT WIND ENERGY, LLC, a Delaware limited liability company, RALLS CORPORATION, a Delaware corporation, RALLS WIND FARM, LLC, a Delaware limited liability company, TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation, LOWER RIDGE WINDFARM, LLC, an Oregon limited liability company, HIGH PLATEAU WINDFARM, LLC, an Oregon limited liability company, MULE HOLLOW WINDFARM, LLC, an Oregon limited liability company, and PINE CITY WINDFARM, LLC, an Oregon limited liability company (collectively, the "Parties").

### RECITALS

WHEREAS, the Parties entered into that certain (a) Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "MIPSA") and (b) Amendment and Waiver to the Master Wind Projects Membership Interests Purchase Agreement and the Security Agreements, dated as of March 15, 2012 (the "First Amendment");

WHEREAS, pursuant to the MIPSA, each of Purchaser, Ralls and Ralls OpCo entered into a Security Agreement with Seller, dated as of March 16, 2012 (each such agreement, as amended, amended and restated, supplemented or otherwise modified from time to time, a "Security Agreement"); and

WHEREAS, the Parties have agreed to extend the deadline for certain requirements in the MIPSA and the Security Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, the Parties agree as follows:

Section 1. Definitions. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the MIPSA and the Security Agreements, as applicable.

Section 2. Amendments to the MIPSA. The Parties hereby agree to amend the MIPSA as follows:

(a)   Section 2.2(b) of the MIPSA is hereby amended and restated in its entirety as follows:

"The Purchase Price shall be allocated among the Project Assets of the Project Companies in accordance with Section 1060 of the Internal Revenue Code, as amended (the "Code") and the Treasury regulations thereunder (and any similar provision of other Applicable Law, as appropriate) (the "Allocation"). Within sixty (60) days after the Closing Date, Seller shall prepare, or cause to be

prepared, and deliver to Purchaser a statement of the Allocation. If Purchaser disagrees with the Allocation, Purchaser shall notify Seller of such disagreement within twenty (20) days after Sellers' delivery of the statement of the Allocation. Purchaser and Seller shall use commercially reasonable efforts for a period of thirty (30) days (or such longer period as they may mutually agree) to resolve such disagreement. If, at the end of such period, Purchaser and Seller are unable to resolve such disagreement, then each of Seller and Purchaser shall be entitled to take an independent position with respect to the Allocation on any Tax return."

Section 3. <u>Extensions</u>.

(a)    Seller and each of the Project Companies hereby agree to extend the following deadlines:

(i)    the deadline set forth in Section 2(a) of the First Amendment for delivering a Transformer Order (as described in Section 4.2(b)(i) of the MIPSA) is extended to April 20, 2012;

(ii)    the deadline set forth in Section 2(b) of the First Amendment for entering into construction contracts (as described in Section 4.2(c) of the MIPSA) is extended to April 20, 2012;

(iii)    the deadline set forth in Section 3(a)(i) of the First Amendment for entering into a warranty and operation and maintenance services agreement (as described in Section 3.3(m) of the MIPSA) is extended to April 20, 2012;

(iv)    the deadline set forth in Section 3(a)(ii) of the First Amendment for entering into Deposit Account Control Agreements (as described in Section 5(a) of the Security Agreements) is extended to April 20, 2012; and

(v)    the deadline set forth in Section 3(a)(iii) of the First Amendment for providing insurance protections to Seller (as described in Section 11(a) of the Security Agreements) is extended to April 20, 2012.

Section 4. <u>Payment Obligations and Termination Rights</u>. The Parties hereby agree that the amendments and extensions set forth in this Amendment, and any subsequent failure to timely complete the requirements set forth in this Amendment, shall not excuse or delay any of Purchaser's payment obligations under the MIPSA and shall not give Purchaser the right to terminate the MIPSA.

Section 5. <u>References</u>. Each reference in the MIPSA to *"this Agreement"*, *"hereunder"*, *"hereof"* and words of like import referring to the MIPSA, and each reference in the Guarantee Agreements, the Security Agreements, the REC Transfer Agreements and each other ancillary document required under the MIPSA to *"the MIPSA"*, *"thereunder"*, *"thereof"* and words of like import referring to the MIPSA, shall mean and be a reference to the MIPSA, as in effect after giving effect to this Amendment. Each reference in the Security Agreements to *"this Agreement"*, *"hereunder"*, *"hereof"* and words of like import referring to a Security Agreement, and each reference in the MIPSA and each other ancillary document required under

NYDOCS02/961537.3                         2

the MIPSA to *"the Security Agreement"*, *"thereunder"*, *"thereof"* and words of like import referring to the Security Agreements, shall mean and be a reference to the Security Agreements, as in effect after giving effect to this Amendment.

Section 6. Execution in Counterparts. This Amendment may be executed in counterparts, all of which taken together shall constitute one Amendment binding on the Parties. Delivery by telecopier or in portable document format (PDF) of an executed counterpart of a signature page to this Amendment shall be effective as delivery of an original executed counterpart thereof.

Section 7. Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

*[Signature page follows]*

IN WITNESS WHEREOF, each of the Parties has executed this Amendment as of the day and year first written above.

**INTELLIGENT WIND ENERGY, LLC,**
a Delaware limited liability company

By:
Name:
Title:

**TERNA ENERGY USA HOLDING CORPORATION,**
a Delaware corporation

By:
Name:
Title:

**RALLS CORPORATION,**
a Delaware corporation

By:
Name:
Title:

**LOWER RIDGE WINDFARM, LLC,**
an Oregon limited liability company

By:
Name:
Title:

**RALLS WIND FARM, LLC,**
a Delaware limited liability company

By:
Name:
Title:

**HIGH PLATEAU WINDFARM, LLC,**
an Oregon limited liability company

By:
Name:
Title:

**MULE HOLLOW WINDFARM, LLC,**
an Oregon limited liability company

By:
Name:
Title:

**PINE CITY WINDFARM, LLC,**
an Oregon limited liability company

By:
Name:
Title:

IN WITNESS WHEREOF, each of the Parties has executed this Amendment as of the day and year first written above.

**INTELLIGENT WIND ENERGY, LLC,**
a Delaware limited liability company

**TERNA ENERGY USA HOLDING CORPORATION,**
a Delaware corporation

By: _____

By: _____

Name:

Name: Georgios Angeletos

Title:

Title:  Secretary

**RALLS CORPORATION,**
a Delaware corporation

**LOWER RIDGE WINDFARM, LLC,**
an Oregon limited liability company

By: _____

By: _____

Name:

Name:

Title:

Title:

**RALLS WIND FARM, LLC,**
a Delaware limited liability company

**HIGH PLATEAU WINDFARM, LLC,**
an Oregon limited liability company

By: _____

By: _____

Name:

Name:

Title:

Title:

**MULE HOLLOW WINDFARM, LLC,**
an Oregon limited liability company

By: _____

Name:

Title:

**PINE CITY WINDFARM, LLC,**
an Oregon limited liability company

By: _____

Name:

Title:

[Signature Page to Second Amendment and Waiver to MIPSA]

EXECUTION COPY

## GUARANTEE AGREEMENT

GUARANTEE AGREEMENT (this "Guarantee"), dated as of February 28, 2012, is made and entered into by and among Ralls Corporation, a Delaware corporation (the "Guarantor"), Intelligent Wind Energy, LLC, a Delaware limited liability company and a wholly owned subsidiary of the Guarantor ("Purchaser"), and Terna Energy USA Holding Corporation, a Delaware corporation ("Terna"). The Guarantor, Purchaser and Terna are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, pursuant to a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, (the "Agreement", capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement), among Terna, Purchaser, Ralls Corporation, Ralls Wind Farm, LLC and the project companies named therein, Terna has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Terna, the membership interests of High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC and Lower Ridge Windfarm, LLC (collectively, the "Project Companies"), on the terms and conditions provided in the Agreement;

WHEREAS, the Parties desire to enter into this Guarantee pursuant to which the Guarantor will guarantee the obligations of Purchaser and, after Closing, the Project Companies under the Agreement, as described herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Terna to enter into the Agreement, the Guarantor hereby agrees as follows:

Section 1.    Guarantee.  The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Terna (a) the punctual payment of all payment obligations of Purchaser when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (b) the punctual performance of all other covenants, agreements, undertakings and obligations of Purchaser under, and to extent set forth in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (c) after Closing and until the Purchase Price has been paid in full, the punctual payment of all payment obligations of each of the Project Companies when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and the Subeasement Agreement and (d) after Closing and until the Purchase Price has been paid in full, the punctual performance of all other covenants, agreements, undertakings and obligations of each of the Project Companies under, and to extent set forth in, the Agreement and the Subeasement Agreement (all such payment and performance obligations being the "Obligations").  For the avoidance of doubt, the Obligations shall include the payment of accrued interest and indemnification for Damages.

