EXECUTION COPY

SECURITY AGREEMENT

Dated March _16_, 2012

From

INTELLIGENT WIND ENERGY, LLC

as Grantor

to

TERNA ENERGY USA HOLDING CORPORATION

as Secured Party

NYDOCS02/958588.4

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| Section 1. Grant of Security | 1 |
| Section 2. Security for Obligations | 4 |
| Section 3. Grantor Remains Liable | 4 |
| Section 4. Delivery and Control of Security Collateral | 5 |
| Section 5. Maintaining the Account Collateral | 5 |
| Section 6. Investing of Amounts in the Collateral Account | 6 |
| Section 7. Release of Amounts | 6 |
| Section 8. Representations and Warranties | 6 |
| Section 9. Further Assurances | 7 |
| Section 10. As to Equipment | 8 |
| Section 11. Insurance | 9 |
| Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts | 10 |
| Section 13. Transfers and Other Liens; Additional Shares | 11 |
| Section 14. Secured Party Appointed Attorney in Fact | 11 |
| Section 15. Secured Party May Perform | 11 |
| Section 16. The Secured Party's Duties | 11 |
| Section 17. Remedies | 11 |
| Section 18. Indemnity and Expenses | 13 |
| Section 19. Amendments; Waivers; Etc. | 13 |
| Section 20. Notices, Etc. | 13 |
| Section 21. Continuing Security Interest; Assignments under the MIPSA | 14 |
| Section 22. Termination | 14 |
| Section 23. Execution in Counterparts | 14 |
| Section 24. Governing Law | 14 |



Schedules

Schedule I    -    Location, Chief Executive Office, Type of Organization, Jurisdiction of
                   Organization and Organizational Identification Number
Schedule II   -    Locations of Equipment
Schedule III  -    Membership Interests
Schedule IV   -    Preexisting Liens

## SECURITY AGREEMENT

This SECURITY AGREEMENT (this *"Agreement"*), dated as of March ____, 2012, is made by and between INTELLIGENT WIND ENERGY, LLC, a Delaware limited liability company (the *"Grantor"*), and TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation (the *"Secured Party"*).

### PRELIMINARY STATEMENTS.

(1) The Grantor has entered into a Master Wind Projects Membership Interests Purchase Agreement, dated as of February 28, 2012, by and among Grantor, Ralls Corporation, Ralls Wind Farm, LLC, the project companies named therein and the Secured Party (as amended, amended and restated, supplemented or otherwise modified from time to time, the *"MIPSA"*).

(2) The Grantor proposes to open a deposit account (the *"Collateral Account"*), which will be the collateral account for purposes hereunder.

(3) Pursuant to Section 3.3(j) of the MIPSA, it is a condition precedent to Closing that that the Grantor shall have granted the security interest contemplated by this Agreement.

(4) The Grantor will derive substantial direct and indirect benefit from the transactions contemplated by the MIPSA.

(5) Terms defined in the MIPSA and not otherwise defined in this Agreement are used in this Agreement as defined in the MIPSA.  Further, unless otherwise defined in this Agreement or in the MIPSA, terms defined in Article 8 or 9 of the UCC (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9.  *"UCC"* means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided that*, if perfection or the effect of perfection or non perfection or the priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, *"UCC"* means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non perfection or priority.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Party to transfer the Membership Interests as contemplated under the MIPSA, the Grantor hereby agrees with the Secured Party as follows:

Section 1. <u>Grant of Security</u>.  The Grantor hereby grants to the Secured Party a security interest in its right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by it, wherever located, and whether now or hereafter existing or arising (collectively, the *"Collateral"*):

(a) all equipment in all of its forms, including, without limitation, all machinery, tools, furniture and fixtures, and all parts thereof and all accessions thereto, including, without limitation, computer programs and supporting information that constitute

equipment within the meaning of the UCC (any and all such property being the "*Equipment*");

(b) all accounts (including, without limitation, health-care-insurance receivables), chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance (including, without limitation, receivables under any cash grant, production tax credit, investment tax credit or similar credit under the American Recovery and Reinvestment Act of 2009 or otherwise and receivables from the sale or transfer of renewable energy credits), and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e) or (f) below, being the "*Receivables*," and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "*Related Contracts*");

(c) the following (collectively, the "*Security Collateral*"):

(i)      the membership interests described in Schedule III (the "*Membership Interests*") and the certificates, if any, representing the Membership Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Membership Interests and all warrants, rights or options issued thereon or with respect thereto;

(ii)      all additional shares of stock and other equity interests from time to time acquired by Grantor in any manner, and the certificates, if any, representing such additional shares or other equity interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other equity interests and all warrants, rights or options issued thereon or with respect thereto; and

(iii)      and all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of

such investment property and all warrants, rights or options issued thereon or with respect thereto;

(d) the following (collectively, the *"Account Collateral"*):

(i)     all deposit accounts, the Collateral Account and all funds and financial assets from time to time credited thereto (including, without limitation, all Cash Equivalents), and all certificates and instruments, if any, from time to time representing or evidencing the Collateral Account;

(ii)    all promissory notes, certificates of deposit, checks and other instruments from time to time delivered to or otherwise possessed by the Secured Party for or on behalf of the Grantor in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)   all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral; and

(e) the following (collectively, the *"Intellectual Property Collateral"*):

(i)     all patents, patent applications, utility models and statutory invention registrations, all inventions claimed or disclosed therein and all improvements thereto (*"Patents"*);

(ii)    all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together, in each case, with the goodwill symbolized thereby (*"Trademarks"*);

(iii)   all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), internet web sites and the content thereof, whether registered or unregistered (*"Copyrights"*);

(iv)    all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, together with any and all maintenance rights, service rights, programming rights, hosting rights, test rights, improvement rights, renewal rights and indemnification rights and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing (*"Computer Software"*);

(v)     all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and



techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "*Trade Secrets*"), and all other intellectual, industrial and intangible property of any type, including, without limitation, industrial designs and mask works;

(vi)    all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration, together with all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)    all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)    all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary ("*IP Agreements*"); and

(ix)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(f) all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of such Grantor pertaining to any of the foregoing Collateral; and

(g) all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (f) of this Section 1) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Secured Party is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, and (B) cash.

Section 2. Security for Obligations.  This Agreement secures all payment and performance obligations of the Purchaser now or hereafter existing under the MIPSA, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such obligations being the "*Secured Obligations*").

Section 3. Grantor Remains Liable.  Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations

thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral (except as such exercise of Secured Party's rights results in Grantor's performance of such duties and obligations in accordance with the terms of such contracts and agreements), and (c) the Secured Party shall not have any obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement and shall not be obligated to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. Delivery and Control of Security Collateral.

(a) All certificates or instruments representing or evidencing Security Collateral, if any, shall be delivered to and held by or on behalf of the Secured Party pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to the Secured Party. The Secured Party shall have the right at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations.

(b) With respect to the Securities Account, the Collateral Account and any Security Collateral, the Grantor will cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Secured Party as the entitlement holder thereof or (ii) to agree with the Grantor and the Secured Party that such securities intermediary will comply with entitlement orders originated by the Secured Party without further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Securities Account Control Agreement"*).

(c) Upon the request of the Secured Party following the occurrence and during the continuance of a failure to make timely payments under the MIPSA (such a failure, a *"Default"*), the Grantor will notify each issuer of Security Collateral granted by it hereunder that such Security Collateral is subject to the security interest granted hereunder.

Section 5. Maintaining the Account Collateral. So long as any payment of the Purchase Price or any other obligation of Purchaser under the MIPSA shall remain unpaid:

(a) The Grantor will maintain deposit accounts (the *"Pledged Deposit Accounts"*) only with a bank (a *"Pledged Account Bank"*), which may be the same bank that Grantor currently uses for its deposit accounts, that has agreed with the Grantor and the Secured Party to comply with instructions originated by the Secured Party directing the disposition of funds in such deposit account without the further consent of the Grantor, such agreement to be in form and substance reasonably satisfactory to the parties hereto (a *"Deposit Account Control Agreement"*).

(b) The Secured Party may, upon five (5) Business Days' prior written notice, transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account to satisfy the Grantor's obligations under the MIPSA if any Default shall have occurred and be continuing; provided that immediately upon receipt of such

written notice, Grantor shall not transfer, or direct the transfer of, funds from the Pledged Deposit Accounts or the Collateral Account.

Section 6. Investing of Amounts in the Collateral Account. The Secured Party will, subject to the provisions of Sections 5, 7 and 17, from time to time (a) invest, or direct the applicable Pledged Account Bank to invest, amounts received with respect to the Collateral Account in such Cash Equivalents credited to the Collateral Account as the Grantor may select and the Secured Party may approve (such approval to not be unreasonably withheld, conditioned or delayed), and (b) invest interest paid on the Cash Equivalents referred to in clause (a) above, and reinvest other proceeds of any such Cash Equivalents that may mature or be sold, in each case in such Cash Equivalents credited in the same manner. Interest and proceeds that are not invested or reinvested in Cash Equivalents as provided above shall be deposited and held in the Collateral Account. In addition, the Secured Party shall have the right at any time to exchange, or direct the applicable Pledged Account Bank to exchange, such Cash Equivalents for similar Cash Equivalents of smaller or larger determinations, or for other Cash Equivalents, credited to the Collateral Account.

Section 7. Release of Amounts. So long as (a) no Default shall have occurred and be continuing or (b) the Secured Party has not provided written notice to the Grantor in accordance with Section 5, the Grantor will be entitled to spend amounts from the Collateral Account, for purposes of operating the business of Ralls OpCo, in the ordinary course of business and in a manner consistent with past practice; provided that any dividends, distributions or other payments made to Affiliates of Grantor (other than Ralls, Ralls OpCo or any of the Project Companies) shall require the prior written consent of the Secured Party, which consent shall not be unreasonably withheld.

Section 8. Representations and Warranties. The Grantor represents and warrants as follows:

(a) The Grantor's exact legal name, location, chief executive office, type of organization, jurisdiction of organization and organizational identification number is set forth in Schedule I hereto. The Grantor has no trade names and, except as identified on Schedule I hereto, has no Subsidiaries.

(b) Except as set forth on Schedule IV, (i) the Grantor is the legal and beneficial owner of the Collateral granted or purported to be granted by it free and clear of any Lien, claim, option or right of others, except for the security interest created under this Agreement or permitted under the MIPSA and (ii) no effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to the MIPSA or as otherwise permitted under the MIPSA.

(c) All of the Equipment of the Grantor is located at the places specified therefor in Schedule II hereto or at another location as to which the Grantor has complied with the requirements of Section 10(a). Such Grantor has exclusive possession and control of its Equipment.

(d) None of the Receivables or Agreement Collateral is evidenced by a promissory note or other similar instrument that has not been delivered to the Secured Party.

(e) The Grantor has no investment property other than investment property as to which the Grantor has complied with the requirements of Section 4.

(f) The Grantor has no deposit accounts, other than the Pledged Deposit Accounts as to which the Grantor has complied with the applicable requirements of Section 5.

(g) The Grantor is not a beneficiary or assignee under any letter of credit.

(h) This Agreement creates in favor of the Secured Party a valid security interest in the Collateral, securing the payment of the Secured Obligations; all filings and other actions (including, without limitation, actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-106 and 9-107 of the UCC and necessary to perfect the security interest in the Collateral granted by the Grantor) have been duly made or taken and are in full force and effect; and such security interest is (except with respect to security interests, if any, identified in Schedule IV) first priority.

(i) No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority (except with respect to security interests, if any, identified in Schedule IV) nature of such security interest), except for the filing of financing and continuation statements under the UCC, which financing statements have been duly filed and are in full force and effect and the actions described in Section 4 with respect to the Security Collateral, which actions have been taken and are in full force and effect, or (iii) the exercise by the Secured Party of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(j) The Grantor has no patents, parent applications, trademarks, service marks, domain names, logos, whether registered or unregistered, copyrights, computer software programs and databases or confidential or proprietary information or rights similar in type to any of the above.

(k) The Grantor has no commercial tort claims.

Section 9. Further Assurances. (a) The Grantor agrees that from time to time, at its expense, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Secured Party may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral.

Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if any such Collateral shall be evidenced by a promissory note or other instrument, deliver and pledge to the Secured Party hereunder such note or instrument duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance satisfactory to the Secured Party; (ii) file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Secured Party may request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; and (iii) deliver to the Secured Party evidence that all other actions that the Secured Party may deem reasonably necessary or desirable in order to perfect and protect the security interest granted or purported to be granted under this Agreement has been taken.

(b) The Grantor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement. A photocopy or other reproduction of this Agreement shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Secured Party to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c) The Grantor will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with such Collateral as the Secured Party may reasonably request, all in reasonable detail.

(d) Upon reasonable advance written notice, the Grantor will provide the Secured Party and its authorized representatives with reasonable access during Grantor's normal business hours to the books and records (including meeting minutes), contracts, commitments, facilities, accounts and financial and operating data of the Grantor relating to the Collateral, including without limitation wind data and maintenance logs, solely for the purpose of protecting the security interest granted to Secured Party hereunder. To the extent any such review may involve proprietary or other confidential information of Grantor, the parties hereto agree that the terms of the confidentiality agreement, dated February 2012, between Ralls Corporation and the Secured Party shall apply to such information; provided that, notwithstanding Section 3 of such confidentiality agreement, such information may be used for the purpose of protecting the security interest granted hereunder.

Section 10. <u>As to Equipment</u>. (a) The Grantor will cause its Equipment to be maintained and preserved in the same condition, repair and working order as when new, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any of such Equipment as soon as practicable after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith that are necessary or desirable to such end. The Grantor will promptly furnish to the Secured Party a statement respecting any loss or damage to any of its Equipment.

(b) The Grantor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including, without limitation, claims for labor, materials and supplies) against, its Equipment.

Section 11. Insurance. (a) The Grantor will (and will cause each of the Project Companies to), at its own expense, obtain and maintain insurance with respect to its Equipment and the Equipment of the Project Companies with responsible and reputable insurance companies or associations in such amounts and covering such risks as usually carried by companies engaged in similar businesses and owning similar properties in the same general areas in which the Grantor (or the applicable Project Company) operates. Each policy for liability insurance obtained by the Grantor (and the Project Companies) shall provide for all losses to be paid on behalf of the Secured Party and the Grantor (or the applicable Project Company) as their interests may appear, and each policy for property damage insurance obtained by the Grantor (or the applicable Project Company) shall provide for all losses to be paid directly to the Secured Party. Each such policy shall in addition (i) name the Grantor (or the applicable Project Company) and the Secured Party as insured parties thereunder (without any representation or warranty by or obligation upon the Secured Party) as their interests may appear, (ii) contain the agreement by the insurer that any loss thereunder shall be payable to the Secured Party notwithstanding any action, inaction or breach of representation or warranty by the Grantor (or the applicable Project Company), (iii) provide that there shall be no recourse against the Secured Party for payment of premiums or other amounts with respect thereto and (iv) provide that at least 10 days' prior written notice of cancellation or of lapse shall be given to the Secured Party by the insurer. The Grantor will (and will cause each of the Project Companies to), if so requested by the Secured Party, deliver to the Secured Party original or duplicate policies of such insurance. Further, the Grantor will (and will cause each of the Project Companies to), at the request of the Secured Party, duly execute and deliver instruments of assignment of such insurance policies to comply with the requirements of Section 10 and cause the insurers to acknowledge notice of such assignment.

(b) Reimbursement under any liability insurance maintained by the Grantor (and the Project Companies) pursuant to this Section 11 may be paid directly to the Person who shall have incurred liability covered by such insurance. In case of any loss involving damage to Equipment when subsection (c) of this Section 11 is not applicable, the Grantor will make or cause to be made (or will cause the applicable Project Company to make) the necessary repairs to or replacements of such Equipment, and any proceeds of insurance properly received by or released to the Grantor (or any Project Company) shall be used by the Grantor (or the applicable Project Company), except as otherwise required hereunder, to pay or as reimbursement for the costs of such repairs or replacements.

(c) So long as no Default shall have occurred and be continuing, all insurance payments received by the Secured Party in connection with any loss, damage or destruction of any Inventory or Equipment will be promptly released and transferred by the Secured Party to the Grantor (or the applicable Project Company) for the repair, replacement or restoration thereof. To the extent that (i) the amount of any such insurance payments exceeds the cost of any such repair, replacement or restoration, or (ii) such insurance payments are not otherwise required by the Grantor (or the applicable Project Company) to complete any such repair, replacement or restoration required hereunder, the Secured Party will not be required to release

the amount thereof to the Grantor (or the applicable Project Company) and shall hold or continue to hold such amount in the Collateral Account as additional security for the Secured Obligations. Upon the occurrence and during the continuance of any Default or the actual or constructive total loss of any Equipment, all insurance payments in respect of such Equipment shall be paid to the Secured Party and shall, in the Secured Party's sole discretion, (i) be released to the Grantor (or the applicable Project Company) to be applied as set forth in the first sentence of this subsection (c) or (ii) be held as additional Collateral hereunder or applied as specified in Section 17.