Section 2.    Guarantee Absolute.  The Guarantor guarantees that the Obligations will be paid and performed strictly in accordance with the terms of, and to the extent set forth in, the Agreement and the Subeasement Agreement, as applicable.  The obligations of the Guarantor under this Guarantee are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guarantee,

irrespective of whether any action is brought against Purchaser or any other Guarantor (as defined in the Agreement) or whether Purchaser or any other Guarantor (as defined in the Agreement) is joined in any such action or actions; provided, however, that Terna will notify Purchaser and give Purchaser 14 days to respond (or such shorter period as may be reasonable under the circumstances) before exercising any of its rights hereunder.

This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by Terna upon the insolvency, bankruptcy or reorganization of Purchaser or otherwise, all as though such payment had not been made. This Guarantee is a guarantee of payment and not of collection only.

Section 3.    Waiver. The Guarantor hereby waives (a) promptness, diligence, presentment, demand, protest, notice of acceptance and (except as set forth in the proviso in Section 2) any other notice with respect to any of the Obligations and this Guarantee, (b) any requirement that Terna protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against Purchaser or any other person or entity or any collateral, and (c) diligence in collection or protection of or realization upon any obligation hereunder, or any security for or guarantee of any of the foregoing, and any and all formalities that otherwise might be legally required to charge the Guarantor with liability.

Section 4.    Subrogation. The Guarantor will not exercise any rights which it may acquire by way of subrogation under this Guarantee, by any payment made hereunder or otherwise, until all the Obligations and all other amounts payable under this Guarantee shall have been paid and performed in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the payment or performance in full of the Obligations and all other amounts payable under this Guarantee, such amount shall be held in trust for the benefit of Terna and shall forthwith be paid to Terna to be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of the applicable Agreement or to be held by Terna as collateral security for any Obligations thereafter existing.

Section 5.    Representations and Warranties. The Guarantor hereby represents and warrants as follows:

(a)     The Guarantor is a corporation duly organized and validly existing under the Laws of Delaware. The Guarantor has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)     The Guarantor has full power and authority to execute and deliver this Guarantee and to perform its obligations under this Guarantee. The execution and delivery of this Guarantee by the Guarantor and the performance by the Guarantor of its obligations hereunder have been duly and validly authorized by all necessary corporate action on the part of the Guarantor. This Guarantee has been duly executed and delivered by the Guarantor and constitutes the valid and binding agreement of the Guarantor, enforceable against the Guarantor in accordance with its terms.

(c)     The execution, delivery and performance of this Guarantee and the fulfillment of and compliance with the terms and conditions hereof do not violate or conflict with, (a) any term or provision of the organizational documents of the Guarantor, (b) any judgment, decree or order of any governmental entity to which the Guarantor is a party or by which the Guarantor is bound or (c) any law applicable to the Guarantor. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required with respect to the Guarantor in connection with the execution, delivery or performance of this Guarantee.

(d)     There are no conditions precedent to the effectiveness of this Guarantee that have not been satisfied or waived.

Section 6.     Amendments, Etc.  No amendment or waiver of any provision of this Guarantee, and no consent to any departure by the Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Terna, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.     Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by telecopy or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand or telecopied, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service), as follows:

To Purchaser or the Guarantor:

> Ralls Corporation
> c/o Jialiang Wu
> 318 Cooper Circle
> Peachtree City, GA 30269
> Facsimile: (770) 631-7731

To Terna:

> Terna Energy USA Holding Corporation
> 400 Montgomery Street, Suite 1105
> San Francisco, California 94104
> Facsimile: (415) 398-3917

Section 8.     No Waiver; Remedies.  No failure on the part of Terna to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.     Continuing Guarantee; Assignment.  This Guarantee is a continuing guarantee and shall (a) remain in full force and effect until the payment and performance in full of the Obligations and the payment of all other amounts payable under this Guarantee, (b) be binding upon the Guarantor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by, Terna and its successors, transferees and assigns.  No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties.

Section 10.     Governing Law.  This Guarantee shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without reference to its choice of law rules.

Section 11.     Consent to Jurisdiction; Waiver of Immunities.  The Guarantor hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City and any appellate court from any thereof in any action or proceeding arising out of or relating to this Guarantee, and the Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court.  The Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

Section 12.     Waiver of Trial by Jury.  The Guarantor hereby irrevocably waives its right to trial by jury.

Section 13.     Severability.  Whenever possible each provision of this Guarantee shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guarantee shall be held invalid or ineffective, such ineffectiveness or invalidity shall not affect any other provisions of this Guarantee, and this Guarantee shall be construed as if such ineffective or invalid provision had never been contained herein.

Section 14.     Counterparts.  This Guarantee may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Guarantee or the terms hereof to produce or account for more than one of such counterparts.

[Signature page follows]

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS CORPORATION, as Guarantor

By:_____

    Name:  **Jialiang Wu**
    Title:    **Chief Executive Officer**

INTELLIGENT WIND ENERGY, LLC

By:_____

    Name:
    Title:

TERNA ENERGY USA HOLDING CORPORATION

By:_____

    Name:
    Title:

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS CORPORATION, as Guarantor

By:_____
    Name:
    Title:

INTELLIGENT WIND ENERGY, LLC

By:_____
    Name:   Xiaolin Zhang
    Title:    President

TERNA ENERGY USA HOLDING
CORPORATION

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS CORPORATION, as Guarantor

By:_____
    Name:
    Title:

INTELLIGENT WIND ENERGY, LLC

By:_____
    Name:
    Title:

TERNA ENERGY USA HOLDING CORPORATION

By:_____
    Name:  Georgios   Angeletos
    Title:
           Secretary

EXECUTION COPY

## GUARANTEE AGREEMENT

GUARANTEE AGREEMENT (this "Guarantee"), dated as of February 28, 2012, is made and entered into by and among Ralls Wind Farm, LLC, a Delaware limited liability company (the "Guarantor"), Intelligent Wind Energy, LLC, a Delaware limited liability company and an affiliate of the Guarantor ("Purchaser"), and Terna Energy USA Holding Corporation, a Delaware corporation ("Terna"). The Guarantor, Purchaser and Terna are sometimes individually referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, pursuant to a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, (the "Agreement", capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement), among Terna, Purchaser, Ralls Corporation, Ralls Wind Farm, LLC and the project companies named therein, Terna has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Terna, the membership interests of High Plateau Windfarm, LLC, Mule Hollow Windfarm, LLC, Pine City Windfarm, LLC and Lower Ridge Windfarm, LLC (collectively, the "Project Companies"), on the terms and conditions provided in the Agreement;

WHEREAS, the Parties desire to enter into this Guarantee pursuant to which the Guarantor will guarantee the obligations of Purchaser and, after Closing, the Project Companies under the Agreement, as described herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Terna to enter into the Agreement, the Guarantor hereby agrees as follows:

Section 1.      Guarantee. The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to Terna (a) the punctual payment of all payment obligations of Purchaser when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (b) the punctual performance of all other covenants, agreements, undertakings and obligations of Purchaser under, and to extent set forth in, the Agreement and, until the Purchase Price has been paid in full, the Subeasement Agreement, (c) after Closing and until the Purchase Price has been paid in full, the punctual payment of all payment obligations of each of the Project Companies when due under, and subject to the fulfillment of all of the conditions contained in, the Agreement and the Subeasement Agreement and (d) after Closing and until the Purchase Price has been paid in full, the punctual performance of all other covenants, agreements, undertakings and obligations of each of the Project Companies under, and to extent set forth in, the Agreement and the Subeasement Agreement (all such payment and performance obligations being the "Obligations"). For the avoidance of doubt, the Obligations shall include the payment of accrued interest and indemnification for Damages.