Section 12. Post-Closing Changes; Collections on Receivables and Related Contracts. (a) The Grantor will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 8(a) of this Agreement without first giving at least 30 days' prior written notice to the Secured Party and taking all action required by the Secured Party for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor will hold and preserve its records relating to the Collateral, including, without limitation, Related Contracts, and will permit, upon reasonable advance written request of the Secured Party, representatives of the Secured Party at any time during normal business hours to inspect and make abstracts from such records and other documents. If the Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Secured Party of such organizational identification number.

(b) Except as otherwise provided in this subsection (b), the Grantor will continue to collect, at its own expense, all amounts due or to become due the Grantor under the Receivables and Related Contracts. In connection with such collections, the Grantor may take such action as the Grantor may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; *provided, however*, that the Secured Party shall have the right at any time that Default shall have occurred and be continuing, upon written notice to the Grantor of its intention to do so, to notify the Obligors under any Receivables and Related Contracts of the assignment of such Receivables and Related Contracts to the Secured Party and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Secured Party and, upon such notification and at the expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Secured Party referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts shall be received in trust for the benefit of the Secured Party hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement) to be deposited in the Collateral Account and applied as provided in Section 17(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof or allow any credit or discount thereon. The Grantor will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 13. <u>Transfers and Other Liens; Additional Shares</u>. The Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral except for the pledge, assignment and security interest created under this Agreement and Liens permitted under the MIPSA.

Section 14. <u>Secured Party Appointed Attorney in Fact</u>. The Grantor hereby irrevocably appoints the Secured Party the Grantor's attorney in fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of a Default, in the Secured Party's reasonable discretion, to take any action and to execute any instrument that the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a) to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(b) to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) above, and

(c) to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral.

Section 15. <u>Secured Party May Perform</u>. If the Grantor fails to perform any agreement contained herein, the Secured Party may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor under Section 18.

Section 16. <u>The Secured Party's Duties</u>. The powers conferred on the Secured Party hereunder are solely to protect the Secured Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

Section 17. <u>Remedies</u>. If a Default shall have occurred and be continuing:

(a) The Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC

applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at a place and time to be designated by the Secured Party that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at the Secured Party's office or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Secured Party may deem commercially reasonable; and (iii) exercise any and all rights and remedies of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b) Any cash held by or on behalf of the Secured Party and all cash proceeds received by or on behalf of the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Secured Party pursuant to Section 18) in whole or in part by the Secured Party against, all or any part of the Secured Obligations. Any surplus of such cash or cash proceeds held by or on the behalf of the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c) All payments received by the Grantor under or in connection in respect of the Collateral shall be received in trust for the benefit of the Secured Party, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Secured Party in the same form as so received (with any necessary indorsement).

(d) The Secured Party may, without notice to the Grantor except as required by law and at any time or from time to time, charge, set off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.

(e) The Secured Party may send to each bank, securities intermediary or issuer party to any Deposit Account Control Agreement, Securities/Deposit Account Control



Agreement, Securities Account Control Agreement or Uncertificated Security Control Agreement a "Notice of Exclusive Control" as defined in and under such Agreement.

Section 18. Indemnity and Expenses. (a) The Grantor agrees to indemnify, defend and save and hold harmless the Secured Party and each of its Affiliates and their respective officers, directors, employees, agents and advisors (each, an "*Indemnified Party*") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from enforcement of this Agreement and Grantor's breach of or nonperformance under this Agreement, except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

(b) The Grantor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts and agents, that the Secured Party may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Secured Party hereunder or (iv) the failure by the Grantor to perform or observe any of the provisions hereof; provided, however, for the purposes of clarity, the obligation to pay expenses described in this Section 18 shall not apply to any costs or expenses of the Secured Party in connection with the negotiation, execution and/or delivery of this Agreement.

Section 19. Amendments; Waivers; Etc. No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No failure on the part of the Secured Party to exercise, and no delay in exercising, any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 20. Notices, Etc. All notices and other communications provided for hereunder shall be either (i) in writing (including telecopier communication) and mailed, telecopied, or otherwise delivered or (ii) by electronic mail (if electronic mail addresses are designated as provided below) confirmed immediately in writing addressed to it at its address specified in the MIPSA or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and other communications shall, when mailed, telecopied, sent by electronic mail or otherwise, be effective when deposited in the mails, telecopied, sent by electronic mail and confirmed in writing, or otherwise delivered (or confirmed by a signed receipt), respectively, addressed as aforesaid; except that notices and other communications to the Secured Party shall not be effective until received by the Secured Party. Delivery by telecopier of an executed counterpart of any amendment or waiver of any provision of this Agreement or Schedule hereto shall be effective as delivery of an original executed counterpart thereof.

Section 21. <u>Continuing Security Interest; Assignments under the MIPSA</u>. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until the earlier of (i) the payment in full in cash of the Secured Obligations and (ii) termination of the MISPA, (b) be binding upon the Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party's successors, transferees and assigns.

Section 22. <u>Termination</u>. Upon the earlier of (a) the payment in full in cash of the Secured Obligations and (b) termination of the MIPSA, the pledge and security interest granted hereby shall terminate automatically (without any further action required by the parties hereto) and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Secured Party will, at the Grantor's expense, promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

Section 23. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other electronic means (e.g. electronic mail or .pdf) shall be effective as delivery of an original executed counterpart of this Agreement.

Section 24. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[Signature page follows]

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

INTELLIGENT WIND ENERGY, LLC, as Grantor

By: _____
    Name:
    Title:

TERNA ENERGY USA HOLDING
CORPORATION, a Delaware corporation, as
Secured Party

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

INTELLIGENT WIND ENERGY, LLC, as Grantor

By: _____
    Name:
    Title:

TERNA ENERGY USA HOLDING CORPORATION, a Delaware corporation, as Secured Party

By: _____
    Name: Georgios Angeletos
    Title:  Secretary

Schedule I to the
Security Agreement

## LOCATION, CHIEF EXECUTIVE OFFICE, TYPE OF ORGANIZATION, JURISDICTION OF ORGANIZATION AND ORGANIZATIONAL IDENTIFICATION NUMBER

| Grantor | Location | Chief Executive Office | Type of Organization | Jurisdiction of Organization | Organizational I.D. No. |
|---|---|---|---|---|---|
| Intelligent Wind Energy, LLC | North Carolina | 11413 Ashbourne Hall Road, Charlotte, NC 28277 | Limited liability company | Delaware | 5080036 |

## LOCATIONS OF EQUIPMENT

All Equipment is located at the Chief Executive Office.

Schedule III to the
Security Agreement

## MEMBERSHIP INTERESTS

High Plateau Windfarm, LLC – 100% owned (as of the Closing Date) by Grantor

Lower Ridge Windfarm, LLC – 100% owned (as of the Closing Date) by Grantor

Mule Hollow Windfarm, LLC – 100% owned (as of the Closing Date) by Grantor

Pine City Windfarm, LLC – 100% owned (as of the Closing Date) by Grantor

NYDOCS02/958588.4

Schedule IV to the
Security Agreement

PREEXISTING LIENS

None.

*Execution Copy*

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement") is made and entered into as of March 26, 2012 (the "Effective Date"), by and between Ralls Corporation, a Delaware corporation ("Buyer"), and U.S. Innovative Renewable Energy, LLC, a Delaware limited liability company ("Seller"). Buyer and Seller re herein referred to as "Parties" and individually as a "Party" to this Agreement.

### RECITALS

A. Seller is the sole member of Intelligent Wind Energy, LLC, a Delaware limited liability company ("IWE").

B. IWE is the sole member of each of Lower Ridge Windfarm, LLC, an Oregon limited liability company ("Lower Ridge"), High Plateau Windfarm, LLC, an Oregon limited liability company ("High Plateau"), Mule Hollow Windfarm, LLC, an Oregon limited liability company ("Mule Hollow"), and Pine City Windfarm, LLC, an Oregon limited liability company ("Pine City," each of Lower Ridge, High Plateau, Mule Hollow and Pine City a "Project Company," and collectively, the "Project Companies").

C. Each of the Project Companies is developing a 10 megawatt ("MW") wind turbine power generation project to be located in the State of Oregon (each Project Company's "Project" and collectively, the "Projects");

D. IWE is a party to that certain Master Wind Turbine Supply Agreement dated December 16, 2011 between IWE and Sany Electric Co., Ltd. (the "TSA").

E. Seller desires to sell to Buyer and Buyer desires to purchase from Seller all of the outstanding membership interests of IWE, on the terms and conditions provided herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF MEMBERSHIP INTERESTS

### Section 1.1. Purchase and Sale Transaction.

Subject to the terms and conditions set forth in this Agreement and the consummation of the transactions contemplated by this Agreement, on the Closing Date (as defined in Section 1.4 hereof) and for the consideration specified in Section 1.2 hereof, Buyer shall purchase from Seller, and Seller shall sell, transfer, assign and convey to Buyer, free and clear of any and all liens, claims, encumbrances, security interests or options whatsoever, all right, title and interest in and to all of the outstanding membership interests in IWE (the "Purchased Membership Interests").

**Section 1.2. Purchase Price; Assumption of Liabilities.**

As consideration for the sale, transfer and assignment of the Purchased Membership Interests and for the covenants of the Seller herein, Buyer agrees to pay Seller as follows $450,000 (the "Purchase Price"), payable as follows:

    a.  $200,000 of which shall be paid by Buyer to Seller no later than twenty (20) business days following the Effective Date; and

    b.  $250,000 of which to be paid upon the earlier of (x) the date of commercial operation of at least 36 MW in nameplate capacity of the Projects, and (y) December 31, 2012.

**Section 1.3. Option to Purchase the Project**

    a.  Subject to the limitations, and compliance with the obligations, described in Section 1.3.c. below, Seller shall have the option (the "Seller Repurchase Option"), exercisable anytime following Closing until the commercial operation date of the first Project (the "Option Period") to repurchase the Purchased Membership Interests from Buyer for a total purchase price of $39,000,000 (the "Repurchase Price"). Seller may exercise the Seller Repurchase Option by delivering to Buyer, not less than thirty (30) days prior to the expiration of the Option Period, a written exercise notice specifying Seller's exercise thereof. Following Seller's delivery of such notice to Buyer, Seller shall satisfy the obligations described in Section 1.3.c. below to allow Buyer to transfer the Purchased Membership Interests to Seller in connection with the exercise of the Seller Repurchase Option. In the event Seller satisfies such obligations such that Buyer may freely transfer the Purchased Membership Interests to Seller, then Seller shall provide Buyer with prompt notice of such satisfaction and Seller shall pay the Repurchase Price to Buyer in immediately available funds to an account designated therefor by Buyer. Such payment shall be made within five (5) business days of Buyer's designation of such account to Seller. If Seller is unable to perform and complete such obligations prior to the expiration of the Option Period, the Seller Repurchase Option shall be void and of no further force or effect. At or before closing of any repurchase transaction between Seller and Buyer and as a condition to any such transaction, Seller shall enter into an agreement with Buyer under which Buyer will provide certain construction management, operation and maintenance services to the Projects for the life of the Projects. In exchange for such services, Seller will pay to Buyer $4,000,000 in immediately available funds to be paid simultaneously with the payment of the Repurchase Price.

    b.  If, prior to the expiration of the Option Period, a third-party unaffiliated with Buyer offers to purchase the Projects from Buyer (whether through an asset purchase, merger, equity purchase of one or more Project Companies, purchase of the Purchased Membership Interests, or other acquisition structure) Buyer shall notify Seller of such offer. Seller shall have twenty (20) business days following the date of Buyer's notice to determine whether to exercise the Seller Repurchase Option. If Seller declines to exercise the Seller Repurchase Option or does not exercise the Seller Repurchase Option within such twenty (20) business day period, then the Seller Repurchase Option shall be terminated and of no further force or effect and Buyer may complete a sale of the Projects (in any applicable form). In the event any such sale to a third party unaffiliated with Buyer occurs on or before September 30, 2012, then Buyer shall pay to Seller an amount equal to $300,000 promptly following Buyer's receipt of proceeds from such sale of the Projects.

2

c.  The parties acknowledge and agree as follows:

1.      The Projects, the interests in the Project Companies and, following Closing, the Purchased Membership Interests are encumbered by third party security and other interests, including, without limitation, the security interests and buyback rights of Terna Energy USA Holding Corporation ("Terna") pursuant to the Project Company Acquisition Agreement (defined below) and the agreements and instruments related thereto (such rights and interests, the "Superior Interests").

2.      The Seller Repurchase Option and Seller's rights with respect thereto are subordinate and junior to the Superior Interests and Seller shall not be entitled to consummate the repurchase of the Purchased Membership Interests following an exercise of the Seller Repurchase Option until the Superior Interests have been discharged and removed in full or until Seller and Buyer have obtained the written consent of each of the holders of Superior Interests, including Terna.

3.      In order to obtain such consent from the holders of Superior Interests, Seller may be required to replace security given by Buyer and its affiliates in connection with the Project Company Acquisition Agreement or post new or additional security and there can be no assurance that any holder of Superior Interests shall accept any such replaced or additional security or provide any such consent or approval.

4.      Notwithstanding anything to the contrary contained herein, Buyer shall not be obligated to proceed with or consummate the repurchase of the Purchased Membership Interest by Seller pursuant to the Seller Repurchase Option or otherwise until Buyer and each of its affiliates are fully released from all of their respective obligations under the Project Company Security Agreement and the agreements and instruments related thereto, including, without limitation, the guarantee agreements and security agreements executed by Buyer and its affiliates in connection therewith.

**Section 1.4. The Closing.**

The closing of the sale of the Purchased Membership Interests (the "Closing") shall take place at the place and time as agreed by the Parties (the date of Closing referred to herein as the "Closing Date").

**Section 1.5. Deliveries at the Closing.**

At the Closing, (a) Seller shall deliver to Buyer the various certificates, instruments, agreements and documents referred to in Section 5.1 below, (b) Buyer shall deliver to Seller the various certificates, instruments and documents referred to in Section 5.2 below and (c) Seller shall deliver to Buyer all necessary certificates, instruments and documents to effect a transfer of the Purchased Membership Interests to Buyer on the terms and conditions provided in this Agreement, including, without limitation, the certificates or other instruments, if any, representing the Purchased Membership Interests, endorsed in blank or accompanied by duly executed assignment documents, including an Assignment and Bill of Sale (the "Assignment") in the form set forth as **Exhibit A** to this Agreement, together with any other documents or certificates necessary to effect the transfer of the Purchased Membership Interests.

**Section 1.6. Effects of the Transaction.**

The purchase and sale of the Purchased Membership Interests shall be effective as of 12:01 a.m. United States central time on the Closing Date. From and after the Closing Date, the portion of profits or losses of IWE and the portions of all other items of income, gain, loss, deduction or

credit allocable to the Purchased Membership Interests on or after such Closing Date shall be credited or charged, as the case may be, to Buyer and not to Seller. From and after the Closing Date, Seller shall not be entitled to any distributions or payments in respect of the Purchased Membership Interests, and Buyer shall be entitled to all distributions or payments in respect of the Purchased Membership Interests made on or after the Closing Date. All profits, losses, each item thereof, and other items of income, gain, loss, deduction or credit allocable to the Purchased Membership Interests and attributable to any period before the Closing Date shall be allocated to Seller in a manner consistent with its past accounting and allocation practices. From and after the Closing Date, Seller will no longer be a member of IWE, will have no right to vote on or participate in the management of IWE and will have no right to any information concerning the business and affairs of IWE.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES CONCERNING THE PARTIES AND THE TRANSACTION

### Section 2.1. Representations and Warranties of Seller.

Seller hereby represents and warrants to Buyer that the statements contained in this Section 2.1 are correct and complete as of the Effective Date and shall be correct and complete as of the Closing Date (as though made at the Closing Date and as if the Closing Date were substituted for the Effective Date throughout this Section 2.1). Provided, however, that with respect to any representations or warranties regarding or relating to the Project Company, Seller only represents and warrants from the period starting with the closing of the Project Company Acquisition Agreement through the Effective Date, Seller has not acted in any way inconsistent with such representation or warranty nor has Seller acted in any manner that would cause such representation and warranty to be untrue.

(a) Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware and in any jurisdiction in which the failure to be so qualified would impair its ability to enter into this Agreement or adversely affect the enforceability of this Agreement. IWE is duly organized, validly existing and in good standing under the laws of the State of Delaware and in any jurisdiction in which the failure to be so qualified would have a material adverse effect on the IWE or its business. Each Project Company is duly organized, validly existing and in good standing under the laws of the State of Oregon and in any jurisdiction in which the failure to be so qualified would have a material adverse effect on the such Project Company or its business.

(b) Seller has full power and authority to execute and deliver this Agreement and any other agreements, documents and instruments delivered in connection with the Closing and to perform its obligations hereunder and thereunder. This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Buyer of this Agreement, constitutes the valid and binding obligation of Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereinafter in effect relating to creditors rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

(c) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which such Seller, IWE or any of the Project Companies are

subject, or any provision of Seller's, IWE's or any Project Company's articles of organization, operating agreement or other similar governing document, or (ii) conflict with, result in a breach of or constitute a default under (upon the giving of notice or lapse of time or both), result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument or other arrangement to which Seller, IWE or any Project Company is a party or by which Seller, IWE or any Project Company is bound or to which the Purchased Membership Interests of Seller is subject.