Section 2.      Guarantee Absolute. The Guarantor guarantees that the Obligations will be paid and performed strictly in accordance with the terms of, and to the extent set forth in, the Agreement and the Subeasement Agreement, as applicable. The obligations of the Guarantor under this Guarantee are independent of the Obligations, and a separate action or actions may be brought and prosecuted against the Guarantor to enforce this Guarantee,

irrespective of whether any action is brought against Purchaser or any other Guarantor (as defined in the Agreement) or whether Purchaser or any other Guarantor (as defined in the Agreement) is joined in any such action or actions; provided, however, that Terna will notify Purchaser and give Purchaser 14 days to respond (or such shorter period as may be reasonable under the circumstances) before exercising any of its rights hereunder.

This Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Obligations is rescinded or must otherwise be returned by Terna upon the insolvency, bankruptcy or reorganization of Purchaser or otherwise, all as though such payment had not been made. This Guarantee is a guarantee of payment and not of collection only.

Section 3.       Waiver. The Guarantor hereby waives (a) promptness, diligence, presentment, demand, protest, notice of acceptance and (except as set forth in the proviso in Section 2) any other notice with respect to any of the Obligations and this Guarantee, (b) any requirement that Terna protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against Purchaser or any other person or entity or any collateral, and (c) diligence in collection or protection of or realization upon any obligation hereunder, or any security for or guarantee of any of the foregoing, and any and all formalities that otherwise might be legally required to charge the Guarantor with liability.

Section 4.       Subrogation. The Guarantor will not exercise any rights which it may acquire by way of subrogation under this Guarantee, by any payment made hereunder or otherwise, until all the Obligations and all other amounts payable under this Guarantee shall have been paid and performed in full. If any amount shall be paid to the Guarantor on account of such subrogation rights at any time prior to the payment or performance in full of the Obligations and all other amounts payable under this Guarantee, such amount shall be held in trust for the benefit of Terna and shall forthwith be paid to Terna to be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of the applicable Agreement or to be held by Terna as collateral security for any Obligations thereafter existing.

Section 5.       Representations and Warranties. The Guarantor hereby represents and warrants as follows:

(a)      The Guarantor is a limited liability company duly organized and validly existing under the Laws of Delaware. The Guarantor has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)      The Guarantor has full power and authority to execute and deliver this Guarantee and to perform its obligations under this Guarantee. The execution and delivery of this Guarantee by the Guarantor and the performance by the Guarantor of its obligations hereunder have been duly and validly authorized by all necessary corporate action on the part of the Guarantor. This Guarantee has been duly executed and delivered by the Guarantor and constitutes the valid and binding agreement of the Guarantor, enforceable against the Guarantor in accordance with its terms.

(c)     The execution, delivery and performance of this Guarantee and the fulfillment of and compliance with the terms and conditions hereof do not violate or conflict with, (a) any term or provision of the organizational documents of the Guarantor, (b) any judgment, decree or order of any governmental entity to which the Guarantor is a party or by which the Guarantor is bound or (c) any law applicable to the Guarantor. No consent, approval, order or authorization of, or registration, declaration or filing with, any governmental entity is required with respect to the Guarantor in connection with the execution, delivery or performance of this Guarantee.

(d)     There are no conditions precedent to the effectiveness of this Guarantee that have not been satisfied or waived.

Section 6.     Amendments, Etc. No amendment or waiver of any provision of this Guarantee, and no consent to any departure by the Guarantor herefrom, shall in any event be effective unless the same shall be in writing and signed by Terna, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 7.     Notices. All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by telecopy or sent, postage prepaid, by registered, certified or express mail or reputable overnight courier service and shall be deemed given when so delivered by hand or telecopied, or if mailed, three days after mailing (one business day in the case of express mail or overnight courier service), as follows:

To Purchaser or the Guarantor:

> Ralls Wind Farm, LLC
> c/o Jialiang Wu
> 318 Cooper Circle
> Peachtree City, GA 30269
> Facsimile: (770) 631-7731

To Terna:

> Terna Energy USA Holding Corporation
> 400 Montgomery Street, Suite 1105
> San Francisco, California 94104
> Facsimile: (415) 398-3917

Section 8.     No Waiver; Remedies. No failure on the part of Terna to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 9.      Continuing Guarantee; Assignment.  This Guarantee is a continuing guarantee and shall (a) remain in full force and effect until the payment and performance in full of the Obligations and the payment of all other amounts payable under this Guarantee, (b) be binding upon the Guarantor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by, Terna and its successors, transferees and assigns.  No assignment or transfer by any Party of such Party's rights and obligations hereunder shall be made except with the prior written consent of the other Parties.

Section 10.      Governing Law.  This Guarantee shall be governed by and construed and enforced in accordance with the internal laws of the State of New York without reference to its choice of law rules.

Section 11.      Consent to Jurisdiction; Waiver of Immunities.  The Guarantor hereby irrevocably submits to the jurisdiction of any New York State or Federal court sitting in New York City and any appellate court from any thereof in any action or proceeding arising out of or relating to this Guarantee, and the Guarantor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State court or in such Federal court.  The Guarantor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.

Section 12.      Waiver of Trial by Jury.  The Guarantor hereby irrevocably waives its right to trial by jury.

Section 13.      Severability.  Whenever possible each provision of this Guarantee shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guarantee shall be held invalid or ineffective, such ineffectiveness or invalidity shall not affect any other provisions of this Guarantee, and this Guarantee shall be construed as if such ineffective or invalid provision had never been contained herein.

Section 14.      Counterparts.  This Guarantee may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Guarantee or the terms hereof to produce or account for more than one of such counterparts.

[Signature page follows]

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS WIND FARM, LLC, as Guarantor

By:_____

    Name:  **Jialiang Wu**
    Title:  **President**

INTELLIGENT WIND ENERGY, LLC

By:_____

    Name:
    Title:

TERNA ENERGY USA HOLDING CORPORATION

By:_____

    Name:
    Title:

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS WIND FARM, LLC, as Guarantor

By:_____
    Name:
    Title:

INTELLIGENT WIND ENERGY, LLC

By:_____
    Name:   Xiaolin Zhang
    Title:   President

TERNA ENERGY USA HOLDING CORPORATION

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, each of the Parties have caused this Guarantee to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

RALLS WIND FARM, LLC, as Guarantor

By:_____
    Name:
    Title:

INTELLIGENT WIND ENERGY, LLC

By:_____
    Name:
    Title:

TERNA ENERGY USA HOLDING
CORPORATION

By:_____
    Name:  Georgios Angeletos
    Title:  Secretary

EXECUTION COPY

SECURITY AGREEMENT

Dated March _16_, 2012

From

RALLS CORPORATION

as Grantor

to

TERNA ENERGY USA HOLDING CORPORATION

as Secured Party

# T A B L E  O F  C O N T E N T S

| Section | Page |
|---|---|
| Section 1. Grant of Security | 1 |
| Section 2. Security for Obligations | 4 |
| Section 3. Grantor Remains Liable | 5 |
| Section 4. Delivery and Control of Security Collateral | 5 |
| Section 5. Maintaining the Account Collateral | 5 |
| Section 6. Investing of Amounts in the Collateral Account | 6 |
| Section 7. Release of Amounts | 6 |
| Section 8. Representations and Warranties | 6 |
| Section 9. Further Assurances | 8 |
| Section 10. As to Equipment | 8 |
| Section 11. Insurance | 9 |
| Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts | 10 |
| Section 13. Transfers and Other Liens; Additional Shares | 10 |
| Section 14. Secured Party Appointed Attorney in Fact | 11 |
| Section 15. Secured Party May Perform | 11 |
| Section 16. The Secured Party's Duties | 11 |
| Section 17. Remedies | 11 |
| Section 18. Indemnity and Expenses | 13 |
| Section 19. Amendments; Waivers; Etc. | 13 |
| Section 20. Notices, Etc. | 13 |
| Section 21. Continuing Security Interest; Assignments under the MIPSA | 13 |
| Section 22. Termination | 14 |
| Section 23. Execution in Counterparts | 14 |
| Section 24. Governing Law | 14 |

Schedules

| Schedule I | - | Location, Chief Executive Office, Type of Organization, Jurisdiction of Organization and Organizational Identification Number |
|---|---|---|
| Schedule II | - | Locations of Equipment |
| Schedule III | - | Membership Interests |
| Schedule IV | - | Preexisting Liens |

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this "*Agreement*"), dated as of March ____, 2012, is made by and between RALLS CORPORATION, a Delaware corporation (the "*Grantor*"), and TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation (the "*Secured Party*").