(d)    None of Seller, IWE or any Project Company has any liability or other obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable.

(e)    (i) Seller holds of record and is the sole beneficial owner of all of the Purchased Membership Interests, which Purchased Membership Interests are validly issued, fully paid and nonassessable, and are free and clear of any restrictions on transfer (other than any restrictions under federal or state securities laws and the Limited Liability Company Agreement of IWE (the "Operating Agreement")), liens, claims, encumbrances, security interests, options, warrants, purchase rights, rights of first refusal or other demands and represent 100% of the outstanding equity interests in IWE. Seller is not a party to, and there does not otherwise exist, any option, warrant, purchase right, right of first refusal or other contract or commitment that could require Seller to sell, transfer or otherwise dispose of the Purchased Membership Interests (other than this Agreement). Seller has good and marketable title to the Purchased Membership Interests, and the Purchased Membership Interests represent Seller's entire interest and investment in IWE.

(ii)   IWE holds of record and is the sole beneficial owner of all of the outstanding membership interests in each Project Company which are validly issued, fully paid and nonassessable and, except for the liens created pursuant to the Project Company Acquisition Agreement (defined below), are free and clear of any restrictions on transfer (other than any restrictions under federal or state securities laws), liens, claims, encumbrances, security interests, options, warrants, purchase rights, rights of first refusal or other demands. IWE is not a party to, and there does not otherwise exist, any option, warrant, purchase right, right of first refusal or other contract or commitment that could require IWE to sell, transfer or otherwise dispose of any such Project Company membership interests. Subject to the liens created under the Project Company Acquisition Agreement, IWE has good and marketable title to all such Project Company membership interests.

(f)    Except with respect to the liens created under the Project Company Acquisition Agreement, IWE has good and marketable title to all of its assets and properties and no other parties own or have any ownership or equity interest in, including a right of first refusal or a right of first offer, or have any lien on any of IWE's assets.

(g)    IWE is not in default under any contract or agreement, whether written or oral, to which it is a party and, to Seller's knowledge, no other parties are in breach or default under any such contract or agreement nor are there any potential defaults under any such contract or agreement.   Seller has provided Buyer with copies of all such contracts and agreements as currently in effect (including all amendments or modifications thereof).

(h)    There is no action, suit, claim or proceeding (including any arbitration proceeding) pending, or, to Seller's knowledge, threatened, nor is there any investigation pending or, to Seller's knowledge, threatened, against IWE or any Project Company, at law or in equity, or

before or by any governmental authority, and none of Seller, IWE or any such Project Company has received any notices respecting the threat or existence of any such proceeding. None of IWE or any Project Company is in default (and to Seller's knowledge, no event exists that with due notice or passage of time, or both, would constitute a default) with respect to any order, writ, injunction or decree known to or served upon such entity of any governmental authority. IWE and each Project Company is in compliance in all material respects with all applicable laws relating to it or its business.

(i)   No registration or filing with, or consent or approval of or other action by, any governmental authority or any other person or entity is or will be necessary for the valid execution, delivery and performance by Seller of this Agreement or the consummation of the transactions contemplated hereby.

(j)   Neither IWE nor any of the Project Companies has any employees or maintains or contributes to, or has any direct or indirect liability with, any employee benefit plan subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended. Neither IWE nor any of the Project Companies owes any sums under any services agreements nor to the Seller's knowledge, can any person make a claim for employment or rights for payment of any kind as an employee thereunder as a result of such service agreements.

(k)   All tax returns required to be filed by or on behalf of IWE and all tax returns required to be filed by or on behalf of the Project Companies have been filed, such tax returns are true, accurate and correct and all taxes required to be shown on such returns or otherwise due or payable have been paid. There are no tax liens or encumbrances on the Purchased Membership Interests or any assets of IWE, except with respect to taxes that are not yet due and payable. Seller has not, on behalf of IWE, waived or extended any statute of limitations for any taxes paid or payable by such Project Company. No party has made a claim for indemnification for taxes under any agreement with IWE. IWE is not a party to any pending action by any Governmental Authority for the assessment or collection of any taxes, and no notice of any such assessment or collection has been received by or communicated in writing to IWE or Seller on behalf of IWE and to the Seller's knowledge, no such notices been threatened IWE is not a party to a tax allocation or tax sharing agreement or arrangement.

(l)   True, accurate and correct copies of the books and records of IWE have been provided to Buyer. The records and minute books, or equivalent records and documents, of IWE have been kept and maintained in all material respects as required by applicable law, and such books and records contain true, accurate, complete and correct copies of IWE's organizational documents, all resolutions and other similar records of IWE through the Closing Date.

(m)   Except with respect to its express future obligations and liabilities under the TSA and the Master Wind Projects Membership Interests Purchase Agreement dated February 28, 2012 (and the other agreements and instruments contemplated therein) by and among IWE, Buyer, Ralls Wind Farm, LLC, the Project Companies and Terna Energy USA Holding Corporation (the "Project Company Acquisition Agreement"), and the Letter of Engagement dated March 2, 2012 between Seller and GCA BroadStone Investments LLC, IWE has no other liabilities or obligations.

(n)   Other than its ordinary course obligations as a member of IWE, Seller has no obligations or liabilities owed to IWE or any other person for which Buyer would or will become responsible following the Closing Date.

(o)   To Seller's knowledge, none of the representations or warranties given by Seller in this Agreement (including any schedules hereto), or any document, exhibit, statement, certificate or schedule heretofore furnished or made available by or on behalf of Seller in connection with the transactions contemplated by this Agreement, when taken as a whole, contains any untrue statement of a material fact, or omits to state any material fact necessary to make the statements or facts contained herein or therein, in light of the circumstances in which they were made, not misleading.

Section 2.2. <u>Representations and Warranties of Buyer.</u>

Buyer represents and warrants to Seller that the statements contained in this Section 2.2 are correct and complete as of the Effective Date and shall be correct and complete as of the Closing Date (as though made at the Closing Date and as if the Closing Date were substituted for the Effective Date throughout this Section 2.2).

(a) Buyer is duly organized, validly existing and in good standing under the laws of the state of Delaware and in any jurisdiction in which the failure to be qualified would impair its ability to enter into this Agreement or adversely affect the enforceability of this Agreement.

(b) Buyer has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement has been duly executed and delivered by Buyer and, assuming the due authorization, execution and delivery by Seller of this Agreement, constitutes the valid and binding obligation of Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereinafter in effect relating to creditors rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

(c) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court to which Buyer is subject, or any provision of Buyer's articles of incorporation or bylaws or (ii) conflict with, result in a breach of or constitute a default under (upon the giving of notice or lapse of time or both), result in the acceleration of, or create in any party the right to accelerate, terminate, modify or cancel, or require any notice under, any agreement, contract, lease, license, instrument or other arrangement to which Buyer is a party or by which Buyer is bound.

# ARTICLE III

# PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Effective Date and the Closing:

Section 3.1 <u>General.</u>

Each of the Parties will use its commercially reasonable best efforts to take all actions and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Article V below).

4852-4793-9086.2

Section 3.2 <u>Access to Information.</u>

Seller shall cause IWE to give Buyer and its management personnel, counsel, accountants, financial advisors and all other reasonable representatives of Buyer ("Representatives") full access and opportunity, during normal business hours, to examine IWE's and each Project Company's respective assets, books and records and to afford Buyer and Representatives full and complete access to examine all assets, contracts, facilities and information used in connection with IWE's and each Project Company's development and intended operations.

Section 3.3 <u>Notices and Consents.</u>

Seller will use its best efforts to cause IWE to give any required notices to third parties and to use reasonable commercial efforts to obtain any third party consents that Buyer may reasonably request in connection with or to effect the transactions contemplated by this Agreement. Each of the Parties will give any notices to, make any filings with, and use its reasonable commercial efforts to obtain any authorizations, consents and approvals of governments and governmental agencies, known to be required in connection with the matters referred to in Section 2.1(c) and Section 2.2(c).

Section 3.4 <u>Operation of IWE Business.</u>

Seller shall use its best efforts to cause IWE to operate its business and conduct its affairs in the ordinary course of business and as set forth in the Operating Agreement, except as otherwise provided in Article VI of this Agreement.  IWE shall not make any distribution with respect to any ownership interest in IWE, including specifically the Purchased Membership Interests, prior to Closing.

Section 3.5 <u>Notice of Developments.</u>

Each Party will give prompt written notice to the others of any development causing a breach of any of its own representations and warranties in Article II above. However, no disclosure by any Party pursuant to this Section 3.5 shall be deemed to prevent or cure any misrepresentation, breach of warranty or breach of covenant.

# ARTICLE IV

## POST-CLOSING COVENANTS

The Parties agree as follows with respect to the period following the Closing:

Section 4.1 <u>Additional Instruments and Further Assurances.</u>

The Parties agree to cooperate at all times from and after the Closing with respect to any of the matters described herein, and to execute such further deeds, bills of sale, assignments, releases, assumptions, notifications and other documents or instruments as may be reasonably requested for the purpose of giving effect to, evidencing or giving notice of the transactions contemplated by this Agreement or the agreements of the Parties under this Agreement.  Further, Seller shall cooperate with Buyer and IWE with respect to any claims made under, including indemnification claims, the Project Company Acquisition Agreement.

Section 4.2 <u>Confidentiality.</u>

From and after the Closing Date, each of Buyer and Seller shall and shall cause each of its respective affiliates to, treat and hold as confidential any information concerning the Projects and the Project Companies that is not already generally available to the public, including this



Agreement and the existence of this Agreement, any notes, analyses, compilations, studies, forecasts, interpretations or other documents that are derived from, contain, reflect or are based upon any such information (the "Confidential Information"), refrain from using any of the Confidential Information except in connection with this Agreement; provided that nothing in this Section 4.2 shall be construed to limit Buyer's ability to develop the Projects. Notwithstanding the foregoing, Confidential Information shall not include information that is (i) generally available to the public other than as a result of a breach of this Section 4.2 or other act or omission of the non-disclosing party or any of its representatives or affiliates or (ii) rightfully received after the Closing Date, as the case may be, from a third party not under any obligation of confidentiality with respect to such information. In the event that any Party or any affiliate of a Party is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, such person shall notify the other Party promptly of the request or requirement so that such Party may seek an appropriate protective order or waive compliance with the provisions of this Section 4.2. If, in the absence of a protective order or the receipt of a waiver hereunder, any Party or any affiliate of a Party is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, such person may disclose the Confidential Information to the tribunal; provided that such disclosing person shall use its reasonable efforts to obtain an order or other assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed as the other Party shall designate.

## ARTICLE V

## CONDITIONS TO OBLIGATION TO CLOSE

### Section 5.1 Conditions to Obligation of the Buyer.

The obligation of the Buyer to purchase the Purchased Membership Interests and to consummate the transactions to be performed by it in connection with the Closing with respect to Seller, is subject to satisfaction of each of the following conditions:

(a) Buyer shall have completed its due diligence review of IWE to Buyer's sole satisfaction.

(b) Each of the representations and warranties of Seller set forth in Section 2.1 above not qualified by materiality or similar qualifier shall be true and correct in all material respects, and each of the representations and warranties so qualified shall be true and correct in all respects at and as of the Closing Date.

(c) Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing.

(d) Buyer shall be satisfied, in its sole discretion, that there has been no material adverse change in IWE's business, financial condition, operations or prospects.

(e) Seller shall have, or shall have caused IWE to have, procured all of the third party consents specified in Section 3.3 above.

(f) All necessary governmental approvals for the transactions contemplated herein shall have been received and all required waiting periods shall have expired or terminated.

(g) The Board of Managers, if applicable, of IWE shall have approved the transfer of the Purchased Membership Interests to Buyer and shall have consented in writing thereto, IWE shall have admitted Buyer as a Member of IWE, IWE shall recognize the transfer of the Purchased

Membership Interests on its books and records as of the Closing Date, and Seller shall have delivered a withdrawal form reasonably acceptable to Buyer in form and content indicating that such Seller has withdrawn from IWE and is no longer a member of IWE.

(h) IWE shall not have made any distribution to the Members nor established a record date of Members entitled to any distribution.

(i) Seller shall have transferred the Purchased Membership Interests to Buyer, with the result that Buyer shall, directly or indirectly, hold 100% of the membership interests of IWE.

(j) No action, suit or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would (i) prevent consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling or charge shall be in effect).

(k) Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified in paragraphs (b) and (c) of this Section 5.1 is satisfied in all respects.

(l) Seller shall cause each person it has appointed as a manager of IWE to resign from the IWE Board, and such resignations shall be in form and content reasonably acceptable to Buyer.

(m) All actions to be taken by Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to the Buyer.

Buyer may waive any condition specified in this Section 5.1 if it executes a writing so stating at or prior to Closing; provided that the occurrence of the Closing shall be deemed to constitute a waiver of any such condition.

### Section 5.2 Conditions to Obligation of Sellers.

The obligation of Seller to sell and transfer the Purchased Membership Interests and to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of each of the following conditions:

(a) The representations and warranties set forth in Section 2.2 above not qualified by materiality or similar qualifier shall be true and correct in all material respects, and each of the representations and warranties so qualified shall be true and correct in all respects at and as of the Closing Date;

(b) Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(c) No action, suit or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling or charge would (i) prevent consummation of any of the transactions contemplated by this Agreement or (ii) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling or charge shall be in effect);

(d) Buyer shall have delivered to such Seller a certificate to the effect that each of the conditions specified above in paragraphs (a) and (b) of this Section 5.2 is satisfied in all respects;

4852-4793-9086.2  10

(e) All actions to be taken by Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Seller.

Seller may waive any condition specified in this Section 5.2 if it executes a writing so stating at or prior to the Closing provided that the occurrence of the Closing shall be deemed to constitute a waiver of any such condition.

### Section 5.3 Undertakings of Parties.

Seller and Buyer will each use its best efforts to cause the conditions specified in Sections 5.1 and 5.2 to be satisfied in a timely manner. Seller and Buyer agree to cooperate at all times with respect to this Agreement and to execute any such deeds, instruments, assignments or other documents reasonably required to give effect to or to evidence the transactions contemplated hereby.

### ARTICLE VI

### OTHER AGREEMENTS OF THE PARTIES

### Section 6.1 Consent to Transfer.

Seller hereby waives any of the conditions and restrictions on the transfer of the Purchased Membership Interests for the purpose of the transactions contemplated by this Agreement and hereby consent to the transfer of the Purchased Membership Interests to Buyer pursuant to the terms and conditions of this Agreement.

### Section 6.2 Amendments to Operating Agreement.

Seller hereby agrees to modify or amend the provisions of the Operating Agreement, if applicable, or to waive their rights and obligations under the Operating Agreement as may be necessary or advisable, upon the request of Buyer, with respect to any other matter to facilitate the transactions contemplated hereby from the date this Agreement is signed to and including the Closing Date.

### Section 6.3 Exclusive Dealing.

In consideration of the costs and expenses to be borne by the Parties in pursuing the transactions contemplated by this Agreement, and further in consideration of their mutual undertakings as to matters described herein, Seller agrees that it will not solicit or initiate any further discussion or enter into any agreement with any other person or entity concerning (a) the acquisition of IWE or any Project Company, whether by merger, sale of membership interests, exchange or asset purchase or otherwise; (b) the sale, issuance or grant by IWE or any Project Company of any of its respective equity or debt securities, or any right to purchase such equity or debt securities, or any combination thereof; and (c) the sale or encumbrance or other transfer, or any combination thereof, by Seller of any of the Purchased Membership Interests or any portion thereof.

### ARTICLE VII

### Intentionally Omitted

## ARTICLE VIII

### REMEDIES FOR BREACHES OF THIS AGREEMENT

**Section 8.1 <u>Survival of Representations, Warranties and Covenants.</u>**

All of the representations, warranties and covenants of the Parties contained in this Agreement shall survive the Closing and continue in full force and effect.

**Section 8.2 <u>Indemnification Provisions for Benefit of Buyer and IWE.</u>**

Seller agrees to indemnify, defend and hold Buyer and IWE, and each of their members, managers, employees, representatives, agents, shareholders, officers, and directors harmless from and against all liabilities, obligations, claims, damages, causes of action and costs and expenses, including attorneys' fees, that are caused by, attributable to, result from or arise out of Seller's breach of or inaccuracy in any representation, warranty or covenant of this Agreement.

**Section 8.3 <u>Indemnification Provisions for Benefit of Seller.</u>**

Buyer agrees to indemnify, defend and hold Seller harmless from and against all liabilities, obligations, claims, damages, causes of action and costs and expenses, including attorneys fees, that are caused by, attributable to, result from or arise out of Buyer's breach of or inaccuracy in any representation, warranty or covenant of this Agreement.