### PRELIMINARY STATEMENTS.

(1) The Grantor has entered into a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, by and among Intelligent Wind Energy, LLC, Grantor, Ralls Wind Farm, LLC, the project companies named therein and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the "*MIPSA*") and a Guarantee Agreement, dated as of February 28, 2012, by and among Grantor, Intelligent Wind Energy, LLC and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the "*Guarantee*").

(2) The Grantor proposes to open a deposit account (the "*Collateral Account*"), which will be the collateral account for purposes hereunder.

(3) Pursuant to Section 3.3(j) of the MIPSA, it is a condition precedent to Closing that that the Grantor shall have granted the security interest contemplated by this Agreement.

(4) The Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the MIPSA.

(5) Terms defined in the MIPSA and not otherwise defined in this Agreement are used in this Agreement as defined in the MIPSA. Further, unless otherwise defined in this Agreement or in the MIPSA, terms defined in Article 8 or 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9. "*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "*UCC*" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Party to transfer the Membership Interests as contemplated under the MIPSA, the Grantor hereby agrees with the Secured Party as follows:

Section 1. Grant of Security. The Grantor hereby grants to the Secured Party a security interest in its right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by it, wherever located, and whether now or hereafter existing or arising (collectively, the "*Collateral*"):

(a) all equipment in all of its forms, including, without limitation, all machinery, tools, furniture and fixtures, and all parts thereof and all accessions thereto, including,

without limitation, computer programs and supporting information that constitute equipment within the meaning of the UCC (any and all such property being the "*Equipment*");

(b) all accounts (including, without limitation, health-care-insurance receivables), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance (including, without limitation, receivables under any cash grant, production tax credit, investment tax credit or similar credit under the American Recovery and Reinvestment Act of 2009 or otherwise and receivables from the sale or transfer of renewable energy credits), and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e) or (f) below, being the "*Receivables*," and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "*Related Contracts*");

(c) the following (collectively, the "*Security Collateral*"):

(i)    the membership interests described in Schedule III (the "*Membership Interests*") and the certificates, if any, representing the Membership Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Membership Interests and all warrants, rights or options issued thereon or with respect thereto;

(ii)    all additional shares of stock and other equity interests from time to time acquired by Grantor in any manner, and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other equity interests and all warrants, rights or options issued thereon or with respect thereto; and

(iii)    and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received,

receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all warrants, rights or options issued thereon or with respect thereto;

(d) the following (collectively, the "*Account Collateral*"):

(i)  all deposit accounts, the Collateral Account and all funds and financial assets from time to time credited thereto (including, without limitation, all Cash Equivalents), and all certificates and instruments, if any, from time to time representing or evidencing the Collateral Account;

(ii)  all promissory notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by the Secured Party for or on behalf of the Grantor in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)  all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral; and

(e) the following (collectively, the "*Intellectual Property Collateral*"):

(i)  all patents, patent applications, utility models and statutory invention registrations, all inventions claimed or disclosed therein and all improvements thereto ("*Patents*");

(ii)  all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together, in each case, with the goodwill symbolized thereby ("*Trademarks*");

(iii)  all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), internet web sites and the content thereof, whether registered or unregistered ("*Copyrights*");

(iv)  all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and indemnification rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("*Computer Software*");

(v)     all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "*Trade Secrets*"), and all other intellectual, industrial and intangible property of any type, including, without limitation, industrial designs and mask works;

(vi)     all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration, together with all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)     all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)     all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary ("*IP Agreements*"); and

(ix)     any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(f) all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of such Grantor pertaining to any of the foregoing Collateral; and

(g) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (f) of this Section 1) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, and (B) cash.

Section 2. Security for Obligations. This Agreement secures all payment and performance obligations of the Purchaser now or hereafter existing under the MIPSA, and all payment and performance obligations of the Grantor now or hereafter existing under the Guarantee, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "*Secured Obligations*").

Section 3. <u>Grantor Remains Liable</u>. Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral (except as such exercise of Secured Party's rights results in Grantor's performance of such duties and obligations in accordance with the terms of such contracts and agreements), and (c) the Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement and shall not be obligated to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. <u>Delivery and Control of Security Collateral</u>.

(a) All certificates or instruments representing or evidencing Security Collateral, if any, shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party. The Secured Party shall have the right at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations.

(b) With respect to the Securities Account, the Collateral Account and any Security Collateral, the Grantor will cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Secured Party as the entitlement holder thereof or (ii) to agree with the Grantor and the Secured Party that such securities intermediary will comply with entitlement orders originated by the Secured Party without further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Securities Account Control Agreement"*).

(c) Upon the request of the Secured Party following the occurrence and during the continuance of a failure to make timely payments under the MIPSA or the Guarantee (such a failure, a *"Default"*), the Grantor will notify each issuer of Security Collateral granted by it hereunder that such Security Collateral is subject to the security interest granted hereunder.

Section 5. <u>Maintaining the Account Collateral</u>. So long as any payment of the Purchase Price or any other obligation of Purchaser under the MIPSA or Grantor under the Guarantee shall remain unpaid:

(a) The Grantor will maintain deposit accounts (the *"Pledged Deposit Accounts"*) only with a bank (a *"Pledged Account Bank"*), which may be the same bank that Grantor currently uses for its deposit accounts, that has agreed with the Grantor and the Secured Party to comply with instructions originated by the Secured Party directing the disposition of funds in such deposit account without the further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Deposit Account Control Agreement"*).

(b) The Secured Party may, upon five (5) Business Days' prior written notice, transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account to satisfy the Grantor's obligations under the MIPSA or the Guarantee if any Default shall have occurred and be continuing; provided that immediately upon receipt of such written notice, Grantor shall not transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account.

Section 6. Investing of Amounts in the Collateral Account. The Secured Party will, subject to the provisions of Sections 5, 7 and 17, from time to time (a) invest, or direct the applicable Pledged Account Bank to invest, amounts received with respect to the Collateral Account in such Cash Equivalents credited to the Collateral Account as the Grantor may select and the Secured Party may approve (such approval to not be unreasonably withheld, conditioned or delayed), and (b) invest interest paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents that may mature or be sold, in each case in such Cash Equivalents credited in the same manner. Interest and proceeds that are not invested or reinvested in Cash Equivalents as provided above shall be deposited and held in the Collateral Account. In addition, the Secured Party shall have the right at any time to exchange, or direct the applicable Pledged Account Bank to exchange, such Cash Equivalents for similar Cash Equivalents of smaller or larger determinations, or for other Cash Equivalents, credited to the Collateral Account.

Section 7. Release of Amounts. So long as (a) no Default shall have occurred and be continuing or (b) the Secured Party has not provided written notice to the Grantor in accordance with Section 5, the Grantor will be entitled to spend amounts from the Collateral Account, for purposes of operating the business of Ralls OpCo, in the ordinary course of business and in a manner consistent with past practice; provided that any dividends, distributions or other payments made to Affiliates of Grantor (other than Purchaser, Ralls OpCo or any of the Project Companies) shall require the prior written consent of the Secured Party, which consent shall not be unreasonably withheld.

Section 8. Representations and Warranties. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name, location, chief executive office, type of organization, jurisdiction of organization and organizational identification number is set forth in Schedule I hereto. The Grantor has no trade names and, except as identified on Schedule I hereto, has no Subsidiaries.

(b) Except as set forth on Schedule IV, (i) the Grantor is the legal and beneficial owner of the Collateral granted or purported to be granted by it free and clear of any Lien, claim, option or right of others, except for the security interest created under this Agreement or permitted under the MIPSA and (ii) no effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to the MIPSA or as otherwise permitted under the MIPSA.

(c) All of the Equipment of the Grantor is located at the places specified therefor in Schedule II hereto or at another location as to which the Grantor has complied with the requirements of Section 10(a).  Such Grantor has exclusive possession and control of its Equipment.

(d) None of the Receivables or Agreement Collateral is evidenced by a promissory note or other similar instrument that has not been delivered to the Secured Party.

(e) The Grantor has no investment property other than investment property as to which the Grantor has complied with the requirements of Section 4.

(f) The Grantor has no deposit accounts, other than the Pledged Deposit Accounts as to which the Grantor has complied with the applicable requirements of Section 5.

(g) The Grantor is not a beneficiary or assignee under any letter of credit.

(h) This Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing the payment of the Secured Obligations; all filings and other actions (including, without limitation, actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-106 and 9-107 of the UCC and necessary to perfect the security interest in the Collateral granted by the Grantor) have been duly made or taken and are in full force and effect; and such security interest is (except with respect to security interests, if any, identified in Schedule IV) first priority.