**Section 8.4 <u>Limitations.</u>**

Notwithstanding the provisions of Section 8.2, the aggregate damages to which Buyer will be entitled from Seller for claims under Section 8.2 shall be limited to the Purchase Price paid to such Seller pursuant to Section 1.2 hereof. In no circumstance shall Buyer be entitled to any punitive, incidental, indirect, special or consequential damages resulting from or arising out of claims made pursuant to Section 8.2 or otherwise, except to the extent the claim results from or arises from a third party claim in which Buyer is required to pay such types of damages. Notwithstanding the provisions of Section 8.3, the aggregate damages to which any Seller will be entitled for claims under Section 8.3 shall be limited to direct damages suffered by such Seller (as opposed to consequential or incidental damages). In no circumstance shall any Seller be entitled to any punitive, incidental, indirect, special or consequential damages resulting from or arising out of claims made pursuant to Section 8.3 or otherwise, except to the extent the claim results from or arises from a third party claim in which Seller is required to pay such types of damages. The limitations in this Section 8.4 shall not apply to damages or claims resulting or arising from fraud or intentional misrepresentation by a Party.

## ARTICLE IX

### TERMINATION

**Section 9.1 <u>Termination of Agreement.</u>**

Certain of the Parties may terminate this Agreement as provided below:

(a) Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b) Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing: (i) in the event Seller has breached any representation, warranty or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and

the breach has continued without cure for a period of five (5) days after the notice of breach, or (ii) by reason of the failure of any condition precedent under Section 5.1 hereof other than conditions with respect to actions the respective Parties will take at the Closing itself (unless the failure results primarily from Buyer itself breaching any representation, warranty or covenant contained in this Agreement in any material respect);

(c) Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (i) in the event Buyer has breached any representation, warranty or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of five (5) days after the notice of breach, or (ii) by reason of the failure of any condition precedent under Section 5.2 hereof other than conditions with respect to actions the respective Parties will take at the Closing itself (unless the failure results primarily from Seller itself breaching any representation, warranty or covenant contained in this Agreement in any material respect); and

(d) Buyer or Seller may terminate this Agreement if the Closing does not occur on or prior to April 15, 2012.

### Section 9.2 Effect of Termination.

If any Party terminates this Agreement pursuant to Section 9.1, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any liability of any Party then in breach).

## ARTICLE X

## MISCELLANEOUS

### Section 10.1 Press Releases and Public Announcements; Confidentiality.

No press release or public announcement relating to the existence of or subject matter of this Agreement may be made without the prior written approval of Buyer and Seller, except for communications with member-owners, employees, customers, suppliers and other groups as may be legally required or necessary or appropriate and except that any Party may make any public disclosure it believes in good faith is required by applicable law, including the application of the securities laws (in which case the disclosing Party will use its reasonable best efforts to advise the other Parties prior to making the disclosure). The Parties may, if agreed by the Parties, make a joint announcement as to the transactions contemplated hereby at a time and place to be mutually agreed upon, as soon as practicable after the date hereof. The Parties agree to keep the terms of this Agreement confidential pursuant to Section 4.2 above, subject to the foregoing disclosure requirement.

### Section 10.2 No Third Party Beneficiaries.

This Agreement shall not confer any rights or remedies upon any person or entity other than the Parties and their respective successors and permitted assigns.

### Section 10.3 Entire Agreement.

This Agreement (including any schedules and exhibits hereto) constitutes the entire agreement among the Parties regarding the transactions contemplated hereby and supersedes any prior understandings, agreements or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof, except as otherwise provided in Section 4.2 hereof.

4852-4793-9086.2



**Section 10.4** <u>Succession and Assignment.</u>

This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of Buyer and Seller (which approval shall not be unreasonably withheld).

**Section 10.5** <u>Counterparts.</u>

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument, and may be executed in whole or part by facsimile or pdf counterparts, each of which shall be deemed an original.

**Section 10.6** <u>Headings.</u>

The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 10.7** <u>Notices.</u>

All notices, requests, demands, claims and other communications hereunder will be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| If to Buyer: | Copy to: |
|---|---|
| Ralls Corporation | Fredrikson & Byron, P.A. |
| 318 Cooper Circle | 200 South Sixth Street, Suite 4000 |
| Peachtree City, GA  30269 | Minneapolis, MN  55402 |
| Attn: Stacy Rowles | Attn: Todd Guerrero |
| Phone: (678) 251-2860 | Phone: (612) 492-7370 |
| E-mail: srowles@sanyamerica.com | E-mail: tguerrero@fredlaw.com |

| If to Seller: | Copy to: |
|---|---|
| U.S. Innovative Renewable Energy, LLC | Joshua Nathan |
| 11413 Ashbourne Hall Rd. | Ravenswood Center |
| Charlotte, NC  28277 | 4256 North Ravenswood Ave, Suite 301 |
| Attn: Xiaolin Zhang | Chicago, IL  60613 |
| Phone: (713) 252-8084 | Phone: (773) 935-6501 |
| E-mail: xzhang1227@yahoo.com | E-mail: Joshua.nathan@orbitenergypa.com |

Any Party may send any notice, request, demand, claim or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

### Section 10.8 Governing Law.

This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

### Section 10.9 Amendments and Waivers.

No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

### Section 10.10 Severability.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

### Section 10.11 Expenses.

Each Party will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, whether or not any of the transactions contemplated herein are consummated.

### Section 10.12 Construction.

The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty and covenant contained herein shall have independent significance and must be true on their own terms.

### Section 10.13 Incorporation of Schedules and Exhibits.

The Schedules and Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

### Section 10.14 Specific Performance.

Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter (subject to the provisions set forth in

15

4852-4793-9086.2

Section 10.15 below), in addition to any other remedy to which they may be entitled, at law or in equity.

### Section 10.15 Submission to Jurisdiction.

Each of the Parties submits to the jurisdiction of any state or federal court sitting in the State of Illinois, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each of the Parties also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other person with respect thereto. Each of the Parties appoints the person or persons to whom notices are directed in Section 10.7 as his or its agent to receive on his or its behalf service of copies of the summons and complaint and any other process that might be served in the action or proceeding.

**[Signature page follows]**

4852-4793-9086.2

16

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement effective as of the Effective Date.

BUYER:

RALLS CORPORATION,
a Delaware corporation

By: _____
Name: _Jia Tiang Wu_
Title: _CEO_

SELLER:

U.S. INNOVATIVE RENEWABLE
ENERGY, LLC, a Delaware limited
liability company

By: _____
Name: Xiaolin Zhang
Title:   President

EXHIBIT A

FORM OF
ASSIGNMENT AND BILL OF SALE

IN CONSIDERATION of Ralls Corporation, a Delaware corporation (hereinafter "Buyer"), as transferee, and other good and valuable consideration given by Buyer U.S. Innovative Renewable Energy, LLC, a Delaware limited liability company (hereinafter "Seller"), as transferor, the receipt and sufficiency of which are hereby acknowledged by Seller, the undersigned Seller does hereby sell, assign, transfer, and convey to Buyer, free and clear of any and all liens, claims, encumbrances, security interests or options whatsoever, all of Seller's right, title and interest in and to a 100 % Membership Interest in Intelligent Wind Energy, LLC, a Delaware limited liability company ("IWE") constituting 100% of Seller's ownership interest in IWE, including all of Seller's rights and other benefits to which holders of Membership Interests in IWE may be entitled under the Operating Agreement of IWE dated _____ (the "Operating Agreement") or otherwise, including, without limitation, (i) Seller's shares of the profits and losses of IWE, (ii) all rights of Seller to receive distributions of IWE's monies and other property or assets due and to become due to Seller under or pursuant to the Operating Agreement or applicable law (regardless of the source of those distributions or payments or when the same was earned or received by IWE), (iii) all rights of Seller to vote on or participate in the management of IWE, (iv) all rights of Seller to information concerning the business and affairs of IWE, (v) all claims of Seller for damages arising out of or for any breach of or default under the Operating Agreement, and (vi) all rights of Seller to act under the Operating Agreement and to compel performance and otherwise exercise remedies under the Operating Agreement (all of the foregoing collectively referred to herein as the "Purchased Membership Interest").

Seller represents and warrants that it has good and marketable title to the Purchased Membership Interest free and clear of any and all liens, claims, encumbrances, security interests, or options whatsoever. Seller's representations, warranties and covenants with respect to the Purchased Membership Interest, as set forth in the Membership Interest Purchase Agreement dated _____ 2012 (the "Agreement") by and between Buyer and Seller, are hereby incorporated into and made a part of this Assignment and Bill of Sale. This Assignment and Bill of Sale is effective _____, 2012, and shall be governed in accordance with the terms and conditions of the Agreement.

Seller does hereby agree, upon the completion by the parties to the Agreement of their respective obligations at Closing (as defined in the Agreement), that the transfer of the Purchased Membership Interest assigned hereunder on and subject to the terms and conditions of the Agreement shall be complete, final and irrevocable, and shall be effective as of _____, 2012.

Capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Agreement.

4852-4793-9086.2

IN WITNESS WHEREOF, Seller has executed this Assignment and Bill of Sale as of the ___ day of _____, 2012.

SELLER:

U.S. INNOVATIVE RENEWABLE
ENERGY, LLC, a Delaware limited
liability company

By: _____
Name: _____
Title: _____

4852-4793-9086.2

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

VOLUNTARY NOTICE TO THE COMMITTEE ON FOREIGN
INVESTMENT IN THE UNITED STATES UNDER SECTION 721
OF TITLE VII OF THE DEFENSE PRODUCTION ACT OF 1950,
AS AMENDED, AND 31 C.F.R. PART 800
WITH RESPECT TO A TRANSACTION BETWEEN

**Ralls Corporation**

**AND**

**Terna Energy USA Holding Corporation**

*Counsel for Terna Energy USA Holding Corp.*

Robert LaRussa
Shearman & Sterling LLP
801 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004

Phone: 202-508-8000
Fax: 202-508-8100
rlarussa@shearman.com

*Counsel for Ralls Corp.*

Stephen Heifetz
Michael Gershberg
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Phone: 202-429-6227
Fax: 202-429-3902
sheifetz@steptoe.com
mgershberg@steptoe.com

Todd J. Guerrero
Ruilin Li
Fredrikson & Byron, P.A.
200 South Sixth Street
Minneapolis, MN 55402

Phone: 612-492-7000
Fax: 612-492-7077
tguerrero@fredlaw.com

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Terna Energy USA Holding Corporation ("Terna") and Ralls Corporation ("Ralls") (collectively, "the Parties") respectfully provide this Notice for consideration by the Committee. As indicated below, the Parties do not believe that Terna and Ralls have engaged in a "covered transaction," nor do the Parties believe that the transaction increases national security risk. The Parties note that the windfarm projects at issue in this Notice previously have been reviewed and approved by the Federal Aviation Administration; further, the Department of Navy has been engaged with and supported Ralls during recent permitting processes. The Parties nevertheless appreciate that CFIUS may have different interests that are unrelated to this prior constructive dialog with the executive branch. The Parties accordingly submit this voluntary Notice in response to the Committee's request and look forward to resolving any questions or concerns from the Committee.

Ralls also notes that contractual obligations and the December 2012 expiry of certain federal renewable energy incentives dictate that construction of the windfarms must continue. Ralls respects the CFIUS process and asks the Committee to recognize that development of the windfarms pursuant to contractual obligations and other commercial realities is not intended to discount the Committee's interests.

Before providing the required content for this Notice, we present below some prefatory points – briefly (1) identifying the Parties, (2) providing background on the development assets and projects, (3) describing prior executive branch approvals, (4) describing prior cooperation with the Navy, (5) explaining the planned resale of the projects, (6) explaining the Parties' position as to why this is not a covered transaction, and (7) explaining why the transaction does not increase national security risk.

<u>Terna and Ralls</u>

Terna Energy SA is a publicly traded renewable energy company listed on the Athens Stock Exchange and is the ultimate parent company of Terna. Terna Energy SA (through its subsidiaries) formed Terna, a Delaware corporation, in December 2010 to acquire and act as a holding company for wind energy projects in the United States. In December 2010, Terna acquired two sets of wind projects – one in Idaho and one in Oregon. As of today, Terna continues to hold (through its subsidiary) all of the membership interests in six project companies that are developing the Idaho projects. Terna also held the membership interests in four companies – Pine City Windfarm, LLC, an Oregon limited liability company, Mule Hollow Windfarm, LLC, an Oregon limited liability company, High Plateau Windfarm, LLC, an Oregon limited liability company, and Lower Ridge Windfarm, LLC, an Oregon limited liability company (collectively, the "Project Companies") – with rights to develop four small windfarm projects in north central Oregon. These companies were originally formed in 2009 by Oregon Windfarms, LLC, an Oregon limited liability company owned by U.S. citizens. In March 2012, Terna sold its membership interests to Intelligent Wind Energy, LLC ("IWE"), a Delaware limited liability company that is owned by Ralls.

Ralls is a Delaware company that is privately owned and controlled by two Chinese nationals – Messrs. Dawei Duan and Jialing Wu. Messrs. Duan and Wu are not Chinese

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

government or military officials.  Mr. Duan is the CFO of the Sany Group ("Sany"), a Chinese global manufacturing company and one of the largest privately-held companies in China.  Sany is not a state-owned or controlled company.   Mr. Duan is also a Vice President of Sany Heavy Industries, a company whose shares are publicly traded on the Shanghai stock exchange and are majority owned by Sany.  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric Company, Ltd. ("Sany Electric"), a wholly-owned Chinese subsidiary of Sany. Sany Electric manufactures wind turbine generators.  Ralls' primary business purpose to date has been to try and identify U.S. market opportunities and help develop wind energy projects for which Sany Electric's wind turbine generators can be used.

The Windfarm Projects

The Project Companies purchased by Ralls are holding companies for the Butter Creek development assets which, with the addition of labor, capital, and equipment will become small operating wind energy projects.  Once constructed, the Butter Creek windfarms will consist of an aggregate of twenty 2.0 megawatt ("MW") wind turbine generators (five turbines per windfarm) and related systems to allow for power production and interconnection to the PacifiCorp transmission grid in the western United States under long-term contracts with PacifiCorp.  At the time of the transaction, construction had not yet commenced and the projects were essentially greenfield projects, existing only on paper and consisting solely of various easements, permits, contracts and other intangible assets.  The Project Companies will not control or have access to PacifiCorp's transmission grid, and PacifiCorp will control only when the turbines operate. PacifiCorp itself owns thousands of MWs of wind energy generating facilities, and nearly 10,600 MW of total generating assets.  Once constructed, Ralls' 40 MW of wind-generated power will comprise approximately 0.37% of PacifiCorp's total generating capacity, and approximately 2.3% of its wind energy generating capacity.

Once completed, the Butter Creek windfarms will be regulated under the federal Public Utility Regulatory Policy Act of 1978 ("PURPA"), the primary purpose of which is to provide a market for the electricity produced by small, mainly renewable power producers and co-generators.  The intent in enacting PURPA was to encourage new, independent power producers to enter the market to compete with traditional utilities to lower energy costs to U.S. consumers and to promote the development of renewable energy.  The Butter Creek windfarm projects at issue meet these important statutory objectives.

Executive Branch Approval of the Windfarm Projects

In 2010 and 2011, prior to the Ralls acquisition, the Federal Aviation Administration ("FAA") issued "Determinations of No Hazard" (*i.e.*, FAA permission) for locations at which the wind farms are proposed to be sited.

The FAA's review process includes a review by the Department of Defense.  This review by the Department of Defense, which allowed the FAA to issue its Determinations of No Hazard for the Butter Creek windfarm projects, is designed to ". . . prevent, minimize, or mitigate adverse impacts on military operations, readiness and testing."  Mission Statement of the DOD Siting Clearinghouse, Office of the Deputy Under Secretary of Defense, Installations and Environment (*see* http://www.acq.osd.mil/dodsc/about/).  After Ralls acquired the Project

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Companies, the Navy expressed safety concerns with regard to the location of one of the four projects. In particular, the Navy urged moving the proposed site of one windfarm development project – the "Lower Ridge Windfarm" – to "reduce airspace conflicts between the Lower Ridge Windfarm wind turbines and low-level military aircraft training." Navy letter dated May 17, 2012, attached as **Exhibit 10**. The Lower Ridge Windfarm is the only one of the four development projects proposed to be located within a restricted flight zone, but like the other projects will be located on private property. Although the Navy indicated that it had no authority to require such a move, Ralls agreed, at significant expense and effort, to move the Lower Ridge Windfarm to a new location 1.5 miles south, a site for which the FAA previously had issued additional permits, but which also was within the restricted flight zone.

The move, however, required the Oregon Public Utility Commission to waive certain rules, and the move further required *de minimis* location and height adjustments to the FAA permits at the new site to accommodate landowner farming concerns and slightly higher turbines. The Navy, in its May 17, 2012 letter, urged the Oregon Commission to waive the relevant rule in order to allow the Lower Ridge Windfarm to be moved 1.5 miles south, and the Oregon Commission did, in fact, waive the rule. The FAA has not yet, however, issued new permits for the location 1.5 miles south. Ironically, Ralls has federal approval to build the Lower Ridge Windfarm where the Navy does not want it, but has not received from the FAA final authorization to build in the location that the Navy would prefer.

In reliance on the FAA permits, Ralls acquired the Butter Creek development assets and signed contracts that have obligated it to begin windfarm construction. As a contractual matter, the construction of the Lower Ridge Windfarm could be either at the original site or at the site 1.5 miles south (which the Navy prefers, and therefore, so too does Ralls). But without new FAA authorizations for the Navy's preferred site, it appears to Ralls that its only option is to construct the Lower Ridge Windfarm on the original site.