(i) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority (except with respect to security interests, if any, identified in Schedule IV) nature of such security interest), except for the filing of financing and continuation statements under the UCC, which financing statements have been duly filed and are in full force and effect and the actions described in Section 4 with respect to the Security Collateral, which actions have been taken and are in full force and effect, or (iii) the exercise by the Secured Party of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(j) The Grantor has no patents, parent applications, trademarks, service marks, domain names, logos, whether registered or unregistered, copyrights, computer software programs and databases or confidential or proprietary information or rights similar in type to any of the above.

(k) The Grantor has no commercial tort claims.



Section 9. Further Assurances. (a) The Grantor agrees that from time to time, at its expense, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if any such Collateral shall be evidenced by a promissory note or other instrument, deliver and pledge to the Secured Party hereunder such note or instrument duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Secured Party; (ii) file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Secured Party may request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; and (iii) deliver to the Secured Party evidence that all other actions that the Secured Party may deem reasonably necessary or desirable in order to perfect and protect the security interest granted or purported to be granted under this Agreement has been taken.

(b) The Grantor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Secured Party to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c) The Grantor will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with such Collateral as the Secured Party may reasonably request, all in reasonable detail.

(d) Upon reasonable advance written notice, the Grantor will provide the Secured Party and its authorized representatives with reasonable access during Grantor's normal business hours to the books and records (including meeting minutes), contracts, commitments, facilities, accounts and financial and operating data of the Grantor relating to the Collateral, including without limitation wind data and maintenance logs, solely for the purpose of protecting the security interest granted to Secured Party hereunder. To the extent any such review may involve proprietary or other confidential information of Grantor, the parties hereto agree that the terms of the confidentiality agreement, dated February 2012, between Ralls Corporation and the Secured Party shall apply to such information; provided that, notwithstanding Section 3 of such confidentiality agreement, such information may be used for the purpose of protecting the security interest granted hereunder.

Section 10. As to Equipment. (a) The Grantor will cause its Equipment to be maintained and preserved in the same condition, repair and working order as when new, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any of such

Equipment as soon as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. The Grantor will promptly furnish to the Secured Party a statement respecting any loss or damage to any of its Equipment.

(b) The Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against, its Equipment.

Section 11. Insurance. (a) The Grantor will, at its own expense, maintain insurance with respect to its Equipment with responsible and reputable insurance companies or associations in such amounts and covering such risks as usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Grantor operates. Each policy for liability insurance shall provide for all losses to be paid on behalf of the Secured Party and the Grantor as their interests may appear, and each policy for property damage insurance shall provide for all losses to be paid directly to the Secured Party. Each such policy shall in addition (i) name the Grantor and the Secured Party as insured parties thereunder (without any representation or warranty by or obligation upon the Secured Party) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Secured Party notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (iii) provide that there shall be no recourse against the Secured Party for payment of premiums or other amounts with respect thereto and (iv) provide that at least 10 days' prior written notice of cancellation or of lapse shall be given to the Secured Party by the insurer. The Grantor will, if so requested by the Secured Party, deliver to the Secured Party original or duplicate policies of such insurance. Further, the Grantor will, at the request of the Secured Party, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 10 and cause the insurers to acknowledge notice of such assignment.

(b) Reimbursement under any liability insurance maintained by the Grantor pursuant to this Section 11 may be paid directly to the Person who shall have incurred liability covered by such insurance. In case of any loss involving damage to Equipment when subsection (c) of this Section 11 is not applicable, the Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment, and any proceeds of insurance properly received by or released to the Grantor shall be used by the Grantor, except as otherwise required hereunder, to pay or as reimbursement for the costs of such repairs or replacements.

(c) So long as no Default shall have occurred and be continuing, all insurance payments received by the Secured Party in connection with any loss, damage or destruction of any Inventory or Equipment will be promptly released and transferred by the Secured Party to the Grantor for the repair, replacement or restoration thereof. To the extent that (i) the amount of any such insurance payments exceeds the cost of any such repair, replacement or restoration, or (ii) such insurance payments are not otherwise required by the Grantor to complete any such repair, replacement or restoration required hereunder, the Secured Party will not be required to release the amount thereof to the Grantor and shall hold or continue to hold such amount in the Collateral Account as additional security for the Secured Obligations. Upon the occurrence and during the continuance of any Default or the actual or constructive total loss of any Equipment,



all insurance payments in respect of such Equipment shall be paid to the Secured Party and shall, in the Secured Party's sole discretion, (i) be released to the Grantor to be applied as set forth in the first sentence of this subsection (c) or (ii) be held as additional Collateral hereunder or applied as specified in Section 17.

Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts. (a) The Grantor will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 8(a) of this Agreement without first giving at least 30 days' prior written notice to the Secured Party and taking all action required by the Secured Party for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor will hold and preserve its records relating to the Collateral, including, without limitation, Related Contracts, and will permit, upon reasonable advance written request of the Secured Party, representatives of the Secured Party at any time during normal business hours to inspect and make abstracts from such records and other documents. If the Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Secured Party of such organizational identification number.

(b) Except as otherwise provided in this subsection (b), the Grantor will continue to collect, at its own expense, all amounts due or to become due the Grantor under the Receivables and Related Contracts. In connection with such collections, the Grantor may take such action as the Grantor may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; *provided, however,* that the Secured Party shall have the right at any time that Default shall have occurred and be continuing, upon written notice to the Grantor of its intention to do so, to notify the Obligors under any Receivables and Related Contracts of the assignment of such Receivables and Related Contracts to the Secured Party and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Secured Party and, upon such notification and at the expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Secured Party referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts shall be received in trust for the benefit of the Secured Party hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement) to be deposited in the Collateral Account and applied as provided in Section 17(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof or allow any credit or discount thereon. The Grantor will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 13. Transfers and Other Liens; Additional Shares. The Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (ii) create or suffer to exist any Lien upon or with respect to any of the

Collateral except for the pledge, assignment and security interest created under this Agreement and Liens permitted under the MIPSA.

Section 14. <u>Secured Party Appointed Attorney in Fact</u>. The Grantor hereby irrevocably appoints the Secured Party the Grantor's attorney in fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of a Default, in the Secured Party's reasonable discretion, to take any action and to execute any instrument that the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(b) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above, and

(c) to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral.

Section 15. <u>Secured Party May Perform</u>. If the Grantor fails to perform any agreement contained herein, the Secured Party may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor under Section 18.

Section 16. <u>The Secured Party's Duties</u>. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 17. <u>Remedies</u>. If a Default shall have occurred and be continuing:

(a) The Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make

it available to the Secured Party at a place and time to be designated by the Secured Party that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at the Secured Party's office or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable; and (iii) exercise any and all rights and remedies of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by or on behalf of the Secured Party and all cash proceeds received by or on behalf of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Secured Party pursuant to Section 18) in whole or in part by the Secured Party against, all or any part of the Secured Obligations. Any surplus of such cash or cash proceeds held by or on the behalf of the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c) All payments received by the Grantor under or in connection in respect of the Collateral shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement).

(d) The Secured Party may, without notice to the Grantor except as required by law and at any time or from time to time, charge, set off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.

(e) The Secured Party may send to each bank, securities intermediary or issuer party to any Deposit Account Control Agreement, Securities/Deposit Account Control Agreement, Securities Account Control Agreement or Uncertificated Security Control Agreement a "Notice of Exclusive Control" as defined in and under such Agreement.

Section 18. Indemnity and Expenses. (a) The Grantor agrees to indemnify, defend and save and hold harmless the Secured Party and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an *"Indemnified Party"*) from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from enforcement of this Agreement and Grantor's breach of or nonperformance under this Agreement, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(b) The Grantor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Secured Party may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Secured Party hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof; provided, however, for the purposes of clarity, the obligation to pay expenses described in this Section 18 shall not apply to any costs or expenses of the Secured Party in connection with the negotiation, execution and/or delivery of this Agreement.

Section 19. Amendments; Waivers; Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Secured Party to exercise, and no delay in exercising, any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 20. Notices, Etc. All notices and other communications provided for hereunder shall be either (i) in writing (including telecopier communication) and mailed, telecopied, or otherwise delivered or (ii) by electronic mail (if electronic mail addresses are designated as provided below) confirmed immediately in writing addressed to it at its address specified in the MIPSA or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, sent by electronic mail or otherwise, be effective when deposited in the mails, telecopied, sent by electronic mail and confirmed in writing, or otherwise delivered (or confirmed by a signed receipt), respectively, addressed as aforesaid; except that notices and other communications to the Secured Party shall not be effective until received by the Secured Party. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or Schedule hereto shall be effective as delivery of an original executed counterpart thereof.