<u>Cooperation with the Navy</u>

As indicated above, the FAA and state permitting processes have involved dialog with the Navy. In fact, since the Navy contacted Ralls in late April of this year, Ralls has had extensive communications with the Navy and has gone to great lengths to be responsive to the Navy's concerns. Ralls voluntarily made costly and disruptive changes to its construction plans and undertook significant additional local, state, and federal permitting activities, notwithstanding the time constraints under which Ralls is operating. Indeed, the Navy told the Oregon Commission that the Navy "recognize[s] the Company's time constraints in completing the project, and we very much appreciate their cooperation and consideration in revising project plans to reduce impacts to the Navy's flight training capabilities." **Exhibit 10**.

Ralls remains committed to satisfying the Navy and other government concerns. Ralls would even be willing to move the Lower Ridge Windfarm to an entirely new location if FAA permits for the new location could be secured expeditiously and related matters could be resolved quickly so that construction at the new location could still be completed this year. Ralls is willing to accept this alternative even though it would incur additional costs and delays in doing so.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Sale of Butter Creek Project Companies to Yeland

      Ralls does not intend to be a long-term owner of the windfarms. In fact, Ralls signed an agreement in June 2012 with Lanxi Wind Power Technology (Dalian) Corporation Ltd., a Chinese limited liability company ("Lanxi"), which is a wholly-owned subsidiary of Yeland Group Co., Ltd. ("Yeland"). Pursuant to this agreement, Ralls intends to sell the Project Companies to Lanxi. However, it is Ralls' intention that Ralls and Lanxi/Yeland will submit a Notice to CFIUS addressing the Ralls-Lanxi transaction prior to closing. Ralls understands that Lanxi/Yeland intend to fully cooperate with the Committee.

      Lanxi's parent company Yeland is a Beijing, China based residential property development and distribution company listed on the Shenzhen Stock Exchange. Yeland is also involved in the development of commercial property and hotels.

      The reason for the re-sale to Lanxi is that Ralls does not want to own a windfarm business. Rather, Ralls is in the business of identifying and developing windfarm project opportunities. Ralls' purchase was only intended to ensure the utilization of Sany Electric wind turbine generators at the Butter Creek sites and thus advance Sany Electric's U.S. marketing strategy.

No "Covered Transaction"

      While the Parties respect the CFIUS process and intend to cooperate fully with the Committee, the Parties do not believe that the transaction between Terna and Ralls is a "covered transaction." Although Ralls formally acquired the ownership of legal entities (*i.e.*, the Project Companies), the only assets of the Project Companies were a set of intangible assets and rights to develop four small windfarms. Ralls did not acquire an operating windfarm or any other going concern. The legal entities acquired do not constitute a "U.S. business," which is a prerequisite for finding a "covered transaction." In particular, a U.S. business is defined under 31 C.F.R. § 800.226 as an entity "engaged in interstate commerce in the United States." The Parties do not believe that Ralls acquired any such business.

      The only assets of the Project Companies acquired by Ralls were the following bundle of intangibles: power purchase agreements, transmission interconnection agreements and ancillary agreements with PacifiCorp; agreements for the management and use of shared interconnection facilities with the owners of nearby windfarms; the land rights to construct the windfarms; and government permits necessary for a commercial windfarm. This set of legal rights does not constitute a business engaged in interstate commerce. In particular, the Project Companies acquired by Ralls did not, either individually or collectively, constitute an operating business that, as of the date of acquisition or even today, engages in interstate commerce. In acquiring the Project Companies, Ralls did not acquire and still does not have any plants, employees, revenue, tangible assets, or technology. It is only with the addition of labor, capital and equipment (and in particular, wind turbines), that the windfarm projects will become an operating business. In this sense, the transaction is equivalent to the acquisition of separate assets not constituting a functioning business, which is not a "covered transaction." In accordance with the seller's (*i.e.*, Terna's) preference, the acquisition was structured as a sale of equity interests in the Project Companies rather than a sale of the Butter Creek development assets. However, this is only a

4

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

difference in form, not substance. Therefore, the transaction approximates Example 1 under 31 C.F.R. § 800.302(c):

> Corporation A, a foreign person, acquires, from separate U.S. nationals (a) products held in inventory, (b) land, and (c) machinery for export. Assuming no other relevant facts, Corporation A has not acquired a U.S. business, and this acquisition is not a covered transaction.

Consistent with CFIUS regulations, this is not a covered transaction because Ralls did not acquire a going concern or an entity that was engaged in interstate commerce at the time of purchase.

<u>No Increase in National Security Risk</u>

The transaction at issue involves the transfer of small, unconstructed wind farm projects – essentially development assets – from one foreign party, Terna, to Ralls. Ralls already owns a small, 10 MW operating windfarm project in the United States, and Ralls has agreed to address the Navy's concerns regarding Butter Creek by moving the Lower Ridge Windfarm site to a location that is more acceptable to the Navy, pending the issuance of new FAA permits.

To the extent that the Committee is concerned about possible espionage or other hostile activities because of the proximity of the planned windfarms to the Navy's Northwest Training Range Complex, Ralls categorically denies any such intent on its part or on the part of any related person or entity. Indeed, it is hard to see how the transaction here could increase espionage or other national security risk. There are many windfarms already present in the area, and there are innumerable other unsecured public and private facilities in the area. Ralls will not even own the windfarms when they are operational, because of the planned resale of the projects. Frankly, the suggestion that Ralls would acquire the windfarm projects for espionage or for other purposes inimical to national security strikes Ralls and its counsel as not credible. If Ralls had any such intent, which it does not, it could engage in leases of other windfarms or any other facilities so as to stay beyond the reach of the Committee. But Ralls is not trying to evade the reach of the Committee – it is happy to cooperate.

Relatedly, and in the hope that the Committee can resolve this matter expeditiously, the Parties note that additional key statutory factors weighing in favor of a full investigation by the Committee are not present here. In particular, the foreign entities are not state-owned, and this case does not involve critical infrastructure.

The acquisition by Ralls of the right to construct four small windfarms from Terna does not involve the participation or action on the part of any foreign government. Ralls' two owners are Chinese businessmen. The Chinese government holds no financial interest in Sany, Sany Electric, or Ralls, and indeed exercises no control over these companies.

Finally, the transaction would not result in the control of any "critical infrastructure" of the United States by a foreign person. The four wind farms acquired by Ralls, when constructed and operational, would constitute the miniscule amount of 0.37% of PacifiCorp's total generating capacity and account for an even lesser amount of the overall energy generating

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

capacity in the region.  The wind turbines themselves are intermittent, and operate only when the wind blows, and will be under the operational control of PacifiCorp.  Destruction of these windfarms would have no measureable effect on the delivery of energy in the area and therefore would have no impact whatsoever on national security.  Neither Ralls nor the Butter Creek companies will have control over PacifiCorp's transmission system.

Ralls' only interest here is in moving forward with renewable energy projects for commercial purposes.  The Parties look forward to resolving any Committee questions or concerns and to developing the windfarms.

1.     **§ 800.402(c)(1)(i):  Describe the transaction in question, including a summary setting forth the essentials of the transaction and a statement of the purpose of the transaction and its scope, both within and outside of the United States.**

The primary purpose of the transaction described below was to facilitate the development of the Butter Creek projects, a group of four wind energy projects located in Morrow County and Umatilla County, Oregon.  The projects are expected to consist of 20 wind turbine generators with a total capacity of 40 MW and will deliver output to PacifiCorp in accordance with the applicable power purchase agreements and interconnection agreements.  The projects are in the development stage, and at the time of the transaction had only secured certain wind development assets, including power purchase and interconnection agreements from PacifiCorp, land rights and permits.  The projects also presented the opportunity to utilize additional Sany Electric turbines in the U.S. wind market.   The scope of the transaction is limited to the acquisition of the Butter Creek development assets, as held by the Project Companies, located in north central Oregon.

At the outset, it is important to understand why, while Ralls and Sany are formally separate and independent entities, due to their affiliations described above, it is necessary that Ralls act as a development arm, in effect, for Sany Electric turbines.  Although Sany is a large private company, Sany Electric – the subsidiary that manufactures wind turbines – is small.  Before it can expect to gain a meaningful foothold in the U.S. market, it will need to show to large-scale purchasers – such as utilities and large wind developers – that the Sany Electric turbines produce energy efficiently and are reliable.  In short, the turbines need to have what is known in the industry as "run-time," *i.e.*, a sufficient period of operating experience that Sany Electric can point to show that its equipment will operate reliably for the long-term.  The U.S. industry bench-mark is said to be approximately 100 turbines operating in the U.S. at an average 95% availability in one year.  Thus, a primary business purpose is to allow greater run time for Sany Electric turbines so that they can better compete in the U.S. wind market in the years ahead.   The other primary purpose, of course, is commercial.  The rates reflected in the PacifiCorp power purchase agreements are generally thought to be attractive, allowing for profit, provided operating expenses are kept in check and within prudent industry practice.  The Butter Creek projects represent the opportunity for an attractive commercial investment.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

**2.      § 800.402(c)(1)(ii): Describe the nature of the transaction, for example, whether the acquisition is by merger, consolidation, the purchase of voting interest, or otherwise.**

On March 16, 2012, IWE acquired all of the membership interests in the Project Companies.  The transaction was structured as a direct purchase by IWE from Terna of 100% of the issued and outstanding membership interests of each of the Project Companies.  The principal acquisition document was a Master Wind Projects Membership Interests Purchase Agreement dated February 28, 2012, by and among Terna, IWE, Ralls, Ralls Wind Farm, LLC ("Ralls OpCo"), and the Project Companies (the "MIPSA"), a copy of which along with all Exhibits and Schedules, is provided as **Exhibit 1** hereto.

At the time of the acquisition, IWE was directly owned by U.S. Innovative Renewable Energy, LLC, a Delaware limited liability company ("USIRE").  USIRE is owned 100% by Xiaolin (Jerry) Zhang, a U.S. citizen.  USIRE has a consulting agreement with Sany Electric under which it works to identify business opportunities for the placement of Sany Electric turbines in the U.S. wind market.  The organizational structure of the relevant companies immediately following the transaction is set forth in **Exhibit 2**.

As described in response to questions 10 and 11 below, part of the purchase price was paid upon the closing of the transaction and the remainder was deferred.  To secure the deferred payments and other obligations of IWE, each of Ralls and Ralls OpCo, a Delaware limited liability company that directly owned all of Ralls' tangible assets in the United States, provided Guarantee Agreements and Security Agreements, each of which are included in the documents provided as **Exhibit 1** hereto.  At closing, each of the Project Companies provided additional security to Terna to secure the deferred payments.  Ralls notes that there was an error in the description of the relationships between Ralls, Ralls OpCo., and IWE in the Guarantee Agreements.  However, that description is currently accurate, and has been accurate at all times since the April 2012 closing of the related transaction below.

After the transaction was consummated, on April 9, 2012, Ralls acquired all of the membership interests in IWE from USIRE pursuant to the Membership Interest Purchase Agreement attached as **Exhibit 3**.  The current organizational structure of the relevant companies is set forth in **Exhibit 2**.

**3.      § 800.402(c)(1)(iii):  Provide the name, United States address (if any), Web site address (if any), nationality (for individuals) or place of incorporation or other legal organization (for entities), and address of the principal place of business of each foreign person that is a party to the transaction.**

Ralls Corporation
318 Cooper Circle
Peachtree City, GA 30269
USA
<u>Place of Organization</u>:  Delaware, USA

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

IWE and Ralls OpCo are wholly-owned subsidiaries of Ralls.

Intelligent Wind Energy, LLC
318 Cooper Circle
Peachtree City, GA 30269
USA
Place of Organization:  Delaware, USA

Ralls Wind Farm, LLC
318 Cooper Circle
Peachtree City, GA 30269
USA
Place of Organization:  Delaware, USA

U.S. Innovative Renewable Energy, LLC
11413 Ashbourne Hall Rd.
Charlotte, NC 28277
USA
Place of Organization:  Delaware, USA

    4.    **§ 800.402(c)(1)(iv):  Provide the name, address, website address (if any), principal place of business, and place of incorporation or other legal organization of the U.S. business that is the subject of the transaction.**

    As described above, the Parties do not believe that the transaction involved the transfer of a "U.S. business," as that term is defined in the CFIUS regulations.  Nevertheless, in response to the Committee's request, the Parties respectfully submit this Notice.  For purposes of this Notice, and without prejudice to the Parties' jurisdictional argument, the Parties refer to the following Project Companies – which are merely holding companies for the Butter Creek development assets – as the "U.S. business."

Lower Ridge Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

High Plateau Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Mule Hollow Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

Pine City Windfarm, LLC
Registered Address:  8630 SW Scholls-Ferry Road #152
Beaverton, OR 97008
Mailing address:  4120 Douglas Blvd. #306-476
Granite Bay, CA 95746-5936
Place of Organization:  Oregon, USA

As described above, the Project Companies were acquired from Terna Energy USA Holding Corporation.

Terna Energy USA Holding Corporation
400 Montgomery St., # 1105
San Francisco, CA 94104
Place of Organization:  Delaware, USA

**5.      § 800.402(c)(1)(v)(A):  Provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the immediate parent, the ultimate parent, and each intermediate parent, if any, of the foreign person that is a party to the transaction.**

Ralls is the ultimate parent in its corporate organization.  See the organizational chart of Ralls attached hereto as **Exhibit 2.**  The response to question 3 contains relevant information regarding Ralls, Ralls OpCo, IWE and USIRE.

**6.      § 800.402(c)(1)(v)(B):  Where the ultimate parent is a private company, provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the ultimate owner(s) of such parent.**

The following two individuals are the only shareholders of Ralls.  Dawei Duan owns 80% of the issued and outstanding stock of Ralls, and Jialing Wu owns 20% of the issued and outstanding stock of Ralls.  They are both directors of Ralls, and Mr. Wu is the CEO of Ralls. Mr. Duan is also the CFO of Sany, and a Vice President of Sany Heavy Industries, a publicly-traded Chinese company that is majority owned by Sany.  Mr. Wu is a Vice President of Sany and also the General Manager of Sany Electric, a wholly-owned Chinese subsidiary of Sany. Ralls is not a subsidiary of any Sany entity, and is an independent entity.

Jialiang Wu
Nationality:  Chinese
Ralls registered address:

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

160 Greentree Drive, Suite 101
Dover, Delaware 19904
<u>Sany Electric address</u>:
Beiqing Road Shahe,
Changping District
Beijing China 102206

Dawei Duan
<u>Nationality</u>: Chinese
<u>Ralls registered address</u>:
160 Greentree Drive, Suite 101
Dover, Delaware 19904
<u>Sany Group address</u>:
SANY Industrial Park, Economic and Technological Development Zone
Changsha, Hunan China

**7.      § 800.402(c)(1)(v)(C):  Where the ultimate parent is a public company, provide the name, address, and nationality (for individuals) or place of incorporation or other legal organization (for entities) of any shareholder with an interest of greater than five percent in such parent.**

Not applicable.

**8.      § 800.402(c)(1)(vi):  Provide the name, address, website address (if any), and nationality (for individuals) or place of incorporation or other legal organization (for entities) of the person that will ultimately control the U.S. business being acquired.**

As the only shareholders of Ralls, Messrs. Jialiang Wu and Dawei Duan will ultimately control the Project Companies until such time as ownership of the Project Companies are transferred to Lanxi/Yeland, which is expected on or about the commercial operation date of the wind turbines.  The response to question 6 contains relevant information regarding Messrs. Wu and Duan.  Ralls is not a subsidiary of any Sany entity, and is an independent entity.

As mentioned above, however, Ralls' primary purpose is to provide business opportunities in the United States for wind turbines provided by Sany Electric.  Despite the formal independence of Ralls and Sany, in making business decisions affecting Ralls, Messrs. Duan and Wu consider their interests as officers of Sany companies.  They regularly consult with other officers of Sany, including Sany Electric's current president, Mr. Fugui Zhou.

The business address for Sany Electric is Beiqing Road Shahe, Changping District, Beijing China 102206.  It does not have a separate website.  The business address of the Sany Group is SANY Industrial Park, Economic and Technological Development Zone, Changsha, Hunan China.  Its website is www.Sanygroup.com.

**9.      § 800.402(c)(1)(vii):  Provide the expected date for completion of the transaction, or the date it was completed.**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

The MIPSA was executed by all parties thereto on February 28, 2012, and the transactions contemplated thereby were completed on March 16, 2012.  Ralls acquired IWE from USIRE on April 9, 2012.

**10.      § 800.402(c)(1)(viii):  Provide a good faith approximation of the net value of the interest acquired in the U.S. business in U.S. dollars, as of the date of the notice.**

The total consideration to be paid for the Project Companies is $6,000,000 plus renewable energy credits, which was a negotiated price.  Under the MIPSA, the purchase price for the Project Companies is divided into a series of payments.  On March 16, 2012, IWE made an initial payment of $600,000.  On May 31, 2012, IWE made a second payment of $1,200,000.  On the earlier of (a) the date on which an aggregate of 36 MW of wind turbine power generation associated with the projects has been commissioned and (b) December 21, 2012, IWE will owe a final payment of $4,200,000.  In addition, the Project Companies are obligated to transfer renewable energy credits generated by the projects to Terna until the latest of (x) the 20th anniversary of the commercial operation date under the relevant power purchase agreements, (y) the date when the relevant power purchase agreements are terminated in accordance with their terms and (z) December 31, 2033.