Section 21. Continuing Security Interest; Assignments under the MIPSA. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full



force and effect until the earlier of (i) the payment in full in cash of the Secured Obligations and (ii) termination of the MISPA, (b) be binding upon the Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party's successors, transferees and assigns.

Section 22. Termination. Upon the earlier of (a) the payment in full in cash of the Secured Obligations and (b) termination of the MIPSA, the pledge and security interest granted hereby shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Secured Party will, at the Grantor's expense, promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 23. Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (e.g. electronic mail or .pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 24. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[Signature page follows]



IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

RALLS CORPORATION, as Grantor

By: _____
    Name: _Jialiang wu_
    Title: _CEO_

TERNA ENERGY USA HOLDING
CORPORATION, a Delaware corporation, as
Secured Party

By: _____
    Name:
    Title:

NY/DOCS02/983391                    [Signature Page to Security Agreement]

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

RALLS CORPORATION, as Grantor

By: _____
   Name:
   Title:

TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation, as Secured Party,

By: _____
   Name: Georgios Angeletos
   Title:  Secretary

Schedule I to the
Security Agreement

## LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER

| Grantor | Location | Chief Executive Office | Type of Organization | Jurisdiction of Organization | Organizational I.D. No. |
|---------|----------|------------------------|----------------------|------------------------------|-------------------------|
| Ralls Corporation | Georgia | 318 Cooper Circle, Peachtree City, GA 30269 | Corporation | Delaware | 4862324 |

Schedule II to the
Security Agreement

## LOCATIONS OF EQUIPMENT

All Equipment is located at the Chief Executive Office.

<div align="right">
Schedule III to the<br>
Security Agreement
</div>

## MEMBERSHIP INTERESTS

Ralls Wind Farm, LLC, a Delaware limited liability company – 100% owned by Grantor

**Schedule IV to the
Security Agreement**

PREEXISTING LIENS

None.

EXECUTION COPY

SECURITY AGREEMENT

Dated March $\underline{16}$, 2012

From

RALLS WIND FARM, LLC

as Grantor

to

TERNA ENERGY USA HOLDING CORPORATION

as Secured Party

# T A B L E   O F   C O N T E N T S

| Section | Page |
|---|---|
| Section 1. Grant of Security | 1 |
| Section 2. Security for Obligations | 4 |
| Section 3. Grantor Remains Liable | 5 |
| Section 4. Delivery and Control of Security Collateral | 5 |
| Section 5. Maintaining the Account Collateral | 5 |
| Section 6. Investing of Amounts in the Collateral Account | 6 |
| Section 7. Release of Amounts | 6 |
| Section 8. Representations and Warranties | 6 |
| Section 9. Further Assurances | 8 |
| Section 10. As to Equipment | 8 |
| Section 11. Insurance | 9 |
| Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts | 10 |
| Section 13. Transfers and Other Liens; Additional Shares | 10 |
| Section 14. Secured Party Appointed Attorney in Fact | 11 |
| Section 15. Secured Party May Perform | 11 |
| Section 16. The Secured Party's Duties | 11 |
| Section 17. Remedies | 11 |
| Section 18. Indemnity and Expenses | 13 |
| Section 19. Amendments; Waivers; Etc. | 13 |
| Section 20. Notices, Etc. | 13 |
| Section 21. Continuing Security Interest; Assignments under the MIPSA | 13 |
| Section 22. Termination | 14 |
| Section 23. Execution in Counterparts | 14 |
| Section 24. Governing Law | 14 |

Schedules

| | | |
|---|---|---|
| Schedule I | - | Location, Chief Executive Office, Type of Organization, Jurisdiction of Organization and Organizational Identification Number |
| Schedule II | - | Locations of Equipment |
| Schedule III | - | Membership Interests |
| Schedule IV | - | Preexisting Liens |

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this *"Agreement"*), dated as of March ____, 2012, is made by and between RALLS WIND FARM, LLC, a Delaware limited liability company (the *"Grantor"*), and TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation (the *"Secured Party"*).

### PRELIMINARY STATEMENTS.

(1) The Grantor has entered into a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, by and among Intelligent Wind Energy, LLC, Ralls Corporation, the Grantor, the project companies named therein and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the *"MIPSA"*) and a Guarantee Agreement, dated as of February 28, 2012, by and among Grantor, Intelligent Wind Energy, LLC and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the *"Guarantee"*).

(2) The Grantor proposes to open a deposit account (the *"Collateral Account"*), which will be the collateral account for purposes hereunder.

(3) Pursuant to Section 3.3(j) of the MIPSA, it is a condition precedent to Closing that that the Grantor shall have granted the security interest contemplated by this Agreement.

(4) The Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the MIPSA.

(5) Terms defined in the MIPSA and not otherwise defined in this Agreement are used in this Agreement as defined in the MIPSA. Further, unless otherwise defined in this Agreement or in the MIPSA, terms defined in Article 8 or 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9. *"UCC"* means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided* that, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, *"UCC"* means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Party to transfer the Membership Interests as contemplated under the MIPSA, the Grantor hereby agrees with the Secured Party as follows:

Section 1. Grant of Security. The Grantor hereby grants to the Secured Party a security interest in its right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by it, wherever located, and whether now or hereafter existing or arising (collectively, the *"Collateral"*):

(a) all equipment in all of its forms, including, without limitation, all machinery, tools, furniture and fixtures, and all parts thereof and all accessions thereto, including,

NYDOCS02/958594.3

without limitation, computer programs and supporting information that constitute equipment within the meaning of the UCC (any and all such property being the *"Equipment"*);

(b) all accounts (including, without limitation, health-care-insurance receivables), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance (including, without limitation, receivables under any cash grant, production tax credit, investment tax credit or similar credit under the American Recovery and Reinvestment Act of 2009 or otherwise and receivables from the sale or transfer of renewable energy credits), and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e) or (f) below, being the *"Receivables,"* and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the *"Related Contracts"*);

(c) the following (collectively, the *"Security Collateral"*):

(i) the membership interests described in Schedule III (the *"Membership Interests"*) and the certificates, if any, representing the Membership Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Membership Interests and all warrants, rights or options issued thereon or with respect thereto;

(ii) all additional shares of stock and other equity interests from time to time acquired by Grantor in any manner, and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other equity interests and all warrants, rights or options issued thereon or with respect thereto; and

(iii) and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received,

receivable or otherwise distributed in respect of or in exchange for any or all of
such investment property and all warrants, rights or options issued thereon or with
respect thereto;

(d) the following (collectively, the "*Account Collateral*"):

(i)     all deposit accounts, the Collateral Account and all funds and
financial assets from time to time credited thereto (including, without limitation,
all Cash Equivalents), and all certificates and instruments, if any, from time to
time representing or evidencing the Collateral Account;

(ii)    all promissory notes, certificates of deposit, checks and other
instruments from time to time delivered to or otherwise possessed by the Secured
Party for or on behalf of the Grantor in substitution for or in addition to any or all
of the then existing Account Collateral; and

(iii)   all interest, dividends, distributions, cash, instruments and other
property from time to time received, receivable or otherwise distributed in respect
of or in exchange for any or all of the then existing Account Collateral; and

(e) the following (collectively, the "*Intellectual Property Collateral*"):

(i)     all patents, patent applications, utility models and statutory
invention registrations, all inventions claimed or disclosed therein and all
improvements thereto ("*Patents*");

(ii)    all trademarks, service marks, domain names, trade dress, logos,
designs, slogans, trade names, business names, corporate names and other source
identifiers, whether registered or unregistered (provided that no security interest
shall be granted in United States intent-to-use trademark applications to the extent
that, and solely during the period in which, the grant of a security interest therein
would impair the validity or enforceability of such intent-to-use trademark
applications under applicable federal law), together, in each case, with the
goodwill symbolized thereby ("*Trademarks*");

(iii)   all copyrights, including, without limitation, copyrights in
Computer Software (as hereinafter defined), internet web sites and the content
thereof, whether registered or unregistered ("*Copyrights*");

(iv)    all computer software, programs and databases (including, without
limitation, source code, object code and all related applications and data files),
firmware and documentation and materials relating thereto, together with any and
all maintenance rights, service rights, programming rights, hosting rights, test
rights, improvement rights, renewal rights and indemnification rights and any
substitutions, replacements, improvements, error corrections, updates and new
versions of any of the foregoing ("*Computer Software*");



(v)     all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, *"Trade Secrets"*), and all other intellectual, industrial and intangible property of any type, including, without limitation, industrial designs and mask works;

(vi)    all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration, together with all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)   all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)  all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary (*"IP Agreements"*); and

(ix)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(f) all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of such Grantor pertaining to any of the foregoing Collateral; and

(g) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (f) of this Section 1) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, and (B) cash.