**11.      § 800.402(c)(1)(ix):  Provide the name of any and all financial institutions involved in the transaction, including as advisors, underwriters, or a source of financing for the transaction.**

No financial institutions were involved in the transaction for the purchase of the Project Companies and IWE.  The transaction was self-financed.  As described in response to question 10, a portion of the purchase price is still outstanding from IWE to Terna.  As of the date of this notice, Ralls and IWE do not intend to borrow any funds to pay the remainder of the purchase price.

Financing to date for Ralls' activities have been through Sany Electric.  Necessary capital infusions into Ralls have been made by Sany Electric as loans to Messrs. Duan and Wu.  To the extent material to this review, Sany Electric is willing to provide additional information regarding its financing activities related to the Project Companies.  In addition, Ralls is willing to provide CFIUS with additional information regarding the relationship between Ralls and the Sany Group of companies.

**12.      § 800.402(c)(2):  With respect to a transaction structured as an acquisition of assets of a U.S. business, provide a detailed description of the assets of the U.S. business being acquired, including the approximate value of those assets in U.S. dollars.**

While the acquisition was formally structured as an acquisition of equity interests, not of assets, it is important to understand what "assets" are actually purchased in a greenfield wind development project.  When Ralls acquired the Project Companies, there was no on-going operating business.  Instead, the Butter Creek projects represented a *potential* operating business.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Typically, in the wind energy development industry, a project developer will form legal entities, which act as holding companies for the various project development assets (*e.g.*, land leases, power purchase agreements, interconnection agreements, permits, etc.).  Although these efforts are accomplished largely by a legal entity during the development phase, the collection of the various development assets into a legal entity does not necessarily constitute a business, and certainly not an operating business.  Only upon completion of construction would any windfarm be aptly considered to be an entity engaged in interstate commerce.

At the time of acquisition by IWE, the Butter Creek projects – like all U.S. wind farm, greenfield projects – consisted of mere development assets, which assets were owned by Project Companies.

The development assets of the Project Companies were acquired by Ralls (through its acquisition of IWE), included the following:  power purchase agreements with PacifiCorp (under which the Project Companies will sell all of the energy produced from the turbines at wholesale); interconnection agreements with PacifiCorp (under which the Butter Creek projects can interconnect to the transmission system owned and operated by PacifiCorp); various local, state, and federal permits (including Determinations of No Hazard issued by the FAA); leases and related real estate agreements with private landowners; wind data specific to the area; and related incidental development assets.

As described in response to question 10, the total value of the development assets, when acquired by IWE from Terna, was $6,000,000 plus renewable energy credits, which was negotiated between the Parties.

The ownership, by itself, of wind development assets does not by itself ensure that the windfarm will actually become an operating business.  Instead, additional capital, labor and equipment need to be invested, including the following:  approximately $7 million of "network upgrades" required to cover the costs to PacifiCorp for its transmission system upgrades to accommodate the injection of wind power from the Butter Creek projects into the grid; approximately $17 million to the U.S. construction firm that is responsible for the balance of plant construction and erection of the wind farm, including all necessary electrical design requirements; transportation of the turbines, towers, rotor blades and related equipment from a port in the United States to the Oregon sites; lease and related real estate payments; legal, accounting, and consulting fees; and of course the costs for the turbines, towers, rotor blades, and related equipment.  Once built, the Butter Creek projects will comprise approximately $85 million of investment.

**13.    § 800.402(c)(3)(i):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide their respective business activities, as, for example, set forth in annual reports, and the product or service categories of each, including an estimate of U.S. market share for such product or service categories and the methodology used to determine market share, and a list of direct competitors for those primary product or service categories.**

The Project Companies are essentially holding companies, holding assets which will comprise the respective wind farm assets. The Project Companies are described above in response to questions 3, 12, and 13.

14.   § 800.402(c)(3)(ii):  **With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide the street address (and mailing address, if different) within the United States and website address (if any) of each facility that is manufacturing classified or unclassified products or producing services described in paragraph (c)(3)(v) of this section, their respective Commercial and Government Entity Code (CAGE Code) assigned by the Department of Defense, their Dun and Bradstreet identification (DUNS) number, and their North American Industry Classification System (NAICS) Code, if any.**

None.

15.   § 800.402(c)(3)(iii):  **With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list each contract (identified by agency and number) that is currently in effect or was in effect within the past five years with any agency of the United States Government involving any information, technology, or data that is classified under Executive Order 12958, as amended, its estimated final completion date, and the name, office, and telephone number of the contracting official.**

None.

16.   § 800.402(c)(3)(iv):  **With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any other contract (identified by agency and number) that is currently in effect or was in effect within the past three years with any United States Government agency or component with national defense, homeland security, or other national security responsibilities, including law enforcement responsibility as it relates to defense, homeland security, or national security, its estimated final completion date, and the name, office, and telephone number of the contracting official.**

None.

17.   § 800.402(c)(3)(v)(A):  **With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that it supplies, directly or indirectly, to any agency of the United States Government, including as a prime contractor or first tier subcontractor, a supplier to any such prime contractor or subcontractor, or, if known by the parties filing the notice, a subcontractor at any tier.**

None.

13

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

18.     § 800.402(c)(3)(v)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development), if known by the parties filing the notice, for which it is a single qualified source (i.e., other acceptable suppliers are readily available to be so qualified) or a sole source (i.e., no other supplier has needed technology, equipment, and manufacturing process capabilities) for any such agencies and whether there are other suppliers in the market that are available to be so qualified.

None.

19.     § 800.402(c)(3)(vi)(A):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that it supplies to third parties and it knows are rebranded by the purchaser or incorporated into the products of another entity, and the names or brands under which such rebranded products or services are sold.

None.

20.     § 800.402(c)(3)(vi)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list any products or services (including research and development) that in the case of services, it provides on behalf of, or under the name of, another entity, and the name of any such entities.

None.

21.     § 800.402(c)(3)(vii)(A):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list for the prior three years the number of priority rated contracts or orders under the Defense Priorities and Allocations System (DPAS) regulations (15 CFR part 700) that the U.S. business that is the subject of the transaction has received and the level of priority of such contracts or orders ("DX" or "DO").

None.

22.     § 800.402(c)(3)(vii)(B):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), list for the prior three years the number of such priority rated contracts or orders that the U.S. business has placed with other entities and the level of priority of such contracts or orders, and the acquiring party's plan to ensure that any new entity formed at the completion of the notified transaction (or the U.S. business, if no new entity is formed) complies with the DPAS regulations.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

None.

23.     § 800.402(c)(3)(viii):  With respect to the U.S. business that is the subject of the transaction and any entity of which that U.S. business is a parent (unless that entity is excluded from the scope of the transaction), provide a description and copy of the cyber security plan, if any, that will be used to protect against cyber attacks on the operation, design, and development of the U.S. business's services, networks, systems, data storage, and facilities.

None.

24.     § 800.402(c)(4)(i):  Indicate whether the U.S. business that is being acquired produces or trades in items that are subject to the EAR and, if so, provide a description (which may group similar items into general product categories) of the items and a list of the relevant commodity classifications set forth on the CCL (i.e., Export Control Classification Numbers (ECCNs) or EAR99 designation).

None.

25.     § 800.402(c)(4)(ii):  Indicate whether the U.S. business that is being acquired produces or trades in defense articles and defense services, and related technical data covered by the USML in the ITAR, and, if so, provide the category of the USML; articles and services for which commodity jurisdiction requests (22 CFR 120.4) are pending; and articles and services (including those under development) that may be designated or determined in the future to be defense articles or defense services pursuant to 22 CFR 120.3.

None.

26.     § 800.402(c)(4)(iii):  Indicate whether the U.S. business that is being acquired produces or trades in products and technology that are subject to export authorization administered by the Department of Energy (10 CFR part 810), or export licensing requirements administered by the Nuclear Regulatory Commission (10 CFR part 110).

None.

27.     § 800.402(c)(4)(iv):  Indicate whether the U.S. business that is being acquired produces or trades in Select Agents and Toxins (7 CFR part 331, 9 CFR part 121, and 42 CFR part 73).

None.

28.     § 800.402(c)(5)(i):  Indicate whether the U.S. business that is the subject of the transaction possesses any licenses, permits, or other authorizations other than those

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

under the regulatory authorities listed in paragraph (c)(4) of this section that have been granted by an agency of the United States Government (if applicable, list the relevant licenses).

A list of all licenses, permits, or other authorizations other than those under the regulatory authorities listed in paragraph (c)(4) are attached hereto as **Exhibit 4**.

**29.   § 800.402(c)(5)(ii):  Indicate whether the U.S. business that is the subject of the transaction has technology that has military applications (if so, identify such technology and describe such military applications).**

None.

**30.   § 800.402(c)(6)(i):  With respect to the foreign person engaged in the transaction and its parents, describe the business or businesses of the foreign person and its ultimate parent, as such businesses are described, for example, in annual reports, and the CAGE codes, NAICS codes, and DUNS numbers, if any, for such businesses.**

Ralls is a Delaware corporation, with its principal place of business in Atlanta, Georgia. It was established in 2010 for the purpose of participating in the U.S. renewable energy market. Ralls' primary business purpose to date has been to try and identify market opportunities and help develop wind energy projects for which Sany Electric's wind turbine generators can be used.  A brochure on Sany Electric's global business is provided at **Exhibit 5**.  Ralls has no DUNS, but its FEIN is 27-3363202.

**31.   § 800.402(c)(6)(ii):  With respect to the foreign person engaged in the transaction and its parents, describe the plans of the foreign person for the U.S. business with respect to:**

**(A) Reducing, eliminating, or selling research and development facilities;**

None.

**(B) Changing product quality;**

None.

**(C) Shutting down or moving outside of the United States facilities that are within the United States;**

None.

**(D) Consolidating or selling product lines or technology;**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

As described above, Ralls intends to sell 100% of its interest in the Butter Creek projects to Lanxi/Yeland, a privately-held Chinese company, as of the beginning of commercial operation.  Ralls and Lanxi/Yeland have signed an agreement to this effect, but Ralls intends that the parties will file a Notice with CFIUS prior to closing.

> **(E) Modifying or terminating contracts referred to in paragraphs (c)(3)(iii) and (iv) of this section; or**

None.

> **(F) Eliminating domestic supply by selling products solely to non-domestic markets.**

None.

**32.**    **§ 800.402(c)(6)(iii):  With respect to the foreign person engaged in the transaction and its parents, indicate whether the foreign person is controlled by or acting on behalf of a foreign government, including as an agent or representative, or in some similar capacity, and if so, the identify the foreign government.**

No.

**33.**    **§ 800.402(c)(6)(iv):  With respect to the foreign person engaged in the transaction and its parents, indicate whether a foreign government or a person controlled by or acting on behalf of a foreign government:**

> **(A) Has or controls ownership interests, including convertible voting instruments, of the acquiring foreign person or any parent of the acquiring foreign person, and if so, the nature and amount of any such instruments, and with regard to convertible voting instruments, the terms and timing of their conversion;**

No.

> **(B) Has the right or power to appoint any of the principal officers or the members of the board of directors of the foreign person that is a party to the transaction or any parent of that foreign person;**

No.

> **(C) Holds any contingent interest (for example, such as might arise from a lending transaction) in the foreign acquiring party and, if so, the rights that are covered by this contingent interest, and the manner in which they would be enforced; or**

No.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

(D) Has any other affirmative or negative rights or powers that could be relevant to the Committee's determination of whether the notified transaction is a foreign government-controlled transaction, and if there are any such rights or powers, their source (for example, a "golden share," shareholders agreement, contract, statute, or regulation) and the mechanics of their operation.

No.

34.   § 800.402(c)(6)(v):  With respect to the foreign person engaged in the transaction and its parents, describe any formal or informal arrangements among foreign persons that hold an ownership interest in the foreign person that is a party to the transaction or between such foreign person and other foreign persons to act in concert on particular matters affecting the U.S. business that is the subject of the transaction, and provide a copy of any documents that establish those rights or describe those arrangements.

None.

35.   § 800.402(c)(6)(vi):  With respect to the foreign person engaged in the transaction and its parents, provide for each member of the board of directors or similar body (including external directors) and officers (including president, senior vice president, executive vice president, and other persons who perform duties normally associated with such titles) of the acquiring foreign person engaged in the transaction and its immediate, intermediate, and ultimate parents, and for any individual having an ownership interest of five percent or more in the acquiring foreign person engaged in the transaction and in the foreign person's ultimate parent, the following information:

(A) A curriculum vitae or similar professional synopsis, provided as part of the main notice, and

(B) The following "personal identifier information," which, for privacy reasons, and to ensure limited distribution, shall be set forth in a separate document, not in the main notice:

(1) Full name (last, first, middle name);

(2) All other names and aliases used;

(3) Business address;

(4) Country and city of residence;

(5) Date of birth;

(6) Place of birth;

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

(7) U.S. Social Security number (where applicable);

(8) National identity number, including nationality, date and place of issuance, and expiration date (where applicable);

(9) U.S. or foreign passport number (if more than one, all must be fully disclosed), nationality, date and place of issuance, and expiration date and, if a U.S. visa holder, the visa type and number, date and place of issuance, and expiration date; and

(10) Dates and nature of foreign government and foreign military service (where applicable), other than military service at a rank below the top two non-commissioned ranks of the relevant foreign country.

Professional profiles for each officer and director of Ralls are attached as **Exhibit 6** to this application. The requested "personal identifier information" has also been provided in a separate sealed envelope.

36.     **§ 800.402(c)(6)(vii):  With respect to the foreign person engaged in the transaction and its parents, provide the following "business identifier information" for the immediate, intermediate, and ultimate parents of the foreign person engaged in the transaction, including their main offices and branches:**

(A) Business name, including all names under which the business is known to be or has been doing business;

(B) Business address;

(C) Business phone number, fax number, and e-mail address; and

(D) Employer identification number or other domestic tax or corporate identification number.

Ralls Corporation
318 Cooper Circle
Peachtree City, GA 30269
USA
FEIN: 27-3363202

37.     **§ 800.402(d):  List any filings with, or reports to, agencies of the United States Government that have been or will be made with respect to the transaction prior to its closing, indicating the agencies concerned, the nature of the filing or report, the date on which it was filed or the estimated date by which it will be filed, and a relevant contact point and/or telephone number within the agency, if known.**

None.

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

38.     **§ 800.402(e):  In the case of the establishment of a joint venture in which one or more of the parties is contributing a U.S. business, assume that the foreign person that is party to the joint venture has made an acquisition of the existing U.S. business that the other party to the joint venture is contributing or transferring to the joint venture and provide the name and address of the joint venture and the entities that established, or are establishing, the joint venture.**

Not applicable.

39.     **§ 800.402(g):  With respect to the foreign person that is a party to the transaction, its immediate parent, the U.S. business that is the subject of the transaction, and each entity of which the foreign person is a parent, append the most recent annual report of each such entity, in English.  Separate reports are not required for any entity whose financial results are included within the consolidated financial results stated in the annual report of any parent of any such entity, unless the transaction involves the acquisition of a U.S. business whose parent is not being acquired, in which case the notice shall include the most recent audited financial statement of the U.S. business that is the subject of the transaction.  If a U.S. business does not prepare an annual report and its financial results are not included within the consolidated financial results stated in the annual report of a parent, the filing shall include, if available, the entity's most recent audited financial statement (or, if an audited financial statement is not available, the unaudited financial statement).**

None of Ralls, IWE, or the Project Companies prepare annual reports.  A copy of Ralls' 2011 financial statement is provided at **Exhibit 7**.  A copy of IWE's financial statement through May 2012 is provided at **Exhibit 8**.  Copies of the Project Companies 2011 financial statements are attached at **Exhibit 9**.

40.     **§ 800.402(i):  Append a copy of the most recent asset or stock purchase agreement or other document establishing the agreed terms of the transaction.**

A copy of the MIPSA, together with all schedules, exhibits and ancillary agreements, is attached as **Exhibit 1**.  A copy of the agreement to effect Ralls' acquisition of IWE is attached as **Exhibit 3**.

41.     **§ 800.402(j)(1):  Append an organizational chart illustrating all of the entities or individuals above the foreign person that is a party to the transaction up to the person or persons having ultimate control of that person, including the percentage of shares held by each.**

Pre-, interim, and post-acquisition organizational charts are appended as **Exhibit 2** to this application.