Section 2. Security for Obligations. This Agreement secures all payment and performance obligations of the Purchaser now or hereafter existing under the MIPSA, and all payment and performance obligations of the Grantor now or hereafter existing under the Guarantee, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the *"Secured Obligations"*).

Section 3. Grantor Remains Liable. Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral (except as such exercise of Secured Party's rights results in Grantor's performance of such duties and obligations in accordance with the terms of such contracts and agreements), and (c) the Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement and shall not be obligated to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. Delivery and Control of Security Collateral.

(a) All certificates or instruments representing or evidencing Security Collateral, if any, shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party. The Secured Party shall have the right at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations.

(b) With respect to the Securities Account, the Collateral Account and any Security Collateral, the Grantor will cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Secured Party as the entitlement holder thereof or (ii) to agree with the Grantor and the Secured Party that such securities intermediary will comply with entitlement orders originated by the Secured Party without further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Securities Account Control Agreement"*).

(c) Upon the request of the Secured Party following the occurrence and during the continuance of a failure to make timely payments under the MIPSA or the Guarantee (such a failure, a *"Default"*), the Grantor will notify each issuer of Security Collateral granted by it hereunder that such Security Collateral is subject to the security interest granted hereunder.

Section 5. Maintaining the Account Collateral. So long as any payment of the Purchase Price or any other obligation of Purchaser under the MIPSA or Grantor under the Guarantee shall remain unpaid:

(a) The Grantor will maintain deposit accounts (the *"Pledged Deposit Accounts"*) only with a bank (a *"Pledged Account Bank"*), which may be the same bank that Grantor currently uses for its deposit accounts, that has agreed with the Grantor and the Secured Party to comply with instructions originated by the Secured Party directing the disposition of funds in such deposit account without the further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Deposit Account Control Agreement"*).

(b) The Secured Party may, upon five (5) Business Days' prior written notice, transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account to satisfy the Grantor's obligations under the MIPSA or the Guarantee if any Default shall have occurred and be continuing; provided that immediately upon receipt of such written notice, Grantor shall not transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account.

Section 6. Investing of Amounts in the Collateral Account. The Secured Party will, subject to the provisions of Sections 5, 7 and 17, from time to time (a) invest, or direct the applicable Pledged Account Bank to invest, amounts received with respect to the Collateral Account in such Cash Equivalents credited to the Collateral Account as the Grantor may select and the Secured Party may approve (such approval to not be unreasonably withheld, conditioned or delayed), and (b) invest interest paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents that may mature or be sold, in each case in such Cash Equivalents credited in the same manner. Interest and proceeds that are not invested or reinvested in Cash Equivalents as provided above shall be deposited and held in the Collateral Account. In addition, the Secured Party shall have the right at any time to exchange, or direct the applicable Pledged Account Bank to exchange, such Cash Equivalents for similar Cash Equivalents of smaller or larger determinations, or for other Cash Equivalents, credited to the Collateral Account.

Section 7. Release of Amounts. So long as (a) no Default shall have occurred and be continuing or (b) the Secured Party has not provided written notice to the Grantor in accordance with Section 5, the Grantor will be entitled to spend amounts from the Collateral Account, for purposes of operating the business of Ralls OpCo, in the ordinary course of business and in a manner consistent with past practice; provided that any dividends, distributions or other payments made to Affiliates of Grantor (other than Purchaser, Ralls or any of the Project Companies) shall require the prior written consent of the Secured Party, which consent shall not be unreasonably withheld.

Section 8. Representations and Warranties. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name, location, chief executive office, type of organization, jurisdiction of organization and organizational identification number is set forth in Schedule I hereto. The Grantor has no trade names and, except as identified on Schedule I hereto, has no Subsidiaries.

(b) Except as set forth on Schedule IV, (i) the Grantor is the legal and beneficial owner of the Collateral granted or purported to be granted by it free and clear of any Lien, claim, option or right of others, except for the security interest created under this Agreement or permitted under the MIPSA and (ii) no effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to the MIPSA or as otherwise permitted under the MIPSA.

(c) All of the Equipment of the Grantor is located at the places specified therefor in Schedule II hereto or at another location as to which the Grantor has complied with the requirements of Section 10(a). Such Grantor has exclusive possession and control of its Equipment.

(d) None of the Receivables or Agreement Collateral is evidenced by a promissory note or other similar instrument that has not been delivered to the Secured Party.

(e) The Grantor has no investment property other than investment property as to which the Grantor has complied with the requirements of Section 4.

(f) The Grantor has no deposit accounts, other than the Pledged Deposit Accounts as to which the Grantor has complied with the applicable requirements of Section 5.

(g) The Grantor is not a beneficiary or assignee under any letter of credit.

(h) This Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing the payment of the Secured Obligations; all filings and other actions (including, without limitation, actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-106 and 9-107 of the UCC and necessary to perfect the security interest in the Collateral granted by the Grantor) have been duly made or taken and are in full force and effect; and such security interest is (except with respect to security interests, if any, identified in Schedule IV) first priority.

(i) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority (except with respect to security interests, if any, identified in Schedule IV) nature of such security interest), except for the filing of financing and continuation statements under the UCC, which financing statements have been duly filed and are in full force and effect and the actions described in Section 4 with respect to the Security Collateral, which actions have been taken and are in full force and effect, or (iii) the exercise by the Secured Party of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(j) The Grantor has no patents, parent applications, trademarks, service marks, domain names, logos, whether registered or unregistered, copyrights, computer software programs and databases or confidential or proprietary information or rights similar in type to any of the above.

(k) The Grantor has no commercial tort claims. 

Section 9. Further Assurances. (a) The Grantor agrees that from time to time, at its expense, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if any such Collateral shall be evidenced by a promissory note or other instrument, deliver and pledge to the Secured Party hereunder such note or instrument duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Secured Party; (ii) file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Secured Party may request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; and (iii) deliver to the Secured Party evidence that all other actions that the Secured Party may deem reasonably necessary or desirable in order to perfect and protect the security interest granted or purported to be granted under this Agreement has been taken.

(b) The Grantor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Secured Party to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c) The Grantor will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with such Collateral as the Secured Party may reasonably request, all in reasonable detail.

(d) Upon reasonable advance written notice, the Grantor will provide the Secured Party and its authorized representatives with reasonable access during Grantor's normal business hours to the books and records (including meeting minutes), contracts, commitments, facilities, accounts and financial and operating data of the Grantor relating to the Collateral, including without limitation wind data and maintenance logs, solely for the purpose of protecting the security interest granted to Secured Party hereunder. To the extent any such review may involve proprietary or other confidential information of Grantor, the parties hereto agree that the terms of the confidentiality agreement, dated February 2012, between Ralls Corporation and the Secured Party shall apply to such information; provided that, notwithstanding Section 3 of such confidentiality agreement, such information may be used for the purpose of protecting the security interest granted hereunder.

Section 10. As to Equipment. (a) The Grantor will cause its Equipment to be maintained and preserved in the same condition, repair and working order as when new, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any of such

8

Equipment as soon as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. The Grantor will promptly furnish to the Secured Party a statement respecting any loss or damage to any of its Equipment.

(b) The Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against, its Equipment.

Section 11. Insurance. (a) The Grantor will, at its own expense, maintain insurance with respect to its Equipment with responsible and reputable insurance companies or associations in such amounts and covering such risks as usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Grantor operates. Each policy for liability insurance shall provide for all losses to be paid on behalf of the Secured Party and the Grantor as their interests may appear, and each policy for property damage insurance shall provide for all losses to be paid directly to the Secured Party. Each such policy shall in addition (i) name the Grantor and the Secured Party as insured parties thereunder (without any representation or warranty by or obligation upon the Secured Party) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Secured Party notwithstanding any action, inaction or breach of representation or warranty by the Grantor, (iii) provide that there shall be no recourse against the Secured Party for payment of premiums or other amounts with respect thereto and (iv) provide that at least 10 days' prior written notice of cancellation or of lapse shall be given to the Secured Party by the insurer. The Grantor will, if so requested by the Secured Party, deliver to the Secured Party original or duplicate policies of such insurance. Further, the Grantor will, at the request of the Secured Party, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 10 and cause the insurers to acknowledge notice of such assignment.