42.     **§ 800.402(j)(2):  Provide the opinion of the person making the filing regarding whether:**

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

**(i) It is a foreign person;**

**(ii) It is controlled by a foreign government; and**

**(iii) The transaction has resulted or could result in control of a U.S. business by a foreign person, and the reasons for its view, focusing in particular on any powers (for example, by virtue of a shareholders agreement, contract, statute, or regulation) that the foreign person will have with regard to the U.S. business, and how those powers can or will be exercised.**

In the opinion of Ralls:

(i) Ralls is a foreign person as defined in 31 C.F.R. § 800.213;

(ii) it is not controlled by a foreign government; and

(iii) the transaction at issue will not result in control of a U.S. business because the Project Companies, as acquired, do not constitute businesses engaged in interstate commerce. As described more fully in the prefatory comments to this Notice, the Parties believe that the development rights acquired by Ralls in this transaction do not meet the regulatory definition of a "U.S. business."

**43.    § 800.402(k):  Provide information as to whether:**

**(1) Any party to the transaction is, or has been, a party to a mitigation agreement entered into or condition imposed under section 721, and if so, specify the date and purpose of such agreement or condition and the United States Government signatories; and**

**(2) Any party to the transaction has been a party to a transaction previously notified to the Committee.**

No party to this transaction has been a party to a mitigation agreement; nor has any party to this transaction previously been a party to a transaction notified to the Committee.

**44.    § 800.402(m): Persons filing a voluntary notice shall include with the notice a list identifying each document provided as part of the notice, including all documents provided as attachments or exhibits to the narrative response.**

A list of the documents included as part of this notice follows:

Exhibit 1:  Membership Interests Purchase Agreement (MIPSA)

Exhibit 2:  Pre-, interim-, and post-acquisition organizational charts

*Confidential and FOIA Exempt Pursuant to 50 U.S.C. App. § 2170(c)*

Exhibit 3:  Membership Interest Purchase Agreement (IWE MIPSA)

Exhibit 4:  List of licenses, permits, or other authorizations

Exhibit 5:  Sany Electric brochure

Exhibit 6:  Professional profiles for each owner/director of Ralls Corp.

Exhibit 7:  Ralls Corporation's 2011 Financial Statement

Exhibit 8:  Intelligent Wind Energy, LLC's Financial Statement as of May 31, 2012

Exhibit 9:  Project Companies' 2011 Financial Statements

Exhibit 10: *In Re: The Request of Lower Ridge Windfarm, LLC and High Plateau Windfarm,
            LLC for a Waiver of the five-Mile Radius Requirement*
            OPUC Docket No. UM-1596

CERTIFICATION

Pursuant to subsection (n) of Section 721 of the Defense Production Act of 1950, I hereby certify that I am a duly authorized designee, as defined at 31 C.F.R. § 800.202, of Ralls Corporation, which is submitting the foregoing Notice, and that, to the best of my knowledge and belief:

1. The foregoing Notice fully complies with the requirements of Section 721 of the Defense Production Act of 1950, as amended, 31 C.F.R. Part 800, and any agreement or condition entered into with the Committee on Foreign Investment in the United States or any member of the Committee; and

2. The foregoing Notice, as it relates to the transaction, Ralls Corporation, and Ralls Corporation's parents, subsidiaries, and any other related entities described in the Notice, is accurate and complete in all material respects.

Signature:      _____
                Jialiang Wu

Title:          Chief Executive Officer

Submitter:      Ralls Corporation

Date:           06/28/2012

CONFIDENTIAL BUSINESS INFORMATION

CERTIFICATION

Pursuant to subsection (n) of Section 721 of the Defense Production Act of 1950, I hereby certify that I am the duly authorized designee, as defined at 31 C.F.R. § 800.202, of Terna Energy USA Holding Corporation, which is submitting the foregoing Notice, and that, to the best of my knowledge and belief:

1.  The foregoing Notice fully complies with the requirements of Section 721 of the Defense Production Act of 1950, as amended, 31 C.F.R. Part 800, and any agreement or condition entered into with the Committee on Foreign Investment in the United States or any member of the Committee; and

2.  The foregoing Notice, as it relates to the transaction, Terna Energy USA Holding Corporation, and Terna Energy USA Holding Corporation's parents, subsidiaries, and any other related entities described in the Notice, is accurate and complete in all material respects.

Georgios Angeletos
Secretary and Vice President
Terna Energy USA Holding Corporation


Submitter:          Terna Energy USA Holding Corporation

Date:               June 27, 2012



# Ralls/Terna Transaction Concerning Butter Creek Windfarm Projects

Steptoe & Johnson LLP and Shearman & Sterling LLP

July 11, 2012



# Map of North Central Oregon Windfarm Projects





# Photos Near Boardman Complex
## Wind turbines as viewed toward Naval facility






# Photos From Bombing Range Road
## County road adjacent to Boardman Complex

  



## Overview of Presentation

- Description of parties

- Overview of windfarm development

- Description of the transaction

- Executive Branch approval processes

- Cooperation with U.S. Navy

- National interest in renewable energy

- No increased national security risk



# Overview of the Parties

- **Parties to the Transaction**
  - Ralls Corp.
  - Terna Energy USA Holding Corp.

- **Terna-affiliated entities**
  - GEK Terna
  - Terna Energy SA

- **Ralls-affiliated entities**
  - Intelligent Wind Energy (IWE)
  - U.S. Innovation Renewable Energy (USIRE)
  - Ralls Wind Farm
  - Sany Group
  - Sany Electric Co.
  - Sany Heavy Industry
  - Sany America



# Terna Energy USA Holding Corp.

- Wholly owned subsidiary of Terna Energy SA, which is a member of the GEK Terna Group.
- Key milestones for US activities:
  - Established in 2010 to acquire and hold wind energy projects being developed in the United States
  - Acquired two sets of such projects in December 2010 – one in Idaho and one in Oregon
  - Commenced construction activities in 2011 for Idaho projects
  - Sold membership interests in the Oregon projects in 2012



# Terna Energy SA and GEK Terna

**Terna Energy SA**
- European renewable energy company listed on the Athens Stock Exchange.
- Founded in 1997 to diversify the holdings of the GEK Terna Group into the renewable energy sector.
- Active in the development, construction financing and operation of wind, hydro, solar, geothermal and waste energy projects.
- Holds various projects in central and east Europe

**GEK Terna**
- Parent company of a broader group of companies with leading position in the fields of:
  - Construction
  - Real estate
  - Concessions
  - Energy



# Ralls Corporation

- Ralls identifies U.S. market opportunities and develops wind energy projects to utilize Sany Electric wind turbines.

- Ralls is 100% owned by two Chinese citizens:
  - Jialing Wu owns 20% of Ralls, and is a director and CEO.  He is also a Vice President of Sany Group and the General Manager of Sany Electric.
  - Dawei Duan owns 80% of Ralls, and is a director.  He is also the CFO of Sany Group, and a Vice President of Sany Heavy Industry.

- Sany Electric is a Sany Group subsidiary that manufactures wind turbines.

- Sany Heavy Industry is publicly traded, and majority owned by Sany Group.



# Ralls Corporation

- While Ralls is a separate and independent company, it is affiliated with Sany through overlapping officers/directors.

- Messrs. Duan and Wu consult with other officers of Sany Group and Sany Electric, and operate Ralls in a manner consistent with the goal of furthering the sale and use of Sany Electric wind turbines in the U.S.

- Neither Ralls nor any Sany entity is owned or controlled by the Chinese government.



# Introduction to Sany

- Sany Group
  - FT Global 500 company
  - Ranks 6th among global construction machinery manufacturers
  - 60,000 employees in more than 150 countries
  - In 2012, Sany Heavy Industry acquired Putzmeister (Germany's largest concrete pump maker) in the largest Chinese corporate acquisition in Europe

- Sany America
  - Wholly-owned subsidiary of Sany Heavy Industry
  - $60 million R&D/production facility in Georgia
  - In 2013, will open new R&D center and employ 500 people



# Introduction to Sany Electric

- Producer of wind turbines

- Employs 1,500 people

- Production capacity of 2,000 turbines a year

- Hundreds of wind turbines installed around the world

- Sany Electric turbine installed by Ralls Wind Farm, and began operation in Texas in 2011 (pilot project)

- Sany Electric turbine installed by Philips in Massachusetts in 2011 (pilot project)

- USIRE has a consulting agreement with Sany Electric under which it identifies business opportunities for the placement of Sany Electric turbines in the U.S. market.



# Overview of Windfarm Development





# Stage 1 – Gathering Legal Rights

- Developers acquire the rights and permits necessary to develop a windfarm:
  - Land rights
  - FAA, environmental, PUC, and building (CUP) permits
  - GIA (interconnection agreement)
  - PPA (power purchase agreement)
- All this gives the buyer is the opportunity to construct the windfarm.
- These rights are held in a holding company pending further development.



# Stage 2 – Financing

- Estimated costs for bringing these windfarm projects into operation was about $82 million.

- When the Project Companies were sold, there was no financing in place (Stage 2).

- Turbines had not been purchased and construction had not commenced (Stage 3).

- After the sale, Terna was no longer involved in developing the projects (except for curing certain land rights).



# Description of Transaction

Two stages:

1. Terna sold 100% of the membership interests in the four Project Companies to IWE.
   - At that time, IWE was 100% owned by USIRE.
   - USIRE is 100% owned by Xiaolin (Jerry) Zhang, a U.S. citizen.
2. Ralls acquired 100% of the membership interests in IWE (which owned 100% of the Project Companies) from USIRE.

All of the parties to these transactions are U.S. corporations or U.S. limited liability companies.

Result: Ownership of the Project Companies was transferred from Terna to Ralls.



# Current Organizational Chart





## Subject of the Transaction

- Sale of four Project Companies
  - Pine City Windfarm, LLC
  - Mule Hollow Windfarm, LLC
  - High Plateau Windfarm, LLC
  - Lower Ridge Windfarm, LLC

- The entities were originally formed in 2009 by Oregon Windfarms, LLC.

- They are holding companies that own the development rights to small windfarm projects in north central Oregon (five 2.0 MW turbines each).



# Subject of the Transaction

The transaction involved unconstructed windfarm projects.
The development assets and rights transferred to Ralls were
limited to:

1. Power purchase agreements, transmission
   interconnection agreements and ancillary agreements
   with PacifiCorp
2. Agreements for the management and use of shared
   interconnection facilities with the owners of nearby
   windfarms
3. Land rights to construct the windfarms
4. Government permits for commercial windfarms



# Photos of Two Butter Creek Windfarm Sites

 



# Commercial Purpose of Transaction

- Sany Electric has little track record in the U.S.  In this industry, a company must have sufficient successful "run-time" before large-scale purchasers will buy wind turbines.

- Ralls develops windfarm projects that enable Sany Electric to establish the necessary run-time.

- North Central Oregon is a prime area for windfarms, and the development rights for several projects were already acquired and available for purchase and commercial development.

- Rates offered by PacifiCorp are attractive and expected to lead to profit, in addition to the market foothold for Sany Electric.



# Post-Acquisition Status

- It is commercially imperative that Ralls proceed with construction.
  - Critical federal incentives require the windfarms to be in use by December 31, 2012.
  - More than $10 million has already been spent in reliance on permits, including FAA authorization.
  - The turbines have been ordered and shipped.

- Commercial operation of the turbines expected in December 2012.

- Continued construction is not intended to discount CFIUS' review, but rather reflects commercial obligations.

- Ralls intends to sell the windfarm projects to Lanxi/Yeland as of commercial operation.  This sale will not close without filing a voluntary Notice to CFIUS.


Steptoe
STEPTOE & JOHNSON LLP

# Executive Branch Approval Processes

- The FAA siting process involves a DOD review by the DOD Siting Clearinghouse.

- According to DOD's website, the Clearinghouse's Mission Statement: "Protect DoD mission capabilities from incompatible development by collaborating with DoD components and external stakeholders to prevent, minimize, or mitigate adverse impacts on military operations, readiness, and testing."

- FAA/DOD can and have denied authorization for renewable energy projects based on military or security concerns.

- This process was formalized and streamlined through 2011 legislation and regulations, due to concerns that renewable energy projects were unnecessarily delayed by security agencies.

- Ralls purchased the projects, and development and construction proceeded, in reliance on this approval from the U.S. Government.



# DOD Siting Clearinghouse

**DoD Siting Clearinghouse**
**Office of the Deputy Under Secretary of Defense**
**Installations and Environment**

Search This Site

Home | About Us | News | Vendor Informal Review | Helpful Websites | FAQs | Contact

**Latest News**

1 2 3 4 5 6 7 8 9 10

Wednesday, May 23 2012

**Army, Air Force Mount Renewable Energy Push**

WASHINGTON, May 23, 2012 □ The Army and Air Force are committed to developing one billion watts of renewable energy on their installations by 2025, senior leaders from both services announced yesterday.

**More News**

## DoD Siting Clearinghouse

The Department of Defense (DoD) is committed to maintaining an effective, consistent, transparent, and timely process for evaluating the impact of energy projects on its military test, training, and operational missions. This is the core responsibility of the DoD Siting Clearinghouse.

Created by DoD in 2010, and further shaped by Congress in the Ike Skelton National Defense Authorization Act for Fiscal Year 2011, the Siting Clearinghouse provides a "one-stop-shop" for comprehensive, expedited evaluation of energy projects and their potential effect on DoD operations.

The Clearinghouse's formal review process applies to projects filed with the Secretary of Transportation, under section 44718 of title 49, U.S. Code (Federal Aviation Administration obstruction evaluation process), as well as other projects proposed for construction within military training routes or special use airspace, whether on private, State, or Federal property (such as Bureau of Land Management lands).

**Our Mission**

Protect DoD mission capabilities from incompatible development by collaborating with DoD Components and external stakeholders to prevent, minimize, or mitigate adverse impacts on military operations, readiness, and testing.

DOD SITING CLEARINGHOUSE
3400 Defense Pentagon, Room 5C646, Washington, DC 20301 - 3400
DoDSitingClearinghouse@osd.mil

DoD FOIA | DoD Privacy & Security | External Links Disclaimer | Web Policy | Contact the Webmaster

Steptoe
STEPTOE & JOHNSON LLP





# Executive Branch Approval Processes

- The FAA/DOD siting process is better suited to address proximity concerns that arise in renewable energy projects, including involvement of foreign equipment and foreign personnel.

- It accounts for location, land use, and military operations. FAA/DOD can impose conditions and engage in mitigation negotiations.



# Executive Branch Approval Processes

The Butter Creek projects all underwent FAA siting review, and the projects were approved.

- A component of DOD reviewed and approved these windfarm projects during the siting authorization process.

- The Navy supported Ralls' relocation of the Lower Ridge windfarm within the restricted airspace in May 2012 (after Ralls acquired the projects).

- If the windfarm locations threatened national security, the sites could have been rejected earlier by DOD/Navy.

- FAA authorization may be, and often is, transferred to new owners.



# Photos Near Boardman Complex
## Turbine and radio tower within restricted airspace

 



# Cooperation with U.S. Navy

- Ralls has cooperated with the Navy throughout the federal and state permitting processes for the Butter Creek projects.

- In response to the Navy's flight safety concern, Ralls voluntarily agreed to move the Lower Ridge Windfarm, which was already fully authorized. The move involved significant cost and regulatory/commercial burden.

- The FAA has not yet issued new determinations for the new site, which are required for *de minimis* location and height adjustments.

- Ralls coordinated with the Navy on this move, and the Navy filed a letter in support of Ralls' Oregon PUC application.

- Ralls remains committed to satisfying the Navy's concerns over siting the Lower Ridge Windfarm, but cannot change locations without FAA authorization.



# National Interest in Renewable Energy

- Renewable energy projects serve critical U.S. interests:
  - Reduce dependence on foreign energy sources
  - Strengthen the economy
  - Protect the environment
- Renewable energy investment is an important governmental goal.
- The United States' renewable energy goals cannot be met without foreign investment.
- U.S.-China clean energy cooperation has been a critical aspect of the bilateral relationship.
- This transaction takes advantage of China's green technology and capital, and provides U.S. jobs and economic benefit.



# National Security Risk

The Parties do not see any increase in national security risk.

- This was a bona fide commercial transaction for the stated purposes.

- Ralls has agreed to address the Navy's siting concerns.

- The windfarms will be from located 7-12 miles from center of Boardman bombing range.

- No access to or control over PacifiCorp's transmission grid.

- PacifiCorp and interconnection safeguards are built-in.

- FAA monitoring and oversight.

- The windfarms will generate only 40 MW, equal to 0.37% of PacifiCorp's total generating capacity.



# National Security Risk

- Many windfarms permitted in restricted flight zone.

- Numerous unsecured roads, buildings, and other structures adjacent to the Boardman complex.

- Alternative ways to access this region, including leasing windfarms, without triggering CFIUS jurisdiction.



# Photos From Bombing Range Road
## The entrance to US Naval facility from country road








**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

JUL 2 5 2012

Stephen Heifetz
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Todd J. Guerrero
Fredrikson & Byron, P.A.
200 South Sixth Street
Minneapolis, MN 55402

Re: CFIUS Case 12-44: Ralls Corporation (United States/UBO: China)/Certain Assets of Terna Energy USA Holding Corporation

Dear Messrs. Heifetz and Guerrero:

This letter transmits an Order Establishing Interim Mitigation Measures (Interim Order) regarding the above-identified transaction, which was notified to the Committee on Foreign Investment in the United States (CFIUS) on June 28, 2012.

If you have any questions regarding the Interim Order, please feel free to contact me at (202) 622-0184 or Robin Epstein at (202) 622-1739.