(b) Reimbursement under any liability insurance maintained by the Grantor pursuant to this Section 11 may be paid directly to the Person who shall have incurred liability covered by such insurance. In case of any loss involving damage to Equipment when subsection (c) of this Section 11 is not applicable, the Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment, and any proceeds of insurance properly received by or released to the Grantor shall be used by the Grantor, except as otherwise required hereunder, to pay or as reimbursement for the costs of such repairs or replacements.

(c) So long as no Default shall have occurred and be continuing, all insurance payments received by the Secured Party in connection with any loss, damage or destruction of any Inventory or Equipment will be promptly released and transferred by the Secured Party to the Grantor for the repair, replacement or restoration thereof. To the extent that (i) the amount of any such insurance payments exceeds the cost of any such repair, replacement or restoration, or (ii) such insurance payments are not otherwise required by the Grantor to complete any such repair, replacement or restoration required hereunder, the Secured Party will not be required to release the amount thereof to the Grantor and shall hold or continue to hold such amount in the Collateral Account as additional security for the Secured Obligations. Upon the occurrence and during the continuance of any Default or the actual or constructive total loss of any Equipment,

all insurance payments in respect of such Equipment shall be paid to the Secured Party and shall, in the Secured Party's sole discretion, (i) be released to the Grantor to be applied as set forth in the first sentence of this subsection (c) or (ii) be held as additional Collateral hereunder or applied as specified in Section 17.

Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts. (a) The Grantor will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 8(a) of this Agreement without first giving at least 30 days' prior written notice to the Secured Party and taking all action required by the Secured Party for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor will hold and preserve its records relating to the Collateral, including, without limitation, Related Contracts, and will permit, upon reasonable advance written request of the Secured Party, representatives of the Secured Party at any time during normal business hours to inspect and make abstracts from such records and other documents. If the Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Secured Party of such organizational identification number.

(b) Except as otherwise provided in this subsection (b), the Grantor will continue to collect, at its own expense, all amounts due or to become due the Grantor under the Receivables and Related Contracts. In connection with such collections, the Grantor may take such action as the Grantor may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; *provided, however,* that the Secured Party shall have the right at any time that Default shall have occurred and be continuing, upon written notice to the Grantor of its intention to do so, to notify the Obligors under any Receivables and Related Contracts of the assignment of such Receivables and Related Contracts to the Secured Party and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Secured Party and, upon such notification and at the expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Secured Party referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts shall be received in trust for the benefit of the Secured Party hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement) to be deposited in the Collateral Account and applied as provided in Section 17(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof or allow any credit or discount thereon. The Grantor will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 13. Transfers and Other Liens; Additional Shares. The Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (ii) create or suffer to exist any Lien upon or with respect to any of the

NYDOCS02/958594.3                                    10

Collateral except for the pledge, assignment and security interest created under this Agreement and Liens permitted under the MIPSA.

Section 14. Secured Party Appointed Attorney in Fact. The Grantor hereby irrevocably appoints the Secured Party the Grantor's attorney in fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of a Default, in the Secured Party's reasonable discretion, to take any action and to execute any instrument that the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(b) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above, and

(c) to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral.

Section 15. Secured Party May Perform. If the Grantor fails to perform any agreement contained herein, the Secured Party may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor under Section 18.

Section 16. The Secured Party's Duties. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 17. Remedies. If a Default shall have occurred and be continuing:

(a) The Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make

it available to the Secured Party at a place and time to be designated by the Secured Party that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at the Secured Party's office or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable; and (iii) exercise any and all rights and remedies of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by or on behalf of the Secured Party and all cash proceeds received by or on behalf of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Secured Party pursuant to Section 18) in whole or in part by the Secured Party against, all or any part of the Secured Obligations. Any surplus of such cash or cash proceeds held by or on the behalf of the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c) All payments received by the Grantor under or in connection in respect of the Collateral shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement).

(d) The Secured Party may, without notice to the Grantor except as required by law and at any time or from time to time, charge, set off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.

(e) The Secured Party may send to each bank, securities intermediary or issuer party to any Deposit Account Control Agreement, Securities/Deposit Account Control Agreement, Securities Account Control Agreement or Uncertificated Security Control Agreement a "Notice of Exclusive Control" as defined in and under such Agreement.



Section 18. <u>Indemnity and Expenses</u>. (a) The Grantor agrees to indemnify, defend and save and hold harmless the Secured Party and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an *"Indemnified Party"*) from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from enforcement of this Agreement and Grantor's breach of or nonperformance under this Agreement, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(b) The Grantor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Secured Party may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Secured Party hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof; <u>provided</u>, <u>however</u>, for the purposes of clarity, the obligation to pay expenses described in this Section 18 shall not apply to any costs or expenses of the Secured Party in connection with the negotiation, execution and/or delivery of this Agreement.

Section 19. <u>Amendments; Waivers; Etc.</u> No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Secured Party to exercise, and no delay in exercising, any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 20. <u>Notices, Etc.</u> All notices and other communications provided for hereunder shall be either (i) in writing (including telecopier communication) and mailed, telecopied, or otherwise delivered or (ii) by electronic mail (if electronic mail addresses are designated as provided below) confirmed immediately in writing addressed to it at its address specified in the MIPSA or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, sent by electronic mail or otherwise, be effective when deposited in the mails, telecopied, sent by electronic mail and confirmed in writing, or otherwise delivered (or confirmed by a signed receipt), respectively, addressed as aforesaid; except that notices and other communications to the Secured Party shall not be effective until received by the Secured Party. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or Schedule hereto shall be effective as delivery of an original executed counterpart thereof.

Section 21. <u>Continuing Security Interest; Assignments under the MIPSA</u>. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full

force and effect until the earlier of (i) the payment in full in cash of the Secured Obligations and (ii) termination of the MISPA, (b) be binding upon the Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party's successors, transferees and assigns.

Section 22. Termination. Upon the earlier of (a) the payment in full in cash of the Secured Obligations and (b) termination of the MIPSA, the pledge and security interest granted hereby shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Secured Party will, at the Grantor's expense, promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 23. Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (e.g. electronic mail or .pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 24. Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[Signature page follows]

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

RALLS WIND FARM, LLC, as Grantor

By: _____
Name: Jia Qiang Li
Title: President

TERNA ENERGY USA HOLDING
CORPORATION, a Delaware corporation, as
Secured Party

By: _____
Name:
Title:

NYDOCS02/953394                    [Signature Page to Security Agreement]

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

RALLS WIND FARM, LLC, as Grantor

By: _____
    Name:
    Title:

TERNA ENERGY USA HOLDING
CORPORATION, a Delaware corporation, as
Secured Party

By: _____
    Name: Georgios Angeletos
    Title:  Secretary

[Signature Page to Security Agreement]

<div align="right">
Schedule I to the
Security Agreement
</div>

## LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER

| Grantor | Location | Chief Executive Office | Type of Organization | Jurisdiction of Organization | Organizational I.D. No. |
|---|---|---|---|---|---|
| Ralls Wind Farm, LLC | Ralls, Texas | 318 Cooper Circle, Peachtree City, GA 30269 | Limited liability company | Delaware | 4860862 |

Schedule II to the
Security Agreement

## LOCATIONS OF EQUIPMENT

Five Sany Electric Company, Ltd. SE8720111E Wind Turbine Generators and related Equipment are located at 1247 State Highway #207, Ralls, TX 79357.

All other Equipment is located at the Chief Executive Office.

<div align="right">

**Schedule III to the
Security Agreement**

</div>

## MEMBERSHIP INTERESTS

None.

**Schedule IV to the**
**Security Agreement**

PREEXISTING LIENS

Certain of Ralls OpCo's assets are subject to a security interest pursuant to that certain Security Agreement dated December 15, 2011, among Ralls OpCo, Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital, executed in connection with that certain Promissory Note dated of even date therewith by Ralls OpCo in favor of Wind Capital Partners, LLC and Shahed Lateef d/b/a BancCorp Capital for the principal sum of Three Hundred and Fifty Thousand Dollars (US$350,000).