Sincerely,

Aimen N. Mir
CFIUS Staff Chair

Enclosure

Exempt from disclosure under the Freedom of Information Act, 5 USC 552(b).  Public disclosure is further prohibited by 50 USC App. 2170(c).

# ORDER ESTABLISHING INTERIM MITIGATION MEASURES

## Regarding the Acquisition of Certain Assets of Terna Energy USA Holding Corporation by Ralls Corporation

Whereas the Committee on Foreign Investment in the United States ("CFIUS") has received written notification, pursuant to section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. App. 2170 ("section 721"), of a transaction ("Transaction") involving the acquisition of Lower Ridge Windfarm, High Plateau Windfarm, Mule Hollow Windfarm, and Pine City Windfarm, each a limited liability company organized under Oregon law ("Project Companies"), by Ralls Corporation, a company organized under the laws Delaware ("Ralls") (together, "the Companies");

Whereas CFIUS has determined that the Transaction, as described in the notice submitted to CFIUS dated June 28, 2012 ("Notice"), constitutes a "covered transaction" for purposes of section 721;

Whereas CFIUS has undertaken a review of the effects of the Transaction on the national security interests of the United States, as required by section 721;

Whereas CFIUS has determined that there are national security risks to the United States that arise as a result of the Transaction, and CFIUS seeks to mitigate those risks pending any further action by the President, or by CFIUS on his behalf;

By the authority vested in CFIUS by section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008), CFIUS hereby establishes the following Interim Mitigation Measures, which shall be effective as of the date of this Order ("Effective Date") and shall apply until such time as this Order expires:

## Section 1.     Interim Mitigation Measures

Unless otherwise approved by CFIUS in accordance with Section 4 of the Order, the Companies, and any persons acting on behalf of the Companies:

(a) **No Further Construction or Operations.** Shall immediately cease all Construction and Operations, and shall not undertake any further Construction and Operations, at the Properties.

(b) **No Stockpiling or Storage.** Shall remove all stockpiled or stored items from the Properties no later than July 30, 2012, and shall not deposit, stockpile, or store any new items at the Properties.

(c) **No Access.** Shall immediately cease all access, and shall not have any access, to the Properties.  Notwithstanding the foregoing, U.S. citizens contracted by the Companies and

approved by CFIUS may access the site until July 30, 2012, solely for purposes of removing any items from the Properties in compliance with the requirement of Section 1(b).

## Section 2.    Enforcement

This Order is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law.

## Section 3.    Definitions

As used in this Order:

(a) "Access" means physical access to, and all forms of communication with any person at, the Properties.

(b) "Construction and Operations" means building, testing, pre-construction activity, or any other activity at the Properties.

(c) "Order" means this Order issued on behalf of CFIUS.

(d) "Properties" means any of the sites on which the Project Companies have proposed in the Notice to construct wind farms.

## Section 4.    Modification

(a) This Order may be revoked or modified by CFIUS or by order of the President. Any request by the Companies for a modification of this Order must be made in writing.

(b) The Companies, together or individually, may request a conference with representatives of CFIUS on any matter related to this Order, including any request for a modification of this Order.

## Section 5.    Expiration

This Order will remain in effect until CFIUS concludes action or the President takes action under section 721 with respect to the Transaction or upon revocation by CFIUS or the President.

## Section 6.    Miscellaneous

(a) The provisions of this Order shall be severable, and if any provision hereof or the application of such provision under any circumstances is held invalid by a court of competent jurisdiction in the United States, it shall not affect any other provision of this Order or the application of any provision hereof.

(b) The terms of these Interim Mitigation Measures are without prejudice to the final disposition of CFIUS's review.

(c) Nothing in this Order is intended to (i) limit any rights the U.S. government may have under law or regulation or (ii) to create rights enforceable at law by any other individuals or entities.

On behalf of CFIUS:

_____

Aimen N. Mir
CFIUS Staff Chair

, 2012

Exempt from disclosure under the Freedom of Information Act, 5 USC 552(b).  Public disclosure is further prohibited by 50 USC App. 2170(c).

# AMENDED ORDER ESTABLISHING INTERIM MITIGATION MEASURES

## Regarding the Acquisition of Certain Assets of Terna Energy USA Holding Corporation by Ralls Corporation

Whereas the Committee on Foreign Investment in the United States ("CFIUS")  has received written notification, pursuant to section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. App. 2170 ("section 721"), of a transaction ("Transaction") involving the acquisition of Lower Ridge Windfarm, High Plateau Windfarm, Mule Hollow Windfarm, and Pine City Windfarm, each a limited liability company organized under Oregon law ("Project Companies"), by Ralls Corporation, a company organized under the laws Delaware ("Ralls");

Whereas, among other things, the primary business purpose of Ralls is to provide business opportunities in the United States for wind turbines provided by the Sany Group, which is a Ralls-affiliated entity; Ralls is wholly owned by Mr. Dawei Duan and Mr. Jialing Wu, who are executives of the Sany Group (which includes Sany Electric and Sany Heavy Industries); and Ralls closely consults with the Sany Group and is financed, at least in part, by the Sany Group with respect to Ralls' activities;

Whereas the Project Companies, Ralls and its subsidiaries, and the Sany Group (which includes Sany Electric and Sany Heavy Industries) are collectively referred to in this Order as the "Companies";

Whereas CFIUS has determined that the Transaction, as described in the notice submitted to CFIUS dated June 28, 2012 ("Notice"), constitutes a "covered transaction" for purposes of section 721;

Whereas CFIUS has undertaken a review of the effects of the Transaction on the national security interests of the United States, as required by section 721;

Whereas CFIUS has determined that there are national security risks to the United States that arise as a result of the Transaction, and CFIUS seeks to mitigate those risks pending any further action by the President, or by CFIUS on his behalf;

By the authority vested in CFIUS by section 721, and Executive Order 11858 of May 7, 1975, as amended by Executive Order 13456, 73 Fed. Reg. 4677 (Jan. 23, 2008), CFIUS hereby modifies the Order Establishing Interim Mitigation Measures dated July 25, 2012, as follows, which shall be effective as of the date of this Order ("Effective Date") and shall apply until such time as this Order expires in accordance with Section 6 below:

## Section 1.   Interim Mitigation Measures

Unless otherwise approved by CFIUS in accordance with Section 5 of the Order, the Companies, including their officers and employees, and any persons acting on behalf of the Companies, andMr. Dawei Duan and Mr. Jialing Wu:

(a) **No Further Construction or Operations.**  Shall immediately cease all Construction and Operations, and shall not undertake any further Construction and Operations, at the Properties.

(b) **No Stockpiling or Storage.**  Shall remove all stockpiled or stored items from the Properties no later than July 30, 2012, and shall not deposit, stockpile, or store any new items at the Properties, any lay down site identified by the Companies in any information or communication submitted to CFIUS, or at any location that is closer to the R-5701 Restricted Airspace than the lay down site that is farthest from the R-5701 Restricted Airspace.

(c) **No Access.**  Shall immediately cease all access, and shall not have any access, to the Properties. Notwithstanding the foregoing, U.S. citizens contracted by the Companies and approved by CFIUS may access the site solely for purposes of removing any items from the Properties in compliance with the requirements of Section 1(b) or (e)(i).

(d) **No Sale or Transfer of Sany Items.**  Shall not sell or otherwise transfer or propose, or otherwise facilitate the sale or transfer to any third party for use or installation at the Properties of any items made or otherwise produced by the Sany Group.

(e) **No Sale of Project Companies.**  Shall not complete a sale or transfer of the Project Companies or their assets to any third party until:

      i. All items deposited, installed, or affixed (including concrete foundations) on the Properties subsequent to the acquisition by Ralls of the Project Companies have been removed from the Properties;

      ii. the Companies notify CFIUS of the intended recipient or buyer;

      iii. the Companies have not received an objection from CFIUS within 10 business days of notification.

## Section 2.   Timing of Notices and Other Communications

All notices and other communications shall be in writing and, unless otherwise provided in this Order, shall be deemed to have been duly given or made as of the date of receipt and shall be sent by e-mail and by one of the following means: (a) personal delivery, (b) facsimile, (c) documented overnight courier service, or (d) registered or certified mail, postage prepaid, addressed to the CFIUS' designated representatives at the addresses shown below, or to such other representatives at such other addresses as CFIUS may designate:

Paul Halpern
CFIUS Director, Manufacturing & Industrial Base Policy
Office of the Under Secretary of Defense for Acquisition, Technology & Logistics
Department of Defense
1777 North Kent Street, Suite 12047
Arlington, VA 22209
Fax: 703-588-0504
Email: MIBP.CFIUS@osd.mil

Aimen Mir
CFIUS Staff Chair
Office of Investment Security
Department of the Treasury
1500 Pennsylvania Avenue, N.W., Room 5221
Washington, DC 20220
Fax: 202-622-0391
Email: cfius@treasury.gov

## Section 3.    Enforcement

This Order is enforceable, through injunctive relief, criminal or civil penalty, or otherwise, pursuant to section 721, the Executive Order, the CFIUS regulations, 18 U.S.C. § 1001, or any other applicable law.

## Section 4.    Definitions

As used in this Order:

(a) "Access" means physical access to, and all forms of communication with any person at, the Properties.

(b) "Construction and Operations" means building, testing, pre-construction activity, or any other activity at the Properties.

(c) "Order" means this Order, as amended, issued on behalf of CFIUS.

(d) "Properties" means any of the sites on which the Project Companies have proposed in the Notice to construct wind farms .

## Section 5.    Modification

(a) This Order may be revoked or modified by CFIUS or by order of the President. Any request by the Companies for a modification of this Order must be made in writing.

    (b)      The Companies, together or individually, may request a conference with representatives of CFIUS on any matter related to this Order, including any request for a modification of this Order.

## Section 6.   Expiration

This Order will remain in effect until CFIUS concludes action or the President takes action under section 721 with respect to the Transaction or upon revocation by CFIUS or the President.

## Section 7.   Miscellaneous

    (a)      The provisions of this Order shall be severable, and if any provision hereof or the application of such provision under any circumstances is held invalid by a court of competent jurisdiction in the United States, it shall not affect any other provision of this Order or the application of any provision hereof.

    (b)      The terms of these Interim Mitigation Measures are without prejudice to the final disposition of CFIUS's review.

    (c)      Nothing in this Order is intended to (i) limit any rights the U.S. government may have under law or regulation or (ii) to create rights enforceable at law by any other individuals or entities.

On behalf of CFIUS:

Aimen N. Mir
CFIUS Staff Chair

August 2, 2012

THE WHITE HOUSE

Office of the Press Secretary

---

For Immediate Release                    September 28, 2012

ORDER

- - - - - - -

REGARDING THE ACQUISITION OF FOUR U.S. WIND FARM PROJECT
COMPANIES BY RALLS CORPORATION

By the authority vested in me as President by the
Constitution and the laws of the United States of America,
including section 721 of the Defense Production Act of 1950,
as amended (section 721), 50 U.S.C. App. 2170,

Section 1.  Findings.  I hereby make the following
findings:

(a)  There is credible evidence that leads me to believe
that Ralls Corporation (Ralls), a corporation organized under
the laws of Delaware, and its subsidiaries, and the Sany Group
(which includes Sany Electric and Sany Heavy Industries), a
Chinese company affiliated with Ralls (together, the Companies);
and, Mr. Dawei Duan (Mr. Duan) and Mr. Jialing Wu (Mr. Wu),
citizens of the People's Republic of China and senior executives
of the Sany Group, who together own Ralls; through exercising
control of Lower Ridge Windfarm, LLC, High Plateau
Windfarm, LLC, Mule Hollow Windfarm, LLC, and Pine City
Windfarm, LLC (collectively, the Project Companies), all limited
liability companies organized under the laws of Oregon, might
take action that threatens to impair the national security of
the United States; and

(b)  Provisions of law, other than section 721 and the
International Emergency Economic Powers Act (50 U.S.C.
1701 et seq.), do not, in my judgment, provide adequate and
appropriate authority for me to protect the national security in
this matter.

Sec. 2.  Actions Ordered and Authorized.  On the basis of
the findings set forth in section 1 of this order, considering
the factors described in subsection 721(f), as appropriate, and
pursuant to my authority under applicable law, including
section 721, I hereby order that:

(a)  The transaction resulting in the acquisition of the
Project Companies and their assets by the Companies or Mr. Wu or
Mr. Duan is hereby prohibited, and ownership by the Companies or
Mr. Wu or Mr. Duan of any interest in the Project Companies and
their assets, whether directly or indirectly through owners,
subsidiaries, or affiliates, is prohibited.

(b)  In order to effectuate this order, Ralls shall divest
all interests in:

2

      (i)    the Project Companies;

      (ii)   the Project Companies' assets, intellectual property, technology, personnel, and customer contracts; and

      (iii)  any operations developed, held, or controlled, whether directly or indirectly, by the Project Companies at the time of, or since, their acquisition

not later than 90 days after the date of this order, unless such date is extended for a period not to exceed three (3) months, on such written conditions as the Committee on Foreign Investment in the United States (CFIUS) may require.  Immediately upon divestment, Ralls shall certify in writing to CFIUS that such divestment has been effected in accordance with this order.

    (c)  No later than 14 calendar days from the date of this order, the Companies shall:

      (i)    remove from the properties on which the Companies have proposed to construct wind farms (including alternate sites) that are identified in the notice filed with CFIUS (Properties) all items, structures, or other physical objects or installations of any kind (including concrete foundations) that the Companies or persons on behalf of the Companies have stockpiled, stored, deposited, installed, or affixed thereon; and

      (ii)   provide CFIUS with a statement signed by Mr. Duan and Mr. Wu certifying that the Companies have completed such removal.

    (d)  The Companies, and any persons acting for or on behalf of the Companies, including officers, employees, and owners, shall cease all access, and will not have any access, to the Properties.  Notwithstanding the foregoing, individuals that are U.S. citizens contracted by the Companies and approved by CFIUS may access the Properties solely for purposes of fulfilling the requirements of subsection (c) of this section.

    (e)  The Companies, Mr. Duan, and Mr. Wu shall not sell or otherwise transfer, or propose to sell or otherwise transfer, or otherwise facilitate the sale or transfer of, any items made or otherwise produced by the Sany Group to any third party for use or installation at the Properties.

    (f)  Ralls shall not complete a sale or transfer of the Project Companies or their assets to any third party until:

      (i)    all items, structures, or other physical objects or installations of any kind (including concrete foundations) that the Companies or persons on behalf of the Companies have stockpiled, stored, deposited, installed, or affixed on the Properties have been removed from the Properties and the Department of Defense has notified the Companies that it has verified the Companies' certification of such removal provided pursuant to subsection (c) of this section;

3

(ii)   Ralls notifies CFIUS in writing of the intended recipient or buyer; and

(iii)  Ralls has not received a provisional or final objection from CFIUS to the intended recipient or buyer within 10 business days of the notification in subsection f(ii) of this section.  Among the factors CFIUS may consider in reviewing the proposed sale or transfer are whether the buyer or transferee:  is a U.S. citizen or is owned by U.S. citizens; has or has had a direct or indirect contractual, financial, familial, employment, or other close and continuous relationship with the Companies or Project Companies, or their officers, employees, or owners; and can demonstrate a willingness and ability to support compliance with this order.

(g)  From the date of this order until Ralls provides a certification of divestment to CFIUS pursuant to subsection (b) of this section, the Companies shall certify to CFIUS on a monthly basis that they are in compliance with this order.

(h)  Without limitation on the exercise of authority by any agency under other provisions of law, and until such time as the divestment is completed and verified to the satisfaction of CFIUS, CFIUS is authorized to implement measures it deems necessary and appropriate to verify that operations of the Project Companies are carried out in such a manner as to ensure protection of the national security interests of the United States.  Such measures may include but are not limited to the following:  on reasonable notice to the Project Companies and the Companies, employees of the United States Government, as designated by CFIUS, shall be permitted access, for purposes of verifying compliance with this order, to all premises and facilities of the Project Companies and the Companies located in the United States:

(i)    to inspect and copy any books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the Companies or the Project Companies that concern any matter relating to this order;

(ii)   to inspect any equipment and technical data (including software) in the possession or under the control of the Companies or the Project Companies; and

(iii)  to interview officers, employees, or agents of the Companies or the Project Companies concerning any matter relating to this order.

CFIUS shall conclude its verification procedures within 90 days after the divestment is completed.

(i)  The Attorney General is authorized to take any steps necessary to enforce this order.

Sec. 3.  Revocation of Prior Orders.  CFIUS's Order Establishing Interim Mitigation Measures of July 25, 2012, and Amended Order Establishing Interim Mitigation Measures of August 2, 2012, are hereby revoked.

4

Sec. 4.  Reservation.  I hereby reserve my authority to issue further orders with respect to the Companies or the Project Companies as shall in my judgment be necessary to protect the national security.

Sec. 5.  Publication and Transmittal.

(a)  This order shall be published in the *Federal Register*.

(b)  I hereby direct the Secretary of the Treasury to transmit a copy of this order to the appropriate parties named in section 1 of this order.


BARACK OBAMA


THE WHITE HOUSE,
     September 28, 2012.


# # #